IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-00886

_____

Malibu Media, LLC,

      Plaintiff,

v.

Jeff Fantalis, Bruce Dunn, and
Stephen Deus,

      Defendants.

_____

F I L E D
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 16 2012

GREGORY C. LANGHAM
            CLERK

_____


## DEFENDANT'S FIRST AMENDED ANSWER AND COUNTERCLAIM

Defendant, Jeff Fantalis, by way of Answer to the complaint of Malibu Media, LLC (the "Plaintiff"), says:

### Introduction[1]

1. Defendant denies that Plaintiff has any cause(s) of action against Defendant under the United States Copyright Act of 1976 or under any other legislation or at common law.

2. Denied in its entirety, including the footnote.

3. Defendant has no personal knowledge of any of the movies referred to by Plaintiff.

4. Denied.

---

[1] The headings of the Complaint are used in this Answer solely for the convenience of the Court. Defendant does not admit any of Plaintiff's allegations by such use.

## Jurisdiction and Venue

5. Defendant denies that Plaintiff has any cause of action against him; however, he admits that this court has subject matter jurisdiction over matters involving federal questions and copyrights.

6. Defendant denies the allegations of this paragraph. Even if the IP address in question (184.96.0.193) was associated with the high-speed internet router located in Defendant's home on or about January 14, 2012, that fact would not give rise to jurisdiction over the Defendant's person. An IP address is not a person but a designation assigned to a piece of technology, which can be accessed by multiple individuals; in addition, in a process commonly known as "spoofing" an IP address can be stolen or misused as follows:  other devices can be configured with the same IP address or an individual can utilize technology to make his or her own IP address to appear to be another IP address.

7. Defendant denies the allegations of this paragraph, except to admit that he is a resident of the City of Louisville, County of Boulder, and State of Colorado. Defendant was not served with a Summons at the time of service of the Complaint, as required by the Federal Rules of Civil Procedure.  For all of these reasons, Plaintiff has failed to plead facts from which a reasonable trier of fact could conclude that this Court has personal jurisdiction over Defendant, or that venue is properly laid in this district. Defendant has no personal knowledge as to relevant information regarding the other defendants in this matter.

## Parties

8. Defendant has no personal knowledge of these facts and can neither confirm nor deny and leaves Plaintiff to its proofs.

2

9. Defendant admits that he is a resident of the state of Colorado. Defendant has no knowledge as to the IP address provided by Qwest/CenturyLink.

10. Defendant has no personal knowledge of these facts and can neither confirm nor deny and leaves Plaintiff to its proofs.

11. Defendant has no personal knowledge of these facts and can neither confirm nor deny and leaves Plaintiff to its proofs.

12. Defendant denies the allegations of this paragraph. Plaintiff's definition is incomplete and misleading.

13. Defendant denies the allegations of this paragraph.

## Joinder

14. Defendant denies the allegations of this paragraph. Among other reasons, Plaintiff's Exhibit C demonstrates that the individual Defendants could not have, in fact, been involved in "the exact same torrent file" or having "act[ed] in concert with each other" as alleged by the Plaintiff, as Exhibit C asserts infringement by the individual Defendants as having occurred on three distinct and separate dates. The factual situations of the three defendants are individual, separate, distinct and unique. Their legal defenses and counterclaims are similarly going to be individual, separate, distinct and unique.

## Factual Background

I.    Plaintiff Owns The Copyright to a Motion Picture

15. Defendant has no personal knowledge of these allegations and can neither confirm nor deny, and leaves Plaintiff to its proofs.

16. Defendant has received a copy of the alleged copyright registrations as Exhibit B.

17. Defendant denies this paragraph to the extent that it alleges copyright infringement or any other unlawful or illegal conduct by the Defendant. Among all other reasons stated herein, Defendant was not at home on the date and at the time of the activity alleged by Exhibit C. Defendant also disputes the validity of Plaintiff's alleged copyrights as a matter of law.

II.   Defendants Used BitTorrent To Infringe Plaintiff's Copyright

18. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology. Defendant has received a copy of Exhibit D.

19. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

A.   Each Defendant Installed a BitTorrent Client onto his or her Computer

20. Defendant denies the allegations of this paragraph.

21. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

22. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

B.   The Initial Seed, Torrent, Hash and Tracker

23. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

24. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

25. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

26. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

27. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

28. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

29. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology and its relation to Plaintiff's alleged copyrighted Works.

30. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

C. Torrent Sites

31. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

32. Defendant denies the allegations of this paragraph.

D. Uploading and Downloading Works Through a BitTorrent Swarm

33. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

34. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology and its relation to Plaintiff's alleged copyrighted Works.

35. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology and its relation to Plaintiff's alleged copyrighted Works.

36. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology.

37. Defendant denies the allegations of this paragraph.   In addition, Plaintiff's own Exhibit C demonstrates that the individual Defendants could not have been part of the same "swarm" as described by the Plaintiff.

38. Defendant leaves Plaintiff to its proofs with regard to this description of BitTorrent technology and its relation to Plaintiff's alleged copyrighted Works.

39. Defendant denies the allegations of this paragraph with regard to any alleged activity by the Defendant. As to the general process of participating in a BitTorrent, Defendant leaves Plaintiff to its proofs.

E. Plaintiff's Computer Investigators Identified Each of the Defendants' IP Addresses as Participants in a Swarm That Was Distributing Plaintiff's Copyrighted Works

40. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs. Upon information and belief, IPP will receive a portion of any judgment or settlement obtained by Plaintiff from these legal proceedings and as such has an improper financial interest in this litigation that taints its potential testimony.

41. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs. Upon information and belief, IPP will receive a portion of any judgment or settlement obtained by Plaintiff from these legal proceedings and as such has an improper financial interest in this litigation that taints its potential testimony.

42. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs. Upon information and belief, IPP will receive a portion of any judgment or settlement obtained by Plaintiff from these legal proceedings and as such has an improper financial interest in this litigation that taints its potential testimony.

43. Defendant denies the allegations of this paragraph including subparts (A) and (B).

44. Defendant denies the allegations of this paragraph.

45. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs.

46. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs.

6

## Miscellaneous

47. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs.

48. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs.

## COUNT I

### Direct Infringement Against Defendants

49. Defendant's denials and statements in response to paragraphs 1–48 are hereby incorporated as though fully set forth herein.

50. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs. Defendant also disputes the validity of Plaintiff's alleged copyrights as a matter of law.

51. Defendant denies the allegations of this paragraph.

52. Defendant has no knowledge as to the Plaintiff's explicit authorization or permission as to any downloads of the Works in question. However, by uploading them to the internet as they allege they have done in this Complaint, they implicitly authorized public access, downloading, copying, distributing, and other use of their Works. Defendant denies having participated in any activity by which Plaintiff's alleged copyrights were infringed.

53. Defendant denies the allegations of this paragraph, including subparagraphs (A) through (D).

54. Defendant denies the allegations of this paragraph.

55. Defendant denies the allegations of this paragraph. Defendant has not engaged in any activity that would harm the Plaintiff or in any way give rise to a cause of action as claimed herein or in any other manner.

WHEREFORE, Defendant respectfully requests that the Court:

(A) Find that the Plaintiff's Complaint is entirely without merit; and

(B) Immediately dismiss Plaintiff's Complaint, with prejudice; and

(C) Award Defendant his reasonable fees and costs of suit; and

(D) Grant Defendant such other and further relief as the Court may deem equitable and just.

## COUNT II

### Contributory Infringement Against Defendants

56. Defendant's denials and statements in response to paragraphs 1-55 are hereby incorporated as though fully set forth herein.

57. Defendant has no personal knowledge of these facts and can neither confirm nor deny, and leaves Plaintiff to its proofs. Defendant also disputes the validity of Plaintiff's alleged copyrights as a matter of law.

58. Defendant denies the allegations of this paragraph.

59. Defendant denies the allegations of this paragraph.

60. Defendant has no knowledge as to the Plaintiff's explicit authorization or permission as to any downloads of the Works in question. However, by uploading them to the internet as they allege they have done in this Complaint, they implicitly authorized public access, downloading, copying, distributing, and other use of their Works. Defendant denies having participated in any activity by which Plaintiff's alleged copyrights were infringed.

61. Defendant denies the allegations of this paragraph.

62. Defendant denies the allegations of this paragraph.

63. Defendant denies the allegations of this paragraph.

64. Defendant denies the allegations of this paragraph.

65. Defendant denies the allegations of this paragraph. Defendant has not engaged in any activity that would harm the Plaintiff or in any way give rise to a cause of action as claimed herein or in any other manner.

WHEREFORE, Defendant respectfully requests that the Court:

(A) Find that the Plaintiff's Complaint is entirely without merit; and

(B) Immediately dismiss Plaintiff's Complaint, with prejudice; and

(C) Award Defendant his reasonable fees and costs of suit; and

(D) Grant Defendant such other and further relief as the Court may deem equitable and just.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim for Relief)

Plaintiff has failed to state a claim upon which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Statute of Limitations)

Plaintiff's claims are barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE
### (Lack of Subject Matter Jurisdictional Failure to Register)

Plaintiff's claims are barred for a lack of subject matter jurisdiction because it lacks valid copyright registrations for the intellectual property rights asserted or has not properly or timely registered its works.

### FOURTH AFFIRMATIVE DEFENSE
### (Lack of Originality)

Plaintiff s works lack originality and are thus not protectable by copyright.

## FIFTH AFFIRMATIVE DEFENSE
### (Invalidity or Unenforceability of Copyright)

Plaintiff's copyrights are invalid and/or unenforceable.

## SIXTH AFFIRMATIVE DEFENSE
### (Fair Use)

Plaintiff's claims are barred by the doctrine of fair use.

