===

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:12-cv-00886-MSK-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

JEFF FANTALIS and BRUCE DUNN,

      Defendants

_____/

## PLAINTIFF'S MOTION TO DISMISS DEFENDANT/COUNTER-PLAINTIFF JEFF FANTALIS'S AMENDED COUNTERCLAIM [DKT. 9]

Plaintiff, Malibu Media, LLC, pursuant to Fed. R. Civ. P. 12(b)(6), moves for the entry of an Order dismissing Defendant's Amended Counterclaim and submits the following memorandum in support.

## I. INTRODUCTION

Each count in Defendant's Amended Counterclaim: (1) Abuse of Process, (2) Invasion of Privacy, (3) Defamation, (4) Intentional Infliction of Emotional Distress, (5) a Declaration of Non-Infringement, and (6) a Declaration that Plaintiff's Works Are Not Subject to the Protections of the United States Copyright Law – fails to state a claim upon which relief may be granted and should be dismissed.[1] As to the abuse of process count, Defendant failed to plead that Plaintiff performed any action in this suit or in the suit in which Plaintiff obtained his identifying information, which is improper. To the contrary, the record demonstrates that this

---

[1] This motion may become moot because Plaintiff served a Rule 11 motion on Defendant for asserting claims that are not warranted by existing law or by a nonfrivolous argument for extending, modifying or reversing existing law or for establishing new law. Consequently, Defendant may voluntarily dismiss the Amended Counterclaim. Unless this Court shortens the

Court found that there was "good cause" for Plaintiff to obtain Defendant's identity and that joinder was proper. Under the law of the case doctrine, these findings preclude a finding that Plaintiff's conduct was improper. Further, Plaintiff is using the process of the underlying copyright infringement lawsuit against Defendant for its intended purpose; namely, to seek redress for the injury caused by Defendant's infringement of Plaintiff's copyright. Under such circumstances, the law makes clear that there is no abuse of process. Additionally, Defendant failed to plead that Plaintiff is using the copyright litigation against him to obtain a "collateral advantage" against *Defendant*, as is required to state a claim for abuse of process, and therefore the abuse of process count unsustainable. Further, Defendant did not plead that Plaintiff's suit is *devoid* of factual support, which is a necessary element, and an element Defendant cannot plead because Plaintiff submitted the Declaration of Tobias Feiser attesting to the infringement. *See Malibu Media, LLC v. John Does 1-30*, 12-cv-402-WYD-MJW, at CM/ECF 6-1. Finally, Defendant failed to plead any legally cognizable damages, which arise out of the putative abuse of process. For all these reasons, the abuse of process count should be dismissed.

Defendant's counts for invasion of privacy, defamation and intentional infliction of emotional distress are barred – as a matter of well-known black letter law – by the *absolute privilege* afforded to litigants to speak during a civil proceeding without the possibility of incurring liability based upon that party's communications during the proceeding. For that reason alone, those counts should be dismissed. The intentional infliction of emotional distress claim also fails to plead conduct that is outrageous, meaning outside the bounds of all decency, and so should be dismissed on that basis as well.

The invasion of privacy count attempts to plead two claims: intrusion and false light. As for intrusion, in addition to it being barred by the litigation privilege, this claim should also be dismissed because: (1) Defendant consented to the intrusion via his contract with Qwest, (2) the

2

intrusion, namely obtaining his identity, was not "unwarranted;" indeed, this Court held that "good cause" existed for Plaintiff to obtain Defendant's identity. Under the law of the case doctrine, there is no basis upon which this finding may now be disturbed. As for Defendant's false light claim, the Colorado Supreme Court held that Colorado does *not* recognize this tort.

Finally, the two declaratory judgment counts should be dismissed. The count seeking a declaration of non-infringement is merely a denial and under established law should not be permitted to continue as a standalone count. The count seeking a declaration that Plaintiff's work is not copyrightable because the work is pornographic should be dismissed. First, the work was registered by the United States Copyright Office and therefore is presumptively copyrightable. Second, the only two Circuit courts (the 5th and 9th), which have ever addressed the issue held that pornography is copyrightable. Significantly, Congress, well aware of these decisions for decades, has not passed legislation overturning them. Third, as explained by the dean of copyright law, Professor Nimmer, there are numerous compelling reasons why courts should not endeavor to ascertain whether a work is copyrightable based upon its subject matter. Fourth, even considering this count would render suspect the contractual rights of thousands of people working in adult entertainment industry and have severe adverse consequences on a multi-billion dollar U.S. industry. In short, since there is *no reason to believe* that the 10th Circuit would erroneously disagree with the 5th and 9th Circuits by finding that pornographic films are not copyrightable, this count should be dismissed.

For these reasons, as more fully explained below, Plaintiff respectfully requests that the Court dismiss Defendant's Counterclaim in its entirety.

## II. LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the Court "should determine whether the allegations of the complaint are sufficient to state a claim within the

meaning of Fed.R.Civ.P. 8(a) . . . ." *McDonald v. Kinder–Morgan, Inc.,* 287 F.3d 992, 997 (10th Cir.2002). "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Ruiz v. McDonnell,* 299 F .3d 1173, 1181 (10th Cir.2002), *cert. denied,* 123 S.Ct. 1908 (2003). Further, the Court should review the complaint to determine whether it "contains enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007)). "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Id.* (Emphasis in original).

## III.  ARGUMENT

### A.  Defendant Failed to State a Claim for Abuse of Process

"A prima facie case for abuse of process includes proof of (1) an ulterior purpose in the use of judicial proceedings;[2] (2) willful actions by a defendant in the use of process that are not proper in the regular conduct of a proceeding; and (3) damages."  *Sterenbuch v. Goss, III*, 266 P.3d 428, 439 (Colo. App. 2011) (dismissing abuse of process count).  *Accord, Tara Woods Ltd. Partnership v. Fannie Mae*, 731 F.Supp.2d 1103, 1122 (D. Colo. 2010) (reciting elements and dismissing abuse of process count); *James H. Moore & Assoc. Realty v. Arrowhead at Vail,* 892 P.2d 367, 373 (Colo App. 1994) (same).  Further, "when the process alleged to have been abused entails, as here, the very filing of a lawsuit, an additional showing is required.  The party

---

[2] Defendant's allegations of an ulterior purpose are based on Anti-Piracy Management Company, LLC's ("APMC") proposed agreement with an unidentified third party.  To wit: prior to this suit, Plaintiff had never heard of APMC and has had no business dealings with it.  Based upon that proposed agreement, Defendant falsely theorizes that Plaintiff's has an ulterior motive for suing him; namely, to encourage other infringers to settle.  *See* Amended Counterclaim at ¶ 15.

asserting the abuse of process claim also has to show that the other party's claims is 'devoid of factual support or if supportable in fact [has] no cognizable basis in law.'" *Sterenbuch* at 438-439, citing *Yadon v. Lowry*, 126 P.3d 332, 337 (Colo. App. 2005) (quoting *Ware v. McCutchen, 784 P.2d 846, 848* (Colo. App. 1989). *See also, Protect Our Mountain Env't, Inc. v. Dist. Court*, 677 P.2d 1361, 1365 1368 (Colo 1984) (the additional showing is necessary to protect a person's First Amendment right to petition the government by filing a lawsuit.) *Accord, James H. Moore & Assoc. Realty v. Arrowhead at Vail,* 892 P.2d 367, 373 (Colo App. 1994) (same).

### 1. Summary of Counter-Plaintiff's Abuse of Process Allegations

Defendant asserts Plaintiff abused the process by alleging: (1) Plaintiff sued Defendant "in order to encourage others to settle," *see* Amended Counterclaim at ¶¶ 15-16; (2) Plaintiff used the joinder rule to avoid filing fees, *Id.* at ¶¶ 72 & 75; (3) Plaintiff attempted to settle the matter early in the litigation, *Id.* at ¶ 74; (4) Plaintiff served Defendant on a Saturday, *Id.* at ¶¶ 76; and (5) Plaintiff alleged Defendant was the infringer despite knowing that the infringer could have been someone using his internet, *Id.* at ¶ 23. Based thereon, Defendant pleads that "on information and belief" Plaintiff's suit is "based on knowingly inaccurate and/or false data that Plaintiff knew does not and would not identify the alleged downloader," *Id.* at ¶ 84.

### 2. Counter-Plaintiff Has Failed to Plead an Improper Use of the Process

"If the action is confined to its regular and legitimate function in relation to the cause of action stated in the complaint there is no abuse, even if plaintiff had an ulterior motive in bringing the action or if he knowingly brought suit upon an unfounded claim. Further, while the ulterior motive may be inferred from the wrongful use of the process, the wrongful use may not be inferred from the motive." *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994), citing *Institute for Professional Development v. Regis College*, 536 F.Supp. 632, 635 (D. Colo. 1982) (applying Colorado law) (emphasis in the original). *See*

*also Restatement 2d Torts § 682*, comment b (1977). Here, all of Plaintiff's actions have been confined to their regular and legitimate functions in relation to the cause of action stated in the Complaint. To explain, in *Malibu Media, LLC v. John Does 1-30*, 12-cv-402-WYD-MJW, Plaintiff obtained Defendant's identity, who was Doe 23, in response to a lawfully issued subpoena. Thereafter, Plaintiff voluntarily dismissed Defendant without prejudice as is its right under Fed. R. Civ. P. 41(a)(1)(A)(i), *see* CM/ECF 16 in 12-cv-402-WYD-MJW. Subsequently, Plaintiff filed the Complaint in this action and served Defendant. None of these actions are irregular or illegitimate. "There is no action for abuse of process when the process is used for the purpose for which it is intended, [although] there is an incidental motive of spite or an ulterior purpose. . . ." *Institute for Professional Development v. Regis College*, 536 F.Supp. 632, 635 (D. Colo. 1982).

Finally, Defendant's assertion that Plaintiff's offer to settle constitutes an abuse of process fails for two reasons: (1) an out-of-court settlement offer is not a "process" within the meaning of the tort[3]; and (2) settlement offers are not only proper but encouraged. "As a matter of public policy the law favors and encourages settlements. . . .The settlement of actions should be fostered to avoid protracted, wasteful and expensive litigation." *Big O Tire v. Bigfoot 4X4, Inc.*, 167 F.Supp.2d 1216 (D. Colo. 2001)(internal citations omitted); *see also* the Supreme Court's statement that "Rule 68's policy of encouraging settlements is neutral, favoring neither plaintiffs nor defendants; it expresses a clear policy of favoring settlement of all lawsuits." *Marek v. Chesny*, 473 U.S. 1, 11 (1985). "Upon receipt of the identifying information sought in the subpoenas, the plaintiff is entitled to seek settlement with these individuals, or decide that pursuing a lawsuit against particular defendants is no longer feasible or cost-effective. Either

---

[3] A "process" is the filing of the Complaint, propounding discovery, or some action taken in the actual proceeding itself.

course selected by the plaintiff would give the copyright owner the opportunity to effectuate its statutorily protected rights and thereby serves our system of justice. *AF Holdings LLC, v. Does 1-1,058*, 1:12-cv-00048-BAH at *32(D.D.C. August 6, 2012).

a. The Law of the Case Doctrine Precludes a Finding That Plaintiff's Use Joinder of Defendants In a Suit is Improper

Here, the only allegation about a legal "process" that Defendant alleges is improper is Plaintiff's use of Rule 20's permissive joinder rule to save filing fees. This allegation cannot support a claim for abuse of process when, as here, this Court *correctly* held that joinder was permitted and proper in the very suit wherein Counter-Plaintiff was identified. *See Malibu Media, LLC v. John Does 1-30*, 12-cv-402-WYD-MJW, CM/ECF 10 (holding "Plaintiff has established that 'good cause' exists for it to serve third subpoenas on the Internet Service Providers listed on Exhibit A to the Motion," at ¶ 1; and, "[a]t this stage of the proceeding, the Court finds that joinder is proper."

"Under the law of the case doctrine, when a court decides an issue of law, that decision should govern all subsequent stages of the litigation." *Padilla-Caldera v. Holder*, 637 F.3d 1140, 1145 (10th Cir. 2011). "The Tenth Circuit recognizes three 'exceptionally narrow' circumstances in which the law of the case doctrine does not apply: (1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *Dobbs v. Anthem Blue Cross and Blue Shield*, 600 F.3d 1275, 1282 (10th Cir. 2010) (applying the law of the case and finding none of the narrow circumstances existed.) Here, a trial has not yet occurred, no controlling authority has held that joinder is improper, and the decision that joinder was proper is not clearly erroneous as is evidenced by the majority of court opinions who so hold. *See e.g., Call of the Wild, LLC v.*

*Does 1-1062*, 770 F.Supp.2d 332 (D.D.C. 2011), and the cases citing positively to it.   Further, there is nothing improper about relying on the joinder rule to avoid filing fees because "[t]he purpose of Rule 20(a) is to address the 'broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged.'" Brotzman v. Lippet, Inc., 2010 WL 2262543 (D. Colo. 2010) (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).   And, Fed. R. Civ. P. 1 states the rule "should be construed and administered to secure the just, speedy, and inexpensive determination of every action." Requiring a Plaintiff to file individual actions at the identification stage of a BitTorrent copyright infringement action does not promote the "inexpensive determination of every action."

### 3. Defendant Failed to Allege that Plaintiff Used a Process For A Purpose Which Said Process Was Not Intended

Defendant has not and cannot allege, as it must, that Plaintiff has used any process  "the purpose for which [said process was not] intended."  *James H. Moore & Assocs. Realty, Inc. v. Arrowhead at Vail*, 892 P.2d 367, 373 (Colo. App. 1994).  Therefore, Defendant has failed to state a cause of action for abuse of process.  *See also, Restatement 2d Torts § 682*, comment b ("a party engages in abuse of process when he files liens against his adversary, not because the filer claims an interest in the property, but to compel the adversary to concede a child custody proceeding."

Indeed, this case is materially indistinguishable from the 10th Circuit's decision in *Hertz v. Luzenac*, 576 F.3d 1103 (10th Cir. 2009) wherein in response to a tortious interference claim by a former employee, the former employer counterclaimed for misappropriation of trade secrets. The 10th Cir. held "[a] litigant uses the legal proceedings in an improper manner when he seeks to use the process to accomplish a coercive goal.  (Citations omitted)  The improper purpose is ordinarily an attempt to secure from another some collateral advantage not properly includable in

8

the process itself and is a form of extortion in which a lawfully used process is perverted to an unlawful use." *Id.* at 1117-1118. The 10th Circuit continued: "Mr. Hertz's claim of abuse stems from Luzenac filing counterclaims against him for misappropriation of trade secrets. Any ulterior motives Zluzenac might have had are insufficient support an inference of improper use. Luznace is entitled to protect its trade secrets. Its counterclaims are an appropriate means of accomplishing that goal." *Id.* Here, Plaintiff is suing Defendant for copyright infringement because Plaintiff genuinely believes Defendant committed the infringement. Significantly, Plaintiff has not sought to obtain any other benefit (i.e., a "collateral advantage") vis-à-vis Defendant from this suit.

### 4. Defendant Failed to Allege that Plaintiff's Complaint's is Devoid of Factual Support or That It has No Cognizable Basis in Law

Defendant failed to allege that Plaintiff's Complaint is devoid of factual support. Nor could Defendant make such an allegation because Plaintiff provided sworn testimony that Defendant's internet was used to commit the subject infringement. *See Malibu Media, LLC v. John Does 1-30*, 12-cv-402-WYD-MJW, Declaration of Tobias Feiser , at CM/ECF 6-1. Instead, Defendant alleges that counsel for unrelated third parties have said that up to 30% of the Doe defendants in other BitTorrent copyright infringement cases may not be the real infringers. This allegation falls woefully short of asserting that Plaintiff's complaint is *devoid* of factual support.

### 5. Defendant Has Not Pled Any Legally Cognizable Damages

"A defendant is only liable for abuse of process if his or her abuse caused damages to the Plaintiff." *J. Mintz v. Accident and Injury Medical Specialists, PC,* 2010 WL 4492222, *4 (Colo. App. 2010), citing *1 Am.Jur.2d Abuse of Process* § 7, and *Ion Equipement Copr. v. Nelson,* 110 Ca.App.3d 868, 876 (1980). "Mere vexation or frustration without demonstrable damage is insufficient to sustain liability." *Id.* The *Ion Equipment* court at p. 876, upon which the *J. Mintz*

court relied, quoted *3 Restatement Torts § 682* as follows "one who uses legal process against another to accomplish a purpose for which it is not designed is liable to the other for the *pecuniary* loss caused thereby." (Emphasis added.) Here, Defendant has not pled any pecuniary damages. Instead, Defendant alleges that Plaintiff saved filing fees by using joinder. Obviously, any fees saved by Plaintiff did not cost Defendant anything, so Defendant cannot claim that he has suffered legally cognizable damages as a result of Plaintiff's use of the joinder rule.

For all the foregoing reasons, Defendant's count for abuse of process should be dismissed.

### B. Defendant's Counts for Invasion of Privacy, Defamation and Intentional Infliction of Emotional Damage Are All Barred by the Litigation Privilege

Defendant's Invasion of Privacy count, Defamation count, and Intentional Infliction of Emotional Distress count are all barred by the litigation privilege. "Communications made in the course of judicial proceedings, even though they are made maliciously and with knowledge of their falsity, are absolutely privileged if they bear a reasonable relationship to the subject of inquiry." *Swanson v. Bixler,* 750 F.2d 810, 814 (!0th Cir. 1984). *Accord Department of Administration v. State Personnel Board of State*, 703 P.2d 595, 596-98 (Colo. App. 1985) (same). "The reason underlying this doctrine is that public interest in the freedom of expression by participants in judicial proceedings, uninhibited by risk from resultant suits for defamation, is so vital and necessary to the integrity of judicial system that it must be made paramount to the right of the individual to a legal remedy where he has been wronged thereby." *MacLarty v. Whiteford,* 496 P.2d 1071, 1072 (Colo. App. 1972), *rev. denied.* (using the language quoted in *Swanson* to define the rule). "A party to a civil litigation . . . is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial

10

proceeding, or in the institution of or during the course and as a part of, a judicial proceeding in which he participates, if the matter has some relation to the proceeding." *Restatement 2d of Torts § 587*

Here, the false light prong of Defendant's Invasion of Privacy tort is predicated upon the allegation that "Plaintiff publicized false allegations – namely, the accusation that Defendant illegally downloaded pornographic films – by placing them into a public document – namely, the Complaint against Defendant." *See* Amended Complaint at ¶ 88. Similarly, the defamation count is entirely and expressly founded upon communications to the Court in the Complaint. To quote . . . "[b]y filing the complaint," see Id. at ¶ 97, "the allegations made by the Plaintiff in the Complaint" Id. at ¶ 97 and 98, all, Defendant alleges, harmed him. Finally, the Intentional Infliction of Emotion Distress count is also based entirely on Plaintiff's having brought the instant lawsuit. *See* Id. at ¶ 112 "by publishing these accusations through this lawsuit, Plaintiff has, in fact, caused Defendant extreme emotional distress." Here, Defendant simply cannot assert that Plaintiff has done anything other than sue him for copyright infringement because Plaintiff has not done anything else. And, under well-established law, Plaintiff is absolutely privileged to sue Defendant without the possibility of being countersued based upon what Plaintiff communicates to the Court in the suit. This is an outcome dispositive affirmative defense. *See Rohner v. Union Pac. R. Co.*, 225 F.2d 272 (10th Cir. 1955) (dismissing claim where, as here, an outcome dispositive affirmative defense was apparent on face of the pleading).

C. Defendant Fails to State a Claim for Invasion of Privacy

Count II of Counter-Plaintiff's claim attempts to assert a cause of action for two different invasion of privacy torts: (1) intrusion and (2) false light. Both claims fail as a matter of law.