## SEVENTH AFFIRMATIVE DEFENSE
### (Estoppel)

Plaintiff's claims are barred by estoppel.

## EIGHTH AFFIRMATIVE DEFENSE
### (Unclean Hands)

Plaintiff's claims are barred by the doctrine of unclean hands.

## NINTH AFFIRMATIVE DEFENSE
### (Waiver)

Plaintiff's claims are barred by waiver.

## TENTH AFFIRMATIVE DEFENSE
### (Authorized Use)

Plaintiff authorized, impliedly or explicitly, Defendant's allegedly infringing use of its works, and Plaintiff's claims are therefore barred by the doctrine of implied license.

## ELEVENTH AFFIRMATIVE DEFENSE
### (License, Consent, and Acquiescence)

Plaintiff's claims are barred by Plaintiff's license, consent, and acquiescence to Defendant.

## TWELFTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate Damages)

To the extent Plaintiff suffered any damages, which Defendant expressly denies; Plaintiff has failed to take the steps necessary to mitigate the damages sustained.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Forfeiture or Abandonment)

Plaintiff's claims are barred to the extent it has forfeited or abandoned its intellectual property.

## FOURTEENTH AFFIRMATIVE DEFENSE
### (Misuse of Copyright)

Plaintiff's claims are barred by the doctrine of misuse of copyright.

## FIFTEENTH AFFIRMATIVE DEFENSE
### (Innocent Intent)

Plaintiff's claims are barred, in whole or in part, because Defendant conduct was in good faith and with non-willful intent, at all times.

## SIXTEENTH AFFIRMATIVE DEFENSE
### (Unconstitutionally Excessive Damages)

Plaintiff's claims are barred because statutory damages sought are unconstitutionally excessive and disproportionate to any actual damages that may have been sustained in violation of the Due Process clause.

## EIGHTEENTH AFFIRMATIVE DEFENSE
### (Statutory Damages)

Plaintiff's claims for statutory damages under 17 U.S.C. § 504 is barred because Plaintiffs copyright registrations were not made within three months after the first publication of the allegedly infringing works, as required by 17 U.S.C. § 412.

## NINETEENTH AFFIRMATIVE DEFENSE
### (Injunctive Relief)

Plaintiff is not entitled to injunctive relief because any alleged injury to Plaintiff is not immediate or irreparable, and Plaintiff has an adequate remedy at law.

Pursuant to FRCP 11, as amended, all possible affirmative defenses may not have been alleged herein insofar as sufficient facts were not available after reasonable inquiry upon the filing of Defendant's Answer, and therefore Defendant reserves the right

11

to amend its answer to allege additional affirmative defenses, if subsequent investigation so warrants.

## COUNTERCLAIM

Defendant, Jeff Fantalis, by way of counterclaim against the Plaintiff, Malibu Media, LLC, says:

1. Defendant is an individual residing in the State of Colorado.

2. This court has jurisdiction over Plaintiff, Malibu Media, LLC, because Plaintiff has availed itself of this court to pursue an action against the Defendant, and this is also therefore the proper venue. This court has subject matter jurisdiction due to diversity and pursuant to the Declaratory Judgment Act, 28 U.S.C.2201, 2202.

### FACTS COMMON TO ALL COUNTS

#### Parties

3. Defendant is a 46 year old married man with two children. He has never downloaded a pornographic film or any other type of film through a BitTorrent. The only films Defendant has ever downloaded are through the Netflix service for which he and his wife pay a monthly service fee.

4. Defendant has no knowledge of any other person or entity using his computer, router or modem to download a pornographic film.

5. Defendant never authorized another person or entity to use his computer, router or modem to download a pornographic film.

6. Defendant never benefited from, nor authorized, either explicitly nor implicitly, any person or entity to use his computer, router or modem to download a pornographic film.

7. Upon information and belief, Plaintiff, Malibu Media LLC, is either a producer, distributor and purveyor of pornography, or it is a shell corporation created solely and expressly for the purpose of purchasing copyrights to pornographic films in order to initiate lawsuits against internet users and collect settlements from them. It is unclear at this stage of the litigation which type of company Plaintiff is; however, upon information and belief, it appears to be the latter. An internet search of "Malibu Media LLC" turns up nothing but these lawsuits for copyright infringement. There is no corporate website, no advertising or marketing materials, and, perhaps most important, no legitimate means for an individual to purchase the films that Plaintiff claims to be trying to protect from infringement.

8. To the extent that Plaintiff holds any copyrights, Defendant is informed and believes that Plaintiff purchased the rights to the pornographic films only after it discovered that the films had been the subject of infringing behavior for the sole purpose of initiating lawsuits such as described herein.

9. While Plaintiff asserts that this action, and by extension the dozens of other identical cases filed by Plaintiff in Colorado alone, are being filed in order to protect its copyrights in these pornographic films, upon information and belief, this case and all the others like it are part of a series of hundreds of litigations initiated over the past several years by this Plaintiff and other pornography companies. Upon information and belief, to date, not a single one of the hundreds of cases filed by Plaintiff and similarly situated producers of pornographic materials have ever been brought to trial.

10. Plaintiff, like the other pornography company plaintiffs, has engaged in a deliberate, intentional and systematic course of action, knowingly relying on often false and inaccurate data, the purpose of which is not to protect their copyrights, but rather to embarrass, shame and coerce individuals who use the internet into paying a settlement in order to avoid litigation, regardless of whether those individuals have actually done anything wrong.  The Plaintiff and the other pornography companies are blatantly misusing the power of the Federal Court system as a tool in their scheme.

11. This wrongful course of action has been well documented in the media (see, for example, **Exhibit A**, www.usnews.com article of February 2, 2012, "Porn Companies File Mass Piracy Lawsuits": http://www.usnews.com/news/articles/2012/02/02/porn-companies-file-mass-piracy-lawsuits-are-you-at-risk; and in a case in the U.S. District Court, Eastern District of New York, it has been called a "nationwide blizzard." *In Re BitTorrent Adult Film Copyright Infringement Cases*, 2:11-cv-03995, 12-1147, 12-1150, and 12-1154, Order and Report and Recommendation dated May 1, 2012 at p. 2.[2]

12. Upon information and belief, the principal and or principals of Plaintiff Malibu Media LLC are also the principal(s) of another pornography company known as Click Here LLC which owns the pornographic website X-Arts.com.  The registered address of Click Here LLC is 31356 Broad Beach Road, Malibu, California 90265, which is the same address alleged for Malibu Media LLC. Complaint ¶ 8.  The agent for service of process, Brigham Field, is the same for Malibu Media LLC and for Click Here LLC.

13. Plaintiff's counsel of record, Jason A. Kotzker, Esq., also represents another pornography company in these types of cases, Patrick Collins, Inc., in Colorado and

---

[2] It is notable that in two out of the four cases to which that order applies, the plaintiff is Malibu Media, LLC, and in three of the four cases, the attorney of record is Jason Kotzker, Esq., counsel for Plaintiff herein.

New York.  Upon information and belief, Patrick Collins, Inc. and yet another one of these pornography companies involved in this blizzard of law suits, Raw Films, Ltd., are substantially the same companies, owned and operated by the same individuals. In this way, small groups of individuals are creating multiple companies behind which they can hide while executing a nationwide money-making agenda.

<u>The For-Profit Business Model of the "Copyright Trolls"</u>

14. These pornography companies who are pursuing infringement lawsuits as a for-profit business model have become known as "copyright trolls."

15. The first step in the "copyright troll" business is the collection of IP (internet protocol) addresses. A third party investigator or "harvester" gathers and collects information regarding IP addresses that are allegedly transmitting a copyrighted work via BitTorrent. In some cases, the investigators are hired by the pornography companies; in other cases, the investigators contact the pornography companies to alert them to this potential source of revenue. *See*, **Exhibit B**, <u>Business Proposal by Anti-Piracy Management Company LLC</u> (APMC) which presents this business model in detail. Upon information and belief, APMC operates in a substantially similar if not identical fashion as IPP Ltd., the "harvester" used by Plaintiff in this case. APMC, an IP "harvesting" firm, offers to collect IP "evidence" which is then "sent to the law firm in the jurisdiction in question so it can prepare an application to court for a disclosure order against the ISPs. Then the names and address (sic) relating to the IP addresses identified can be acquired... The infringers are then written to and a demand for payment of damages and costs is made..." Of great interest is the concluding sentence of the third paragraph on the first page:  "**If payment is not forthcoming, proceedings are then commenced to obtain an order from the court, which can then be enforced against the infringer, if necessary, and also sent to other infringers, *pour encourager les autres*. (in order to encourage the**

15

**others).**" (italics in original, emphasis added). This sentence could not be more clear: it is part of the business plan to utilize court proceedings against one individual to threaten and intimidate the others.

16. Indeed, that is exactly what has happened in this case here in Colorado: as will be demonstrated below, Plaintiff has filed dozens of cases against approximately 500 Doe defendants and only two cases against actual named defendants. Clearly, Defendant is being used as an exemplar "pour encourager les autres" in the words of APMC's business proposal. Defendant's case can be used as an additional threat to hold over other Does – "look what happened to this guy when he didn't settle." The term "to encourage the others" is shockingly disingenuous, when what it really means is to hold a club over their heads.

17. APMC's proposal goes on to say that the monetary amount claimed should not be excessive: "Ordinarily, we usually claim from each infringer an amount (depending on the copyright work involved) which is not unduly excessive, the aim being for the infringer to experience receiving **an expensive, but affordable, 'parking ticket'** for his or her misdemeanor." Exhibit B, p. 1, para. 4 (emphasis added). APMC happily asserts a 25% success rate after the initial demand letter and notes, "[u]p to a further 10% tend to pay up once they have had their questions answered." APMC notes that "the deterrent effect (and revenue collected) can be quite substantial." APMC also brags about its partner law firms' success at obtaining court orders, a key element to the success of this scheme. This for-profit business model is further complicated by the fact that the pornography company's attorney is paid a portion of any settlements received, establishing a champertous relationship ripe for abuse against mostly defenseless *pro se* defendants who would likely be bankrupted by even the most minimal legal defense.