1. Defendant Does Not Have a Legally Cognizable Claim for Intrusion Upon Solitude

"The tort of invasion of privacy by intrusion requires an unreasonable manner of intrusion or an intrusion for an unwarranted purpose." *Slaughter v. John Elway Dodge Southwest/AutoNation*, 107 P.3d 1165, 1070 (Colo. App. 2005), citing *Denver Publ'g Co. v. Bueno,* 54 P.3d 893 (Colo. 2002); *Doe v. High-Tech inst., Inc.*, 972 P.2d 1060 (Colo. App. 1998). Here, Defendant alleges that: (a) Plaintiff intentionally intruded upon Defendant's solitude by collecting data about the IP Address used by his internet service without his knowledge, *see* Amended Counterclaim at ¶ 86, and by "forcing Qwest/Century Link to disclose his identifying information," *Id.* at ¶ 87.

Defendant's claim for intrusion due to Plaintiff's investigation fails because: (1) investigating the infringement of one's copyrighted works is warranted and necessary so that one may enforce one's copyrights, and (2) Plaintiff's investigation was not done in an unreasonable manner. Indeed, as alleged by Plaintiff, Defendant used his computer to reach out to Plaintiff's investigator, IPP Limited, perform a digital hand shake with IPP Limited's computer, and then Defendant transmitted a piece of Plaintiff's copyrighted work to IPP Limited. There is nothing unreasonable in this process. To the contrary, it is the best and only way to establish that Defendant was distributing Plaintiff's works via his internet. And, Plaintiff has a right under the First Amendment's Petition Clause to sue for infringement committed via the internet.

Defendant's claim for intrusion due to Plaintiff's subpoenaing his identity from Qwest fails because: (1) this court found that Plaintiff had "good cause to do so (i.e., "warranted"), and under the law of the case doctrine, discussed above, there is no reason to disturb this finding, (2) Defendant did not have a reasonable expectation of privacy, and (3) Defendant consented to the disclosure of his information via his contract with Qwest.

Regarding Defendant's expectation of privacy, "[i]nternet subscribers do not have a reasonable expectation of privacy in their subscriber information—including name, address,

phone number, and email address—as they have already conveyed such information to their ISPs." *First Time Videos, LLC v. Does 1-500*, 276 F.R.D. 241, 247 (N.D. Ill. 2011), *citing Achte/Neunte Boll Kino Beteiligungs Gmbh & Co. v. Does 1–4,577*, 736 F.Supp.2d 212, 216 (D.D.C. 2010). Defendant acknowledged this fact by accepting Qwest's contract, Section 10 of which provides that: "Qwest may provide customer information to third parties or governmental entities when required or permitted by law. . . ." *See* Exhibit A. Qwest has an additional Privacy Policy, attached as Exhibit B, which states "we may share customer information: (1) to comply with laws or to respond to lawful demands such as subpoenas or court orders . . . [and,] [a]mong the information we might be asked to provide are a customer's name, address, telephone number, account number, any Internet Protocol or network address that we assigned to the customer. . . ."[4] Defendant consented to Qwest's Agreement when he obtained his internet service from it. By so agreeing, he consented to Qwest delivering his identifying information to a third party, like Plaintiff here, in response to a subpoena. "Consent alone is fatal to Plaintiff's claim" for abuse of process. *L. Kozak v. Catholic Health Initiatives of Color-ADO,* 2009 WL 3497782 (D. Colo. 2009) (dismissing the abuse of process count based on this affirmative defense.)

---

[4] Defendant also agreed to secure his IP Address, take responsibility for his use and not to violate laws. See Section 2(b)(i) of Qwest's High-Speed Internet® Subscriber Agreement (the "Agreement"), attached as Exhibit A, stating that Qwest's subscribers will "receive a user name and password upon completing the registration process." Further, that Qwest's subscribers have "responsibility for maintaining the confidentiality of the user name and password, and are fully responsible for all activities that occur under your [ the subscriber's] user name and password." Also, that "only you [the subscriber] and your authorized designees will use your user name and password and that you will not transfer or disclose either your user name or password to any other person." Finally, in capitalized letters "QWEST RECOMMENDS USE OF COMMERCIALLY AVAILABLE CONTENT FILTERING SOFTWARE" which would block peer to peer file sharing.[4] Section 7(d) states "[t]he Service cannot be used for any . . . purpose . . . [that] violates any law, order ordinance, governmental requirement or regulation or this Agreement."

2.  Colorado Does Not Recognize the Tort of False Light Invasion of Privacy

As for false light invasion of privacy, paraphrasing Defendant, he alleges: (1) Plaintiff published false statements about him by including them in the Complaint, *see* Amended Counterclaim at ¶ 88; and (3) "by making these allegations public, Plaintiff has portrayed the Defendant in a false light," *Id.* at ¶ 89. This count fails because the Supreme Court of Colorado expressly held that Colorado does not recognize the tort of false light invasion of privacy. *See Denver Publishing Co. v. Bueno*, 54 P.3d 893, 894 (Colo. 2002) (in a long opinion on this one issue, the Court held "[w]ith this case we address whether Colorado permits a plaintiff to sue for the tort of false light invasion of privacy . . . . we now decline to recognize the tort . . . .") Even if Colorado had recognized the tort, the false light claim would be barred by the absolute litigation privilege since it is based entirely on allegations made in the Complaint. *See Swanson v. Bixler*, 750 F.2d 810, 814 (!0th Cir. 1984).

**D.  Defendant Fails to State a Claim for Defamation**

Plaintiff's allegations that Defendant infringed its copyright do not give rise to liability for defamation because these allegations are privileged as a matter of law. *See, e.g., Swanson v. Bixler*, 750 F.2d 810, 814 (!0th Cir. 1984); *accord Walters v. Linhof*, 559 F.Supp. 1231, 1237 (D. Colo. 1983) (holding that "statements made during judicial proceedings are absolutely immune" from liability for defamation). "Even if false, statements that stepson was going to abscond with stepfather's assets were absolutely privileged where made during course of proceedings seeking conservatorship for stepfather and temporary restraining order…[.]"); *accord Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 335 F.3d 1161, 1166 (10th Cir. 2003) ("recognize[ing] the litigation privilege under which attorneys, parties, jurors, and witnesses are immune from defamation liability for statements made in the course of judicial or quasi-judicial proceedings, so long as the statements are relevant to the proceeding.").

14

### E. Defendant/Counter-Plaintiff Fails to State a Claim for Intentional Infliction of Emotional Distress

To establish a claim of extreme and outrageous conduct, or intentional infliction of emotional distress, Defendant/Counter-Plaintiff must allege that: "1) the defendant engaged in extreme and outrageous conduct; 2) recklessly or with the intent of causing the plaintiff severe emotional distress; and 3) which caused the plaintiff to suffer severe emotional distress." *LaBrecque v. L3 Communication Titan Corp.*, 2007 WL 1455850, at *4 (D. Colo. 2007). The level of outrageousness necessary to meet the first element is "extremely high." *Id.*, at *4-5, *citing Archer v. Farmer Bros. Co.*, 70 P.3d 495, 499 (Colo. App. 2002). "Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities are insufficient; only conduct that is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community, will suffice." *Id*.

Here, Defendant alleges that Plaintiff's allegations as set forth in the Complaint that Defendant illegally downloaded Plaintiff's pornographic work have caused him severe emotional distress. *See* Amended Complaint at ¶¶ 112-114. First, since the claim is based on communications to the Court, the absolute litigation privilege acts as a complete bar. *See Swanson v. Bixler*, 750 F.2d 810, 814 (!0th Cir. 1984). Second, Plaintiff's filing of legitimate claims to remedy copyright infringement, does not constitute "extreme and outrageous conduct." *See Swanson v. Bixler*, 750 F.2d 810, 814-15 (10th Cir. 1984) (upholding dismissal of claim for intentional infliction of emotional distress where plaintiff complained that judicial proceedings for a conservatorship and injunction against him to prevent him from removing step-father's assets constituted "outrageous conduct"). Underscoring that Plaintiff's suit is not outrageous are the opinions from similar cases involving Doe defendants who have attempted to proceed

anonymously, and in which courts have held that "[t]he potential embarrassment…of being associated with allegations of infringing hardcore pornography does not constitute an exceptional circumstance that would warrant allowing the defendants to proceed anonymously." *Liberty Media Holdings, LLC v. Swarm Sharing Hash File*, 2011 WL 5161453, at *7 (D. Mass. 2011); *accord Boy Racer, Inc. v. John Does 1-34*, 2012 WL 1535703, at *4 (S.D. Fla. 2012), *citing AF Holdings, LLC v. Does 1-162*, 2012 WL 488217, at *4 (S.D. Fla. 2012).

Lacking any merit on its face, Defendant/Counter-Plaintiff's claim for intentional infliction of emotional distress should thus be dismissed out of hand by this Court.

### F. Defendant/Counter-Plaintiff Fails to State a Claim for Declaratory Judgment that Defendant is Not Liable to Plaintiff for Copyright Infringement

Defendant/Counter-Plaintiff's claims for declaratory judgment concerning liability for copyright infringement should be dismissed as an inappropriate "repackaging" of his affirmative defenses. The Declaratory Judgment Act gives the Court "the *authority* to declare the rights and legal relations of interested parties, but not a *duty* to do so." *Stickrath v. Globalstar, Inc.*, 2008 WL 2050990, at *3 (N.D. Cal. 2008), *citing Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 533 (9th Cir. 2008), *which in turn cites Wilton v. Seven Falls Co.*, 515 U.S. 277, 288, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (within a district court's sound discretion to dismiss an action for declaratory judgment), *and* 28 U.S.C. § 2201(a) (emphasis in original).

Accordingly, numerous courts have used that discretion to dismiss counterclaims "where they are either the 'mirror image' of claims in the complaint or redundant of affirmative defenses." *Id. See also Rayman v. Peoples Sav. Corp.*, 735 F.Supp. 841, 852-53 (N.D. Ill. 1990) (court dismisses counterclaim that "simply duplicates arguments made by way of affirmative defense"); *Tenneco Inc. v. Saxony Bar & Tube, Inc.*, 776 F.2d 1375, 1379 (7th Cir. 1985) ("The label 'counterclaim' has no magic. What is really an answer or defense to a suit

does not become an independent piece of litigation because of its label."); Fed. R. Civ. P. 8(c)(2) ("If a party mistakenly designates a defense as a counterclaim, or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated…[.]"). "Ordinarily the court will refuse a declaration which can be made only after a judicial investigation of disputed facts, especially where the disputed questions of fact will be the subject of judicial investigation in a regular action." *Washington-Detroit Theater Co. v. Moore*, 249 Mich. 673 (MI 1930); *See also*, *Product Engineering and Mfg, Inc. v. F. Barnes*, 424 F.2d 42 (10th Cir. 1970) ("Dismissal of federal court action seeking declaratory judgment that patent was invalid and that licensee's machine did not infringe patent, wherein licensee asserted no more than what would be defense to Colorado court contract action brought by patentee on license agreement, was not an abuse of discretion.") This is rule is founded on sound policy because otherwise Plaintiff would have to answer a declaratory action denying everything and saying see Complaint. Also, it would confuse a jury if the matter proceeds to that stage. Moreover, the declaration is simply unnecessary. If Defendant wins at trial, the jury's verdict will find him not liable.

Additionally, it should be noted that although Count V ostensibly involves copyright infringement, Defendant fails to allege or even address the elements of copyright infringement. *See generally*, Count V; *see also Medias & Co., Inc. v. Ty, Inc.*, 106 F.Supp.2d 1132, 1136 (D. Colo. 2000) ("To prove copyright infringement a plaintiff is required to show: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'") Instead, Defendant/Counter-Plaintiff repeats the irrelevant *ad hominem* attacks set forth in the great bulk of his Amended Counterclaim.

    G. Defendant Fails to State a Claim for Declaratory Judgment that <u>Plaintiff's Works are Not Entitled to Protections of United States Copyright Law</u>

Defendant's claim for a declaration that the works sued upon in Plaintiff's Complaint are not entitled to protection fails as matter of basic copyright law. "[T]he currently prevailing view" is that "no works are excluded from copyright by reason of their content." 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright*, § 2.17 (2008), *citing Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) ("*Mitchell Brothers*"). Sound policy reasons support the "Congressional intent to avoid content restrictions on copyrightability." *Id.*, at § 2.17. *See also Belcher v. Tarbox*, 486 F.2d 1087, 1088 (9th Cir. 1973) ("There is nothing in the Copyright Act to suggest that the courts are to pass upon the truth or falsity, the soundness or unsoundness, of the views embodied in a copyrighted work. The gravity and immensity of the problems, theological, philosophical, economic and scientific that would confront a court if this view were adopted are staggering to contemplate.").

The *Mitchell Brothers* is a seminal decision on the issue of avoiding content-based exclusions in copyright law. In *Mitchell Brothers*, accused infringers of a pornographic film asserted as an affirmative defense in the trial court—in the same manner that Defendant/Counter-Plaintiff does here—that the copyrighted material was obscene, and that the plaintiffs were barred from relief under the doctrine of "unclean hands." *Mitchell Brothers*, 604 F.2d at 854. Following the acceptance of the affirmative defense by the trial court, the Fifth Circuit reversed, holding there is not even a hint in the Copyright Act that obscene nature of a work makes it less copyrightable:

> [The Copyright Act's]… statutory language "all the writings of an author" is facially all-inclusive, within itself admitting of no exceptions. There is not even a hint in the language of s 4 that the obscene nature of a work renders it any less a copyrightable "writing." There is no other statutory language from which it can be inferred that Congress intended that obscene materials could not be copyrighted.

*Id.* (footnote omitted).

18

The *Mitchell Brothers* court then noted that the historical absence of any content-based restrictions in copyright law demonstrated that "Congress has seldom added restrictions on copyright based on the subject matter of the work, and in each instance has later removed the content restriction." *Id.*, at 855. Such congressional "additions and subsequent deletions," the *Mitchell Brothers* court noted, "suggest that Congress has been hostile to content-based restrictions on copyrightability." *Id.*

The court also articulated its position that obscenity concerns were inconsistent with the goal of furthering creativity:

> Obscenity law is a concept not adapted for use as a means for ascertaining whether creative works may be copyrighted. Obscenity as a constitutional doctrine has developed as an effort to create a tolerable compromise between First Amendment considerations and police power. It is an awkward, barely acceptable concept that continues to dog our judicial system and society at large. The purpose underlying the constitutional grant of power to Congress to protect writings is the promotion of original writings, an invitation to creativity. This is an expansive purpose with no stated limitations of taste or governmental acceptability. Such restraints, if imposed, would be antithetical to promotion of creativity. The pursuit of creativity requires freedom to explore into the gray areas, to the cutting edge, and even beyond. Obscenity, on the other hand, is a limiting doctrine constricting the scope of accepting of the written word.

*Id.*, at 856 (footnote omitted).

The Ninth Circuit followed *Mitchell Brothers* three years later in *Jartech, Inc. v. Clancy*, 666 F.2d 403 (9th Cir. 1982) ("*Jartech*"), which similarly reversed a trial court that had invalidated a copyright on obscenity grounds. The *Jartech* decision elucidated an additional, pragmatic reason to avoid an obscenity defense to copyright infringement:

> Pragmatism further compels a rejection of an obscenity defense. Under the dictates of *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973), obscenity is a community standard which may vary to the extent that controls thereof may be dropped

> by a state altogether.  *Paris Adult Theatres I v. Slaton*, 413 U.S. 49,
> 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973); *United States v. 2,200
> Paper Back Books*, 565 F.2d 566, 569-70 (9th Cir. 1977).
> Acceptance of an obscenity defense would fragment copyright
> enforcement, protecting registered materials in a certain
> community, while, in effect, authorizing pirating in another locale.

*Jartech*, 666 F.2d at 406.

Although the Fifth and the Ninth Circuit Courts are the only Circuit Courts to have addressed the issue that pornography is not copyrightable on obscenity grounds, the weight of their decisions is clear.  As noted in *Mitchell Brothers*, Congress historically has not enacted content-based restrictions on copyrightability, and has chosen not to do so even after these decisions.  As explained above, numerous reasons—from the legal to the creative to the pragmatic—militate against enacting such content-based restrictions.

Accordingly, the current Copyright Office position on the issue, as expressed in Compendium II of Copyright Office Practices, § 108.10, states: "Obscene or Pornographic Works. The Copyright Office will not ordinarily[5] attempt to examine a work to determine whether it contains material that might be considered obscene or pornographic."

In this regard, and during her tenure as Register of Copyright, Mary Beth Peters explained the rights of copyright holders in peer-to-peer infringement actions in the context of pornographic works to the Senate Judiciary Committee as follows:  "The law is unambiguous. Using peer-to-peer networks to copy or distribute copyrighted works without permission is infringement and copyright owners have every right to invoke the power of the courts to combat such activity.   Every court that has addressed the issue has agreed that this activity is

---

[5] The qualifier "ordinarily" was only made a consideration in 1991 as a policy decision regarding child pornography.

infringement."[6]    Ms. Peters explained that these types of suits are necessary to deter

infringement:

> [F]or some users of peer-to-peer technology, even knowledge that
> what they are doing is illegal will not be a sufficient disincentive to
> engage in such conduct.  But whether or not these infringers know
> or care that it is against the law, the knowledge that such conduct
> may lead to expensive and burdensome litigation and a potentially
> large judgment should have a healthy deterrent effect.  While we
> would like to think that everyone obeys the law simply because it
> is the law and out of a sense of obligation, we also know that laws
> without penalties may be widely ignored.  For many people, the
> best form of education about copyright in the internet world is the
> threat of litigation.  In short, if you break the law, you should be
> prepared to accept the consequences.  <u>Copyright owners have
> every right to enforce their rights in court, whether they are taking
> action against providers of peer-to-peer services designed to profit
> from copyright infringement or against the persons engaging in
> individual acts of infringement using such services</u>.

*Id*. (emphasis added).  She further added that "[c]opyright owners have every right to enforce

their rights in court…against the person engaging in individual acts of infringement using such

(peer-to-peer) services." *Id*.

 In this case, Defendant/Counter-Plaintiff fails to cite any authority supporting his claim

that Plaintiff's works are not entitled to copyright protection.  Instead, and as with the rest of his

pleading, Defendant/Counter-Plaintiff reverts once more to irrelevant and scandalous allegations

and *ad hominem* attacks, this time accusing Plaintiff of violating laws prohibiting "pimping,

pandering, solicitation and prostitution."[1]  Counterclaim, p. 51, at ¶ 13.  In brief, there is no

---

[6] *Pornography, Technology, and Process: Problems and Solutions on Peer-to-Peer Networks Statement of Marybeth Peters The Register of Copyrights before the Committee on the Judiciary*, 108th Cong. (2003), *available at* http://www.copyright.gov/docs/regstat090903.html.

[1] Interestingly enough, Defendant/Counter-Plaintiff feels at liberty to assert libelous and defamatory accusations of criminal conduct against Plaintiff without citing any factual or legal basis, but claims defamation when Plaintiff asserts claims for copyright infringement on clear factual allegations and legal grounds.  *See* Counterclaim, Count III.

reason to believe that the courts of the 10th Circuit would now disagree with established judicial precedent and public policy on the copyrightability of the works at issue. Defendant/Counter-Plaintiff's claim thus should be dismissed out of hand by this Court.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully moves for the entry of an order dismissing Defendant's Amended Counterclaim in its entirety.

Respectfully submitted,

By: /s/ *Jason Kotzker*
Jason Kotzker
jason@klgip.com
KOTZKER LAW GROUP
9609 S. University Blvd. #632134
Highlands Ranch, CO 80163
Phone: 303-875-5386
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on August 8, 2012, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that service was perfected on all counsel of record and interested parties through this system.