18. With such prospects for success, the pornography company rarely leaves the infringement to chance. Frequently, the plaintiff sets out to actively draw infringers to its films, and does so by uploading a digital file containing its films to the internet. This digital file planted on the internet is known as a "honeypot."

19. Once this file becomes involved in a BitTorrent download, the pornography company, through its investigator, can track other IP addresses that may or may not be involved in the BitTorrent. It is well known that the kind of tracking technology commonly used by such companies is not reliable and may result in "false positives" showing infringement by devices such as printers, routers or telephones which are incapable of performing the download; *see, e.g.*, **Exhibit C**, Piatek, Kohno, and Krishnamurthy, <u>Challenges and Directions for Monitoring P2P Filesharing Networks, or Why My Printer Received a DMCA Takedown Notice,</u> <u>http://dmca.cs.washington.edu/dmca_hotsec08.pdf</u>).

20. Once IP addresses are collected, the company files a Complaint in Federal Court claiming that hundreds or thousands of individuals have illegally downloaded their copyright protected materials. The Complaint identifies the defendants as "John Does" and states that they are subscribers to certain IP addresses. The Complaint further avers that the subscriber to the IP address is the infringer who illegally downloaded the copyrighted pornography. This statement is without foundation in the law or in common sense, and yet the pornography companies are counting on the possibility that some judges would not be technologically savvy order to accomplish their goals.[3]

---

[3] Magistrate Judge Gary R. Brown, for one, was not fooled: "Thus, it is no more likely that the subscriber to an IP address carried out a particular computer function – here the purported illegal downloading of a single pornographic film – than to say an individual who pays the telephone bill made a specific telephone call." <u>In Re BitTorrent Adult Film</u>, <u>supra</u>, 2:11-cv-03995, May 1, 2012, at p. 6.

21. The plaintiff company further represents to the court in its Complaint that the Doe defendants are all guilty of downloading plaintiff's copyrighted works; that the acts of copyright infringement occurred using each of the Doe defendants' IP addresses; and that the ISP can correlate or connect the IP address to the Doe defendant's true identity. The plaintiff makes these statements despite the fact that, at this point, the identity – and therefore, the conduct, actions and intent – of any of the defendants is entirely unknown to the plaintiff company.

22. Furthermore, the plaintiff company makes these statements even though it knew or should have known that the IP addresses it identifies in the Complaint do not represent people, nor can they even be said with certainty to be computers; in fact, an IP address may be assigned to or attached to many different kinds of electronic devices, such as wireless routers, video games, printers, or telephones, or indeed any other device capable of operation through a modem. Numerous courts have definitively affirmed this principle. *See, e.g., In Re BitTorrent Adult Film*, supra, 2:11-cv-03995, May 1, 2012, at p. 6; *Malibu Media LLC v. John Does* 1-10, 2:12-cv-3623, Order, June 27, 2012.

23. Furthermore, the plaintiff makes these statements in the Complaint even though it knew or should have known that even if a computer was used to illegally download, copy, and distribute its materials through the IP addresses it identifies in the Complaint, that fact in no way ties the act to the subscriber. The act could have been done by another person with a computer connected to the IP address without the knowledge or consent of the subscriber. In the case of a wireless internet connection, the alleged infringing activity could have been performed by any person with a computer within range of the wireless network, a fact of which the plaintiff was or should have been well aware. It could also have been done from a remote location

by an individual or entity who had "spoofed" or duplicated the subscriber's IP address, a fact of which the plaintiff was or should have been well aware.

24. The high error rate of the IP "harvesters" has been acknowledged by at least one pornography company plaintiff.  In one case in the Southern District of New York, counsel for the plaintiff "estimated that 30% of the names turned over by ISPs are not those of individuals who actually downloaded or shared copyrighted material." Opinion and Order, *Digital Sin, Inc. v. John Does 1-176*, 2012 W.L. 263491, 12-cv-00126 (S.D.N.Y. Jan. 30, 2012), at p. 5.  This high error rate, shocking in and of itself, is compounded by the nature of the allegations that the Complaint makes public – namely, the illegal download of hardcore pornographic materials – which can have a devastating effect on the personal and professional lives of those falsely accused.

25. To highlight the recklessness and malice with which Plaintiff in this case has acted, if for example a federal prosecutor were to bring criminal charges of, say, downloading child pornography based upon harvested IP addresses with a known error rate of approximately 30%, not only would that be a clear abuse of process – not to mention running afoul of numerous Constitutional protections – but would likely be criminally actionable prosecutorial misconduct.   By the same token, no civil attorney would bring such frivolous and misguided lawsuits – the cost of which would bankrupt the average plaintiff – based on a known 30% rate of innocence without seriously implicating duties under Federal Rule of Civil Procedure 11 as well as 28 U.S.C. 1927. Such actions as those demonstrated by this Plaintiff and its attorney personify a policy of "shoot first, ask questions later" style of litigation.

26. The plaintiff company next files a motion requesting expedited discovery, seeking leave to serve subpoenas upon the ISPs (Internet Service Providers) that issued the IP addresses. The subpoena, when issued, commands the ISP to release personal

identifying information of the subscriber associated with that IP address – generally, the individual's name and address; often, his or her telephone number and email address as well. Because the Does are anonymous and never find out about it, the motion stands unopposed. In reliance on the unfounded and false representations of the plaintiff company and its counsel – which the Doe defendants have no opportunity to oppose – the court grants leave for plaintiff to issue the subpoenas.

27. The plaintiff knows and intends that the ISPs will pass along the subpoenas to the subscribers whose identifying information is sought. A Doe defendant faced with such a subpoena is unlikely to be sophisticated or knowledgeable about the law, and is likely to be frightened and intimidated by the receipt of such a document. In most cases, a Doe defendant will be unaware of his or her right to move the court to quash the subpoena; even if the Doe defendant knows of this right, in many cases, he or she is unlikely to be able to afford an attorney to do so. The Doe defendant, afraid of being involved publicly in such an unseemly litigation – indeed, in any litigation – may simply contact the plaintiff's counsel in an attempt to make the problem go away. Or, the Doe defendant may simply ignore the notice, which will result in the ISP's turning over of his or her personal identifying information to the plaintiff.

28. Once the plaintiff is in possession of the personal identifying information of the Doe defendants, the plaintiff begins a process of trying to get settlements. Depending on the plaintiff's business plan, this may begin with high-pressure phone calls or letters, but it always involves informing the defendant that he or she is about to become the target of a litigation that will accuse him or her of downloading pornography; that the defendant stands to lose hundreds of thousands of dollars in statutory damages and attorney's fees for each alleged incident, not to mention having to retain an attorney on his or her own behalf; and that the defendant can make it all go away for a comparatively small amount of money, usually several thousand dollars. *See* **Exhibit**

D, settlement letter sent to LiuXia Wong, filed in *LiuXia Wong v. Hard Drive Productions, Inc., and Does 1-50*, 4:12-cv-00469. In no instance is any offer of innocence, or even an offer to inspect a John Doe's personal computer, accepted. Such a personalized investigation would simply be too time consuming and would hurt the business by actually discovering that many of those who stand accused are in fact innocent.

29. If the plaintiff companies truly were concerned about protecting their copyrights and preserving the profits thereon, one would expect to see such companies take certain actions once they had the IP addresses and personal information obtained through their investigations and lawsuits. One would expect to see plaintiff companies issuing Digital Millenium Copyright Act (DMCA) takedown notices, or sending out cease-and-desist letters, or seeking injunctive relief in the courts. Such a course of action would be reasonable to expect in a company that sought to minimize illegal downloads, mitigate damages, and protect its copyrights. However, that is not the course of action pursued by these pornography companies. To the contrary, not only do they not remove their films from the internet, they encourage the continued downloading of their works through the use of "honeypots" in order to promote the income stream to be obtained through settlements of threatened lawsuits.

30. Due to the vast number of individuals being sued, the burden of pursuing these Does is often passed on to a call center where non-attorney agents of the plaintiff repeatedly call, harass and threaten the Does, who often have no idea that their information was even turned over to the plaintiff by their ISP. These calls can go on for months. They often contain threats of criminal prosecution for "exposing minors to pornography" and pointedly remind the Doe defendant that they do not want the publicity that a lawsuit would bring. One Colorado Doe defendant was threatened with such criminal action in exactly this way, and was told ominously that he wouldn't

21

want to see his name in the Denver Post. See, Declaration of John Doe, Exhibit E, paras. 5 and 3. This Doe was also threatened that the company that gathered the information on his IP address could tell whether he had sold the allegedly downloaded movie and whether he had downloaded other copyrighted material in which case, they would sue him for that too. Exhibit E, paragraph 6. He was also told explicitly that if he did not settle, they would sue. These harassing phone calls continued, with only a short break, for a period of fourteen months. Exhibit E, para. 10.

31. Based upon information and belief, counsel for Plaintiff does not even engage in settlement discussions with putative defendants in this or other Plaintiff's other similar BitTorrent cases. Defendant has never been contacted by Mr. Kotzker for the purpose of settlement discussions. Upon information and belief, the "call center" is being actively used by Plaintiff and Plaintiff's counsel in this case and numerous other Colorado BitTorrent cases referred to in this document to make continuing harassing and intimidating phone calls to Doe defendants, threatening them with public humiliation and, in some cases, with criminal action. The sole purpose of these threats and statements is to coerce the Doe defendants into paying a quick monetary settlement of a few thousand dollars without Plaintiff and Plaintiff's attorney having to file an additional lawsuit (after the Doe lawsuit in which the defendant's identifying information was obtained). Upon information and belief, the "call center" acts as Plaintiff's agent in this matter and these threats and intimidating statements are made with the full knowledge of Plaintiff and Plaintiff's counsel, and in fact at the direction of Plaintiff and/or Plaintiff's counsel and/or some other individual acting on Plaintiff's behalf.