By: _/s/ Jason Kotzker_

# Qwest High-Speed Internet® Subscriber Agreement

This Qwest High-Speed Internet® Subscriber Agreement together with the exhibits and materials referenced herein ("Agreement") is between Qwest and the end user of the Qwest service(s) and equipment described below ("you" or "Customer"). For Customer convenience, this Agreement combines obligations of multiple Qwest entities, but does not create joint liability between the Qwest entities. The particular Qwest entity providing you Service, Equipment and/or Software and the provision and receipt of such is subject to all provisions of this Agreement, unless otherwise specified herein. Please review the Agreement carefully; it governs your use and Qwest's provision of the Service, Software, and Equipment.

BY ENROLLING IN, ACTIVATING, USING, OR PAYING FOR THE SERVICE AND/OR EQUIPMENT, FAILING TO RETURN THE EQUIPMENT AND CANCEL SERVICE WITHIN 30 DAYS AFTER ORDERING SERVICE OR EQUIPMENT, OR INSTALLING THE EQUIPMENT YOU AFFIRM THAT YOU UNDERSTAND AND AGREE TO THE TERMS AND CONDITIONS IN THIS AGREEMENT, EVEN IF YOU CHOOSE NOT TO READ IT. FURTHER, YOU AFFIRM THAT YOU UNDERSTAND AND AGREE TO THE PRICES, CHARGES, AND OTHER TERMS AND CONDITIONS QUOTED TO YOU DURING THE ORDERING PROCESS AND ON www.qwest.com/legal/highspeedinternetsubscriberagreement/ and www.qwest.com/legal, ALL OF WHICH ARE INCORPORATED BY REFERENCE, AND YOU REPRESENT THAT YOU ARE OF LEGAL AGE TO ENTER INTO THIS AGREEMENT AND ARE BOUND BY IT. IF YOU DO NOT AGREE TO ALL OF THE TERMS AND CONDITIONS IN THIS AGREEMENT (INCLUDING FUTURE REVISIONS), DO NOT USE THE SERVICE OR EQUIPMENT, CALL QWEST AT 1 800-244-1111 (Consumer/Residential accounts), 1 800-603-6000 (Small Business accounts), or 1 800-777-9594 (Global/Business & Government Services accounts) TO CANCEL THE SERVICE IMMEDIATELY, AND RETURN THE EQUIPMENT TO QWEST ACCORDING TO THE RETURN POLICY & PROCEDURE FOUND IN THE EQUIPMENT BOX (BLACK & WHITE CARD) OR IN THE USER MANUAL ("User Manual").

## 1. Definitions.

"*AUP*" means the Qwest Acceptable Use Policy posted at http://www.qwest.com/legal/, including all future revisions.

"*Equipment*" means Qwest-provided modem(s) and equipment to enable networking which may include without limitation USB adaptors and/or wireless cards.

"*Force Majeure Event*" means an unforeseeable event beyond the reasonable control of a party, including without limitation: act of God; fire; flood; labor strike or unrest; sabotage; cable cuts; acts of terror; power shortage or power failure, e.g., rolling blackouts; material shortages or unavailability or other delay in delivery not resulting from Qwest's failure to timely place orders therefore; lack of or delay in transportation; government codes, laws, regulations, ordinances, rules, or restrictions; war or civil disorder; or failures of suppliers of goods and services.

"*Late Charge*" is the portion of the payment not received by or immediately available to Qwest by the due date multiplied by the highest lawful amount for commercial transactions in the state you receive Service, Equipment, and/or Software in.

"*MRCs*" means monthly recurring charges.

"*NRCs*" means non-recurring, one-time charges.

"*Qwest*" means the affiliate of Qwest Services Corporation that provides you the Service, Software, and/or Equipment.

"*Regulatory Activity*" means any regulation and/or ruling, including modifications thereto, by any regulatory agency, legislative body or court of competent jurisdiction.

"*Service*" means all of the services you receive from Qwest from the following list: Qwest High-Speed Internet® (formerly called Qwest® Broadband, Qwest DSL® or IDSL); Pure Broadband, Qwest Connect® Internet Basic, Qwest® Office Basic (formerly called Qwest Choice™ Internet Basic), and Qwest® Office Plus (formerly called Qwest Choice™ Internet Prime), MSN® Premium or Windows Live™ from Qwest, or other Qwest-provided Internet access service; Qwest® Home Network Backer™; Qwest® Office Network Backer™; Qwest® Message Manager (formerly qHome™); additional services described in the Service Description Section below, and related Qwest installation, repair, support and provisioning. "Service" when used in the Service Description Section below refers to the specific service being described.

"*Taxes*" means foreign, federal, state and local taxes, surcharges, other similar charges, and any other imposition that may be passed on by Qwest to Customer.

## 2. Service Description.
Qwest Corporation ("QC") and/or Qwest Broadband Services, Inc. ("BSI") will provide, and you will purchase the Service. Further details regarding the Service may be provided in product literature, user manuals, and on www.qwest.com and are incorporated herein by reference. Qwest High-Speed Internet® is also part of Office Basic and Office Plus service. Office Basic and Office Plus customers are also subject to Section 2(a) below.

(a) <u>Qwest High-Speed Internet®</u>.

    (i) Qwest will provide Qwest High-Speed Internet® service that runs over the same line as your Qwest wireline telephone line (except for IDSL). If you do not have a Qwest wireline telephone line, Qwest will provide stand-alone Service that runs over a physical connection to your location. You must specify a Qwest telephone number to use with the Service (unless you order stand-alone Service). Qwest may terminate your Service or charge you for stand-alone Service if you change your Qwest local telephone service to another company, or move your Qwest local telephone service to a wireless service provider.

Copyright © Qwest. All rights reserved.
v33.041511

1



**EXHIBIT A**

(ii) *Availability.* Qwest High-Speed Internet® service may not be available in all areas or at the rates or speeds generally marketed. The speed(s) available at your location are identified during the ordering process. Service speeds are "up to" and Qwest will provision your line at the maximum speed it qualifies for within the speed range of the Service you selected. Your location may subsequently be eligible for additional speed options; provided that you will be charged a speed change charge for any speed change. Additionally, some ISPs may not be supported for all speeds and in all areas and, if you change speed you may no longer be able to utilize the ISP you originally selected. Availability of service depends on availability and limits of Qwest wire centers and facilities. Service will not be provided using unsuitable facilities or if provision of Service creates interference with other services. Service is offered only to location(s) qualified by Qwest line qualification procedures. Some lines may not qualify for the Service even if initial tests qualified such lines. Speed and availability of Service are not guaranteed and may be limited by a variety of factors including but not limited to the physical condition of your line and wiring at your location, your service location, phone line qualifications, computer performance/configuration, and network/Internet congestion. Service is provided on a per-line basis, and the actual throughput and connection speed of your Service depends on a number of factors such as Internet traffic and congestion or bandwidth, distance of your home from a Qwest central office, viruses or spyware, server speed of the Web sites you connect to, traffic and congestion on your home network or corporate LAN, and Windows PC settings, in addition to the factors listed above. Uninterrupted or error-free Service is not guaranteed and Qwest may limit speeds.

(iii) *Moves.* If you move to another location (including a move within the same building) you are not guaranteed to have Service at the new location. Your line must be re-qualified for Service at any new location and MRCs and NRCs applicable to new Service will apply.

(iv) *Qwest Facilities and Equipment to Provide Service; Licenses.* Certain Qwest facilities and equipment used to provide you high-speed Internet service may be located on your premises. These facilities and equipment are the property of Qwest and must be installed, relocated, rearranged, tested, inspected, and maintained only by Qwest. You are responsible for damage to such facilities and equipment resulting from your negligence (including failure to reasonably prevent damage by others) or willful conduct. You may not attach or connect anything to the Qwest facilities or equipment unless authorized by Qwest. Any unauthorized attachments or connections may be removed or disconnected by Qwest and your Service may be suspended or terminated as a result. You agree to provide Qwest access to your premises at reasonable hours if necessary to terminate or cancel Service or to maintain or remove the facilities and/or equipment. Qwest is not liable for defacement or damage to your premises resulting from the existence of Qwest facilities or equipment and associated wiring, or from the installation or removal thereof, when such defacement or damage is not the result of Qwest negligence. You may be required to provide, install, and maintain, at your expense, certain items such as appropriate space and power, and rights or licenses, to receive high-speed Internet service, if such items are not already in place. These items may include without limitation suitable commercial power, power wiring and outlets, housing, heat, light, and ventilation for the operation of telephone facilities, rights to use or install pathways, shafts, risers, conduit, telephone closets, interior wiring, service areas, racks, cages, utility connections, entries and/or trench (for purpose of providing entrance facilities into multi-unit housing complexes, commercial properties or business developments to reach points of termination).

(b) *Internet Access.* You must select a qualifying Internet access provider at the time you order Qwest High-Speed Internet® service. If you select a provider other than Qwest (Qwest Connect® Internet Basic, Qwest Choice™ Internet Prime, Qwest® Office Basic, Qwest® Office Plus, or other Qwest-provided Internet access service), this Agreement does not apply to your Internet access service (but does apply to all other Services, Software, and Equipment you receive from Qwest) and you will be subject to the third-party provider's terms. After commencement of your high-speed Internet service, if the provider you selected either: (1) no longer has a relationship with Qwest, (2) you change speeds, and your current ISP is not supported at the new speed; or (3) will no longer offer the service in your area, Qwest may contact you to determine a qualifying replacement provider. In such situation, Qwest will allow you to move to a replacement provider and will waive the associated destination change charge. Qwest may charge you a destination change charge for any other change in Internet service provider.

(i). *Account Usage and Password.* You will receive a user name and password upon completing the registration process. You are responsible for maintaining the confidentiality of the user name and password, and are fully responsible for all activities that occur under your user name or password including payment for all such activities. You agree: (A) that only you and your authorized designees will use your user name and password and that you will not transfer or disclose either your user name or password to any other person, (B) to immediately notify Qwest of any unauthorized use of your user name or password or any other breach of security, and (C) to ensure that you exit from your account at the end of each session. "Authorized designees" means members of your family or business associates that you, at your own risk and responsibility, permit to access the Internet access service using your user name and password. You must ensure that any such authorized designees will comply with this Agreement and you will be responsible for all use of the Internet access service and any other services accessed through the Internet access services on your account whether or not authorized by you. You acknowledge that you are aware that certain content accessible through the Internet access service may contain material that is unsuitable for minors. Accordingly, you agree to supervise any minor's use of the Internet access service through your account. Qwest will not be liable for any loss or damage arising from your failure to comply with this Section. QWEST RECOMMENDS USE OF COMMERCIALLY AVAILABLE CONTENT FILTERING SOFTWARE.

(ii). *E-mail Storage Space and Other Limitations.* Your mailbox storage space, the size of outgoing and incoming e-mail, and the number of mailboxes available to you are limited. Limits are based on your Service type and are listed at http://sitecontrol.qwestoffice.net, http://www.qwest.net, and http://my.qwest.net/nav4/help/your_acct/quota_warning.html. When a mailbox reaches its limit, you will not be able to receive or send e-mail. Additionally, e-mail that exceeds the size limit will not be delivered, and you will receive a notice that the e-mail was too large. Qwest e-mail accounts may not be used for purposes of distributing and storing excessive amounts of multimedia files. Multimedia files are defined as any graphics, audio, and video files. Additional User IDs provided for e-mail boxes are not intended for use as dial-up connections. Any usage associated with

Copyright © Qwest. All rights reserved.
v33.041511

2

additional e-mail box User IDs will be charged the per-hour rate associated with usage above the monthly allotment for dial-in access (where available).

(iii) *Only you may use your e-mail account.* You must keep your e-mail accounts and passwords confidential and not authorize any third party to access or use the e-mail accounts on your behalf. You must contact us right away if you suspect misuse of your e-mail accounts or any security breach in the Service. For some parts of the Service, you may be able to set up additional accounts that are dependent on your account ("associated accounts"). If you use associated e-mail accounts, you represent and warrant that you are authorized to accept this contract on behalf of the individuals using those e-mail accounts. You are responsible for all activity that takes place with your Service account and any associated e-mail accounts. If you use an associated e-mail account, you acknowledge that the holder of the Service account has full control over your associated e-mail account. If you establish any associated e-mail accounts, you understand and agree that the holder of the Service account may: manage your e-mail account, reset your password, or suspend or cancel your account; view your account's usage and profile data, including how and when your account is used; and read or store content in your account, including electronic communications, contact lists, and other information. You hereby indemnify Qwest for any claims, costs, and/or damages incurred as the result of any e-mail account holder, associated with your Service account, asserting that the Service account holder accessed the account or its contents in excess of the Service account holder's authority.

(iv) *NationWide Roaming Service and Dial-In Numbers.* (This service has been grandfathered effective November 6, 2008, and is only available to customers who ordered Qwest.net dial up or Qwest High-Speed Internet® Service prior to that date.) Qwest Choice™ Internet Prime customers have 10 hours of local dial-in access via the NationWide roaming numbers included in their package price. If you use the Qwest.net NationWide Roaming ("NWR") service, this Section also applies to your use of the Service. All Qwest dial-up numbers are subject to change immediately without notice.

   (A) You are responsible for checking the availability of the NWR service for the particular city where you use the NWR service. Local numbers are offered in each of the 48 contiguous states, but may not be available in all cities. The available NWR numbers are posted on the www.qwest.net. Use of unpublished NWR numbers is prohibited and you are solely responsible for any and all charges associated with using unpublished numbers.

   (B) Simultaneous use of NWR numbers is prohibited and may result in termination of your Internet access service. You are responsible for any charges associated with simultaneous use of NWR service regardless of whether your Internet access service has been terminated.

   (C) Qwest is not responsible for any toll, long-distance or other charges in the event access to the Internet access service is not provided via a local telephone number. You will pay for any long-distance, toll, or other charges you incur and you are solely responsible for determining if use of a particular dial-up number will cause you to incur long-distance, toll, or other charges.

   (D) The Internet access service is also subject to "idle time-outs" whereby a session for a dial-up account is disconnected because it has been idle for a specified period of time (activity does not include any data generated by an automatic re-dialer, script or other program that runs on the user's computer system for the purpose of avoiding inactivity disconnects).

(v) *Change of Service.* A change of Service could lead to the loss of stored e-mail. Such loss may ordinarily be prevented by saving such e-mail on your personal computer prior to the change of Service. Customer will not hold Qwest liable for the loss of e-mail during the change of Service process, whether caused by Customer or Qwest.

(vi) *Web Hosting Service.* Some Qwest customers are eligible to receive one of three optional Web hosting packages, described more fully on the Qwest Web site. Additional charges may apply. If you are an eligible Web hosting customer, Qwest will provide the Services described for the package you select, including space on a shared Web server for your Web site, as well as assistance with domain name registrations. If you use the Web hosting feature of the Services, this section also applies to your use of the Services.

   (A) Customer Responsibilities. You acknowledge and agree that:

      (1) the use of your Web site and any content, information, and all other aspects of your Web site will comply with the AUP and any applicable laws and will not violate any rights of another;

      (2) you are solely responsible for the content, quality, performance, and all other aspects of the information or other content contained in or provided through your Web site; and

      (3) Qwest has no interest in, nor control over, any of the content or information that is accessible on your Web site. Qwest may, without prior notice, terminate or suspend your Web site if Qwest believes that you have violated this section.

   (B) Domain Name.

      (1) Use of Domain Name. If Qwest provides you with a domain name that has Qwest's name or marks embedded therein ("Qwest Domain Name"), you may only use the Qwest Domain Name during the term of the Agreement. Qwest owns and has the right to change the Qwest Domain Name. Other than for identifying the location of your Web site, you may not issue any public announcement regarding this Agreement or use the name or any marks of Qwest or any of its affiliates without the prior written approval of Qwest.

Copyright © Qwest. All rights reserved.
v33.041511

3

(2) Renewal of Domain Name. If you have obtained a Qwest Domain Name, you may request that Qwest automatically renew your Qwest Domain Name registration annually. You will be charged an Annual Domain Name Registration fee for each such renewal. If you do not request Qwest to automatically renew your Qwest Domain Name, you will be responsible for renewal.

(3) Expiration or Termination of Domain Name. If your Qwest Domain Name expires, it will be placed in redemption status starting thirty (30) days after expiration. The redemption status period lasts for up to thirty (30) days. If you ask Qwest to reinstate your Qwest Domain Name during the redemption status period, you will be charged a domain name reinstatement charge. Your e-mail and Web hosting will not function while your Qwest Domain Name is in redemption status. Your Qwest Domain Name may not be reinstated after the redemption status period has expired. Please consult the Qwest High-Speed Internet® rate card ("Rate Card") applicable to you for details. The Rate Card is posted at: http://www.qwest.com/legal/highspeedinternetsubscriberagreement/. If you want to terminate your Qwest Domain Name, please contact Qwest at http://sitecontrol.qwestoffice.net to request termination. You will need to specify that you would like to cancel your Qwest Domain Name. The cancellation of your Qwest Domain Name does not automatically terminate your Web site or other Service under this Agreement.

(C) Web Hosting Storage Space and Other Limitations. Your Web hosting storage space is limited. Limits are based on your Service type and are available at http://sitecontrol.qwestoffice.net and http://www.qwest.com/smallbusiness/internet/qwestnet_features.html. Qwest Web hosting accounts may not be used for purposes of distributing and storing excessive amounts of multimedia files. Multimedia files are defined as any graphics, audio and video files. Any Web hosting site whose disk space usage for storing multimedia files exceeds 70% of its total usage in terms of total size or number of files will be considered to be using an excessive amount.

(D) Traffic Allowance. Traffic limits are located at http://sitecontrol.qwestoffice.net. If you exceed your traffic allowance, you will be charged a traffic overage charge depending on the resources utilized, and you may be given the option to either (a) reduce the resources used to an acceptable level, or (b) upgrade your Service to a higher priced plan.

(E) Databases. Any database stored on Qwest's servers will be limited in size to 10% of the total disk space allotted for that particular domain's plan/Web site account.

(F) Ownership of Web Site. The legal owner of any Web site or account with Qwest will be the individual or organization whose name is listed in Qwest's database as the owner. Customer will fully cooperate with and abide by any and all of Qwest's security measures and procedures in the event of any dispute over ownership of Customer's Web site or account with Qwest. You own all graphics, text or other information or content supplied by you for incorporation into or delivery through your Web site. Qwest owns any software developed or modified by Qwest and all graphics, text or other information or content materials supplied by Qwest for incorporation into your Web site ("Qwest Materials"). You may only use the Qwest Materials in association with your Web site, and only during the term of this Agreement.

(vii) *Web Design Services.* Qwest customers purchasing the Grow Essentials or Grow Complete packages ("Packages") under the Agreement are eligible to receive optional Web design services, described more fully on the Qwest Web site. If you are an eligible customer, the Web site design terms and conditions ("Design Terms") in this section will also apply to any Web design Services you order. If these Design Terms conflict with any others provisions of the Agreement, these Design Terms will prevail for purposes of the Web design Services only. Charges for Web design Services are set forth in the Rate Card posted at http://www.qwest.com/legal. Qwest may subcontract all or a portion of the Web design Services. Actual work may be performed by Qwest or other third parties selected by Qwest. A minimum service term ("MST") of 12 months is required for the Grow Complete Package. Qwest will not include any customized Web design Services that you request.

(A) Detailed Web Design Service Descriptions. If you order Web design Services ("Design Services"), Qwest will provide you with services included in the Package you select as further described below. For the Grow Complete Package and Additional Pages, Qwest will deliver your Web site project within approximately ten to eighteen business days. However, this estimate is based on your ability and availability to consult with your Account Manager. If you are unable to provide times when you are available for your consultations, neither Qwest nor its partners may be held responsible for meeting this timeframe. You will be given an estimated completion date at the time of sale. The 10 to 18 day delivery time begins once all Content (defined below) has been submitted to the Qwest design team by you.