32. The plaintiff pornography companies utilize the emotional impact of their lawsuits, or threat thereof, in order to manipulate, influence and coerce the Doe defendants into

settling. There can be no doubt that it is a frightening prospect to be part of a lawsuit, to say nothing of the prospect of thousands or hundreds of thousands of dollars in attorney's fees, which most people cannot afford. Moreover, these pornography companies rely upon the public stigma which attaches to accusation of having downloaded pornography and the scorn and disgust which such an idea engenders in the public mind. That this distasteful act was also committed illegally increases the harm of the accusation exponentially. Separate or combined, these accusations, if made public, may brand and stigmatize the innocent accused in ways that may be difficult if not impossible to overcome. Family relationships, friendships, community standing, business and commercial opportunities, career advancement, eligibility to run for or assume public office, the ability to work in any capacity with children or youth groups such as in ways such as teaching, coaching, or scouting volunteer, the ability to gain security clearance, eligibility for the Bar or medical school admission, qualification for a passport or visa: all of these may be adversely impacted by the allegation, even if it is never proven.  Such allegations, knowingly based on grossly inaccurate information, is the quintessential definition of a willful abuse of the judicial process that has a devastating effect on the wrongly accused.

33. In this manner, these pornography companies can sue thousands of Doe defendants and, based upon APMC's estimates, they can expect a 35% settlement rate with payoffs from hundreds of Does in thousands of dollars. A truly terrified Doe defendant – one who, like a teacher, stood to lose their livelihood – might settle for tens of thousands of dollars. Thus, with very little effort on its part, a pornography company could profit substantially by simply collecting information about individuals who are engaging in any kind of activity on the internet.

34. This "for-profit litigation model" is especially pronounced as the Court begins to appreciate the sheer magnitude of the numbers of potential John Does that can be

named in a single or even multiple lawsuits by a single attorney. As here, it would be impossible for the pornography company plaintiffs to actually litigate against every IP addresses harvested. In that sense, the only way that such a model can work is to assert weak claims of copyright infringement, while evading any type of judicial review of the merits of the actual case.  As time passes and courts begin to question why such cases never progress, the plaintiffs then file a few token suits against individuals to provide a patina of legitimacy.

35. As the Fifth Circuit recently affirmed in *dicta*, not surprisingly in affirming contempt sanctions for an identical "copyright troll" "[t]his course of conduct indicates that the plaintiffs have used the offices of the Court as an inexpensive means to gain the Doe defendants' personal information and coerce payment from them. The plaintiffs seemingly have no interest in actually litigating the cases, but rather simply have used the Court and its subpoena powers to obtain sufficient information to shake down the John Does. Whenever the suggestion of a ruling on the merits of the claims appears on the horizon, the plaintiffs drop the John Doe threatening to litigate the matter in order to avoid the actual cost of litigation and an actual decision on the merits." *Mick Haig Production v. John Does 1-670, v Evan Stone; Order affirming contempt sanction, Case 11-cv-10977, pg, 6, July 12, 2012; citing Raw Films, Ltd. v. Does 1-32*, 2011 WL 6182025, at *3 (E.D. Va. 2011)

36. That this is a nationwide campaign akin to a plague of locusts cannot be denied. What started in 2010 had by January of 2011 impacted some 100,000 individuals in the United States.  https://torrentfreak.com/100000-p2p-users-sued-in-us-mass-lawsuits-110130/. By August of 2011, that number had passed the 200,000 mark. http://torrentfreak.com/200000-bittorrent-users-sued-in-the-united-states-110808/, and by February, 2012, the number had passed 250,000. Tens of thousands of individuals every month are being victimized by this extortionate scheme.  A review

of various Court's dockets show that such huge numbers are being pursued by only a handful of attorneys around the country, perhaps fewer than twenty.  As such, it is clear to any reasonable observer that such suits are essential to mass "for-profit" litigation schemes that are not designed to be actually litigated in court, but merely enforced through harassing phone calls and threatening letters, with the occasional "token" suit being filed to intimidate and frighten the others into wondering: "Will I be next?"

37. Upon information and belief, the mastermind and driving force behind many of the copyright trolls, including Malibu Media, LLC, is a Florida attorney named M. Keith Lipscomb, Esq. In an email, Mr. Lipscomb asserts to Brad Patrick, Esq., an attorney representing several Doe defendants, that Mr. Lipscomb's clients include Patrick Collins, Inc. and Kbeech, Inc., and that "my clients' lawyers" will begin filing suits for copyright infringement in a multitude of jurisdictions: that as of the date of the email, July 1, 2011, they had already filed "over 50 federal cases in NY, CA, DC, MD, VA, NY, NJ, CO, FL and my clients have counsel in and new cases will soon be filed in NC, OH, PA. Further we have counsel retained and any moment cases in TX, AZ, IL, CT, GA. (sic)" **Exhibit F**, email dated July 1, 2011, p. 1. This clearly evinces a nationwide strategy with several layers of attorneys and clients involved. The current flooded state of the Federal docket shows that Mr. Lipscomb's plan is being implemented.

38. Mr. Lipscomb's plan is, in his own words, "a campaign." Exhibit F, email dated July 1, 2011, p. 2. Mr. Lipscomb warns Mr. Patrick that his motions to quash filed on behalf of his Doe defendant clients were "impeding our ability to use the court system in a way that we believe we are legally entitled to do it" and that "*[w]e cannot stand for that* under any circumstances. Accordingly, the state court arguments have been teed up and to exert the maximum amount of pressure that we can we are filing (sic)

to file individual federal suits *to teach your clients the lesson that this is not the way to deal with us.*" Id., emphasis added. Mr. Lipscomb, the mastermind of the pornography companies' legal strategy, is quite clear: when Doe defendants resist, it will not be tolerated and those Does must be taught a lesson, and the means of imposing that lesson is the filing of a federal lawsuit.

39. Moreover, Mr. Lipscomb reveals that the filing of such federal suits will not be burdensome or difficult for these attorneys because "the federal court suits have been standardized." Id. Thus, for all of the clients Mr. Lipscomb represents and/or advises – and upon information and belief, this includes the Plaintiff – there is very little cost or effort required to file and prosecute the federal lawsuits, as the work has already been prepared and "standardized."

40. Mr. Lipscomb warns Mr. Patrick not to "test" him. "[I]f we have to file suit, our settlement demands will increase. Toward that end, you should also apprise your clients that the average cost of a copyright litigation is 600K through trial, according to an AIPLA survey of fees in IP cases."

41. One month later, in a subsequent email, Mr. Lipscomb threatens Mr. Patrick's clients with further litigation if they do not settle:

> ...you can tell your clients that IPP[4] is one of three companies doing these scans and that they have provided me with information which establishes several of your clients infringed movies from studios that I do not represent. In my individual suits, I am going to call all of those studios and have them become additional plaintiffs. Right now, statistically there is only about a .1 percent chance they'll get hit by these studios with a suit. Then I am going to go the (sic) other two companies that scan and get all the other plaintiffs I can from all of them.

---

[4] IPP is the same "harvesting" company retained by Plaintiff herein, yet another indication of the connection between Mr. Lipscomb and Plaintiff. If IPP's collection techniques mistakenly obtained Defendant's IP address, it is not unlikely that IPP collection techniques also mistakenly obtained the information asserted here by Mr. Lipscomb, nor is it unlikely that Mr. Lipscomb was well aware of that fact.

**Exhibit G**, email dated August 25, 2011.

42. Mr. Lipscomb is the attorney involved in the case of the Colorado Doe defendant who has been repeatedly harassed by telephone calls from a call center in Florida. One Mr. Stern, calling on behalf of Mr. Lipscomb's law firm, informed the Doe defendant that he was involved in a lawsuit in a Florida court. Mr. Stern, on Mr. Lipscomb's behalf, also told Doe, among other threats, that because he maintained an open wireless connection, he was facing criminal prosecution for exposing minors to pornography. Further, Mr. Lipscomb himself sent Doe a letter informing him that if he did not settle, Lipscomb would sue. Exhibit G.

43. Upon information and belief, counsel for Plaintiff, Mr. Kotzker, is directly associated with, and indeed takes direct instructions from, Mr. Lipscomb and that the two are jointly involved in Plaintiff's nationwide "campaign." Upon information and belief, Mr. Lipscomb specifically instructed Mr. Kotzker to file against a Doe defendant in Colorado because Mr. Patrick would not withdraw his motions to quash; this is alluded to in Mr. Lipscomb's email of July 1, 2011:  "So, if they want to test me sooner, just pick a Doe in Florida, Colorado or California and say he is not going to settle today and that suit will be filed over the weekend." Exhibit F, page 2.

<u>The Plaintiff's Actions Leading Up To The Current Litigation</u>

44. Upon information and belief, Plaintiff utilized a "honeypot" to lure potential infringers. Plaintiff admits as much by grounding its Complaint upon an alleged download by all of the defendants herein of "most of a website containing 107 movies." Complaint ¶2. The fact that there were 107 films together in one digital file, thirteen of which were allegedly owned by Plaintiff (Complaint ¶¶ 3, 15), is indicative of a "honeypot." Upon information and belief, Plaintiff and/or its employees and/or IPP Ltd., acting as its

agent and with its authorization and consent, intentionally placed these films together and created a "honeypot."