(1) Grow Essentials Package. Qwest will provide you with access to a Web design tool and templates, plus additional support described on the Qwest Web site to assist you with creating your Web site.

(2) Grow Complete Package Design Services. Design Service described in this section consists of a template-based Web site, and includes an online Quote Request/Contact Us form. You understand and agree that Qwest will provide a template-based Web site in accordance with the information provided by you during the discovery / intake phase of development. After Qwest receives all complete information from you, Qwest will deliver a mock-up site for your review prior to the Web site entering the development phase. The mock-up will give you the opportunity to ensure the Web site meets the template specifications. Once the mock-up is approved, development will begin. When development is completed, the initially-developed Web site ("beta site") will be presented to you for final approval and one-time Content modification. Editing beyond correction of Content will be considered as additional services and will be billed as such.

Copyright © Qwest. All rights reserved.
v33.041511

4

Qwest will attempt to contact you once the Web site is completed and ready to publish. If you do not respond within 5 business days, the Web site will be deemed accepted by you and Qwest will deem the Service engagement completed.

(3) Additional Pages for Grow Complete Package. Additional pages (beyond the number allowed under the Grow Complete Package) ("Additional Pages") may be added to your template Web site design for an additional, per-page set fee set forth in the Rate Card. The charge for an additional page includes no more than one hour of designer time. Any further customizations or time needed to create an additional page will incur an additional fee, to be quoted by Qwest. You understand and agree that Qwest will provide additional pages in accordance with the information provided by you in the submittal form sent via e-mail and subsequent telephone interviews. After Qwest receives all complete information from you, Qwest will deliver a beta site for your review. The Web site modifications will be made available for you to view prior to hosting for purposes of editing for corrections to Content only. Editing beyond correction of Content will be considered as additional services and will be billed as such. Qwest will attempt to contact you once the additional pages are completed and ready to publish. If you do not respond within 5 business days, the pages will be deemed accepted by you and Qwest will deem the Service engagement completed.

(B) Your Responsibilities. You acknowledge and agree that: (a) The setup and other fees applicable to the Grow Complete Package and Additional Pages are non-refundable once development work has commenced. It is your sole responsibility to ensure that Qwest receives all necessary Content before design work begins. No design work will be initiated until all required content is provided to Qwest. (b) You must send Content to the Qwest design team in electronic format. Fax copies and handwritten or typed hardcopy letters cannot be accepted. (c) Web page development commences once your written submittal form is submitted via e-mail and your Content has been provided to Qwest. (d) Once you receive a beta site from the Qwest design team, you have 5 business days to respond with approval or revisions. Upon approval, or if there is no response from you within 5 business days, the Web site will be deemed accepted by you and Qwest will deem the service engagement completed. (e). If you have revisions to the beta site, the Qwest design team will complete the revisions and send you a final proof of the Web site. You will be given an additional 5 business days to approve or make final alterations to Content before the Web site is deemed accepted by you and Qwest deems the service engagement completed. (f) YOU ARE RESPONSIBLE FOR THE ACCURACY AND APPROPRIATENESS OF ALL DATA AND CONTENT WITHIN YOUR WEB SITE, INCLUDING ACCURATE SPELLING AND GRAMMAR. QWEST WILL NOT BE HELD RESPONSIBLE FOR INACCURATE INFORMATION AND ANY POTENTIAL DAMAGES CAUSED BY SUCH INACCURACIES. (g) You understand that the Qwest design team will not maintain copies of files or documents that are sent by you, and that you are solely responsible for backing up this data. Furthermore, Qwest retains all ownership and proprietary rights in all source codes developed by Qwest. (h) You understand and agree that Qwest's performance under these Design Terms will be dependent upon your timely and satisfactory performance of your responsibilities. If Qwest is unable to perform or is delayed in performing its responsibilities under these Design Terms as a result of your delay or failure to perform your responsibilities, the parties will discuss, mutually agree to and document, in a change order, any modified roles and/or fees associated with such delay or failure.

(C) Fees. Fees applicable to the Packages and Additional Pages are described in the Rate Card, available at http://www.qwest.com/legal. All fees will be automatically charged to the credit card you provide when you sign up for the Services. The terms and conditions in Section 11 of this Agreement will also apply. Qwest may alter its fees as provided in this Agreement. All payments for the Packages and Additional Pages are non-refundable and may not be credited back unless otherwise provided in subpart (F) below.

(D) Rights and Licenses.

(1) Definitions.

Your "Content" means all content or information (including, without limitation, any text, music, sound, photographs, video, graphics, data, or software), in any medium, provided by you to Qwest.

"Qwest Materials" means all content, software, source code or other programming material owned by Qwest or its suppliers and used in the development, display or running of a Web site.

"Third-Party Materials" means any content, software, or other computer programming material that is owned by an entity other than Qwest , and licensed by Qwest or generally available to the public, including you, under published licensing terms, and that Qwest will use in the development of or to display or run a Web site. The graphics utilized from Qwest's graphics library are licensed from third-party suppliers.

"Background Technology" means computer programming/formatting code or operating instructions developed by or for Qwest and used to create any portion of a Web site or used to operate the Web site or a Web server in connection with a Web site. Background Technology includes, but is not limited to, any files necessary to make forms, buttons, checkboxes, and similar functions and underlying technology or components, such as style sheets, Web site templates, animation templates, interface programs that link multimedia and other programs, customized graphics manipulation engines, and menu utilities, whether in database form, dynamically driven, or provided in any other format. Background Technology does not include any of your Content or any derivatives, improvements, or modifications of your Content.

(2) Right to Web Site. Until full payment of fees has been made to Qwest for Services rendered, Qwest will have no obligation to deliver the Web site developed to you, including your Content. Upon full payment of fees, Qwest will grant to

Copyright © Qwest. All rights reserved.
v33.041511

5

you all rights, title and interest in the Web site, with the exception of any Qwest Materials, Third-Party Materials, and Background Technology, as defined in subpart (1) above.

(3) Limited License to Qwest Materials, Third-Party Materials and Background Technology. Subject to these Design Terms, Qwest hereby grants you a perpetual, nonexclusive license to copy, distribute, transmit, display and perform any and all Qwest Materials, Third-Party Materials, and Background Technology that is incorporated into your Web site, in whole or in part, solely as necessary for you to operate, maintain, and make the Web site available in the normal course of your business. You may not duplicate or distribute any Qwest Materials, Third-Party Materials or Background Technology to any third party without the prior written consent of Qwest. All ownership and proprietary rights in the Qwest Materials, Third-Party Materials, and Background Technology remain at all times with the respective owner thereof, and nothing herein transfers or assigns any rights or interest therein except the licenses granted thereto. All rights to the Qwest Materials, Third-Party Materials and Background Technology not expressly granted to you hereunder are retained by Qwest. Qwest reserves the right to re-use Qwest Materials, Third-Party Materials and Background Technology used to develop your Web site in the development of another customer's website. Without limiting the foregoing, you agree not to reverse-engineer, reverse-assemble, decompile, or otherwise attempt to derive any source code of the Qwest Materials, Third-Party Materials or Background Technology, except as allowed by law.

(4) Limited License to Content. Your Content and material derivatives, improvements, or modifications thereof will at all times remain your sole property. You hereby grant to Qwest the limited, nonexclusive right and license to copy, distribute, transmit, display, perform, create derivative works from, modify, and otherwise use and exploit your Web site, any of your Content, or any of your marks provided to Qwest hereunder, solely for the purpose of rendering the Web site design Service under these Design Terms. Such limited right and license will extend to no other materials or for any other purpose and will terminate automatically upon termination of these Design Terms for any reason.

(E) Content Standards. You are solely responsible for all Content you provide to Qwest hereunder. You covenant that your Content will not: (a) be false, inaccurate or misleading; (b) infringe or misappropriate any third party's copyright, patent, trademark, trade secret or other proprietary rights or rights of publicity or privacy; (c) violate any law, statute, ordinance or regulation (including, but not limited to, those governing privacy, publicity, export control, consumer protection, unfair competition, antidiscrimination or false advertising); (d) be defamatory, trade libelous, unlawfully threatening or harassing, or advocating, promoting or providing assistance involving violence, significant risk of death or injury, or other unlawful activities; (e) be obscene or contain child pornography; (f) contain any viruses, Trojan horses, worms, time bombs, cancelbots, easter eggs or other computer programming routines that may damage, detrimentally interfere with, surreptitiously intercept or expropriate any system, data or personal information; (g) link directly or indirectly to or include descriptions of goods or services that violate any applicable law, statute, ordinance or regulation, or that violate Qwest's AUP that is incorporated herein by reference and may be amended from time to time.

(F) Term and Termination. The term of the Grow Essentials Package commences when you submit an order for such Services, and continues on a month-to-month basis. The term of the Grow Complete Package commences when you submit an order for such Services, and continues for a 12-month MST. You may terminate your Package at any time by contacting our billing department or your Account Manager. For the Grow Complete Package, you are entitled to a 100% refund within 30 days of order assuming that you have not entered into the Pre-development/Mock-up phase. The Pre-development/Mock-up phase begins when an Account Manager has been assigned to your project, and has commenced working on your Web design, including gathering Content and information from you and consulting with you regarding your Web site design. If you have entered the Pre-development/Mock-up phase, you are entitled to a 50% refund should you decide to terminate before entering the Development phase and within the first 30 days after order. After 30 days from purchase, or once the Development phase has begun, all fees are non-refundable and no refunds will be given. The Development phase begins when your project is assigned to Qwest's Web development team, and any design work has commenced. Any refunds will be credited to your credit card to which the Services were originally billed. Termination of your Package does not terminate other services, commitments and contracts you may have with Qwest. Except as provided above, if you terminate your Package prior to expiration of the MST (or if Qwest terminates for Cause), you will be charged an early termination charge equal to the monthly recurring charge for your Package for any months remaining in the MST, plus any charges for Services accrued but not yet paid ("Cancellation Charge"). For all terminations of any Package(s), Qwest will not retain a copy or a backup of any of Your Content and other data and such Content or data cannot subsequently be restored by Qwest. Qwest may: (a) terminate these Design Terms upon seven (7) days written notice for any reason; or (b) immediately suspend or terminate your use of the Package and destroy any of your Content (provided to Qwest for the Grow Complete Package), including all contents of the Web site, if Qwest, in its sole discretion, concludes that you (1) have engaged in illegal activities, in activities or sales that may damage the rights of Qwest or others, or (2) have violated or threatened to violate Qwest's AUP, the Design Terms, the terms of this Agreement or any other agreement you may have with Qwest. Any suspension or termination under subpart (b) of this paragraph may take effect immediately. Termination under subpart (b) will be considered a termination by Qwest for "Cause". If Qwest terminates your Package in connection with subpart (b), you will not be entitled to a refund or credit of any fees you have paid, and you may be subject to a Cancellation Charge. Without limitation, you expressly acknowledge and agree that in addition to this subpart (F), the terms and conditions in Section 12 (Term and Termination) of the Agreement also apply to termination of the Package. In the event of a conflict between this subpart (F) and Section 12 of the Agreement, this subpart (F) will prevail. Subpart (B)(g) and Sections (D) and (E) will survive the termination or expiration of these Design Terms.

Copyright © Qwest. All rights reserved.
v33.041511

(viii) *Optional Qwest Office Backup Service.* This section does not apply to Qwest Personal Digital Vault Service ("QPDV"). QPDV is purchased under a separate agreement available at http://www.qwest.com/legal/digitalvault/. Prior to using the Qwest Office Backup, you must activate the Service via SiteControl. Additional Qwest Office Backup Service plans are available to Office Plus customers as an option at the rates shown in the Business Rate Card. System requirements and features of the Service are set forth at http://help.qwestoffice.net/. The following additional terms and conditions apply to your use of Qwest Office Backup Service:

(A)     Use of the Service requires download of software to your PC. During the download process, you will be asked to review and agree to the terms of a third-party end user license agreement ("EULA").

(B)     The Service provides remote storage and backup capability of data from your PC's hard drive. Storage space available for backups is limited by the plan you select. If you exceed the storage space allotted to you for your plan, you will receive an error message, and backup will not proceed until you either delete unneeded files from your backup so that sufficient storage space becomes available, or you purchase a plan with sufficient additional storage space. Deleting files removes them from all stored backup versions, and they will no longer be accessible for recovery. You will be solely responsible to determine what data gets backed up, and the backup intervals.

(C)     If you access Qwest Office Backup Service from outside of the United States, any information that you transmit through the Service will be transferred to the United States and stored in servers located there, which may be owned and maintained by a third party processor. Qwest contractually requires such processors to maintain your personally-identifiable information under specific confidentiality terms which comply with United States law. Your information may be subject to less protective data protection laws than the country in which you are located.

(D)     Qwest Office Backup Service is not an archival service. You are solely responsible to maintain original versions of your files on your personal computer that you backup. Access to your files through your Qwest Office Backup account will cease upon termination or expiration of your account.

(ix) *Qwest @Ease™ Plans.* Qwest @Ease is available to residential Qwest High-Speed Internet customers, subject to certain restrictions and limitations. The Qwest @Ease $0.00 Plan is provided at no additional charge to Qwest High-Speed Internet customers, however not all features of the Qwest @Ease $0.00 plan are available to customers with Qwest Internet Basic or customers who have ISP or Internet access service provided by a third party. Other Qwest @Ease plans with additional features are available to residential customers for an additional charge, as shown in the Consumer Rate Card found at http://www.qwest.com/legal/highspeedinternetsubscriberagreement/. Details regarding restrictions and the services included in each plan are located on http://www.qwest.com/ease and in the Consumer Rate Card. You will be asked to agree to additional terms and conditions related to some services under the Qwest @Ease plans at the time of installation or use of those services.

Certain Qwest @Ease™ Plan(s) include advanced home networking setup and maintenance Service as further described at http://www.qwest.com/ease. The following additional terms and conditions apply to the Qwest @Ease advanced home networking Service.

(A) Service is only available with those Qwest @Ease Plans which specifically include it as further described in the Rate Card. Service is available to residential customers only and must be purchased per physical location and per high-speed Internet line. Service is only available with networking equipment (e.g., modems and other wireless networking devices) leased from Qwest. Qwest certified technician results may vary, depending on a number of factors, including but not limited to, the type and condition of Customer-provided software, equipment and other peripherals. Qwest will use reasonable efforts to connect Customer devices to the network device. However, successful networking setup and maintenance are not guaranteed. Modem port forwarding may need to be configured for specific network devices. Configuration of network devices for specific functionality and demonstration of how to use network devices is not included in the Service.

(B) You may cancel your Qwest @Ease plan that includes advanced home networking service by contacting Qwest as provided in the second paragraph of this Agreement.

(C) Advanced home networking Service includes:

- 24/7 technical support for connectivity and security settings for covered equipment;
- Same day or next day on-site support for networking maintenance for covered equipment;
- Enabling of wireless encryption for wireless networks;
- Assistance connecting your peripheral devices (1 network device, 1 printer and up to 5 computers (with a maximum of 7 peripheral devices, including both computers and game consoles) to the network;
- Configuration of high-speed Internet application software that is supported as part of your Qwest @Ease Plan.

(D) Service does not include any items not specifically listed as included above, including without limitation:

- Issues related to the establishment or use of a wireless fidelity ("WiFi") hotspot.
- Issues that exist prior to successful installation of networking equipment, establishment of an operating network, or prior to ordering Service.
- Issues reported after the termination of Service.
- On-site support prior to successful installation of networking equipment and establishment of an operating network.
- Issues resulting from your intentional abuse, misuse, or negligence.

Copyright © Qwest. All rights reserved.
v33.041511

- Repair or replacement of any equipment or connections (whether Qwest certified or not), except as provided in the limited warranty provisions below.
- Installation of devices that are not part of the network, including without limitation fax machines, scanners, routers, hubs and switches.
- Support of a network that contains any devices not supported by Qwest.  Please see supported devices on http://www.qwest.com/ease.
- Support of a network on an operating system that does not meet Qwest's minimum system requirements.
- Security of your network and data.
- Issues with software, other than software support provided as part of your Qwest @Ease $12.99 Plan.
- Removal of viruses, spy ware, and ad ware, other than via PC Tune Up or one of the Norton™ products provided as part of a Qwest @Ease Plan.
- Configuration of network devices for specific functionality and demonstration of how to use network devices
- Printer drivers, cables to connect Customer equipment to the networking modem, NIC card or wireless equivalent.

(x)  *Additional Features and Applications.*  Additional features and applications may be provided as part of the Service.  Additional charges may apply.  Please consult the Rate Card for details.

(xi)  *Chat Rooms.* .Qwest does not allow customers to install their own chat rooms, since chat rooms require significant system resources.  However, for an additional charge, Qwest will provide a chat room for your use.  Please see the Rate Card for details.

(xii)  *Changes to Your Plan.*  You may elect to change to a lower priced Web hosting plan on the same platform.  Additionally, you may elect to upgrade to a higher priced plan on the same platform.  No charge will apply for upgrades/downgrades.  Requests for upgrades or downgrades should be directed to:  http://sitecontrol.qwestoffice.net.

(xiii)  *Qwest web.help Service.*  If you type a nonexistent or unavailable Uniform Resource Locator ("URL"), or enter a search term into your browser address bar, the Qwest web.help service will present you with a Qwest web.help search page containing suggested links based upon the nonexistent or unavailable URL or query you entered, rather than an NXDOMAIN or similar error message or a redirection from your browser or toolbar software. If you have made a typing error in the browser address bar whereby you get the main name of the entity right but the prefix or suffix wrong (such as wwww.qwest.com or www.qwest.con), Qwest web.help may correct the error and take you directly to that entity's home page (in this example, www.qwest.com – Qwest's home page).  The Qwest web.help service may impact applications that rely on an NXDOMAIN or similar error message and may override similar browser-based or toolbar-based search results pages. If you would prefer not to receive the Qwest web.help service, you should follow the opt-out instructions that are available by clicking on the "http://www.qwest.net/web.help/" link on the Qwest web.help page.

(c)  Networking – Qwest® Home Network Backer™ and Qwest® Office Network Backer™ (This Service has been grandfathered effective August 21, 2008, and is only available to customers who ordered Qwest Home Network Backer or Office Network Backer prior to that date).

(i)  Qwest's Home Network Backer™ and Office Network Backer™ (collectively "Network Backer") services are only available to Qwest High-Speed Internet® customers (excluding IDSL) who also purchased Qwest-provided networking equipment and Qwest-provided Internet access and must be purchased per physical location and per high-speed Internet line.

(ii)  Network Backer Service is provided on a month-to-month basis.  You may cancel Network Backer by contacting Qwest as provided in second paragraph of this Agreement.

(iii)  Network Backer services include:

    (A)  24/7 telephone and on-site support for connectivity, security settings, and simple file and print sharing on wireless networks created with Qwest-provided networking equipment;
    (B)  High-speed Internet application software that assists Qwest in providing the support referenced above.  Qwest also provides regular updates to such software.  If Network Backer service is cancelled, Qwest will turn off the applications in the modem; and
    (C)  Configuration of high-speed Internet application software.

(iv)  Network Backer services do not include any items not specifically listed as included above, including without limitation:
    (A)  Issues related to the establishment or use of a wireless fidelity ("WiFi") hotspot.
    (B)  Issues that exist prior to successful installation of networking equipment, establishment of an operating network, or prior to ordering Network Backer service.
    (C)  Issues reported after the termination of Network Backer service.
    (D)  On-site support prior to successful installation of networking equipment and establishment of an operating network.
    (E)  Issues resulting from your intentional abuse, misuse, or negligence.
    (F)  Repair or replacement of any equipment or connections (whether Qwest certified or not).
    (G)  Installation of devices that are not part of the network, including without limitation printers, fax machines, scanners, routers, hubs and switches.
    (H)  Support of a network that contains any devices not certified by Qwest.
    (I)  Support of a network on an operating system that does not meet Qwest's minimum system requirements.
    (J)  Security of your network and data.
    (K)  Issues with software (whether provided by Qwest, you, or a third-party).