45. Plaintiff utilized IPP Ltd., a third party investigator, to "harvest" information regarding IP addresses. Complaint ¶40. Upon information and belief, as part of the process of "harvesting" IP addresses, companies such as IPP Ltd., must upload an original copy of the digital file in order to participate in a "swarm" and track downloads and obtain IP addresses allegedly involved in BitTorrents. Thus, Defendant is informed and believes that Plaintiff either created and uploaded the website of 107 movies which it claims the three defendants in this action infringed, or it authorized IPP Ltd., to do so with the specific purpose of tracking IP addresses and initiating lawsuits.[5]

46. Having collected IP addresses through IPP Ltd., Plaintiff has followed the "copyright troll" business model and has filed hundreds of "John Doe" lawsuits against thousands of Doe defendants in fourteen separate Federal district courts. As of the filing of the original Answer and Counterclaim, Plaintiff had brought cases in California, Colorado, the District of Columbia, Florida, Maryland, New York, Pennsylvania and Virginia. In just over one month since then, Plaintiff has expanded into Illinois, Indiana, Kentucky, Michigan, New Jersey and Texas.    See, http://dockets.justia.com/search?query=malibu+media.    This is in line with the nationwide "campaign" delineated in Mr. Lipscomb's letter.

47. Now in possession of personal information of hundreds of Colorado Doe defendants and thousands of Does in other states, Plaintiff has not behaved in a manner to protect its copyrights and mitigate its damages. Upon information and belief, it has not caused any Digital Millennium Copyright Act (DMCA) takedown notices to be issued, it has not sent any cease-and-desist letters, and it has not sought injunctive

---

[5] As noted above, Defendant denies having participated in any BitTorrent that may have downloaded any of Plaintiff's allegedly copyrighted films. There are many different ways that IPP Ltd. may have erroneously or falsely obtained the IP address assigned to Defendant's account by Qwest/CenturyLink.

relief or any restraining orders against the Does against the use or distribution of Plaintiff's allegedly copyrighted films. Most notably, out of the hundreds of Does it has sued to obtain personal information, it has commenced only two cases in Colorado that actually name any defendants, and upon information and belief, this was only done at the prompting of a show cause order issued to Plaintiff's counsel, Mr. Kotzker, for lack of prosecution of Plaintiff's numerous cases.

### The Case Before This Court

48. Plaintiff commenced the instant action against the Defendant by filing a suit against thirty "John Does" (Case No. 1:12-cv-00402) on or about February 15, 2012. The sole purpose of that action was to obtain the issuance of subpoenas to the John Does' internet service providers (ISPs) in order to determine the identity of the John Does.

49. On or about February 15, 2012, Plaintiff also filed seven other cases as follows:

| Malibu Media LLC v. John Does 1-29 | Case No. 1:12-cv-00397 |
| --- | --- |
| Malibu Media LLC v. John Does 1-27 | Case No. 1:12-cv-00406 |
| Malibu Media LLC v. John Does 1-27 | Case No. 1:12-cv-00409 |
| Malibu Media LLC v. John Does 1-18 | Case No. 1:12-cv-00407 |
| Malibu Media LLC v. John Does 1-16 | Case No. 1:12-cv-00399 |
| Malibu Media LLC v. John Does 1-15 | Case No. 1:12-cv-00408 |
| Malibu Media LLC v. John Does 1-10 | Case No. 1:12-cv-00405 |

50. On or about April 2, 2012, Plaintiff filed two more such cases, as follows:

| Malibu Media LLC v. John Does 1-28 | Case No. 1:12-cv-00834 |
| --- | --- |
| Malibu Media LLC v. John Does 1-21 | Case No. 1:12-cv-00835 |

51. On or about April 3, 2012, Plaintiff filed seven further such cases, as follows:

| | |
|---|---|
| Malibu Media LLC v. John Does 1-9 | Case No. 1:12-cv-00846 |
| Malibu Media LLC v. John Does 1-23 | Case No. 1:12-cv-00836 |
| Malibu Media LLC v. John Does 1-17 | Case No. 1:12-cv-00839 |
| Malibu Media LLC v. John Does 1-16 | Case No. 1:12-cv-00840 |
| Malibu Media LLC v. John Does 1-11 | Case No. 1:12-cv-00843 |
| Malibu Media LLC v. John Does 1-10 | Case No. 1:12-cv-00837 |
| Malibu Media LLC v. John Does 1-6 | Case No. 1:12-cv-00845 |

52. On or about April 4, 2012, on the same day that Plaintiff filed the current action against Defendant and the other defendants, Plaintiff filed an additional case against one more John Doe as Case No. 1:12-cv-00885.

53. On or about May 29, 2012, Plaintiff filed a case against one John Doe as Case No. 1:12-cv-01386.

54. On or about May 30, 2012, Plaintiff filed eight more cases, as follows:

| | |
|---|---|
| Malibu Media LLC v. John Does 1-14 | Case No. 1:12-cv-01406 |
| Malibu Media LLC v. John Does 1-15 | Case No. 1:12-cv-01408 |
| Malibu Media LLC v. John Does 1-33 | Case No. 1:12-cv-01394 |
| Malibu Media LLC v. John Does 1-5 | Case No. 1:12-cv-01395 |
| Malibu Media LLC v. John Does 1-5 | Case No. 1:12-cv-01404 |
| Malibu Media LLC v. John Does 1-5 | Case No. 1:12-cv-01405 |
| Malibu Media LLC v. John Does 1-54 | Case No. 1:12-cv-01407 |

55. On or about June 12, 2012, Plaintiff filed an action against named defendants, 1:12-cv-1522. There is no way of knowing which of the hundreds of Does these defendants are.

56. On or about June 27, 2012, Plaintiff filed yet another action against 19 Does, as Case No. 1:12-cv-1692.

57. The attorney representing plaintiff here in Colorado and who has filed these nearly 30 cases is the same attorney who filed the twenty-five separate cases against hundreds of John Does in the Federal District Courts for the Southern and Eastern Districts of New York on behalf of Malibu Media LLC. This same attorney, representing Patrick Collins, Inc., has filed thirty-seven copyright infringement cases against Doe defendants in New York, and nineteen such cases in Colorado. Upon information and belief, this attorney, Jason A. Kotzker, does not maintain a physical office in Colorado, but instead uses a Post Office Box as his only address within the state. See, ABC 7 local television news report, http://www.thedenverchannel.com/news/31030100/detail.html. The sheer number of cases filed by Plaintiff and handled by Mr. Kotzker begs the question: how can one attorney diligently prosecute hundreds of cases at the same time in jurisdictions which are some two thousand miles apart? The answer, of course, is that neither he nor Plaintiff have any expectation that he will have to, because they anticipate settlements from the majority of the Doe defendants before they ever have to start moving forward into litigation. The entire business model is built on this premise.

58. On or about February 22, 2012, a subpoena was issued in the case of Malibu Media LLC v. John Does 1-30, Case No. 1:12-cv-00402 to Qwest/CenturyLink seeking the personal identifying information of Defendant and eight other Doe defendants (Does Number 22-30). Qwest/Century Link provided a copy of this subpoena to Defendant. See **Exhibit H**, letter and subpoena.

59. In that letter from Qwest/CenturyLink, Defendant was informed that he had until March 15, 2012, to notify Qwest/CenturyLink in writing of any objections and further, that it was necessary to "file your objections with the court on or before the date specified to prevent the release of your records pursuant to the subpoena." Id.

60. This placed Defendant in the position of either attempting to quash the subpoena on his own behalf, in which case he would have to appear in court *pro se* and thereby provide to Plaintiff exactly the information it sought to obtain by the subpoena, or having to hire an attorney to bring a motion to quash on his behalf, which would have required a great deal of expense and could potentially have also resulted in Defendant's personal identifying information being provided to the Plaintiff if the court did not permit Defendant to proceed anonymously (not all courts have done so). Moreover, at that point, Defendant did not comprehend the nationwide scope and malicious intent of the Plaintiff and the other copyright trolls. Defendant did not attempt to quash the subpoena.

61. On or about March 22, 2012, a person named Anthony Palmer telephoned Defendant. He represented to Defendant that he was calling on behalf of Malibu Media and told Defendant that he was the "primary" and/or "main" defendant in a lawsuit about to be filed. He urged Defendant to obtain an attorney and to settle the matter. Upon information and belief, Mr. Palmer works for the aforementioned "call center" overseen by Mr. Lipscomb and Mr. Kotzker.

62. Defendant did not settle because he is innocent.

63. On or about April 4, 2012, the instant case was filed against these defendants.

64. By April 5, 2012, the first of the Doe defendants were starting to settle. An examination of the court's P.A.C.E.R. website reveals the following regarding the other Doe defendants Malibu Media sued along with Defendant:

| DATE | AS TO DOE DEFENDANTS | DISPOSITION |
|---|---|---|
| 4/5/12 | 8,23,24,25,29 | Dismissed w/out prejudice |
| 4/5/12 | 9,17,20 | Settled and dismissed w/ prejudice |
| 4/10/12 | 4 | Settled and dismissed w/ prejudice |
| 4/17/12 | 22 | Settled and dismissed w/ prejudice |
| 4/30/12 | 2,12,13,21,26,27,30 | Dismissed w/out prejudice |
| 4/30/12 | 1 | Settled and dismissed w/ prejudice |
| 5/30/12 | 3 | Settled and dismissed w/ prejudice |
| 6/14/12 | 6,7,10,11,14,15,16,19,28 | Dismissed w/out prejudice because Plaintiff's attorney stated he would be unable to serve these defendants within the time required by the rules of court |
| 7/5/12 | 18 | Settled and dismissed w/ prejudice |

65. Thus, out of the thirty defendants sued by Plaintiff on February 15, 2012, eight settled before they were even named in a lawsuit. Presumably three of these Does are the three defendants named in the current action, although there is no way to be certain of that since Plaintiff and its counsel are in sole possession of the Does' identifying information. Significantly, Plaintiff is still in possession of the personal identifying information of nineteen individuals who face the prospect of a lawsuit being brought against them if they do not settle.