Copyright © Qwest.  All rights reserved.
v33.041511

8

(L) Removal of viruses, spy ware, and ad ware.

**3. Equipment.** Separately leased equipment is required to use the Service. Certain Equipment is available from QC and other equipment must be provided by Customer.

(a) Qwest-Provided Equipment.

(i) *Leased Equipment.* Leased Equipment from Qwest: (i) the Equipment is Qwest's property and you may not assign, rent, or transfer the Equipment or your rights or duties under this Agreement to another without Qwest's prior written consent; (ii) you agree not to mishandle, abuse, misuse, or improperly store or operate the Equipment, including using the Equipment with equipment electrically or mechanically incompatible with, or of inferior quality to, it, and (iii) you agree if the Equipment is damaged by you and/or non-operational or malfunctioning for reasons other than a manufacturing defect at anytime during the term of this Agreement or upon termination of this Agreement, Qwest may charge you for its full retail cost, not to exceed $150 (the "Equipment Charge"). Qwest does not refund or credit leases, so please call Qwest immediately if your leased Equipment is not working properly for replacement Equipment. Lease payments are due for every month you lease the Equipment and lease payments do not count towards a purchase of the Equipment.

(ii) *Purchased Equipment.* You will be deemed the owner of the purchased Equipment, and bear all risk of loss of, theft of, casualty to or damage to the Equipment, from the time it is received by you until the time (if any) when it is returned by you pursuant to this Agreement and has been received by Qwest.

(iii) *Delivery and Installation of Equipment.* Equipment may be delivered to you only in the United States. You understand that you are responsible for self-installing the Equipment once you receive it, unless you select a technician installation from Qwest for an additional charge. You are encouraged to complete installation of the Equipment promptly because you will be responsible for full payment for the charges on your bill even if you have not yet installed the Equipment and used the Service at the time the bill is rendered. Information on installation procedures is located at www.qwest.com/residential/internet/installation.html.

(iv) *Damaged/Defective Equipment.* If the Equipment is inoperable, technical support is available at 1 888-777-9569. If Qwest deems the Equipment has a manufacturing defect, the Limited Warranty (set forth in the "Warranty" section below) will apply if it has not expired. If the Equipment fails as a result of a manufacturing defect after the Limited Warranty has expired or fails for any other reason you may request that Qwest deliver replacement Equipment. Any such replacement Equipment will be leased to you at the price specified at www.qwest.com/legal/highspeedinternetsubscriberagreement/ plus shipping and handling and any applicable Taxes. If Qwest provides you replacement leased Equipment outside the Limited Warranty, you will be charged the full retail cost of your non-operational or malfunctioning Equipment plus a monthly lease charge for the replacement Equipment. Replacement Equipment may or may not be the same model.

(b) Customer-Provided Equipment. If you do not lease a modem from Qwest you understand and acknowledge that QWEST, ITS AFFILIATES, SUPPLIERS, AND/OR AGENTS WILL NOT BE RESPONSIBLE/LIABLE IF YOU CANNOT ACCESS YOUR SERVICE, IF SERVICE DOES NOT FUNCTION CORRECTLY OR AT ALL, OR IF CUSTOMER EQUIPMENT, SOFTWARE, PERIPHERALS, DATA, OR EQUIPMENT IS DAMAGED. YOU WILL BE LIABLE TO QWEST FOR DAMAGE TO ANY EQUIPMENT LEASED FROM QWEST. The foregoing limitation of liability is in addition to and will not limit any other limitation of liability set forth in this Agreement.

**4. Changes to Service or this Agreement.** Qwest is not obligated to give you notice of changes to this Agreement before it becomes effective. You should review the Agreement at the time it becomes effective for you. Subject to any applicable rules or laws, Qwest may:

(a) at any time, effective upon posting to www.qwest.com/legal or any written notice to you, including e-mail: (i) stop offering the Service and/or leased Equipment, (ii) modify the Service and/or any of the terms and conditions of this Agreement, and/or (iii) reduce MRCs or NRCs. Please check such Web site and your e-mail regularly for changes.

(b) upon 30 days notice to you: (i) increase MRCs and/or NRCs or (ii) change this Agreement or the Service in a way that directly results in a material and adverse economic impact to you. Qwest may reduce the foregoing notice period where commercially reasonable and/or if such increase is based upon Regulatory Activity.

Your continued use of the Service and/or Equipment constitutes acceptance of those changes. You must immediately stop using the Service and Equipment and cancel your Service if you do not agree to the changes. Any changes you make or other terms you add to this Agreement, or propose in any other documents, written or electronic, are void.

**5. Third-Party Services, Software and Equipment.** Purchase, rental, use, or subscription to any third-party services, software, or equipment offered by or through Qwest is subject to the third-party provider's terms and Qwest is not responsible or liable for any such services, software, or equipment.

**6. Software.**
(a) Software. Use of the Service may require or enable you to download or otherwise install or use certain software that is owned by Qwest or by third parties (the "Software"). By installing the Software and using the Services or using Equipment with embedded Software you are agreeing to abide by all of the terms and conditions of this Agreement that relate to the Software, including without limitation the terms and conditions of this Section.

(b) License. If the Software is accompanied by an end user license agreement ("EULA"), your use of the Software is governed by the terms of that agreement and by the terms of this Agreement where applicable. You must accept and agree to the terms of the EULA before installing the Software and using the Service. If the Software is not accompanied by a EULA, Qwest grants you a limited,

Copyright © Qwest. All rights reserved.
v33.041511

personal, revocable, nonexclusive, nontransferable, non-assignable license to install and use the Software for purposes of using the Service and/or Equipment. The license is effective upon the earlier of delivery or installation, and extends only to Customer's own use of such Software and only on the designated Equipment or with the designated Service.

(c)  No Modification.  You may not modify the Software in any way or change or delete any copyrights, trademarks, service marks or other proprietary rights or notices of Qwest or a third-party that appear or are used in connection with the Software or the Service. You agree that the Software is the confidential and proprietary property of its owner and may not be disclosed or reproduced unless specifically authorized by Qwest or the third-party licensor or supplier. In addition, you agree that you will not de-compile, disassemble, reverse engineer or otherwise reduce the Software to a human readable form.

(d)  Ownership.  You acknowledge that Qwest or the third-party licensor or supplier of the Software, as applicable own all right title and interest, including without limitation all copyright, patent, trademark, and trade secret rights in the Software and related documentation, updates, and upgrades. You are not granted any ownership rights in the Software and may not sublicense, loan, rent, lease, distribute, share, or otherwise transfer the Software to any one else.

(e)  No Export.  The Software may be used only in the United States and any export of the Software is strictly prohibited.

(f)  Updates, Upgrades, or Changes.  Qwest may update, upgrade or change the Software and related settings on your computer from time to time. You agree to cooperate with Qwest in performing such activities. A program downloaded to your computer when Service is installed will perform automatic updates to certain Service-related Software on a regular basis. This program may collect certain information necessary to perform this function. Any information collected as part of this process will be treated in accordance with Qwest's Privacy Policies. You may choose to turn off the automatic updates function. If you order new Services from Qwest at a later date, and the automatic updates feature has been turned off, you may be prompted at that time to update Software currently on your computer before the new Software can be downloaded.

(g)  Termination.  Qwest may discontinue provision of the Software for any reason, including without limitation if Qwest's agreement with a software vendor is terminated. Additionally, for certain third-party vendors Software will no longer be functional if: (i) you or your End Users discontinue subscribing to the vendor product for which the Software was provided or to Qwest's Service; (ii) this Agreement is terminated for any reason whatsoever; or (iii) when your prepaid term for Service under this Agreement expires and you have not purchased a new term. Upon termination of your Service or Qwest notice to you of discontinuance of the Software offering for any reason, you must immediately stop using the Software associated with the terminated Service and destroy any copies you may have and delete it from your computer.

(h)  Federal Procurements.  This section applies to all acquisitions of the Software by or for the Federal Government or by any prime contractor or subcontractor (at any tier) under any contract, grant, cooperative agreement or other transaction with the Federal Government which calls for delivery or use of the Software by the Government. By accepting delivery of the Software under any such contract, grant, cooperative agreement, or as part of any such transaction, the Government agrees that the Software qualifies as commercial computer software and that the associated documentation qualifies as commercial computer software documentation within the meaning of the acquisition regulations and contract clauses applicable to this procurement. The terms and conditions of this Agreement are fully applicable to the Government's use and disclosure of the Software and documentation, and will supersede any conflicting terms or conditions. No license of any kind is granted in the case of acquisitions which contain or are subject to the clauses FAR 52-227.19 COMMERCIAL COMPUTER SOFTWARE-RESTRICTED RIGHTS (JUNE 1987) or any other clause which purports to grant to the Government rights greater than, or additional to, those set forth in this Agreement, or which purports to impose additional requirements upon Qwest to make the Agreement effective, unless Qwest specifically so consents by separate written agreement. Please contact Qwest for Software manufacturer information.

**7.  Service Conditions.**  The following conditions apply to the Service. Qwest may suspend, terminate, or limit use of your Service if you violate any of these conditions.

(a)  Limits on Use.  You agree not to use the Service for high volume or excessive use, in a business or for any commercial purpose if your Service is a residential service, or in a way that impacts Qwest network resources or Qwest's ability to provide services. You agree not to: (i) offer public information services (unlimited usage or otherwise), (ii) permit more than one dial-up log-on session to be active at one time, or (iii) permit more than one high-speed Internet log-on session to be active at one time, except if using a roaming dial-up account when traveling, in which case 2 sessions may be active. A log-on session represents an active connection to your Internet access provider. The active session may be shared to connect multiple computers/devices within a single home or office location or within a single unit within a multiple dwelling unit (e.g., single apartment or office within an apartment complex) to your modem and/or router to access the Service (including the establishment of a wireless fidelity ("WiFi") hotspot), but the Service may only be used at the single home or office location or single unit within a multiple dwelling unit for which Service is provisioned by Qwest. You may not use a WiFi hotspot in violation of this Agreement or in a way that circumvents Qwest's ability to provide Service to another customer (e.g., you cannot use a WiFi hotspot to provide Service outside your single home or office location or outside your single unit within a multiple dwelling unit and you cannot resell Service provided over a WiFi hotspot). You may not use more than one IP address for each log on session unless an advanced service allocating you more than one IP address has been purchased. Service may only be used in the U.S. Service may be used to host a server, personal or commercial, as long as such server is used pursuant to the terms and conditions of this Agreement applicable to Service and not for any malicious purposes. Malicious purposes include without limitation Spam, viruses, worms, Trojans, etc. Qwest may restrict your use of or interrupt the Service without notice for: (i) maintenance activities; (ii) equipment, network, or facility upgrades or modifications; and (iii) to ensure the provision of acceptable service levels to all Qwest customers. Qwest is not responsible or liable for any Service deficiencies or interruptions caused by such events.

Copyright © Qwest. All rights reserved.
v33.041511

(b)  No Resale, Distribution, Transfer, or Assignment.  You agree not to resell or distribute, transfer or assign this Agreement and/or the Service via any means including but not limited to wireless technology, except with Qwest's prior consent and according to Qwest's policies and procedures; provided that you may establish a WiFi hotspot as provided above, but may not resell Service provided over the WiFi hotspot.  This Agreement is intended solely for you and it will not benefit or be enforceable by any other person or entity. Qwest may assign this Agreement and your rights and obligations under this Agreement, in whole or in part, at any time without notice to you and you agree to make all subsequent payments as directed.  If we do that, we have no further obligations to you.

(c)  Authorized Use.  You (i) are responsible for maintaining the confidentiality of passwords used with the Service, (ii) are responsible for all use of the Service, including your primary account and any secondary accounts or sub-accounts registered to that account, and will not permit any unauthorized use of the Service, and (iii) will ensure that all use of the Service complies with this Agreement.  You are responsible for unauthorized and non-compliant use of the Service.

(d)  Compliance.  The Service cannot be used for any unlawful, abusive, or fraudulent purpose, including without limitation, using the Service in a way that:  (i) interferes with Qwest's ability to provide service to Qwest customers, (ii) avoids your obligation to pay for services, (iii) constitutes a criminal offense, (iv) gives rise to a civil liability, or (v) otherwise violates any law, order, ordinance, governmental requirement or regulation or this Agreement.

(e)  Monitoring and Testing the Service.  Qwest may, but is not obligated to, monitor the Service for various purposes, including but not limited to verifying AUP compliance and for usage statistics that may be used for marketing purposes.  You are responsible for monitoring your accounts for access to newsgroups and Web sites that may contain improper material.  You will notify Qwest of the continual receipt of e-mail that you view as illegal or that is unsolicited.  You must not design or provide systems used for the collection of information about others without their express knowledge and consent.  Qwest may also test Service for maintenance purposes to detect and/or clear trouble.

(f)  Wi-Fi.  Service may be used in a wireless network environment at your own risk.  Wireless networking devices use public radio channels to transmit voice and data communications.  Qwest cannot guarantee the security, privacy, or confidentiality of any transmissions made via such devices, and Qwest makes no assurances or warranties relating to their use by you.  You are responsible for all use of your Service regardless of the source of a transmission, whether by you, or an authorized or unauthorized third-party, over your Service.

(g)  Data Management and Security.  QWEST STRONGLY RECOMMENDS USE OF COMMERCIAL ANTI-VIRUS AND FIREWALL SOFTWARE.  You are responsible for the management and security of your data, including without limitation backing up and restoring your data, managing file and print sharing, implementing procedures for accuracy of data and its transmission, and implementing security such as anti-virus and firewalls.  Qwest is not responsible or liable for the management or security of your data, including without limitation loss of your data or back-up or restoration of your data, regardless of whether your data is maintained on Qwest servers or your computer or server.

(h)  Port 25 Filtering.  Port 25 is primarily used for communication between e-mail servers.  Filtering e-mail communication going to and from customers on port 25 improves network security and helps to reduce the spread of e-mail-borne viruses and reduce the overall volume of spam on the Internet.  Port 25 filtering is a recognized Internet industry best practice for service providers and is used by Qwest to automatically protect your computer from being used by malware (typically caused by a virus) to send or relay spam.  If you need to adjust port 25 filter settings, contact Qwest Tech Support (1-888-777-9569) or follow the instructions found at http://www.qwest.com/internethelp.

(i)  Intellectual Property Rights.  Unless otherwise expressly provided in this Agreement, all aspects of the Service are the property of Qwest and are protected by trademark, copyright or other intellectual property laws and international treaty provisions.  Qwest grants you a personal, revocable, limited, nonexclusive, nontransferable, non-assignable right and license to use the Service in accordance with the terms and conditions of this Agreement.   No other license or rights are granted by Qwest or will be implied or arise by estoppel, with respect to any Service.

8.   Installation, Maintenance and Support.  You may choose on-site installation for a charge or select the self-installation method. Charges may apply for certain maintenance, trouble isolation, and support services and if a technician is dispatched.  Charges may be per technician, may vary depending on when services are performed (e.g., time of day and weekday, holiday or weekend), and may include a minimum charge regardless of the actual number of hours worked.  Qwest will notify you of any applicable charges in advance of you incurring such charges. If you report trouble, you must pay a dispatch charge if the trouble is not found in Qwest facilities (no charge if Qwest later finds the trouble was in Qwest facilities) or Qwest equipment or trouble in customer equipment/systems or Equipment. A dispatch charge also applies if:  (A) Customer requests a service date change but fails to notify Qwest before the service date and Qwest technician is dispatched on the service date (will have to pay dispatch charge and Qwest will change the service date) or (B) Qwest technician dispatched for maintenance of service and no trouble is found in Qwest facilities (applies each time this happens).  Any requested repairs to your facilities or equipment are not included in the dispatch fee, and will be charged on a time and materials basis.  If you purchased networking equipment from Qwest and did not purchase a Network Backer service, Qwest will provide you telephone support for connectivity, and settings, on wireless networks created with the Qwest-provided networking equipment for 30 days from the date of the networking equipment purchase, at no additional charge.

9.   Acceptable Use Policy.  All use of the Services will comply with the AUP, posted at www.qwest.com/legal/.  Among other things, the AUP prohibits sending unsolicited e-mail messages, including bulk commercial advertising or informational announcements (collectively, "Spam").  Qwest may immediately terminate or suspend any account which Qwest believes is transmitting or is otherwise connected with any Spam.  Further, Qwest may hold you liable for Qwest's actual damages in any way arising from, or related to, any Spam transmitted by or in any way connected to you or your account, to the extent such actual damages can be reasonably calculated. If actual damages cannot be reasonably calculated, you agree to pay Qwest liquidated damages of five U.S. dollars ($5.00) for each

Copyright © Qwest.  All rights reserved.
v33.041511                                                                11

piece of Spam transmitted from or otherwise connected with you or your account.  You will not, however, be liable for actual or liquidated damages arising from Spam generated from you or your account if you establish that the Spam was sent as a result of a virus or worm or other malicious software infection and if you have taken reasonable actions to prevent and resolve such infections and stop the Spam.

10.  **Privacy.**  Qwest may provide customer information to third parties or governmental entities when required, or permitted by law, to establish rights or obligations under this Agreement; or to protect Qwest's or others' rights or property regarding our services or the services of other providers from fraudulent, abusive or unlawful use of, or subscription to, such services.  See also Qwest Privacy Policies posted at www.qwest.com/legal/privacy.html, which may change from time to time.  Additionally, Qwest, its affiliates and third-party vendors, may access and use information regarding your bandwidth usage and performance of your Equipment, Software, and Service to: (a) perform related registration (Equipment serial number, activation date, and WTN also provided to manufacturer), maintenance, support, and other service-quality activities, (b) verify AUP compliance and network performance as well as (c) develop targeted marketing.

Qwest does not require or intend to access or use confidential health related information of Customer or Customer's clients (collectively "End Users") that constitutes Protected Health Information ("PHI"), as defined in 45 C.F.R. §160.103 under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").  The obligation to comply with HIPAA is the sole responsibility of the Customer.  Standard commercial telecommunications service providers acting as a conduit for such information are not considered "business associates" as defined in 45 CFR 160.103 under HIPAA.  In its role as a conduit telecommunications service provider, HIPAA does not apply to Qwest.  Any exposure to End Users' PHI will be incidental to Qwest's provision of Service and is not meant for the purpose of managing the PHI or creating or manipulating the PHI.  Such incidental exposure is allowable under 45 CFR 164.502(a)(1)(iii) and, as such, Qwest represents that it is not a "Business Associate" or "covered entity" under HIPAA for the purposes of this Agreement.

**11.  Rates and Charges; Payment.**
(a)  Rates and Charges.  All Service and Equipment is provided to you at the MRCs and NRCs quoted to you during the ordering process and as set forth on www.qwest.com/legal/highspeedinternetsubscriberagreement/ at the time(s) you order Service and/or Equipment.  You are responsible for any charges associated with the Service and Equipment, including without limitation Equipment lease charges, monthly Service charges, and charges related to installation or activation, maintenance, delivery, shipping and handling, changes to Service, and Taxes.  In the event Qwest offers the ability to pay any of the charges in installment payments over time ("Installment Option"), the aggregate payments under the Installment Option may be greater than the charge(s) paid by customers who pay the total charge(s) in one payment.

You will not be eligible for any discounts or promotional offers other than those you qualify for at the time you order qualifying Service and/or Equipment, unless the discount or promotional offer specifically states that existing customers are eligible and in that instance you will receive the discount or promotional offer strictly in accordance with its terms.  Customers who move Service or disconnect and reconnect Service may not be eligible for promotional pricing available to new customers.  You may only take advantage of one special pricing promotion per Service per account during any twelve-month period.