66. On or about April 6, 2012, and April 9, 2012, Defendant received voice mail messages from Plaintiff's agent Anthony Palmer again stressing that he was the "main" defendant in a lawsuit and advising him to get an attorney and contact him regarding settlement. Mr. Palmer told Defendant to "Google" his name so he could see that the case had been filed. Defendant did not return these phone calls.

67. On or about May 5, 2012, Defendant was served with the Complaint in the instant matter. Service was made at Defendant's home on a Saturday morning when his family and neighbors were at home. His eleven-year-old son answered the door and told Defendant the police had arrived.

68. The communications from Plaintiff's agent Anthony Palmer and the manner in which the Defendant was served were clearly designed and intended to embarrass,

manipulate and intimidate Defendant and coerce him into settling despite his innocence and despite the absence of any evidence against him.

# COUNT I

## ABUSE OF PROCESS

69. Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

70. Plaintiff has wrongfully, improperly and illegally used the Federal Court system in an effort to obtain money from this Defendant, the other two defendants in this matter, and the multitude of other defendants which Plaintiff has sued in eight other Federal District Courts.

71. The filing of the initial case, Malibu Media LLC v. John Does 1-30, Case No. 1:12-cv-00402-WYD, was done solely with the intent of generating the subpoenas which would provide the identifying information of the individual defendants and to no other purpose.

72. At the time that the initial case was filed, Plaintiff had no knowledge as to the identities of any of the Doe defendants, and therefore, Plaintiff could not honestly represent to the court that any reason to join all of these individuals existed. According to the information provided by Plaintiff to the court, the individual acts were alleged to have taken place on separate, distinct dates and times (see Exhibit H) and were in no way connected, and therefore, each individual John Doe ought to have been sued separately and each subpoena issued separately. By filing the case against multiple defendants in this way, Plaintiff evaded over ten thousand dollars in filing fees which ought to have lawfully been paid to the Court.

73. Plaintiff made misleading, false and fraudulent statements to the Court in order to convince the Court to grant its motion to issue subpoenas. Further, Plaintiff intentionally and maliciously misused the information obtained from those subpoenas to effect an object not within the proper scope of the subpoenas: namely, the extortion of settlement money from the Doe defendants.

74. Once the Plaintiff had utilized the power of the courts to issue the subpoenas and obtain the Defendant's identifying information, this information was first used NOT to protect Plaintiff's copyrights by issuing a DMCA takedown notice, or by sending a cease-and-desist letter or by taking any other reasonable measure that would demonstrate a desire to protect its copyrights and mitigate its damages. Instead, an agent of Plaintiff acting in some unknown capacity contacted Defendant in an effort to prevail upon him to settle the matter out of court. Plaintiff expected that it would cost Defendant thousands of dollars to obtain legal counsel and respond to a lawsuit, and Plaintiff anticipated and intended that the allegations of illegal conduct and the distasteful subject matter of such a lawsuit (namely, the pornographic nature of the films in question) would induce Defendant to settle quickly.

75. When Defendant refused to settle, Plaintiff filed the instant case, again avoiding the payment of multiple filing fees by joining three defendants in one case even though, according to Plaintiff's own information, the alleged actions (which Defendant has denied) took place on three distinct dates and times. As with the case filed against the 30 Does, there is no factual or legal basis for joining these three defendants in one action.

76. Thereafter, pressure to settle was still brought to bear in the form of phone calls, not from Plaintiff's attorney of record, but by Plaintiff's agent Anthony Palmer. Service of the Complaint was made on a weekend morning when Defendant's neighbors were known to be home and likely to observe. The Defendant's son answered the door

and was upset because he thought the police had arrived. In all of these ways, Plaintiff and its attorney intended to bring pressure to bear upon Defendant so that he would not oppose the lawsuit, so that he would seek to avoid the embarrassment and cost of litigating against Plaintiff and pay Plaintiff a settlement.

77. Plaintiff's conduct of these two cases against the Defendant must also be viewed in the light of the fact that this is not an isolated incident. Plaintiff has proceeded in this very same way in hundreds of cases in fourteen different states, and has snagged thousands of Doe defendants in its net, regardless of guilt or innocence. Moreover, Plaintiff is part of a nationwide network of pornography companies all working with a single goal: use the Federal Court system to obtain financial settlements from internet subscribers through bullying and intimidation.

78. Plaintiff's attorney also represents Patrick Collins, Inc., which, upon information and belief, is essentially the same entity as Malibu Media LLC and is undeniably engaged in the same policy of mass copyright infringement litigation. Patrick Collins, Inc., has already been chastised and warned by this court regarding its use of the information it obtains from subpoenas in its Doe cases: "[t]he Court emphasizes that Plaintiff may only use the information disclosed in response to the [*3] subpoenas for the purpose of protecting and enforcing its rights as set forth in its Complaint. *The Court cautions Plaintiff that improper use of this information may result in sanctions.*" Patrick Collins, Inc. v. Doe, 2012 U.S. Dist. LEXIS 91249, 2-3 (D. Colo. June 29, 2012) (emphasis added).

79. Plaintiff has failed to pay court filing fees which were due and proper based on the causes of action Plaintiff alleged.

80. Plaintiff has utilized this Federal Court in a manner which was intended to intimidate and harass the Defendant.

81. The Plaintiff's sole goal and motive is not a just and fair trial resulting in the preservation of any legal copyrights, but a swift extortion of money out of the pockets of an intimidated and embarrassed Defendant and other defendants like him.

82. Plaintiff will argue that it does not matter what its motives are where the end result is the same; that is, where it obtains monetary compensation for its allegedly infringed copyrights, it does not obtain some result which a defendant could not otherwise be compelled to do. However, when Plaintiff invokes the full force of the justice system, it must do so honorably and with clean hands; it must not do it with the intent to use the judicial process as a bludgeon to be wielded wildly. "The federal courts are not cogs in a plaintiff's copyright-enforcement business model. The Court will not idly watch what is **essentially an extortion scheme**, for a case that plaintiff has no intention of bringing to trial." *Malibu Media LLC v. John Does 1-10*, 2:12-cv-03623, Order, June 27, 2012, at p. 6 (emphasis added). This Plaintiff, like a schoolyard bully, has picked on thousands of victims and has used the judicial system as a mechanism to beat up on them. In such a case, Plaintiff's motives do matter, very much.

83. The Defendant has been damaged in his personal and professional life by the conduct of the Plaintiff. Not only has he suffered from the stress, embarrassment and indignities of these lawsuits, and from the publication of these allegations by Plaintiff which expose him to public censure, shame and ridicule, his career has been negatively impacted because he has had difficulty when interviewing for employment.

84. Finally, all of the public allegations, harassing phone calls from a mass settlement "call center" and indeed the entire nationwide "campaign" are, on information and belief, based on knowingly inaccurate and/or false data that Plaintiff knew does not and would not identify the alleged downloader. Despite this malicious behavior and

37

willful disregard for the judicial process.  Plaintiff proceeded with this case with the intent and purpose of damaging Defendant.

WHEREFORE, the Defendant respectfully requests that the Court:

1. Find that these acts of Plaintiff amount to abuse of process;

2. Granting Defendant damages in the amount of $1 million;

3. Granting the Defendant all fees and costs of suit;

4. For such other and further relief as the court may deem equitable and just.

## COUNT II

### INVASION OF PRIVACY

85. Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

86. Plaintiff intentionally intruded upon Defendant's solitude, seclusion and private affairs by collecting data about the access individual IP addresses made of the internet without Defendant's knowledge, authorization, or permission.

87. Plaintiff intentionally intruded upon Defendant's solitude, seclusion and private affairs by forcing Qwest/Century Link to disclose the Defendant's identifying information through the issuance of the subpoena in Case No. 1:12-cv-00402-WYD. This information was subject to Defendant's reasonable expectation of privacy and was indeed protected by law such that Plaintiff had to obtain a subpoena (albeit by making false allegations) in order to obtain it. See generally, 47 U.S.C. § 551.

88. Plaintiff publicized said false allegations – namely, the accusation that Defendant had illegally downloaded pornographic films – by placing them into a public document – namely, the Complaint against Defendant. This information is easily accessible to any interested person who searches Defendant's name through the Google search engine and/or any other search engine. In addition, since court

documents are public, all of Plaintiff's false allegations are available to the public through the court clerk's office.

89. By making these allegations public, the Plaintiff has portrayed the Defendant in a false light, and has exposed Defendant to publicity that unreasonably places him in a false light before the public.

90. The publication of these allegations is highly offensive to Defendant, as it falsely alleges illegal and distasteful activity on his part, and as such, would be highly offensive to any reasonable person.

91. The public can have no legitimate concern in hearing false allegations whose only purpose is to intimidate, embarrass and harass. Defendant is not a public official or a public figure in whom the public might have some legitimate interest.

92. The Defendant has been damaged in his personal and professional life by the conduct of the Plaintiff. If an individual uses the Google or Bing search engine to search Defendant's name, the first page has several entries that are all related to this lawsuit.

93. Moreover, due to the nature of the internet, Defendant will continue to be damaged in the future by this lawsuit. Just as gossip continues to hurt and rumors continue to swirl whether there is any truth to them or not, these allegations will remain in the public consciousness and the public record long after this case is concluded.