(b)  Payment.
  (i)  Billing.  Charges are billed monthly with MRCs and NRCs billed in advance and usage and governmental charges billed in arrears.  You will pay all billed charges by the due date set forth in your billing statement, as well as any Late Charge.  You will be charged for each additional copy of your bill.

  You will provide all information necessary for Qwest to provide and bill for the Service and Equipment.  You affirm that the information you supply to us is correct and complete and will promptly notify Qwest whenever your personal or billing information changes.  If you elect to pay by credit card, you are responsible for directly updating, or notifying Qwest, of any changes to your credit card (including, but not limited to card number, expiration date, billing address, or card status).  You understand that false or incorrect information may result in Service provisioning or delivery delays or the suspension or termination of your Service.

  (ii)  Disputes.  The billed rate will continue unless you call us promptly and inform us that the billed monthly rate is not the one quoted to you.  You must give Qwest notice of any dispute on your bill.  If you pay the disputed amount you will receive interest at the lesser of the highest lawful amount for commercial transactions or 1% per month on any amounts Qwest determines were wrongly charged to you.  If you give notice of a billing dispute within 90 days of the billed date such interest will be from the due date to the date Qwest credited back or refunded the wrongly charged amount.  If you give notice after this 90-day period, such interest will be from the date Qwest received your notice to the date Qwest credited back or refunded the wrongly charged amount.  You will be charged a Late Charge on any amounts withheld that are undisputed or ultimately determined to have been correctly charged.  You will pay all Qwest expenses incurred to recover such withheld amounts, including attorneys' fees.

  (iii)  Deposit.  Qwest may reasonably modify the payment terms or require other assurance of payment, including a deposit, based on Customer's payment history, lack of established credit, or a material and adverse change in Customer's financial condition.  Refunded deposit amounts will be credited to your account and any credit balance will be refunded.  If you make a cash deposit, you will receive interest at the rate required in the state you receive Service, Equipment, or Software from date Qwest received deposit until date Qwest refunded the deposit.

  (iv)  Method of Payment.  Some Internet access services require you to pay by credit card.  For those services, Qwest currently accepts VISA, MasterCard or American Express.  If you provide Qwest your credit card information, you authorize Qwest to automatically charge your credit card for charges that apply to your account.  Qwest will automatically charge your credit card on the billing due date shown on your billing statement.  In the event you request a chargeback on your credit card of the amounts Qwest has charged you, you will be subject to a chargeback fee.  If Qwest is unable to charge your credit card for any reason, the

Copyright © Qwest.  All rights reserved.
v33.041511

Late Charge will be the greater of ten dollars ($10.00) or five percent (5%) of the amount due, plus an interest charge of 1.5% per month on the amount due until paid. Additionally, you may be subject to Service suspension or account termination at Qwest's discretion. Please see the Rate Card for applicable charges. You will not pay for the Services (as defined above), or any related services you may purchase, with funds obtained through the American Recovery and Reinvestment Act (or ARRA) or other similar stimulus grants or loans that would obligate Qwest to provide certain information or perform certain functions unless each of those functions and obligations is explicitly identified and agreed to by the parties in this Agreement or in an Amendment to this Agreement.

**12. Term and Termination.**
(a) 30-Day Cancellation Policy. You may cancel Service and return the Equipment within 30 days following your order of such Service or Equipment and avoid payment of MRCs if: (i) you are a new Service customer, (ii) you have not activated or used the Service (for Network Backer service only), and either (iii) you notify Qwest you wish to cancel Service because you do not agree with the terms and conditions of this Agreement, or (iv) you notify Qwest you wish to cancel because you are not satisfied with the Service. Except as provided below, you must pay all NRCs related to canceled Service, including without limitation installation, maintenance and shipping charges. You must also pay MRCs related to canceled Service and any termination liability charges (if you ordered Service with a term commitment) if you cancel Service and return Equipment: (v) more than 30 days after ordering or (vi) after you activated or used the Service (for Network Backer service only). Follow the return process found in the Equipment box (black and white card) or in the User Manual to return Equipment.    No billing credit will be given for Equipment that is incomplete or not in new condition. Existing customers, including those who make changes to their Service, or customers who cancel more than 30 days after ordering, are not eligible for the 30-day cancellation policy.

(b) Month-to-Month Term. Unless otherwise specified herein, Service is offered on a monthly basis for a term that begins on the date your Service order is completed, ends on the last day of the billing cycle during which you placed the order for Service, and automatically renews monthly.

(c) Term Commitment and Early-Termination Charge. IF YOU ORDER SERVICE WITH A TERM COMMITMENT, YOU AGREE TO MAINTAIN THAT SERVICE FOR THE ENTIRE TERM COMMITMENT PERIOD. IF YOU TERMINATE THAT SERVICE BEFORE THE END OF THE TERM COMMITMENT PERIOD YOU WILL BE REQUIRED TO PAY THE EARLY-TERMINATION CHARGE SET FORTH IN THIS AGREEMENT OR AT www.qwest.com/legal/highspeedinternetsubscriberagreement/ under "Qwest High-Speed Internet® Rates Cards." FOR PURPOSES OF THIS SECTION, MOVING, CHANGING YOUR INTERNET SERVICE PROVIDER, OR MAKING A CHANGE TO ANY PART OF YOUR SERVICE THAT CARRIES A TERM COMMITMENT IS CONSIDERED TERMINATION OF THE ENTIRE SERVICE. THE EARLY-TERMINATION CHARGE IS NOT A PENALTY. RATHER, IT IS AN OFFSET OR RECOVERY OF QWEST COSTS RELATED TO EARLY TERMINATION AND THE DISCOUNTS ASSOCIATED WITH YOUR TERM COMMITMENT. THE EARLY-TERMINATION CHARGE WILL BE WAIVED IF: (A) YOU NOTIFY QWEST WITHIN 30 DAYS OF THE DATE YOU ORDERED THE SERVICE WITH A TERM COMMITMENT THAT YOU DO NOT AGREE TO THE TERMS OF THIS AGREEMENT AND (B) QWEST HAS NOT PERFORMED AND YOU HAVE NOT USED ANY OF THAT SERVICE. Qwest may waive the early-termination charge if you move or upgrade Service; your original term commitment period may start over. After the term commitment period, Service will continue month-to-month until terminated by you or by Qwest.

(d) Termination. You may terminate this Agreement and your use of the Services at any time and for any reason by calling Qwest at 1 800-244-1111 (Consumer/Residential accounts), 1 800-603-6000 (Small Business accounts), or 1 800-777-9594 (Global/Business & Government Services accounts); **you cannot terminate your Service online or by e-mail**. Qwest does not monitor, and will not automatically cancel, Service for problems relating to domain name transfers. If you have trouble transferring your domain name and you wish to terminate Service, you must contact Qwest as indicated above. Whether or not your domain name transfers, you will be responsible for paying any outstanding amounts owed on your account through the date of termination. Qwest may terminate this Agreement, your password, your account, and/or your use of the Service, without notice and for any reason, including, without limitation, if you fail to pay any charges when due or if Qwest believes you or someone using your account has violated this Agreement. Qwest may, but is not obligated to, send notice of any violations to you before termination. When an account has been terminated or suspended, the reactivation of the old account or the acquisition of a new account will only be allowed by the express approval of Qwest and is subject to applicable charges. If Service is terminated by you or Qwest prior to the end of a monthly term, you will be required to pay a prorated amount of the MRCs for the month and the full amount for any NRCs or other charges for the month and any accrued but unpaid amounts related to Service and Equipment through the effective date of termination.

(e) Return of Leased Equipment. Upon termination, you must promptly return your leased Equipment to Qwest by following the return process found in the Equipment box (black and white card) or in the User Manual. Qwest will, at its option, either: (1) charge you the Equipment Charge if Qwest does not receive the Equipment within 30 days after termination; (2) charge you the Equipment Charge upon termination and credit you back for such charge ONLY if Qwest receives your Equipment within 30 days following termination; or (3) continue to charge you the monthly lease charge for the Equipment until Qwest receives the Equipment.

(f) Deletion of Data upon Termination. Upon termination of your Service, Qwest may immediately delete all data, files, and other information stored in or for your account or on your Web site without notice. In certain circumstances you may request that Qwest reactivate your account and restore your deleted Web hosting and e-mail data. Qwest must receive your request no later than 90 days after termination.

(g) Seasonal Service (Vacation Service). Residential customers with qualifying Service may temporarily suspend Service ("Seasonal Service" or "Vacation Service") for a minimum of 30 days at the rates and charges set forth in the Rate Card. If you put your Service on Seasonal Service, your Service and any related Internet access will be unavailable for your use. And, if you use your Service to support Internet-based calling (e.g., voice over Internet protocol (VoIP)), you will **not** be able to make **any** incoming or outgoing calls,

Copyright © Qwest. All rights reserved.
v33.041511

13

including 911 calls, from your service address unless and until you have Qwest re-activate your Service. While you are on Seasonal Service, any term commitment period will continue to run.

**13. Limitation of Liability.** TO THE EXTENT THAT ANY LIMITATION IN THIS SECTION IS NOT PERMITTED BY APPLICABLE LAW, SUCH LIMITATION WILL NOT APPLY TO CUSTOMER TO THE EXTENT IT IS BARRED BY APPLICABLE LAW.

(a) YOU ASSUME TOTAL RESPONSIBILITY FOR USE, RESULTS OF USE, AND PERFORMANCE OF THE SERVICE, SOFTWARE, EQUIPMENT, AND THE INTERNET AND ACCESS THE SAME AT YOUR OWN RISK. QWEST EXERCISES NO CONTROL OVER AND DISCLAIMS ANY RESPONSIBILITY FOR THE CONTENT CREATED OR ACCESSIBLE USING THE SERVICE, SOFTWARE, OR EQUIPMENT AND FOR ACTIONS TAKEN ON THE INTERNET. QWEST RECOMMENDS YOU DO NOT USE THE SERVICE IN HIGH RISK ACTIVITIES WHERE AN ERROR COULD CAUSE DAMAGE OR INJURY.

(b) REGARDLESS OF THE LEGAL THEORY UNDER WHICH LIABILITY IS ASSERTED AND REGARDLESS OF WHETHER QWEST HAS BEEN ADVISED OF THE POSSIBILITY OF LIABILITY, LOSS, OR DAMAGE, QWEST, ITS AFFILIATES, AGENTS, AND CONTRACTORS WILL NOT BE LIABLE TO YOU FOR ANY INCIDENTAL, INDIRECT, SPECIAL, RELIANCE, PUNITIVE OR CONSEQUENTIAL DAMAGES OF ANY KIND (INCLUDING, WITHOUT LIMITATION, ANY LOSS OF USE, LOSS OF BUSINESS, LOST OR IMPUTED PROFITS OR REVENUES, LOSS OF INFORMATION OR DATA, COSTS OF COVER, INTERRUPTED SERVICE, OR RELIANCE UPON THE SOFTWARE AND/OR ASSOCIATED DOCUMENTATION) ARISING OUT OF OR RELATED TO THIS AGREEMENT, SERVICE, SOFTWARE, OR EQUIPMENT EVEN IF ANY SUCH DAMAGES ARE CAUSED BY QWEST, ITS AFFILIATES, AGENTS, OR CONTRACTORS.

(c) THE REPAIR OR REPLACEMENT REMEDY SET FORTH IN THE LIMITED WARRANTY IN SECTION 15 BELOW IS THE ONLY REMEDY AVAILABLE WITH RESPECT TO THE EQUIPMENT. WITH REGARD TO ANY SERVICE RELATED CLAIM FOR DAMAGES THAT IS NOT LIMITED BY THIS SECTION 13, YOUR EXCLUSIVE REMEDIES FOR SUCH CLAIM WILL BE LIMITED TO THE TOTAL MRCs OR USAGE CHARGES PAID BY YOU TO QWEST FOR THE AFFECTED SERVICE IN THE ONE MONTH IMMEDIATELY PRECEDING THE OCCURRENCE OF THE EVENT GIVING RISE TO THE CLAIM. QWEST'S TOTAL AGGREGATE LIABILITY ARISING FROM OR RELATED TO THIS AGREEMENT WILL NOT EXCEED THE TOTAL MRCs AND USAGE CHARGES PAID BY YOU TO QWEST UNDER THIS AGREEMENT IN THE ONE MONTH IMMEDIATELY PRECEDING THE OCCURRENCE OF THE EVENT GIVING RISE TO THE CLAIM ("DAMAGE CAP").

(d) QWEST DISCLAIMS ALL LIABILITY OR RESPONSIBILITY FOR ACTS AND OMISSIONS OF OTHER PROVIDERS. ADDITIONALLY, IF PART OF THE SERVICE IS PROVIDED BY A THIRD-PARTY AND THE THIRD-PARTY FAILS TO PROVIDE THAT SERVICE, QWEST WILL NOT BE RESPONSIBLE OR LIABLE FOR ANY DEFICIENCIES IN OR LACK OF SERVICE.

(e) QWEST DISCLAIMS ALL LIABILITY OR RESPONSIBILITY IF SERVICE CHANGES REQUIRE EQUIPMENT CHANGES, DEGRADE EQUIPMENT PERFORMANCE OR SERVICE PERFORMANCE WITH THE EQUIPMENT, OR MAKE EQUIPMENT OBSOLETE.

(f)     As part of providing Service we may access your premises, computer hardware and software, and your networking and high-speed Internet-related equipment. We do not represent or warrant that the technicians doing such work have any special expertise regarding your computer or such equipment. Qwest liability is limited to damage arising from willful misconduct or grossly negligent acts of Qwest technicians in accessing your premises, computer, or networking and high-speed Internet-related equipment up to $500. This is your sole remedy for such activity and neither Qwest nor its affiliates, agents, or contractors is liable for any other damages, loss or destruction regardless of the theory, whether direct, indirect, incidental, special or consequential. This is a limitation upon the remedy for such grossly negligent or willful misconduct, and is NOT part of any benefit under this Agreement.

(g). Any claim or dispute arising out of or relating to this Agreement must be brought within one year after the cause of action arises.

**14. Personal Injury, Death, and Property Damage.** QWEST'S LIABILITY TO YOU ON ACCOUNT OF ANY ACT OR OMISSION OF QWEST RELATED TO THIS AGREEMENT WILL BE LIMITED TO ACTUAL DAMAGE TO REAL OR TANGIBLE PERSONAL PROPERTY (AS LIMITED IN SECTION 13 ABOVE), OR BODILY INJURY OR DEATH DIRECTLY CAUSED BY QWEST'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE. EXCEPT FOR DAMAGES DESCRIBED IN THE PREVIOUS SENTENCE, YOU WILL NOT BE ENTITLED TO ANY OTHER DAMAGES, INCLUDING INDIRECT OR CONSEQUENTIAL DAMAGES, REGARDLESS OF THE FORM OF ACTION. QWEST AND OUR AFFILIATES, AGENTS, AND CONTRACTORS WILL HAVE NO LIABILITY WHATSOEVER FOR ANY DAMAGES OR MODIFICATIONS TO, OR LOSS OR DESTRUCTION OF, ANY OF YOUR SOFTWARE, FILES, DATA OR PERIPHERALS, REGARDLESS OF THE CAUSE. Damages under this Section will be subject to the limitation of liability in this Agreement but not the Damage Cap. TO THE EXTENT THAT ANY LIMITATION IN THIS SECTION IS NOT PERMITTED BY APPLICABLE LAW, SUCH LIMITATION WILL NOT APPLY TO CUSTOMER TO THE EXTENT IT IS BARRED BY APPLICABLE LAW.

**15. Warranty.**

(a) Limited Warranty for Equipment. Qwest extends a Limited Warranty to the original lessor (you) for the Equipment. The terms of the Limited Warranty are set out below (the "Limited Warranty") and are part of this Agreement. A copy of the Limited Warranty is also available upon request from Qwest at no charge. Nothing in this Agreement will be deemed to alter the terms of the Limited Warranty. THE REPAIR OR REPLACEMENT REMEDY SET FORTH IN THE LIMITED WARRANTY IS THE ONLY REMEDY AVAILABLE WITH RESPECT TO THE EQUIPMENT, WHETHER ARISING UNDER THE LIMITED WARRANTY, UNDER A LEGALLY EFFECTIVE IMPLIED WARRANTY OR OTHERWISE.

LIMITED WARRANTY

Copyright © Qwest. All rights reserved.
v33.041511

(i)  This Equipment is warranted by Qwest to the person originally leasing the Equipment, and no others, to be free of manufacturing defects: (A) during the term of the modem lease, only (for modems leased from Qwest) and (B) for a period of 30 days from the date of Equipment lease (for networking equipment (other than a modem) leased from Qwest if Network Backer service is not purchased).  Notwithstanding the foregoing, any unexpired limited warranty period for networking equipment will expire immediately upon termination of your Network Backer service and you will have no further warranty for such equipment.

(ii)  This Limited Warranty covers only the basic operations of the Equipment, and Qwest does not warrant the compatibility of the Equipment with any computer, operating system, or networking equipment, nor does this Limited Warranty cover any defect present in any computer, network, or operating or other system. If the Equipment malfunctions due to a manufacturing defect, before the one year term expires, Qwest will replace or repair it, at its option, without charge, so long as (A) you notify Qwest by calling the correct number set forth in Section 15(a)(vi) below, report that the Equipment's basic operations are not functioning properly, and cooperate with the Qwest representative to evaluate the circumstances; (B) the date you so notify Qwest is within the warranty period specified above; and (C) you promptly return the Equipment as provided in the Return Policy & Procedure found in the Equipment box (black & white card) or in the User Manual. Qwest will:  (1) replace or repair the Equipment, at its option, and return the replacement or repaired Equipment to you, within thirty (30) days after you comply with (A) through (C), above; (2) provide you with an expedite option whereby Qwest will send you a replacement Equipment promptly after you comply with (A) and (B); provided that, prior to sending you such replacement Equipment, Qwest may charge you, via a credit card that Qwest accepts or other means Qwest chooses, for the full retail cost of the replacement Equipment ("Advance Charge").  If you return your defective Equipment to Qwest according to the Return Policy & Procedure found in the Equipment box (black & white card) or in the User Manual, and Qwest receives your defective Equipment on or before the 30th day after you request a replacement Equipment pursuant to this Limited Warranty, Qwest will credit back the Advance Charge to the same payment method to which the Advance Charge was applied (e.g., credit card) or to your monthly service bill; or (3) such other option that you and Qwest may agree to. No other person or party is authorized to provide repair or replacement service pursuant to this Limited Warranty.

(iii)  *Repaired/Replacement Equipment.*  Qwest may use new or reconditioned parts to repair the Equipment, or replace the Equipment with new, repaired, or reconditioned Equipment, all at the sole discretion of Qwest. This Limited Warranty will apply to the replaced or repaired Equipment, for ninety (90) days or until the end of the warranty period set forth herein, whichever is longer.

(iv)  *Exceptions and Exclusions.*  This Limited Warranty does not cover defects due to defacement, misuse, abuse, neglect, improper use, improper electrical voltages or current, repairs by others, alterations, modifications, accidents, fire, flood, vandalism, acts of God or the elements.  No advice or information given by Qwest, its affiliates, its contractors, or their respective employees will vary the terms of the Limited Warranty.

(v)  *No Other Express Warranties and Limitation of Implied Warranties.*  This Limited Warranty is the only express warranty extended by Qwest in connection with the Equipment. Implied warranties which may not be disclaimed are limited in time to the duration of this Limited Warranty, and all remedies for all such implied warranties are restricted to the remedy and procedure set forth for this Limited Warranty. This Limited Warranty is in lieu of all other warranties, however arising, and all such other warranties are hereby disclaimed. Some states do not allow limitations on how long an implied warranty lasts, so the above limitation may not apply to you.