94. Defendant has been a coach of youth athletic teams for several years. In future years, when background checks are performed, the first item that appears is going to be a lawsuit involving the illegal download of pornography. It is unlikely that that will be acceptable to any youth athletic association.

95. Defendant has been hampered and damaged in his career. He has received several calls from recruiters in the months since this case was filed but nothing has gone beyond the initial phone interview despite Defendant's clear qualifications for and

suitability for the job. This can only be due to the discovery by the recruiter of the distasteful allegations of Plaintiff's Complaint.

WHEREFORE, the Defendant respectfully requests that the Court:

1. Find that these acts of Plaintiff amount to invasion of Defendant's privacy;

2. Granting Defendant damages in the amount of $1 million;

3. Requiring Plaintiff to pay for and take out an advertisement which shall run in the Denver Post and the Daily Camera and the Colorado Hometown Weekly, Louisville Edition, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of Hometown Weekly, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that Plaintiff wrongfully brought this lawsuit against the Defendant, state that this lawsuit was groundless, acknowledge that the Defendant has not infringed in any manner against the Plaintiff and that Defendant is innocent of any wrong-doing in this matter, and apologize to Defendant, with the stipulation that the exact language of the advertisement shall be subject to the review and approval of Defendant and/or his attorneys;

4. Granting the Defendant all fees and costs of suit;

5. For such other and further relief as the court may deem equitable and just.

## COUNT III
## DEFAMATION

96. Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

97. By filing the Complaint in the instant matter, Plaintiff has made public false and defamatory statements about the Defendant, including but not limited to the

allegations that Defendant has illegally downloaded movies that are protected by copyright, and that Defendant has downloaded pornographic movies.

98. Plaintiff acted with negligence as to the truth or falsity of these statements. The Plaintiff treats this Defendant, as it treats all its defendants, as a cash cow to be milked at will.

99. The statements are false because (1) Defendant has not ever downloaded any movies via BitTorrent; (2) Defendant has not ever downloaded any pornographic movies; (3) Defendant has not infringed upon Plaintiff's copyrights; (4) upon information and belief, Plaintiff's asserted copyrights to the movies in question are not valid; and (5) Plaintiff knew or should have known that just because it allegedly discovered potentially infringing activity tied to an IP address, that does not in any way prove who the individual is who did the infringing activity (if, indeed, there was any infringing activity at all).

100.    Plaintiff knew or should have known all of the above facts before filing the present action with this court.

101.    The allegations made by the Plaintiff in the Complaint subject to Defendant to scorn, distrust, ridicule, contempt and tend to harm his reputation. The allegations tend to lower him in the estimation of his peers, involving as they do, illegal and contemptible and distasteful activities.

102.    The allegations made by the Plaintiff in the Complaint have a tendency to injure the Defendant's occupation, business or employment. In fact, the Defendant has already been hampered in looking for work. The instant action is one of the first items that appears on a search of Defendant's name in the Google search engine and it appears multiple times. This case is also one of the first items that appears on a search using the Bing search engine. These facts clearly have had and will continue

to have a negative impact on the Defendant's reputation personally and professionally.

103.   Anthony Palmer, the individual who contacted Defendant on behalf of Plaintiff several times, specifically told Defendant that he should "Google" himself to see that the lawsuit had been filed and find out facts about the case, thereby waiving any privilege that could be asserted. Clearly, Plaintiff intended that Anthony Palmer, as its representative, make Defendant aware of this very public exposure.   As prospective employers rely heavily on internet searches to find and verify information regarding applicants, this fact is and has been incredibly injurious to Defendant.

104.   The Defendant has been, and will continue to be, damaged in his personal and professional life by the conduct of the Plaintiff.  Not only has Defendant suffered from the stress, embarrassment and indignities of these lawsuits, and from the publication of these allegations by Plaintiff which expose him to public censure, shame and ridicule, his career has been negatively impacted because he has had difficulty when interviewing for employment. Even if Plaintiff withdraws its Complaint, the detrimental effect of these allegations may linger for years.

105.   Plaintiff should not be permitted to assert the defense of privilege to this claim because Plaintiff comes before this court with unclean hands. Plaintiff is part of nationwide epidemic, and Plaintiff has already been castigated and sanctioned by courts in California and New York for its tactics. Plaintiff knew or should have known that it had no evidence tying Defendant to the alleged acts of infringement, and yet it brought this lawsuit with utter disregard for that fact. Moreover, upon information and belief, Plaintiff intentionally and willfully placed its works on the internet as a "honeypot" or authorized its agents and/or employees to do so, for the express purpose of luring potential infringers who could then be sued for infringement and

bullied into a settlement. This lawsuit is not an isolated incident; it is part of a deliberate, calculated business plan.

WHEREFORE, the Defendant respectfully requests that the Court:

1. Find that these acts of Plaintiff amount to defamation;

2. Granting Defendant damages in the amount of $1 million;

3. Requiring Plaintiff to pay for and take out an advertisement which shall run in the Denver Post and the Daily Camera and the Colorado Hometown Weekly, Louisville Edition, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of Hometown Weekly, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that Plaintiff wrongfully brought this lawsuit against the Defendant, state that this lawsuit was groundless, acknowledge that the Defendant has not infringed in any manner against the Plaintiff and that Defendant is innocent of any wrong-doing in this matter, and apologize to Defendant, with the stipulation that the exact language of the advertisement shall be subject to the review and approval of Defendant and/or his attorneys;

4. Granting the Defendant all fees and costs of suit;

5. For such other and further relief as the court may deem equitable and just.

## COUNT IV

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

106. Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

107. In all Plaintiff's actions connected with the filing of both cases (Malibu Media LLC v. John Does 1-30 and Malibu Media LLC v. Fantalis, Dunn and Deus), Plaintiff has

acted with the specific intent to obtain a monetary settlement from every Doe at the lowest cost possible.

108.    Once again, Plaintiff's conduct in this specific case must be viewed in the light of Plaintiff's conduct in all of the cases filed in all of the Federal Districts: hundreds of cases with thousands of Doe defendants. In Colorado alone, Plaintiff's tally is already over 465 citizens targeted in 27 cases. Significantly, by lumping all of these Doe defendants together and not suing them individually, Plaintiff has saved over $150,000.00 in filing fees. At the settlement rate of 35% estimated by one IP "harvester," APMC (see Exhibit B), Plaintiff can expect approximately 163 settlements totaling anywhere from $163,000 to $500,000 or more, assuming settlements in the range of $1,000 to $3,000 which is on the low side.  Plaintiff reaps all this for an investment of less than $10,000 in filing fees and a few hours of an attorney's time. This misuse of the Federal Courts is outrageous and extreme.

109.    In the instant case, Plaintiff's first act after obtaining Defendant's identifying information was not to attempt to protect its copyrights through various legal means but to attempt to obtain a monetary settlement from Defendant. Moreover, Plaintiff's counsel of record did not make the contact. Defendant has never once been contacted by Plaintiff's legal counsel regarding settlement, only by Anthony Palmer, a person who claims to represent Malibu Media and whose name has been tied to Patrick Collins, Inc., in connection with other, similar mass copyright suits of this type.

110.    There is no way of looking at Plaintiff's scheme and calling it, as Plaintiff does, a legitimate means of enforcing its copyrights. Rather, as Judge Wright in the Central District of California portrays it, it is "essentially an extortion scheme." Malibu Media LLC v. John Does 1-10, supra, at p. 6.

111.    In the instant case, Plaintiff alleges that Defendant downloaded pornographic films, the names of which would cause any reasonable person to cringe. Plaintiff's intent is clearly to cause Defendant the emotional distress, shame and embarrassment that would naturally result from a list like this being associated with one's name, because by causing such emotional anguish, Plaintiff intends to motivate Defendant to pay a monetary settlement.

112.    By accusing Defendant of downloading pornographic films, Plaintiff has in fact caused Defendant extreme emotional distress. By publishing these accusations through this lawsuit, Plaintiff has, in fact, caused Defendant extreme emotional distress, daily and ongoing anxiety, worry, and embarrassment. Defendant exists in a constant state of worry and fear over who will next discover these appalling – and false – accusations.

113.    In the instant case, Plaintiff alleges that Defendant downloaded content from the internet illegally, which is offensive and damaging to Defendant's good name and reputation. Plaintiff's intent is clearly to cause Defendant the emotional distress, outrage, humiliation, and damage to one's reputation that would naturally result from such an allegation, because by causing such emotional anguish, Plaintiff intends to motivate Defendant to pay a monetary settlement.

114.    By accusing Defendant of engaging in illegal internet downloads of Plaintiff's pornographic films, Plaintiff has in fact caused Defendant extreme emotional distress. Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact. But mere accusation was not enough for Plaintiff: Plaintiff had to make it public, exposing Defendant to contempt, humiliation and scorn among his friends, his community, his business colleagues, potential employers, and indeed, the entire world due to the broad reach of the internet. This has, in fact, caused Defendant extreme emotional distress, daily and

ongoing anxiety, worry, and embarrassment. Defendant exists in a constant state of worry and fear over who will next discover these appalling – and false – accusations.

115.    Since the inception of the first Doe lawsuit against Defendant in February, Defendant has been consumed by worry, anxiety, fear and stress due to Plaintiff's ruthless pursuit of him, an innocent victim. Further, Defendant feels outrage and anger at being victimized by Plaintiff along with so many other thousands of citizens across the country.

116.    Because of these false allegations and the Plaintiff's outrageous and despicable handling of these lawsuits, the Defendant has suffered both personal emotional distress and damage to his professional reputation, which damage inflicts even more stress. Until one has been falsely accused of contemptible and illegal behavior, one cannot imagine the devastating emotional impact. Worst of all, no matter what the outcome of this case, these false allegations may cloud the Defendant's reputation for years to come.