(vi)  This Limited Warranty is extended to the person originally leasing the Equipment, and no others, by:

Qwest, 5 William White Blvd., Pueblo, CO 81001-4894

Consumer/Residential Accounts, please call 1 800-244-1111
Small Business Accounts, please call 1 800-603-6000
Global/Business & Government Services Accounts, please call 1 800-777-9594

If you have questions or comments, call or write us at the above number or address.

(vii)  This Limited Warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

(b)  Disclaimer of Warranties.  THE SERVICE, SOFTWARE, AND EQUIPMENT ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITH ALL FAULTS. EXCEPT FOR THE LIMITED WARRANTY IN THE PRECEEDING SECTION, QWEST PROVIDES THE SERVICE, SOFTWARE, AND EQUIPMENT WITHOUT WARRANTIES OF ANY KIND, WRITTEN OR ORAL, STATUTORY, EITHER EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF TITLE, NONINFRINGEMENT, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, ACCURACY, NON-INTERFERENCE, COMPATIBILITY OF COMPUTER SYSTEMS, INTEGRATION, AND THOSE ARISING FROM COURSE OF DEALING OR COURSE OF TRADE AND DISCLAIMS ANY SUCH WARRANTIES. QWEST DOES NOT WARRANT THAT THE SERVICE OR SOFTWARE WILL BE UNINTERRUPTED, ERROR-FREE, SECURE, OR FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. NO ADVICE OR INFORMATION GIVEN BY QWEST, ITS AFFILIATES, ITS AGENTS, OR ITS CONTRACTORS OR THEIR RESPECTIVE EMPLOYEES WILL VARY THE TERMS OF THE LIMITED WARRANTY OR THIS AGREEMENT OR CREATE ANY WARRANTY. QWEST IS NOT RESPONSIBLE FOR DEFACEMENT, MISUSE, ABUSE, NEGLECT, IMPROPER USE, IMPROPER ELECTRICAL VOLTAGES OR CURRENT, REPAIRS BY OTHERS, ALTERATIONS, MODIFICATIONS, ACCIDENTS, FIRE, FLOOD, VANDALISM, ACTS OF GOD, OR THE ELEMENTS. QWEST TECHNICAL SUPPORT IS NOT WARRANTED AND IS USED AT YOUR OWN RISK. QWEST MAKES NO WARRANTY REGARDING TRANSACTIONS EXECUTED AND CONTENT AND INFORMATION ACCESSED BY USING THE SERVICE. TO THE EXTENT THAT ANY LIMITATION IN THIS SECTION IS NOT PERMITTED BY APPLICABLE LAW, SUCH LIMITATION WILL NOT APPLY TO CUSTOMER TO THE EXTENT IT IS BARRED BY APPLICABLE LAW.

**16. Indemnification.**  You agree to indemnify, defend, and hold harmless Qwest and its affiliates, contractors, officers, directors, employees, or agents from any and all third-party claims, liabilities, costs, and expenses, including reasonable attorney fees and

Copyright © Qwest. All rights reserved.
v33.041511

punitive damages arising from: (a) violation of any provision of this Agreement by you or others who use your Service, Software, and/or Equipment; (b) installation, modification, or use of the Service, Software, and/or Equipment by you and/or any parties who use your Service, Software, and/or Equipment, with or without your permission; (c) claims for libel, slander, invasion of privacy, or infringement of any intellectual property rights arising from the use of the Service, Software, or the Internet; (d) patent infringement arising from your acts combining or using the Service in connection with facilities or equipment (circuit, apparatus, system or method) furnished by you; (e) negligent acts, errors, or omissions by you; or (f) injuries to or death of any person and for damages to or loss of any property, which may in any way arise out of or result from or in connection with this Agreement, except to the extent that such liabilities arise from the gross negligence or willful misconduct of Qwest.

**17. Dispute Resolution and Arbitration; Governing Law.** PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS RIGHTS THAT YOU MAY OTHERWISE HAVE. IT PROVIDES FOR RESOLUTION OF DISPUTES THROUGH MANDATORY ARBITRATION WITH A FAIR HEARING BEFORE A NEUTRAL ARBITRATOR INSTEAD OF IN A COURT BY A JUDGE OR JURY OR THROUGH A CLASS ACTION.

(a) <u>Arbitration Terms</u>. You agree that any dispute or claim arising out of or relating to the Services, Equipment, Software, or this Agreement (whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory) will be resolved by binding arbitration. The sole exceptions to arbitration are that either party may pursue claims: (1) in small claims court that are within the scope of its jurisdiction, provided the matter remains in such court and advances only individual (non-class, non-representative, non-consolidated) claims; and (2) in court if they relate solely to the collection of any debts you owe to Qwest.

(i) *Arbitration Procedures*. Before commencing arbitration you must first present any claim or dispute to Qwest in writing to allow Qwest the opportunity to resolve the dispute. If the claim or dispute is not resolved within 60 days, you may request arbitration. The arbitration shall be conducted by the American Arbitration Association ("AAA"). The Federal Arbitration Act, 9 U.S.C. Sections 1-16, not state law, shall govern the arbitration of the dispute. Colorado state law, without regard to choice of law principles, shall otherwise govern and apply to any and all claims or disputes. All face-to-face proceedings shall be conducted at a location which is reasonably convenient to both you and Qwest. Arbitration is final and binding. Any arbitration shall be confidential, and neither you nor Qwest may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement of the arbitration award. The arbitrator may award any relief or damages that a court could award, except an arbitrator may not award relief in excess of or contrary to what this Agreement provides. Judgment on any arbitration award may be entered in any court having jurisdiction.

(ii) *Costs of Arbitration*. The party requesting arbitration must pay the applicable AAA filing fee, except that if you are an individual using the Services for household or personal use and you initiate arbitration against Qwest: (1) you must pay one-half the arbitrator's fees up to a maximum of $125 if your claim does not exceed $10,000; (2) you must pay one-half the arbitrator's fees up to a maximum of $375 if your claim is more than $10,000 but less than $75,000; and (3) you must pay an Administrative Fee in accordance with the AAA's Commercial Fee Schedule if your claim exceeds $75,000 or if your claim is non-monetary. Except as provided in the preceding sentence, each party shall pay its own expenses of the arbitration, including the expense of its own counsel, witnesses, and presentation of evidence at the arbitration. If any party files a judicial or administrative action asserting a claim that is subject to arbitration and another party successfully stays such action or compels arbitration, the party filing that action must pay the other party's costs and expenses incurred in seeking such stay or compelling arbitration, including reasonable attorneys' fees.

(b) <u>Waiver of Jury and Class Action</u>. By this Agreement, both you and Qwest are waiving rights to litigate claims or disputes in court (except small claims court as set forth in paragraph (a) above). Both you and Qwest also waive the right to a jury trial on your respective claims, and waive any right to pursue any claims on a class or consolidated basis or in a representative capacity.

**18. Notices.** Except as otherwise provided herein, all required notices to Qwest must be in writing and sent to 1801 California Street, Suite 900, Denver, Colorado 80202; Facsimile #: 1 888-778-0054; Attn.: Legal Department. Except as otherwise provided herein, you agree that all required notices to you will be provided by one or more of the following: posting, bill message, bill insert, postcard, letter, call to your billed telephone number, *or e-mail to an address provided by you when you ordered Service or Equipment.* You agree to provide Qwest with any and every change to your e-mail address by calling 1 800-244-1111 (Consumer/Residential accounts), 1 800-603-6000 (Small Business accounts), or 1 800-777-9594 (Global/Business & Government Services accounts). Except as otherwise provided herein, all notices will be deemed given: (a) when delivered in person to the recipient named above; (b) three business days after mailed via regular U.S. Mail; (c) when delivered via overnight courier mail; or (d) when delivered by facsimile so long as duplicate notification is also sent in the manner set forth in subsection (b).

**19. General.** If any term of this Agreement is held invalid, illegal or unenforceable, such term will be construed as nearly as possible to reflect the original intent of the parties and the remaining terms will remain in effect. Neither party's failure to insist upon strict performance of any provision of this Agreement will be construed as a waiver of any of its rights hereunder. All terms of this Agreement that should by their nature survive the termination of this Agreement will so survive. Qwest will not be liable for any delay or failure to perform its obligations hereunder if such delay or failure is caused by a Force Majeure Event. This Agreement, together with the other agreements and policies and posted information referenced herein, constitutes the entire agreement between you and Qwest with respect to the subject matter hereof, and supersedes all prior or contemporaneous oral or written agreements or understandings relating to the subject matter hereof. In the event of any inconsistency between this Agreement and any other documents exchanged between you and Qwest related to the Service, Software, or Equipment, the provisions of this Agreement will control.

Please call Qwest at 1 800-244-1111 (Consumer/Residential accounts), 1 800-603-6000 (Small Business accounts), or 1 800-777-9594 (Global/Business & Government Services accounts) if you have any questions regarding your account.

Copyright © Qwest. All rights reserved.
v33.041511

16

Where required by law, customers who cancel their Service within the first three days, or seven days, as applicable, following acceptance of this Agreement will be refunded all charges incurred with respect to their account.

Copyright © Qwest.  All rights reserved.
v33.041511

17



About Us | Residential | Small Business | Large Business | Wholesale

## About Us

Company Information | Investor Relations | Community | Press Room | Careers | Governance | Legal

- Acceptable Use Policy
- Privacy Policy
- Copyright Notices
- Website User Agreement
- Online Security
- Terms & Conditions

# Qwest's Privacy Policy

**Effective August 20, 2010**

Política de Privacidad de Qwest en Español

# Overview

Like most companies, we collect information about our customers and use it to provide our services. We also share it as needed to meet our business goals or fulfill our legal obligations. We protect the information we have about our customers, and we require those we share it with to protect it too.

The purpose of this overview is to describe the information we collect, how we use and share it, the choices you have about our use and sharing, and the steps we take to protect it. This overview summarizes and gives you direct links to the relevant sections of our full Privacy Policy, which you can find *here*. To see answers to frequently asked questions (FAQs) about our practices related to collection, use and sharing of customer information, *click here*.

What information does Qwest collect?

How does Qwest use customer information?

Does Qwest share customer information?

What choices do our customers have about the customer information we collect and how we use it?

What access do customers have to information about them?

How long does Qwest retain customer information?

How does Qwest secure customer information?

Questions about this policy or our practices?

- ▸ Qwest Frequently Asked Questions (FAQs)
- ▸ Qwest Choice TV Privacy Notice

### What information does Qwest collect?

We collect information from customers when we provide our services, which include Internet access, local and long distance telephone, Voice over Internet Protocol (VoIP), and additional voice and broadband services. The information we collect may include your name, address, email address, telephone number, date of birth, social security number, driver's license number, credit information, payment information, and contact information. We may also collect information about how you use our services.

We also collect information from visitors to our websites and those who click on our Internet ads. This may include information such as the user's operating system, location, Internet Protocol (IP) address, and what sites the user visited immediately before or after our site.

**Recording, reviewing or monitoring of your interactions with Qwest.** For quality assurance and training, we sometimes review email correspondence and record or listen to calls to or from our customer service and repair personnel, sales offices, and business account managers. We also save the text of "click to chat" sessions with our online sales and service consultants, and may save screen shots when customers give our repair personnel remote access to their computers for technical support.

**Network management.** We collect and use information generated on our networks to manage them and to keep our services running efficiently. For example, we monitor data to check for viruses, to control spam, to prevent attacks that might disable our services, to ensure that our traffic does not violate our Qwest High-Speed Internet Subscriber Agreement or our Acceptable Use Policy, and to guard against other inappropriate or illegal activity. This involves looking at the characteristics of our network traffic, such as traffic volumes, beginning and ending points of transmissions, and the types of applications being used to send traffic across our network. Sometimes we need to look into the content of the data (such as the specific websites being visited, files being transmitted, or application being used) for the purposes described above, in circumstances when we are concerned about fraud or harassment, to repair

# EXHIBIT B

a problem we detect or that a customer contacts us about, or when we are providing the content of broadband traffic to law enforcement which we only do as authorized by law.

You can get more detail about our collection practices by *clicking* here.

^Top of overview

### How does Qwest use customer information?

We use customer information to provide Qwest services and keep you informed of changes to our services, to market our services and sometimes those of others, to manage our networks, and to plan improvements to the services we offer and the way we interact with our customers.

You can get more detail about our uses of customer information by *clicking* here.

^Top of overview

### Does Qwest share customer information?

Yes, but we do so responsibly. Qwest is made up of a number of companies and we share information among them. We also use other companies to help us market, sell and bill for our services, and we share information with them. We share information with companies that give us credit evaluations (and let them use the information we give them to provide credit evaluation services for others), collect our unpaid bills, or provide other services to us (such as advice on products or about our customers may be interested in). We may also allow companies to match information provided to them by their potential customers with name and address information in our databases to confirm the identity of their potential customers. Our contracts with those companies require them to keep the information safe and confidential.

We may share information with other companies if, for example, we anticipate merging, selling or transferring a portion of our business with or to them. Again, we require those companies to keep the information confidential.

Additionally, we give customer information to other service providers when they have our customer's consent, when they need the information to provision service accurately, bill for their services or verify accounts, or when they have a legal right to the information. We may also provide information to government agencies (other than law enforcement) to help with communications assistance programs, or to gain benefits for our company like lower mailing fees. And we share information with law enforcement when the law allows us to do so, such as in emergencies or to protect our rights and property, including our network and the networks of others. We also respond to lawful demands for information from law enforcement and private parties. The law requires us to share names and phone numbers with emergency service providers, whether that information is publicly available in directories or not.

We also must share similar information with directory publishers (who publish white pages, yellow pages and other similar directories) and directory assistance providers (who provide telephone numbers or addresses to those asking for that information). In some cases we limit how this information is used. And in all cases these companies must honor restrictions you have asked for, such as that your information not be published or used for marketing.

- If you have elected to have your name, address and telephone number published in white pages directories (which means that it will be public information), we allow that information to be used by our official directory publisher and purchasers of our directory assistance offerings for their own marketing or to create marketing lists. To choose not to be included on lists that may be used by others for marketing, *click* here.

You can get more detail about our sharing of customer information by *clicking* here.

^Top of overview

### What choices do our customers have about the customer information we collect and how we use it?

You have some choices about what customer information we collect and how we use it.

- You can choose whether to be included in a published directory or directory assistance services. Under federal law, directory publishers and directory assistance providers must honor restrictions requested by our customers, such as that the information not be published or used for marketing.
- If you have elected to have your name, address and telephone number published in white pages directories (which means that it will be public information), we allow that information to be used by our official directory publisher and purchasers of our directory assistance offerings for their own marketing or to create marketing lists. To choose not to be included on lists that may be used by others for marketing, *click* here.
- You can choose not to receive telephone, direct mail, or email marketing messages from us. To do so, please *click* here.

You can get more detail about what choices our customers have regarding our collection and use of customer information by *clicking* here.

^Top of overview

**What access do customers have to information about them?**

You may access information about you in three ways:

- Through your bill, whether you receive it by mail or electronically.
- If you are a residential customer and have an online MyAccount – and we encourage you to establish one at Qwest.com - it shows service information and may provide usage information as well. Business customers may obtain information online through QControl.
- You can also call us to discuss your account or to authorize someone else to talk with us about your services or other account details.
  - Residential: 1-800-244-1111
  - Small business: 1-800-603-6000
  - Larger business: 1-800-777-9594 (or your dedicated account representative)

You can get more detail about accessing customer information by *clicking here*.

^Top of overview

**How long does Qwest retain customer information?**

How long we keep different types of information is determined by business requirements and applicable laws and regulations.

^Top of overview

**How does Qwest secure customer information?**

We take the security of our customer information seriously. We do several things to protect it:

- We have administrative, physical and technical controls to safeguard it;
- We train our employees on the importance of protecting it; and
- We require businesses that act on our behalf and have access to our information to keep information about you confidential and secure.

You can get more detail about how Qwest secures customer information by *clicking here*.

^Top of overview

**Questions about this policy or our practices?**

Please email us at privacy@qwest.com, or write us at:

Qwest Privacy Group
1801 California Street, Suite 1160
Denver, CO 80202

^Top of overview

# Qwest Full Privacy Policy

**What information does Qwest collect and how does Qwest use customer information?**

General practices - collection
General practices - use
When Qwest provides voice service
When Qwest is your Internet service provider
When you visit a Qwest website
When Qwest advertises on others' websites

**Does Qwest share customer information?**

General practices
Sharing of customer information with third parties for their use
Disclosure of information through links from Qwest websites
When other companies advertise on Qwest websites
Sharing of customer information with the government

**What choices do our customers have about information we collect and how we use it?**

General practices
Choices regarding directory listings
Choices regarding marketing contacts

What access do customers have to information about them?

How does Qwest secure customer information?

Changes to this Privacy Policy

Contacting us

## What information does Qwest collect and how does Qwest use customer information?

General practices – collection

**Signing up and ordering services.** When customers sign up for service, we ask for their name, street address, email address, how they want their listing to appear in phone directories and directory assistance, and contact information. We may ask for date of birth, social security or driver's license numbers (to confirm identity or determine creditworthiness), billing information including whether bills should be sent by mail or set up for online access, and bank account or credit card information if a customer elects to pay electronically. We also keep notes of contacts we have with our customers.

**Recording, reviewing or monitoring of your interactions with Qwest.** For quality assurance and training, we sometimes review email correspondence and record or listen to calls made to or from our customer service and repair personnel, sales offices, and business account managers. We also save the text of "click to chat" sessions with our online sales and service consultants, and may save screen shots when customers give our repair personnel remote access to their computers for technical support.

**Network recording of service usage.** We record information about usage of our networks or systems. For example, we may collect dates and times of calls and numbers called or calling. If a customer activates a "call trace" feature, we will record the number of the calling party. And when we are your Internet service provider (ISP), we maintain logs of the total volume of data a user transmits, and the date, time and length of time that a user accessed the Internet through our services, including the user's IP address at the time. For more about information we collect see the section below entitled, When Qwest is your Internet service provider.

**Information collected when visiting Qwest websites.** When a user visits a Qwest website (such as Qwest.com or myqwest.com), we get information about the user's operating system and its browser, the site accessed immediately before accessing a Qwest website, pages the user goes to within the Qwest website and sometimes the website accessed after leaving a Qwest website. We also get the user's Internet Protocol (IP) address,* including the city and state of its location. That lets us customize product availability and pricing for that community. We may also keep information entered by users on our online order pages, even if the customer does not complete an order.

*An IP address is assigned to a user's browser by the user's ISP. The IP address identifies users on the Internet by a number, and part of that number usually identifies the user's city and state. Your IP address stays the same while you're connected to the Internet, but a new one may get assigned between Internet sessions.

**When other companies advertise on Qwest websites.** When other companies advertise on Qwest websites like myqwest.com, the ad networks (companies that help businesses place Internet advertising) and advertisers we work with to place ads there may put a cookie or web beacon on your computer. The ad networks use these cookies and web beacons to keep track of what ads are displayed and whether users click on the ads (both as required by their relationships with advertisers), and to better understand the ads that users like. We do not allow the ad networks or advertisers who advertise on our sites to place cookies or web beacons in order to gather information that identifies users individually or builds profiles about their web use. All the ad networks we work with agree to the Network Advertising Initiative (NAI) Principles and participate in the NAI's opt-out process. To learn more about cookies, web beacons, and the NAI and its opt-out process go to our Frequently Asked Questions

**Information collected when clicking on Qwest ads on other websites.** When we place ads on others' websites, the ad networks we work with give us general information about users who click on our ads, including the types of browsers they use and their city and state. The ad networks we work with may use that information to predict what Qwest ads may be most effective in a location.

**Multiple privacy policies might apply.** In some cases, more than one privacy policy will determine how information about you is collected and used. For example, when we sell you services either with or through another business (such as an Internet, TV or wireless service), their privacy policies will be relevant. This is also true when you access non-Qwest websites.