WHEREFORE, the Defendant respectfully requests that the Court:

1.  Find that these acts of Plaintiff amount to intentional infliction of emotional distress;

2.  Granting Defendant damages in the amount of $1 million;

3.  Requiring Plaintiff to pay for and take out an advertisement which shall run in the Denver Post and the Daily Camera and the Colorado Hometown Weekly, Louisville Edition, which advertisement shall be no less than ¼ of a page in size and shall be run in the primary news section of each newspaper in its Sunday edition (or in the case of Hometown Weekly, in one weekly edition), and which advertisement shall specifically retract the claims of the Complaint, acknowledge that Plaintiff wrongfully brought this lawsuit against the Defendant, state that this lawsuit was groundless, acknowledge that the Defendant has not infringed in any manner against the Plaintiff

and that Defendant is innocent of any wrong-doing in this matter, and apologize to Defendant, with the stipulation that the exact language of the advertisement shall be subject to the review and approval of Defendant and/or his attorneys;

4. Granting the Defendant all fees and costs of suit;

5. For such other and further relief as the court may deem equitable and just.

## COUNT V

### DECLARATORY JUDGMENT THAT DEFENDANT IS NOT LIABLE TO PLAINTIFF FOR COPYRIGHT INFRINGEMENT

117.    Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

118.    Upon information and belief, Plaintiff created or caused and/or authorized its agents and/or employees to create a single digital file or website containing its films in order to lure potential infringers. This is known as a "honeypot" and it is done in order to trap infringers and, using the threat of infringement litigation as a weapon, to coerce them into a financial settlement.

119.    By placing its films in a "honeypot" to lure infringers, Plaintiff explicitly and/or implicitly authorized the download, distribution and other use of its films.

120.    Plaintiff is part of a nationwide scheme masterminded by a Florida attorney by which pornography companies make millions of dollars by tracking IP addresses, using call centers and/or settlement letters to pressure internet users – whose innocence is irrelevant to the pornography companies – into a settlement which is less expensive and less embarrassing than a public lawsuit, and then sharing the fees among the attorneys, the pornography companies and the tracking companies in arrangements that defy the Rules of Ethics governing the conduct of lawyers everywhere.

121.    Upon information and belief, at no time did Plaintiff attempt to stop the download of its movies by removing them from the internet. In fact, by maintaining the films as a "honeypot," it actively sought to encourage downloads in order to have more targets to extort money from.

122.    Upon information and belief, at no time did Plaintiff attempt to mitigate its damages by removing the films from the internet. Again, by maintaining the films as a "honeypot," it actively sought to encourage downloads in order to profit from infringement or allegations of infringement.

123.    Upon information and belief, at no time did Plaintiff undertake to prevent any alleged infringers from continuing to infringe upon Plaintiff's works, nor did Plaintiff attempt to prevent any alleged infringers from selling, distributing or otherwise using Plaintiff's works. To Defendant's knowledge and belief, no DMCA takedown notices were issued, no cease-and-desist letters were ever sent, and no injunctions or restraining orders were ever sought.

124.    Thus, upon information and belief, Plaintiff not only failed to prevent infringement of its allegedly copyrighted works, it actively encouraged that infringement in order to profit thereby.

125.    The Plaintiff's claims in its Complaint are therefore barred by the equitable doctrines of unclean hands and estoppel.

126.    Defendant did not download any of the films listed in Exhibit B to Plaintiff's Complaint, to which Plaintiff claims copyright.

127.    Defendant has never downloaded any pornography whatsoever from the internet.

128.    Defendant did not participate, at any point in time, in any BitTorrent that may have downloaded any works that Plaintiff alleges it owns the copyrights of.

129.    Defendant did not engage in any conduct that infringed in any way upon any copyrights alleged to be held by Plaintiff.

48

130.    Based on all the information stated herein, an actual and continuing controversy exists between Defendant and Plaintiff such that Defendant needs the court to declare the rights between the parties.

WHEREFORE, the Defendant respectfully requests that the Court:

1.   Issue a declaratory judgment that Defendant has not infringed upon any rights that Plaintiff may have in the motion pictures listed in Exhibit B of its Complaint;

2.   Issue a declaratory judgment that Defendant is not liable to Plaintiff for copyright infringement;

1.   Issue a declaratory judgment that the Plaintiff has come before this court with unclean hands;

2.   Issue a declaratory judgment that the Plaintiff has not mitigated damages;

3.   Issue a declaratory judgment that the Plaintiff is estopped from asserting its claims against Defendant;

4.   Issue a declaratory judgment that the Plaintiff failed to issue Digital Millenium Copyright Act (DCMA) takedown notices or otherwise seek to enjoin and prevent infringement of its works;

5.   Issue a declaratory judgment that the Plaintiff not only failed to prevent the download of the works it now seeks to protect but rather encouraged and promoted said download in order to profit thereby;

6.   Issue a declaratory judgment that the Plaintiff, its agents and/or employees have unlawfully and improperly instituted lawsuits not supported by facts or law and sought settlements of same, which constitutes misuse of copyright;

7.   Granting the Defendant all fees and costs of suit;

8.   For such other and further relief as the court may deem equitable and just.

COUNT VI

DECLARATORY JUDGMENT THAT PLAINTIFF'S

WORKS ARE NOT ENTITLED TO THE PROTECTIONS

OF UNITED STATES COPYRIGHT LAW

1. Defendant restates and realleges all of the allegations of the previous paragraphs as if more fully stated herein.

2. Article I, Section 8, Clause 8 of the United States Constitution reads as follows: "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." From this Clause, all copyright and patent law springs.

3. Under this Clause, copyright is authorized only for works which promote the progress of science and the useful arts.

4. Plaintiff's works do not promote the progress of science.

5. Plaintiff's works do not promote the useful arts.

6. Upon information and belief, Plaintiff's works are hardcore pornography. Defendant has never seen any of these films, but judging by the graphic nature of the titles listed in Exhibit B to Plaintiff's Complaint, there can be no doubt that these are pornographic.

7. Upon information and belief, Plaintiff's works depict obscene material, or in other words, Plaintiff seeks to protect works which, taken as a whole, appeal to the prurient interest in sex, portray sexual conduct in a patently offensive way and, which, taken as a whole, do not have any serious literary, artistic, political or scientific value.

8. There is no protection under the First Amendment for works that are obscene. *Roth v. United States*, 354 U.S. 476 (1957).

9. In *Miller v. California*, 413 U.S. 15, 24 (1973), the Supreme Court stated that works which, "taken as a whole, appeal to the prurient interest in sex, which portray sexual conduct in a patently offensive way and, which, taken as a whole, do not have any serious literary, artistic, political or scientific value" are obscene.

10. It is unsettled in the Circuit Courts, and has not been tested in the Supreme Court, whether obscene works can be copyrighted. It is a question of first impression in Colorado and in the 10th Circuit.

11. That illegal and immoral works have no right to legal protections is an ancient common law doctrine stretching back to 19th century England and the Rule in Priestley's Case.

12. Hardcore pornography is not speech by any definition of the term; it is simply sex. The fact that the sexual acts take place on film does not elevate them to the level of speech.

13. Upon information and belief, in order to create the works that are the subject of this lawsuit, Plaintiff and/or its agents and/or employees violated laws which prohibit pimping, pandering, solicitation and prostitution, including any and all claims of conspiracy to commit these acts. Thus, Plaintiff's works depict criminal acts and/or conduct, and they came about as a result of criminal acts and/or conduct.

14. The illegal act of paying others to engage in sexual conduct so that one may watch is not protected speech if done in person; doing such illegal acts and filming it does not and should not elevate the request or the acts out of the realm of illegality or obscenity into the realm of protected speech.

15. Plaintiff's works are not copyrightable.

16. Based upon all of the information stated herein, an actual and continuing controversy exists between Defendant and Plaintiff such that Defendant needs this Court to declare the rights between the parties.

WHEREFORE, the Defendant respectfully requests that the Court:

1. Issue a declaratory judgment that each and every motion picture listed in Exhibit B of Plaintiff's Complaint is obscene;

2. Issue a declaratory judgment that each and every one of Plaintiff's motion pictures listed in Exhibit B of Plaintiff's Complaint are not entitled to copyright protection because they are obscene, because they do not promote the progress of science and the useful arts, and because they were created by and depict unlawful activity;

3. Striking Plaintiff's copyright registration of each and every motion picture listed in Exhibit B of Plaintiff's Complaint;

4. Finding that Plaintiff is not entitled to recover statutory damages and/or attorneys' fees;

5. Granting the Defendant all fees and costs of suit; and

6. For such other and further relief as the court may deem equitable and just.


DEMAND FOR A JURY TRIAL

Defendant-Counterclaimant hereby demands a trial by jury on all issues so triable.

Respectfully submitted,


Jeff Fantalis
Defendant *pro se*
818 Trail Ridge Drive
Louisville CO 80027
(303) 482-1211

Dated:        July 12, 2012

## CERTIFICATION OF SERVICE

I, Jeff Fantalis, hereby certify that on July 12, 2012, I caused this First Amended Answer and Counterclaim to be filed with the Clerk of the Court by U.S. Mail, Priority Delivery with Delivery Confirmation, at the following address:

Clerk's Office
Alfred A. Arraj United States Courthouse
Room A-105
901 19th Street
Denver, Colorado 80294-3589

On the same date, I served a copy of this First Amended Answer and Counterclaim upon Plaintiff by mailing to Plaintiff's attorney of record, by U.S. Mail, Priority Mail with Delivery Confirmation, at the following address:

Jason A. Kotzker
Kotzker Law Group
9609 S. University Blvd. #632134
Highlands Ranch CO 80163

_____
Jeff Fantalis
Defendant *pro se*

Dated:          July 12, 2012