**Personal information collected from third parties.** We receive information about our customers from other businesses. This happens, for example, when another business sells our services, or when we bundle our services with services from a TV or wireless company. It also happens when we bill for a business, such as a long distance company or other type of service provider. We also buy information about our customers from businesses that gather it from many sources, including the Census Bureau and public records. Finally, we work with companies that provide us email addresses for our customers.

^Top of full policy

General practices – use

**Routine business uses of personal information.** We use information that we collect from customers or generate while providing our services to set up and maintain accounts, provide and repair our services, respond to customers' questions and concerns, bill and collect for our services, and communicate with our customers and others about our services. We also use our customer information, and information we buy from third parties, to determine our customers' creditworthiness and predict what new services our customers may want. We do not resell customer information that we buy from third parties.

^Top of full policy

When Qwest provides voice service

As a communications service provider of local, long distance, and Voice over Internet Protocol (VoIP) services, we collect and use information as outlined above under General Practices.

When we provide VoIP service, an extra step is necessary. In line with Federal Communications Commission (FCC) rules, we rely on our customers to keep their service addresses current by updating their online customer profile when they change locations. In the event of an emergency, we provide this information to first responders so that they can find you.

^Top of full policy

When Qwest is your Internet service provider

As your ISP, we collect and use information as outlined above under General Practices.

**Information we collect when Qwest provides Internet access.** We collect and use information generated on our networks to manage them, and to keep our services running efficiently. For example, we monitor data to check for viruses, to control spam, to prevent attacks that might disable our services, to ensure that your traffic does not violate our Qwest High-Speed Internet Subscriber Agreement or our Acceptable Use Policy, and to guard against other inappropriate or illegal activity. This involves looking at the characteristics of our network traffic, such as traffic volumes, beginning and ending points of transmissions, and the types of applications being used to send traffic across our network.

Sometimes we need to look into the content of the data (such as the specific websites being visited, files being transmitted, or application being used) for the purposes described above, in circumstances when we are concerned about fraud or harassment, to repair a problem we detect or that a customer contacts us about, or when we are providing the content of broadband traffic to law enforcement which we only do as authorized by law.

Most of the specific information we collect that is attributable to a user is kept only for a matter of hours or days. We may retain data for longer if, for example, we see patterns in the traffic that give us concerns about potential harm to our network, or if we are doing a specific study on the impact of certain applications used on our networks. We also retain for longer periods logs of the total amounts of data transmitted, and the date, time, and duration of access to the Internet through our services by a user, including the user's IP address at the time.

We do not look into the content of your email, websites visited or other communications for marketing purposes.

**Children's use of Qwest's Internet services.** We understand that children may use our Internet services. We urge you to pay attention to what your children are doing on the Internet and what sites they are visiting. For more information about online safety, please visit our sponsored site at http://www.incredibleinternet.com/online safety. Also, check out http://www.netsmartz411.org, a resource provided by the National Center for Missing and Exploited Children, for answering questions about Internet safety, computers, and the web.

^Top of full policy

When you visit a Qwest website

**Information collection and use.** We maintain a variety of websites, some for general audiences (such as myqwest.com) and some for specific customer segments such as large businesses. When a user visits one of these sites, our systems use "cookies," or similar tracking files that provide information about the user's operating system and its browser, the site accessed immediately before accessing a Qwest website and sometimes the website accessed after leaving a Qwest website. To learn more about cookies and other Internet information technologies visit our Frequently Asked Questions.

We also collect information about users when they interact with our sites, such as which pages they visit and any ads they click on.

We use this information to analyze and manage our sites so we can keep making them better. To improve our visitors' experiences, we may store preferences or other information they volunteer to personalize service offerings and ads. For example, we may use a stored telephone number and location to show local product availability and pricing.

We also use information we collect from our sites for security purposes, such as to detect unauthorized intrusions, prevent malicious attacks, and help ensure a safe online experience for our customers.

We may also keep information entered by users on our online order pages, even if the customer does not complete an order. We use this information for marketing purposes.

**Collecting information from children under 13.** Our websites are intended for general audiences. Our content is not designed to attract children. We do not knowingly collect personal information from children under 13. Note that other providers' web pages are accessible through links on many of our websites, and those providers may have different practices on collecting and using information from children under 13. If you are concerned about those sites, you should review them and their privacy policies.

^Top of full policy

When Qwest advertises on others' websites

We work with ad networks (companies that help businesses place Internet advertising) to place our ads on other companies' websites. This process could involve the use of cookies or other Internet information technologies by the ad networks. **To learn more** about cookies and other Internet information technologies visit our Frequently Asked Questions. Ad networks also give us feedback about the effectiveness of our ads.

All the ad networks we work with agree to the Network Advertising Initiative (NAI) Principles and participate in the NAI's opt-out process. **To learn more** about NAI and its opt-out process go to our Frequently Asked Questions.

^Top of full policy

Does Qwest share customer information?

General practices

**Sharing information within Qwest.** Qwest is made up of a number of companies and we share information among them as permitted by law. We think you benefit when we better understand your interests and needs. And knowing more about how our customers use our services and sharing that information among Qwest's companies helps us improve our networks, the services we provide, and our customer service. It also lets us personalize our interactions with you, including your online experience.

**Sharing information with companies who support our services.** We share customer information with companies that help us market, sell, bill and collect for, and otherwise support our services. Often when these companies act on our behalf, they refer to themselves as "Qwest." We also share limited customer information with companies that provide our customers with telephone equipment, Internet services, TV offerings, and wireless services, which we may sell as part of our service packages. We require these businesses to use our information *only* for the purposes we specify and to protect it from unauthorized access or disclosure.

**Providing information when lawfully permitted and necessary.** Like other businesses, we may share customer information: (1) to comply with laws or to respond to lawful demands such as subpoenas or court orders; (2) to assert or defend our legal rights or the rights of our employees, agents, contractors, or customers; (3) to investigate and protect against fraud, harassment, or other types of unlawful activity involving us, other providers we do business with, or our customers; (4) to protect our property, including our networks, or the property or networks of others; or (5) as otherwise permitted by law.

**Sharing information when merging, selling or transferring part of our business.** If we decide to merge, sell or transfer a part of our business to or with another company, we might provide confidential customer information to the company as part of the decision process or as a result of the sale. We might also provide customer information to another company if we decide to stop providing a service. In all these cases, the companies receiving the information would be required to keep it confidential and use it only for the purposes that would be stated in our agreements with those companies.

**Providing information when customers ask.** We will disclose information about a customer's account to others when the customer asks us to do so in writing. For information on where to send a request go to our Frequently Asked Questions.

**Caller ID.** We disclose customer information through call-identifying products and services like Caller ID. In some instances, you can block that disclosure. For more information about call-identifying features and how to block disclosure of that information go to our Frequently Asked Questions.

**Sharing of customer proprietary network information (CPNI).** CPNI is a subcategory of protected customer information defined by federal law as information about a consumer's account, including usage and billing of telecommunications services. Those services are offered by providers of traditional local, long distance, and wireless services, as well as providers of Voice over Internet Protocol (VoIP) services to consumers. CPNI includes what services you subscribe to, how you use them, and what service providers charge you for them. It does not include your name, address, telephone number, or other types of information such as information about your telephone equipment or Internet access services. Communications companies are required to treat CPNI confidentially, and we do. The FCC regulates when and how CPNI can be shared and used. To find out more about the FCC's CPNI rules go to our

CenturyLink | Qwest Privacy Policy

Frequently Asked Questions.

^Top of full policy

### Sharing of customer information with third parties for their use

Subject to the exceptions described below for credit reporting businesses and identity confirmation services, we share customer information with third parties for their own use either because the law requires it or customers have consented to it. For the most part, federal law covers the release of information in these circumstances.

**Providing information to other carriers and service providers.** We share customer information with carriers and other service providers, including competing local and long distance companies, VoIP providers, Internet service providers, and billing companies so that they can accurately provide and bill for their services. This exchange of information is often legally required, and is also consistent with industry standards. In some cases the customer whose information is being provided is a customer of both Qwest and the other provider. In other cases, the other provider has told us that it has the customer's permission to receive the information. And we will also share information with another provider if we suspect fraud, harassment, a threat to their networks, or some other unlawful activity.

For example, companies like Qwest are legally required to provide customer information to long distance and other service providers (or their billing agents) so they can verify orders, be aware of customer moves, get paid for their services and for other similar non-marketing purposes. We are required to provide such information even if the information is not listed or published, and the law limits these companies in their use of the information.

**Directory publishers.** By law, when Qwest accepts a directory listing for publication, we must provide that listing information to all directory publishers - both our official publisher as well as third-party publishers. When we receive listings from other carriers, they tell us what directories (if any) they want their customer information published in. Once publishers have the listing information, they can use, sort, organize or package the information in any manner they wish: arranged by name or by telephone number, for example, or published in paper directories, electronic directories over the Internet, on CDs, or in any future directory format that may be developed.

We are also required to give directory publishers the names and addresses of customers with non-listed and non-published information. These publishers can use this information *only* to deliver their directories and for no other purpose.

- If you have elected to have your name, address and telephone number published in white pages directories (which means that it will be public information), we allow that information to be used by our official directory publisher and purchasers of our directory assistance offerings for their own marketing or to create marketing lists. **To choose not to be included on lists that may be used by others for marketing, click** *here*.

**Directory assistance providers.** The Federal Communications Commission requires carriers to share customer names, addresses, and telephone numbers with directory assistance providers (including names but not telephone numbers of non-published customers). Some of these providers offer Internet or online directory assistance services. The FCC does not allow us to restrict how these providers use the customer information we give them. But we do require companies that buy our directory assistance information to sign a contract agreeing to honor restrictions you have asked for, such as that it not be published, when they use the information for purposes other than directory assistance.

**Emergency service providers.** Federal law requires us to provide customer names, addresses, and telephone numbers - including information on non-published and non-listed customers - to emergency services providers, including 911 and reverse-911 providers (who notify the public of emergencies). This information is also provided to those responsible for answering 911 calls when they receive such calls.

**Credit reporting businesses.** We may provide information on customers' payment histories to credit evaluation or reporting businesses. We may permit those businesses to incorporate that information into their own databases as part of offering their services.

**Identity confirmation services.** We may also allow companies to match information provided to them by their potential customers with name and address information in our databases to confirm the identity of their potential customers.

**California privacy rights.** California Civil Code Section 1798.83 entitles California customers to request information concerning whether a business has disclosed personal information to any third parties for the third parties' direct marketing uses. California customers who want more information about our compliance with this law or have questions or concerns about our privacy practices and policies may contact us at privacy@qwest.com.

^Top of full policy

### Disclosure of information through links from Qwest websites

Our websites contain links to websites of other businesses. We are not responsible for information those sites collect. If you are concerned about the information collected by these other sites, you should review their privacy policies.

^Top of full policy

When other companies advertise on Qwest websites

When other companies advertise on Qwest websites like myqwest.com, the ad networks and advertisers we work with to place ads there may put a cookie or web beacon on your computer. The ad networks use these cookies and web beacons to keep track of what ads are displayed and whether users click on the ads (both as required by their relationships with advertisers), and to better understand the ads that users like. We do not allow the ad networks or advertisers who advertise on our sites to place cookies or web beacons in order to gather information that identifies users individually or builds profiles about their web use. All the ad networks we work with agree to the Network Advertising Initiative (NAI) Principles and participate in the NAI?s opt-out process. **To learn more** about cookies, web beacons, and the NAI and its opt-out process go to our Frequently Asked Questions.

^Top of full policy

Sharing of customer information with the government

**Responding to lawful process.** We may provide customer information to the government in response to a subpoena, warrant or court order. Among the information we might be asked to provide are a customer's name, address, telephone number, account number, any Internet Protocol or network address that we assigned to the customer, records of service usage (including interactive session times and durations), how long the customer has subscribed to our services (including start date and the types of services used), and the means and source of customer payment (including any credit card or bank account number used to pay for our services). In response to a search warrant or court order, we may be required to disclose to law enforcement agencies the content of and records relating to telephone calls, email messages (including attachments), and Internet usage. We do not provide notice to our customers of law enforcement demands for information. But our usual policy is to provide notice and the opportunity to object when we receive requests related to civil lawsuits whether from the government or private parties.

**Voluntary release of information in an emergency.** We may provide customer information to the government if we believe in good faith that an emergency involving immediate danger of death or serious physical injury to any person requires disclosure without delay.

**Other voluntary releases of information.** Under certain conditions, we voluntarily share information with governmental agencies:

- If we encounter situations where we think our customers or others that we might be in contact with are violating the law, we may contact law enforcement and provide them with the information that led to our belief.
- When customers complain about us to federal and state regulatory authorities, we provide pertinent information (including customer information) in response to those complaints.
- We may share information with the government to protect our rights or property, including information indicating that some portion of our network or the network of another provider is or has been subject to a cyber attack.
- Periodically, we compare our customers' name and address information with the information possessed by the U.S. Postal Service. This lets us mail at reduced rates and helps ensure that our customers get their bills and other information from us more economically and reliably.
- We also share information with federal and state agencies in connection with their programs to fund universal service and other communications assistance programs for low-income or otherwise eligible persons, including persons with disabilities.

**Reporting of child pornography.** Like other service providers, we are required to report apparent violations of laws concerning child pornography when we know of facts or circumstances that warrant a report. In those cases, we contact the National Center for Missing and Exploited Children and may also contact law enforcement directly.

^Top of full policy

What choices do our customers have about information we collect and how we use it?

General practices

**Telephone directory treatment.** You can choose whether and how your entry appears in Qwest directories and through Qwest directory assistance. You can choose not to have your name and address in these directory services at all or opt for full names or initials, or full or partial addresses.

**Product choices.** We provide a number of telephone related services that may help you protect your privacy, including Caller ID and Caller ID blocking services, Anonymous Call Rejection, and No Solicitation. For more information about these services, please contact us:

- Residential: 1-800-244-1111
- Small business: 1-800-603-6000
- Larger business: 1-800-777-9594 (or your dedicated account representative)

**Third party marketing.** If you have elected to have your name, address and telephone number published in white pages directories (which means that it will be public information), we allow that information to be used by our official directory publisher and purchasers of our directory assistance offerings for their own marketing or to create marketing lists. To choose not to be included on lists that may be used by others for marketing, **click** here.

**Opting out of marketing communications.** You can ask not to receive our marketing calls, mail and email. You may

still receive informational or administrative calls, mail or email. See Choices regarding marketing contacts below.

^Top of full policy

### Choices regarding directory listings

You can choose not to be published in our directories or listed in our directory assistance service. A non-published status means that a number is unavailable in both places, while a non-listed status means that name and number are not printed in directories but are available through directory assistance. To make one of these choices (for which there is usually a fee), please contact us:

- Residential: 1-800-244-1111
- Small business: 1-800-603-6000
- Larger business: 1-800-777-9594 (or your dedicated account representative)

If you choose to be listed in a directory, you can limit the information provided. For example, you can decide to list only your last name and first initial, or you may use either a community address (such as "Denver") or no address at all.

**Please note** that we are required to give non-published and non-listed customer names and addresses to directory publishers for directory deliveries and to directory assistance providers. But we mark the information so that they know our customers' privacy choices and by contract we require them to follow those preferences.

^Top of full policy

### Choices regarding marketing contacts

**Telephone.** Federal Do Not Call laws allow you to place residential landline and wireless phone numbers on the National Do Not Call Registry to prevent telemarketing calls to those numbers. If you would like to add your numbers to this list, you may do so by calling 1-888-382-1222, or by visiting www.donotcall.gov.

**Please note** that being on a federal or state Do Not Call list will not keep customers from getting our marketing calls because we have an established business relationship with our customers.

Residential customers who don't want to receive our marketing telephone calls may ask to be placed on our internal Do Not Call list. For more information see http://www.qwest.com/legal/donotcall/files/Qwest_s_Do_Not_Call_Policy.pdf.

If a current Qwest customer does not want to receive our marketing calls, the customer must expressly tell us not to call by getting on our internal Do Not Call list by *clicking here* or *calling* us at:

- Residential: 1-800-244-1111
- Small business: 1-800-603-6000
- Larger business: 1-800-777-9594 (or your dedicated account representative)

**Direct mail.** If you want to stop direct mail marketing, including the receipt of catalogs, from companies other than Qwest, you should contact them directly or go to the Direct Marketing Association (DMA) website at https://www.dmachoice.org/dma/member/home.action for more information.

If you do not want to receive our direct mail marketing, you must expressly tell us by *clicking* here or contacting us at the telephone number above. We will stop sending you direct mail marketing for two years from the date of your request.

**Email marketing.** To stop receiving commercial emails from us, follow the "unsubscribe" instructions on the email message, *click* here or contact us at the telephone number above.

Our Qwest.com MyAccount residential customers may also go to their My Profile, email preferences, to add or remove themselves from our email lists.

**Please note** that it may take up to thirty days for your choices regarding marketing contacts from us to become effective. If you are our customer, you will still receive service related contacts and notices from us even if you choose not to receive marketing contacts.

^Top of full policy

### What access do customers have to information about them?
**Access through billing statements.** Your monthly billing statement contains the primary name on your account, the services you subscribe to or use, and the amount billed. A paper billing statement may contain less detailed information about specific services or usage than information available online. Both may contain other information, such as regulatory notices and charges passed on to you from other service providers. If you find a mistake in the information we have or if you have any questions about your account, please call us at:

- Residential: 1-800-244-1111
- Small business: 1-800-603-6000
- Larger business: 1-800-777-9594 (or your dedicated account representative)

**Telephone and online access.** We will discuss your account with you or with someone you authorize (once the caller is properly authenticated). Information may also be available to an authorized user through your online account profile or through interactive tools on our website such as "click to chat." If you want to authorize someone to talk about your services or other account details, call us at the telephone number above.

**Releasing information upon written request.** We will release information about your account to others when you ask us to do so in writing. For information on where to send your request go to our Frequently Asked Questions.

**Protecting your passwords.** Please help us protect your privacy by guarding the confidentiality of your password and other authentication information.

^Top of full policy

How does Qwest secure customer information?

**Qwest controls generally.** We have many information databases and systems, all of which have administrative, physical, and technical controls designed to safeguard them and prevent unauthorized access to customer information.

**Securing sensitive information.** We use secure technologies to transfer sensitive information. We comply with the Payment Card Industry Data Security Standards, and a variety of other standards, as well as federal and state laws regarding the protection of customer information.

**Restricted access to information.** Only Qwest employees, agents, service providers and other businesses we work with and share information with and who have a legitimate business purpose are authorized to access customer information. This access is strictly defined (often involving password controlled access and other security controls) and subject to policies and contracts requiring confidential treatment of the information.

**Employee and vendor training.** We require employees to protect customers' information. We train our employees on those policies when they are hired, and we update that training routinely. When necessary, we train vendors on our policies as well.

**Proactively protecting your own information.** We encourage our customers to actively protect their personal information. Don't give identifying information to strangers or others unless you're certain they have a right to or a need for the information. Also, protect the security of personal information you transmit over home networks, wireless routers, WiFi networks, and similar devices by using encryption and other techniques to prevent unauthorized interception.

If you think information about you or others has been disclosed without proper authorization, please contact us at privacy@qwest.com, or write us at:

Qwest Privacy Group
1801 California Street, Suite 1160
Denver, CO 80202

^Top of full policy

Changes to this Privacy Policy
We update this privacy policy from time to time to reflect evolving technology and other service, process and policy changes. We will notify you of any material changes by posting a notice on our website home page and the privacy policy page for 30 days before making the change.

^Top of full policy

Contacting us
For questions about this policy or our practices, please email us at privacy@qwest.com, or write us at:

Qwest Privacy Group
1801 California Street, Suite 1160
Denver, CO 80202

^Top of full policy

Home    About Us    Careers    Investor Relations    Media    Legal    Privacy    Site Map    Tariffs

© 2011 Qwest Communications International. All Rights Reserved.    Feedback    Find a Store    Contact Us