1                 IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF COLORADO

3     Case No. 12-CV-00886-MEH

4     _____

5     MALIBU MEDIA, LLC

6         Plaintiff,

7     vs.

8     JEFF FANTALIS, *et al,*

9         Defendants.

10    _____

11

12            Proceedings before MICHAEL E. HEGARTY, United

13    States Magistrate Judge, United States District Court

14    for the District of Colorado, commencing at 2:08 p.m.,

15    November 5, 2012, in the United States Courthouse,

16    Denver, Colorado.

17    _____
              WHEREUPON, THE ELECTRONICALLY RECORDED
18    PROCEEDINGS ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...

19    _____
                            APPEARANCES
20
                  MR. JASON AARON KOTZKER, ESQ.
21          Appearing on behalf of the Plaintiff.

22                  MR. JEFF FANTALIS
                    Appearing pro se.
23

24    _____

25                          MOTION HEARING

                AVERY/WOODS REPORTING SERVICE, INC.
      455 SHERMAN STREET, SUITE 250, DENVER, CO 80203
            303-825-6119        FAX 303-893-8305

```
 1                      P R O C E E D I N G S
 2                (Whereupon, within the electronically recorded
 3     proceedings are herein transcribed, pursuant to order of
 4     counsel.)
 5                THE COURTROOM DEPUTY:  All rise.  Court is now
 6     in session.
 7                THE COURT:  Good afternoon.  Please be seated.
 8     Case No. 12-CV-886, Malibu Media, LLC versus Jeff
 9     Fantalis and Bruce Dunn.  Could I have appearances,
10     please.
11                MR. KOTZKER:  Good afternoon Your Honor.
12     Jason Kotzker for the plaintiff, Malibu Media.
13                THE COURT:  Thank you.
14                MR. FANTALIS:  Good afternoon, Your Honor,
15     Jeff Fantalis.
16                THE COURT:  Mr. Fantalis.  Who is with you,
17     please?
18                MR. FANTALIS:  This is my wife Maryann.
19                THE COURT:  Okay.  Under what rule are you
20     having your wife sit here with you at the table?
21                MR. FANTALIS:  Just to help me with documents,
22     Your Honor, and --
23                THE COURT:  Okay.
24                MR. FANTALIS:  -- organize things.  There's a
25     lot to keep track of.
```

1           THE COURT:  All right.  All right.  Well, if

2      she's sitting there in the nature of a paralegal would

3      sit next to an attorney then I don't think I'll have any

4      problem with that.

5           All right.  Mr. Kotzker, do you disagree with

6      Mr. Fantalis's date calculation as far as your response

7      having been due November 1st instead of November 2nd?

8           MR. KOTZKER:  Are you saying he claimed it was

9      due the 1st instead of the 2nd?

10           THE COURT:  Correct.

11           MR. KOTZKER:  I believed it was due the 2nd,

12      Your Honor.

13           THE COURT:  Why?

14           MR. KOTZKER:  That was my calculation based on

15      the calendar of when --

16           THE COURT:  Well, let me tell you what we

17      perceive.  He signed the certificate of service on

18      October 8th.  You mailed it that day; is that right,

19      Mr. Fantalis?  All right.  He actually filed the

20      document October 11th.  There's 21 days.  Twenty days is

21      October 31st; 21 days is November 1st.  Do you come up

22      with any other time?

23           MR. KOTZKER:  I don't based on that.  But it

24      would have been, you know, when I saw it showing up in

25      Pacer obviously --

1          THE COURT:  Okay.

2          MR. KOTZKER:  -- as delayed.

3          THE COURT:  So, October 11th you had 21 days

4   made it November 1st.  So, you were -- as we calculate

5   time it appears to me you were one day out of time

6   (unintelligible).  The docket sheet shows the 11th as

7   the date of the motion.  So, anyway, that's not the end

8   of it.  I mean, you were technically out of time.  And I

9   guess the problem, Mr. Fantalis, with going down the

10  route of strict adherence is --

11          MR. FANTALIS:  Cuts both ways.

12          THE COURT:  -- those who live in glass

13  houses --

14          MR. FANTALIS:  Yeah.

15          THE COURT:  Which as I always lived with as a

16  lawyer, I was always worried that some day I may be on

17  the bad end of the time argument.  So I need to consider

18  the arguments on the merits.  But your point is well

19  taken, and if you were an attorney and had to spend fees

20  in objecting to their late filing, it's likely I would

21  give you fees.

22          MR. FANTALIS:  It's unfortunate, Your Honor,

23  that it seems the court doesn't recognize my time as

24  having the same financial value.

25          THE COURT:  I can't.  I can't.

1                    MR. FANTALIS:  No, I understand that.

2                    THE COURT:  You --

3                    MR. FANTALIS:  When I say the court --

4                    THE COURT:  You understand that there's

5         just --

6                    MR. FANTALIS:  -- I don't mean Your Honor, I

7         mean --

8                    THE COURT:  Right.

9                    MR. FANTALIS:  -- the system.

10                   THE COURT:  Courts don't.  The system doesn't.

11                   MR. FANTALIS:  Yes.  Sorry, yes.

12                   THE COURT:  Because there's decades of

13        precedent that we're just not allowed to do that.

14                   MR. FANTALIS:  I understand.

15                   THE COURT:  But I would award you fees, and if

16        you had any actual cost of filing, and also I would

17        award you that because it was out of time.  So, my hands

18        are tied a little bit in that regard.  But -- but you

19        are exactly correct in your objection on the dates.

20        So --

21                   MR. FANTALIS:  Your Honor, my objection was a

22        little stronger than that in addition.  Everything that

23        the plaintiff has had to file that we've asked for has

24        either been the last day or after the day that it was

25        supposed to be provided.  I -- I'm not aware of any time

1     that that was not the case.  I think the motion to

2     dismiss that they recently filed was I think one of the

3     first times, if not the first time, that it was

4     something that didn't happen on the last day.  But, of

5     course, that benefited them.

6              In addition, they have continually, as we're

7     here to talk about today, tried to avoid discovery.

8     Everything about what they've done is trying to avoid

9     discovery and, you know, this is just part of that.

10    This is just part of everything that they're trying to

11    do.  They can't afford to have discovery.  It's pretty

12    clear why.  Anyone who follows these cases knows why.

13    They would -- you know, all their cases around the

14    country would be immediately dropped if they actually

15    responded to discovery and were honest about it.  And so

16    that was part of that.

17             The date thing was only, quite frankly, a

18    little jab that they can't even file things --

19             THE COURT:  Sure.

20             MR. FANTALIS:  -- when they're supposed to be

21    filed.

22             THE COURT:  Well, I guess the point that I'll

23    take for the present is also well taken by Mr. Fantalis.

24    And, you know, I guess as -- as judges go in the country

25    at the moment on the spectrum of squeezing your client

1  and being extremely permissive to your client, and there
2  are judges who are doing both.  Can we agree on that?
3          MR. KOTZKER:  Agreed, Your Honor.
4          THE COURT:  I'm trying to take a middle,
5  reasonable position, but -- but it is a good point by
6  Mr. Fantalis that you can't let the numerosity of these
7  cases drive you to the point where you're doing
8  everything at the last minute and then, in a situation
9  like this, beyond the last minute.
10         So, I'll -- I'll just advise that you can have
11  one bite of that apple but not two, and you've had your
12  bite as far as being late.  From now on, fair warning,
13  if you violate the timing then whatever you file will be
14  rejected.  Okay.
15         So, I think it's -- it would be wise not to
16  wait until the last second and risk the press of some
17  other emergency matter, whether it be in your private or
18  professional life, to interfere with getting things done
19  on time.
20         So, having said that, Docket 99, request for
21  an extension of time to file response will be granted.
22         MR. FANTALIS:  Your Honor, I'd like to add one
23  other thing.
24         THE COURT:  Go ahead.
25         MR. FANTALIS:  No issue with your response

1    there, of course.  I expected it, quite frankly.

2              THE COURT:  Go ahead.

3              MR. FANTALIS:  I also had an issue with the

4    request 4 extension.  Again, no issue with it being

5    granted and all that, but it goes to the way they have

6    been handling things.  They have been not truthful

7    throughout this case -- entire case and through cases

8    around the country, over and over and over again.  And I

9    can cite many cases if Your Honor would like.  I don't

10   believe, necessarily, his excuse, first of all.  It may

11   or may not be true, but when someone lies over and over

12   again, obviously you tend to stop trusting whether it's

13   true or whether it's not true.

14              In addition, it's pretty clear that

15   Mr. Kotzker is working with Mr. Lipscomb to respond to a

16   lot of these items here.  I don't believe that he's

17   personally responding to all this on his own.  And so to

18   actually state that he had a personal emergency when

19   someone else probably wrote the response is probably a

20   little disingenuous.

21              THE COURT:  Well, have you written every word

22   of everything you filed with --

23              MR. FANTALIS:  No.  I don't have a problem

24   with him doing that, Your Honor, but to state that he

25   had a personal emergency, you know, and use that as an

1    excuse, you know, when someone else is probably --

2            THE COURT:  Well, he didn't say personal he

3    just said emergency.  Go ahead, Mr. Kotzker, if it's not

4    something that's completely confidential what was the

5    reason that arose last Friday or -- yeah, I guess,

6    Friday.

7            MR. KOTZKER:  It was Thursday going into

8    Friday, Your Honor.

9            THE COURT:  Thursday.

10           MR. KOTZKER:  And I'd been battling flu-like

11   illness all week.  And the paralegal that had been

12   assisting me on, you know, preparing this called out

13   late Thursday night/Friday morning and wasn't going to

14   be able to come in.  And it was just something that --

15   it wasn't complete.  And it was actually, as you

16   correctly pointed out, due on Thursday instead of Friday

17   but it was just something that -- you know, as you can

18   see from the response it was 90 pages long.

19           THE COURT:  Well, it's extensive.

20           MR. KOTZKER:  And it simply wasn't done.

21           THE COURT:  Okay.

22           MR. FANTALIS:  Your Honor, may I add a little

23   bit more?

24           THE COURT:  You can, although I'm not going to

25   disbelieve him at the moment no matter what you say, but

1    you can go ahead.

2              MR. FANTALIS:  No.  No.  No, of course not.

3    He filed five motions that day.  It seemed that the

4    other motions were important to file, but the motion to

5    compel was not.

6              MR. KOTZKER:  Your Honor, those other motions

7    were one-page motions that can quickly be put --

8              MR. FANTALIS:  This was quite long, Your

9    Honor.

10             MR. KOTZKER:  Which was completed well before

11   the actual filing.

12             THE COURT:  You don't -- I mean, I've already

13   told him that it can't happen again and that --

14             MR. FANTALIS:  This just goes to the way it's

15   being handled, Your Honor, not the decision.

16             THE COURT:  I understand.  You know, and it's

17   not -- I know sitting in your chair it's frustrating.

18   Sitting in my chair it's not unusual to see -- are you a

19   solo practitioner?

20             MR. KOTZKER:  I am, Your Honor.

21             THE COURT:  It's not unusual to see a solo

22   practitioner who's too busy.  It's a fairly common thing

23   in the legal practice.

24             MR. FANTALIS:  Again, I could belabor the fact

25   that they shouldn't be suing thousands of people across

1    the country if he can't handle the work.  I could

2    belabor the fact --

3              MR. KOTZKER:  Your Honor, I'm not suing other

4    people around the country.

5              MR. FANTALIS:  New York and Colorado, there

6    are at least hundreds.  I could belabor the fact that,

7    you know, it's been stated in the bellwether case in

8    Pennsylvania that Mr. Lipscomb, his office steps in to

9    write some of the things for his puppet attorneys which

10   Mr. Kotzker falls under.  And so, also the writing

11   styles significantly change through some of the

12   responses showing that it wasn't the same person writing

13   them.  But, again, we've kind of been through that

14   before.

15             THE COURT:  Okay.  All right.  So, we have

16   other motions pending.  Probably should get to the

17   motion to compel, if -- if you all feel ready to address

18   that.

19             MR. FANTALIS:  A couple of items I'd like to

20   cover first which go into that, Your Honor.

21             THE COURT:  Go ahead.

22             MR. FANTALIS:  The plaintiff has said on

23   multiple documents now that he'll be dropping the

24   contributory liability and the actual damages.  When I

25   asked him about it he said that although he put it in

12

1    the document, he wasn't sure if he was actually going to

2    file that.

3              THE COURT:  Contributory liability?

4              MR. FANTALIS:  Yes, and actual damages.

5    Leaving, I believe only --

6              THE COURT:  And what is contributory liability

7    in that context?

8              MR. FANTALIS:  In this context the idea was

9    that I might have been a member of the swarm, not

10   necessarily the one who actually downloaded the film but

11   the file might have passed through one of my computers.

12   And so the plaintiff has changed their tactics as they

13   begin to get, you know, told by the court that they have

14   no weight whatsoever.

15             In addition, I believe they're dropping those

16   specifically to avoid discovery.  In any case, in

17   multiple documents they've stated that because they are

18   dropping that that certain things don't apply anymore,

19   but yet they haven't changed their original pleading.

20   Again, I'm not sure -- I don't think they can just state

21   in a document they plan on dropping it without actually

22   dropping it.

23             THE COURT:  Well, is it your client's

24   intention to dismiss those aspects of the case?

25             MR. KOTZKER:  Correct, Your Honor.  We're

1    going to proceed with one count for direct infringement

2    and seek statutory damages.

3              THE COURT:  All right.  Can you file a

4    stipulated -- are you going to stipulate to that?  To

5    the dismissal of the other claims?

6              MR. FANTALIS:  They're going to get knocked

7    out at any point.  It doesn't really matter if he wants

8    to drop them or he loses.  It's irrelevant.

9              THE COURT:  Well, it does.  I -- I mean, it

10   matters to you because he said he would.  And so it

11   matters to you.

12             MR. FANTALIS:  Yeah.  Yeah, that's fine.

13             THE COURT:  So, do you object to him filing a

14   stipulated motion to dismiss those aspects of the case?

15             MR. FANTALIS:  As long as it doesn't change

16   the original part of the case.  For example, they filed

17   with -- yeah, joinder with joint and several liability.

18   I don't believe dropping those changes that, and so then

19   I don't have an issue with them dropping that.

20             THE COURT:  All right.  So can you get a

21   motion to dismiss filed this week, please.

22             MR. KOTZKER:  Yes, Your Honor.

23             THE COURT:  All right.

24             MR. FANTALIS:  Your Honor.

25             THE COURT:  Go ahead.

14

1           MR. FANTALIS:  Every time you've asked them to

2    file something, almost every time, they never file it

3    when you tell them to.

4           THE COURT:  It's due by the 9th.

5           MR. FANTALIS:  Thank you.

6           THE COURT:  All right.

7           MR. FANTALIS:  I'm sorry, Your Honor, but --

8           THE COURT:  No, no.  It's fine.  It's a valid

9    point.  I was vague.  Motion to dismiss is due by the

10   9th.

11          MR. FANTALIS:  Thank you very much.  The next

12   item had to do with our last discussion and actually

13   goes to what we just talked about.  If you recall, I had

14   requested that some of the items that they marked

15   confidential it didn't give the details of the

16   confidentiality as provided by the protective order.

17   They did not respond within the 10 days.  In fact, at

18   that point I believe it was 18 to 20 days and they had

19   not responded.  At that point you also changed the

20   protective order to say that they had to, after the

21   10 days was up, file with the court within 5 days.

22          At that Monday you had told them -- again, you

23   gave them a sort of, I guess, it was a softer date that

24   they would file by the end of the week, come back and

25   either file I guess with the court or come back to me

```
 1   with their concerns by the end of the week.  It's
 2   2 weeks later or so, nothing.  I'm assuming --
 3            THE COURT:  So these are explanations for
 4   designating documents as confidential?
 5            MR. FANTALIS:  Yes, sir.
 6            THE COURT:  Okay.
 7            MR. FANTALIS:  And so I assume, based on the
 8   change in the protective order, that those items are no
 9   longer confidential.  And I just wanted to confirm with
10   the court because that's what the protective order said.
11            THE COURT:  Are you waiving that?
12            MR. KOTZKER:  I'm not waiving that, Your
13   Honor.  We are working on that expeditiously, and I can
14   also have that filed by the 9th.
15            THE COURT:  But -- but is Mr. Fantalis correct
16   that I gave you a time limit?
17            MR. KOTZKER:  I did advise you that I would be
18   filing it by the end of the week and then I have not
19   done so.
20            THE COURT:  By the end of what week?
21            MR. KOTZKER:  The week that we had the
22   conference call.  I --
23            MR. FANTALIS:  Two weeks ago, I believe, Your
24   Honor.
25            THE COURT:  Okay.  Well, you see -- you know,
```

1    it's not that difficult to get extensions with good

2    cause, but the problem is you've got to ask.  And if you

3    don't ask then it appears, clearly to Mr. Fantalis and

4    maybe even to me, that you just don't care enough about

5    the case to do the things that you're required to do,

6    which is obviously a bad situation to be in from a

7    judge's perspective.  Because, you know, these cases are

8    fairly important; they're certainly being discussed

9    amongst judges; they're high profile; it's at the

10   forefront right now of certain districts' dockets,

11   and -- and you've got to give me reason not to believe

12   that those judges that are squeezing your client, you

13   know, are doing something improper.

14           So -- I mean, this honestly I think this is

15   the first moment that I'm kind of seeing that -- that

16   things aren't going so well, okay.  So, tell me what --

17   tell me a game plan that you're -- what corrective

18   remedial measures you're going to engage in so that

19   Mr. Fantalis doesn't feel like I'm sitting here giving

20   you extension, after extension, after extension and, you

21   know, not making the playing field level.

22           MR. KOTZKER:  And I can understand

23   Mr. Fantalis's frustration and yours as well, Your

24   Honor, and I've already taken steps to remedy that.

25   I've advised my client that I'm not in a position now to

1    be able to file new cases to the extent that I was

2    before, simply because this suit and, you know, the

3    other named suits that we have pending before this court

4    are taking considerably more time than -- you know,

5    running through initial stages of John Doe suits.  So,

6    it has become apparent that this is taking more time

7    than I originally anticipated, and I have already taken

8    the steps, Your Honor.

9           THE COURT:  Okay.  Well, I guess what we'll do

10    on this one is, Mr. Fantalis has established somewhat of

11    a record today on the prosecution of the case.  If in

12    the event that the deadlines I set today are not met

13    then the case will be dismissed for failure to

14    prosecute, okay.

15           MR. KOTZKER:  Understood, Your Honor.

16           THE COURT:  So, I'll go ahead and --

17           MR. FANTALIS:  Your Honor?

18           THE COURT:  -- set the confidentiality

19    explanations by Wednesday close of business.  What?

20           MR. FANTALIS:  If I may point out,

21    five minutes ago you said you're not going to continue

22    to give them -- that you gave him the one shot and they

23    aren't going to get any more.

24           THE COURT:  Right.  But that doesn't count --

25    I mean, it counts after today.  That's --

1          MR. FANTALIS:  Okay.

2          THE COURT:  -- the point there.  So, I mean, I

3    just -- Mr. Fantalis, you're doing a good job of

4    bringing to my attention matters that should be brought

5    to my attention.

6          MR. FANTALIS:  Thank you, Your Honor.

7          THE COURT:  And -- and so deadlines just have

8    to be met.  So you have the deadline of Wednesday close

9    of business for your explanations or justifications on

10   confidentiality.  You have then --

11         MR. FANTALIS:  Your Honor, is that -- that's

12   to the court, right?  Not back to me, correct?

13         THE COURT:  I think it's to you.  Not to me.

14         MR. FANTALIS:  It's to me?

15         THE COURT:  Yeah.  It's not a document you

16   file with the court.  So, I expect at 5:01 a filing by

17   you if that deadline is not met, if it's not -- close of

18   business means 5 o'clock.

19         MR. FANTALIS:  Okay.  And that is that the end

20   of the -- I mean, it was originally -- I just want to

21   make sure I understand.  It was originally 10 days.

22         THE COURT:  No, my -- my -- I haven't been

23   strict.  I will be strict from now on with time limits.

24         MR. FANTALIS:  No.  No.  I just want to

25   understand.

19

1            THE COURT:  So, I'm not changing any prior

2    orders.

3            MR. FANTALIS:  No, I understand that, Your

4    Honor.

5            THE COURT:  Okay.

6            MR. FANTALIS:  The protective order now says

7    they have 10 days to get back to me, and within that

8    10 days we have to agree to whatever they get back.  If

9    we don't agree then they have 5 days to file.  I can

10   tell you right now I'm not going to agree to most of it

11   because most of it is public information, so how can

12   they be claiming it confidential.  That's one of the

13   things I warned about when we first talked about the

14   protective order, they'll just throw it on anything, and

15   sure enough.

16           So, unless they throw it off of most of it and

17   just do it on a couple items, which may make sense, if I

18   object I want to know, is that objection the end of the

19   10 days and then they have 5 days to respond since we're

20   beyond the 10 days.  I just want to understand the

21   rules, Your Honor.

22           THE COURT:  Okay.  Why don't you repeat that

23   again because --

24           MR. FANTALIS:  Okay.

25           THE COURT:  -- you through a lot of days out

1     there.

2              MR. FANTALIS:  Yeah.  So, the protective order

3     states that we have 10 days to agree on the

4     confidentiality of anything that they put that I -- I

5     question.

6              THE COURT:  So if they designate something

7     confidential on day one, and 10 days --

8              MR. FANTALIS:  After I object.

9              THE COURT:  It's typically construed as 10

10    business days.

11             MR. FANTALIS:  Which is fine, whatever it is.

12             THE COURT:  Which means 14 calendar days.

13             MR. FANTALIS:  So do they have -- do we have

14    10 more days in which to discuss this before they have

15    to -- that ten-day period --

16             THE COURT:  Yes.

17             MR. FANTALIS:  -- is up?

18             THE COURT:  I mean, they're --

19             MR. FANTALIS:  So, we're starting the clock

20    from zero at Wednesday.

21             THE COURT:  Right.

22             MR. FANTALIS:  Okay.

23             THE COURT:  Well, doesn't the --

24             MR. FANTALIS:  I just wanted to understand it.

25             THE COURT:  -- clock start with their

```
 1    explanations?

 2              MR. FANTALIS:  No, the clock starts with my --

 3    my statement to them that I disagree with their

 4    confidentiality.

 5              THE COURT:  Okay.

 6              MR. FANTALIS:  That's when the clock was

 7    supposed to start, which was about 30 days ago.

 8              THE COURT:  Okay.  And then 10 days from

 9    that --

10              MR. FANTALIS:  They have to -- basically, to

11    convince me, if you will, that there should be

12    confidential, whether by providing more information --

13              THE COURT:  I understand.

14              MR. FANTALIS:  -- or discussion.

15              THE COURT:  And then you have 5 days.

16              MR. FANTALIS:  Then they have 5 days to get

17    back to the court with an explanation of why it should

18    be confidential.

19              THE COURT:  Okay.  So are you just going to

20    stipulate right now that you're not going to agree to --

21              MR. FANTALIS:  No.

22              THE COURT:  No.

23              MR. FANTALIS:  I have to see their

24    explanation, Your Honor.  I'm just wondering where --

25              THE COURT:  Well, how much time do you want
```

```
 1    after you see their explanation?
 2            MR. KOTZKER:  Well, that would be a time for
 3    me, Your Honor, if we don't agree to confidentiality
 4    labeling, for me to file with the court.
 5            MR. FANTALIS:  Right.
 6            THE COURT:  Okay.
 7            MR. FANTALIS:  So, I guess what I would ask
 8    the court, what would make sense, is if I get back to
 9    them and say I disagree they have 5 days from that
10    point.
11            THE COURT:  Correct.
12            MR. FANTALIS:  Is that a fair way?
13            THE COURT:  Yes.
14            MR. FANTALIS:  I'll get back to them within
15    24 hours, Your Honor.
16            THE COURT:  That's fair.  All right.  So the
17    5 days starts then.  But that's 5 business days, so it's
18    7 calendar days, although Monday is a federal holiday,
19    so --
20            MR. FANTALIS:  Five business days.
21            THE COURT:  Yeah.  All right.
22            MR. FANTALIS:  Yeah.  Thank you, Your Honor.
23            THE COURT:  All right.  So, to reiterate
24    deadlines, Wednesday 5 o'clock for the justifications.
25    Friday -- what was Friday?
```

MR. FANTALIS: To --

MR. KOTZKER: To stipulate --

MR. FANTALIS: -- contributory -- to remove the filings on some of the pleadings, Your Honor. To remove the contributory and the actual (unintelligible).

THE COURT: Right. File the motion to dismiss by Friday, November 9th. All right.

Before we get into the motion then, anything else?

MR. FANTALIS: That's it, Your Honor.

THE COURT: All right.

MR. FANTALIS: Thank you for --

THE COURT: Very good.

MR. FANTALIS: -- talking through that.

THE COURT: All right. Let me proceed off of your document, Mr. Fantalis. The first thing you say is -- well, let's -- you object to the general boilerplate.

MR. FANTALIS: He didn't answer most of the questions, Your Honor.

THE COURT: I am interested in only objections stated as to each of the individual requests. So, your first set appears on page 9, and that is Request for Productions 1, 6, 8, 17, 18, 33 to 49, and 64. And then Interrogatories 8 through 10, correct? That's that --

1   Mr. Kotzker's objection that those requests are outside

2   the scope of the case.

3          And until there's a stay of discovery then

4   it's the pleadings that are currently operative that

5   define the scope of the case.  The current state of

6   pleadings includes Mr. Fantalis's counterclaims.  There

7   is no stay of discovery nor do I think has there been a

8   motion for stay filed.  Have you filed a motion to stay?

9          MR. FANTALIS:  Just filed --

10          MR. KOTZKER:  I did, Your Honor.

11          THE COURT:  What day was that?

12          MR. KOTZKER:  I believe it was either late

13   Friday or Saturday, Your Honor.

14          MR. FANTALIS:  I think it was over the

15   weekend.

16          THE COURT:  Has it been docketed?

17          UNKNOWN SPEAKER:  Yeah.

18          THE COURT:  Oh, okay.  All right.  Well, until

19   that motion to stay is adjudicated, and it won't be

20   until I receive your response --

21          MR. FANTALIS:  We can talk about it today,

22   Your Honor.  I'm perfectly fine with getting that

23   dismissed today if you'd like.

24          THE COURT:  All right.  If you want to -- if

25   you don't mind me ruling on it without a written

1    response by you we can deal with it today.

2              MR. FANTALIS:  It's pretty obvious, Your

3    Honor.

4              THE COURT:  Go ahead and respond.

5              MR. FANTALIS:  I'm going to read from another

6    case, Your Honor.

7              The discussion to issue a protective order and

8    thereby stay discovery rests within the sound discretion

9    of the trial court.  Such protection is warranted upon a

10   showing of good cause to protect a party or person from

11   annoyance, embarrassment, so on and so forth.  Here,

12   defendant seeks protection from the burden of discovery

13   at this stage of the case.  A stay in all discovery is

14   generally disfavorable in this court.

15             THE COURT:  Is that -- are you reading from an

16   opinion?

17             MR. FANTALIS:  Yes.

18             THE COURT:  My opinion, probably.

19             MR. FANTALIS:  It happens to be, sir.

20             THE COURT:  Okay.  Can you cite it.

21             MR. FANTALIS:  In this matter, stating the

22   case law, defendant's motion --

23             THE COURT:  No, no.  Cite the case.

24             MR. FANTALIS:  Oh, sorry.  Jerry Jackson, an

25   individual, plaintiff versus Denver Water Board,

1    defendant.

2             THE COURT:  Does it have a case number on it I

3    could -- a 11 or a 10 --

4             MR. FANTALIS:  I don't know if this has the

5    case number, Your Honor.

6             THE COURT:  -- preceding a colon.

7             MR. FANTALIS:  Unfortunately, where I got --

8    the site I got this from I don't think listed a case

9    number, Your Honor.

10            THE COURT:  All right.  Jackson versus Denver

11   Water Board, is that what you said?

12            MR. FANTALIS:  Yeah.

13            THE COURT:  Okay.  Go ahead.

14            MR. FANTALIS:  In this matter, stating the

15   case law, defendant's motion to dismiss is pending could

16   substantially delay the ultimate resolution of this

17   matter with adverse consequences such as decrease in

18   evidentiary quality and witness availability.

19   Defendants claim that a stay of proceeding is warranted

20   because, in quotes, "discovery on all issues posed by

21   complaint would be wasteful and burdensome."  Docket No.

22   13.  "However, defendant always are burdened when they

23   are sued, whether the case ultimately is dismissed,

24   summary judgment is granted, the case is settled, or

25   trial occurs."  And then it points to a case, Your

1   Honor.

2            THE COURT:  Okay.

3            MR. FANTALIS:  Generally, it is the policy of

4   this district not to stay discovery pending a ruling on

5   motions to dismiss -- states a case -- this is

6   particularly true in cases like this one pending before

7   Judge Krieger who instructs the parties that motions

8   having the effect of delaying proceedings may adversely

9   affect the scheduling of the case and other cases.

10  Consequently, the general interest of controlling the

11  court's docket and fair and speedy admission of justice

12  require that the motion to stay be denied.

13           Your Honor, it's pretty clear here to anyone

14  that looks at this case, anyone who looks at this case

15  and cases around the country, that Malibu Media has no

16  interest in discovery.  Everything they're doing in this

17  case has to do with squirming out of discovery.  They

18  can't have discovery, because what they're doing is

19  illegal.  They have no case whatsoever.

20           I mean, I could spend five minutes with you

21  and explain the technology and explain to you that they

22  have absolutely no case.  They know they don't have a

23  case.  They know they can't possibly win.  They know

24  that they're extorting money out of hundreds of people

25  around the country.  And I think it's actually thousands

1   when you don't just include Mr. Kotzker cases, but other

2   cases.  They can't possibly have discovery.

3         They will do everything in their power to not

4   have discovery and so far they have avoided any real

5   discovery.  All this is is another ploy to delay

6   discovery.  They can't do it.  They can't answer the

7   questions.  They spend more time responding to the

8   motion to compel than a lot of the things they complain

9   would be overburdensome to respond to.  They can't do

10  discovery, Your Honor.  And until the court forces them

11  to do discovery they'll continue to squirm around this

12  case and not provide anything of real value.

13        THE COURT:  I think part of their concern -- I

14  don't mean to speak for them, but it would be my

15  concern -- you're obviously tied in with people around

16  the country who are experiencing what you're

17  experiencing.

18        MR. FANTALIS:  Yes, sir.

19        THE COURT:  And I'm sure that Mr. Kotzker has

20  a concern that everything that lands into your hands is

21  going to be broadcast to a whole lot of people around

22  the country whether it's designated confidential or not.

23  That's probably a concern of his.  Although, you

24  probably know that violation of a protective order would

25  be a contempt of court.

```
 1              MR. FANTALIS:  Wouldn't even dream of it, Your

 2     Honor.

 3              THE COURT:  Okay.

 4              MR. FANTALIS:  In my business I do

 5     confidentiality clauses all the time.

 6              THE COURT:  Very good.  Now, let's talk

 7     about -- the reason why we try to avoid stays -- and by

 8     the way, Mr. Kotzker, I know it's -- it was my practice

 9     too to recycle headings for cases, but you're using the

10     MSK on your headings and -- including the motion to

11     stay, which was filed on the 4th.  So we just need to

12     have the proper caption on the case.

13              MR. KOTZKER:  I apologize, Your Honor.

14              THE COURT:  That's okay.  So, the issue

15     typically with a stay is this.  The -- the district

16     judges in this courthouse have criminal cases on their

17     plate as well as civil.  And they've historically given

18     relatively less responsibility to magistrate judges in

19     cases than maybe some other judges around the country;

20     which means they're busier than many district judges

21     around the country; which means that it often takes

22     six months to more than a year to decide motions such as

23     the one that the plaintiff -- that the plaintiff filed

24     to dismiss your counterclaims.

25              So, therefore -- and by the way, I mean,
```

 1    quoting from judge -- from a case involving Judge

 2    Krieger is appropriate for you, but she does have

 3    specific directions to magistrate judges in her cases

 4    about stays that other district judges don't have.

 5            So, she's -- she's the strongest judge in the

 6    courthouse for not permitting a stay of discovery.  Even

 7    her fellow brethren on the district bench are more

 8    lenient in allowing stays.  Okay.  But the reason why

 9    stays are disfavored is because the case may sit around

10    for a year and that's not fair to anybody.  Because you

11    have both the right to defend yourself and the right to

12    pursue your affirmative claims.

13            I think you would also agree that just because

14    someone files a claim, regardless of its merit -- and

15    I'm not even commenting on any of the merits of any

16    claims in this case, but one cannot simply file a case

17    and then harass the other side.  That's your whole

18    point, isn't it?

19            MR. FANTALIS:  Yeah.

20            THE COURT:  The mere filing of a claim doesn't

21    mean it so.  And in fact, you're saying that it ain't so

22    here, right?

23            MR. FANTALIS:  Yes, sir.

24            THE COURT:  So that shoe would fit on both

25    feet, correct?

1           MR. FANTALIS:  Yes, sir.

2           THE COURT:  Now, you haven't filed a motion to

3    dismiss in this case, I don't believe.

4           MR. FANTALIS:  I couldn't, Your Honor, because

5    we made the mistake of filing an answer and

6    counterclaim, and so we weren't allowed to file a motion

7    to --

8           THE COURT:  Right.

9           MR. FANTALIS:  -- dismiss.  I planned to, but

10   then I messed up.

11          THE COURT:  Right.

12          MR. FANTALIS:  If they would respond to

13   discovery we can get their case dismissed.

14          THE COURT:  Well, you're going to file a

15   dispositive motion I think is your point.  You'll file

16   at least a motion for summary judgment eventually.

17          MR. FANTALIS:  I would plan to, Your Honor.

18   You know, again, a five-year old could dismiss this case

19   if they understood the facts, so --

20          THE COURT:  Well, I hope I'll live up to the

21   standard of a five-year old.

22          MR. FANTALIS:  I'm sure you will, Your Honor.

23          THE COURT:  All right.  But my point being --

24          MR. FANTALIS:  To add one other thing, Your

25   Honor, sorry to interrupt.

1              THE COURT:  Go ahead.

2              MR. FANTALIS:  But to quote yourself again,

3    most to all of the discovery questions apply to their

4    case against me.  Again, one of the reasons they're

5    trying -- they want to drop those other pieces because

6    they want to kind of say, well, the discovery doesn't

7    apply which of course is wrong, Your Honor --

8              THE COURT:  Right.

9              MR. FANTALIS:  -- because I have a fairly wide

10   breadth and I'm allowed to make my case about them as a

11   company and their tactics and so forth.  So, I don't

12   think any of the questions would actually go away even

13   if my counterclaims were dismissed, which I don't

14   believe they will be --

15             THE COURT:  Okay.

16             MR. FANTALIS:  -- but even if they were.  It's

17   been I think about three months since we filed the

18   discovery.  If you notice, they didn't file the stay

19   when they first did it because, again, it's a delaying

20   tactic.  First they give garbage answers.  Then when

21   that doesn't work and a -- you know, a compel goes.

22   Again, to them it's a game, according to Mr. Kotzker, so

23   then they go and they file a stay.

24             THE COURT:  Why -- why do you say that he says

25   it's a game?

1          MR. FANTALIS:  Because he said that to me on

2    the phone, Your Honor.

3          THE COURT:  All right.

4          MR. FANTALIS:  He said the discovery process

5    is a game.

6          THE COURT:  Well, that may be interpreted

7    broadly, but -- so, the main -- the main impediment to

8    granting a stay is the delay it causes to a case.  In

9    this situation I'm not sitting here deciding the issue

10   of stay with concern about what a district judge will do

11   and how long they will take to decide your rights, which

12   I have no control over.  Here, I have perfect control

13   over getting a decision out.

14          So, if I were to do a stay -- first of all,

15   how issue -- how soon an order on the motion to dismiss

16   would be entered depends on when it's fully briefed.

17   So, he's moved to dismiss.  Do you plan on taking the

18   full 21 days to respond?

19          MR. FANTALIS:  It might even be longer, Your

20   Honor.  I was going to ask for some extensions today for

21   several reasons.  One, I now have five things to respond

22   to.  Secondly, I'll be out of state for 10 days and

23   unavailable to do any work on this.

24          THE COURT:  Okay.

25          MR. FANTALIS:  And so I was going to ask for

1    an extension.  And then of course he can reply and

2    then -- we're talking about two months again, and

3    hundreds of more people they are going to sue in that

4    time.  And that's what this is all about, Your Honor,

5    for them to continue to find a way to extort money as

6    long as the courts will allow them to do so.  It's not

7    just about me.  It's about all the other people that

8    they're abusing out there.

9             THE COURT:  Right.

10            MR. FANTALIS:  And the longer that the

11   discovery is not done and a court doesn't step up and

12   make a statement to them that you can't do this, the

13   longer the other people will be sued and abused and

14   managed in this way.

15            THE COURT:  Well --

16            MR. FANTALIS:  And that's all they're trying

17   to do.  They know that their lifeline is ending over

18   time.  Right.  We have the bellwether case in

19   Pennsylvania.  More and more people are stepping up.

20   I'm getting phone calls from other people who are

21   getting sued now who are willing to stand up to these

22   guys, finally.  Partially, I think, because I've gone

23   through the hell I've gone through and now they can kind

24   of follow in some of my footsteps.  And so if the court

25   allows them to continue to do this, all the court's

1    doing is allowing them to continue to abuse of process

2    and all the claims that I have there.

3            THE COURT:  Continue to do what, though?

4            MR. FANTALIS:  Excuse me?

5            THE COURT:  Continue to do what?  You said,

6    "if the court allows them to continue to this."  What is

7    "this"?

8            MR. FANTALIS:  Continue to not respond to

9    discovery.  Continue to sue people when they have

10    absolutely no case to sue people.  Continue to do

11    extortion on people when, again, they have no -- they

12    don't want to try this case, Your Honor.  They never

13    wanted to try this case.  It's very obvious to everyone

14    in the entire world, Your Honor.  They wanted me to

15    basically give in and pay them $3,000 so that they can,

16    you know, make their money on extortion and go away.

17            THE COURT:  Well, then why haven't they

18    dismissed the case?

19            MR. FANTALIS:  Why haven't they dismissed

20    their side of the case?  Because it would make them look

21    worse, Your Honor.  We're in it already.  Dismissing

22    their piece doesn't help them at all.  They're

23    dismissing, if you notice, a good portion of the case.

24    Why are they suddenly dismissing a good portion of the

25    case?  Did the facts change?  No.  Of course not.  They

1    haven't gotten any new facts on this case.  They've just

2    decided it's time for a new tactic.

3              THE COURT:  Well, how much time were you going

4    to request, by the way, for your response?

5              MR. FANTALIS:  Some of it depends on what may

6    get dismissed today, but the 10 days I'm going to be

7    gone and probably another 10 days at least.  Again,

8    there were five things filed since Friday, Your Honor.

9              THE COURT:  Right.  So, you're talking about

10   40 days then which takes you into Christmas.  Is that

11   when you're going to be responding?

12             MR. FANTALIS:  Something in that range.  You

13   know, and then when we get into the holidays.  You know,

14   I might have to ask for an extension.  Again, Your

15   Honor, I want to get this stuff in as soon as possible,

16   you know, of course.  I would like this to be off my

17   plate.  My life has been hell for six months.  I'd like

18   this gone.  But I have to respond and I have to do a

19   good job of responding.  I have a full-time job.  It's

20   hard to, you know, do all this stuff.  They have a whole

21   staff they can lean on.

22             THE COURT:  Well --

23             MR. FANTALIS:  Part of -- I believe part of

24   what they've done in filing these five things at once is

25   purposely, you know, big guy picking on little guy.

```
 1    Let's throw lots of stuff at him so they can't handle
 2    it.
 3              THE COURT:  Well, five things at once -- I
 4    guess, they filed a motion for -- they filed a motion to
 5    dismiss second amended counterclaim, motion to amend.
 6    I'm trying to get the five things down that you're
 7    saying that they filed.
 8              MR. FANTALIS:  Motion to dismiss, motion to
 9    strike affirmative defenses, motion to stay discovery,
10    response to motion to compel, motion to change
11    scheduling order.
12              THE COURT:  Okay.
13              MR. FANTALIS:  All since Friday.
14              MR. KOTZKER:  Your Honor, I would like to say
15    that I think it's in the court's best interest and the
16    parties' best interest to finalize the pleadings so that
17    we can move forward.  And my client and I have every
18    intent to move this case forward, and we did from the
19    point of filing the complaint, so that once the --
20              THE COURT:  Well, what --
21              MR. KOTZKER:  -- pleadings are finalized --
22              THE COURT:  What substantive discovery -- what
23    documents -- how many documents have you produced in the
24    case?
25              MR. KOTZKER:  I couldn't tell you that
```

1     specifically, Your Honor.

2                THE COURT:  Hundreds?  Thousands?

3                MR. KOTZKER:  I don't even think it's in the

4     ream of hundreds.

5                THE COURT:  Okay.

6                MR. KOTZKER:  But if we responded to discovery

7     as it was propounded by Mr. Fantalis right now it would

8     be in the tens of thousands.  And I think by ruling on

9     our motion to dismiss we'll narrow this down to one

10    count for direct copyright infringement and we'll be

11    ready to move forward with documents and responses that

12    correlate to that specific count.

13               THE COURT:  I do have an obligation under the

14    Federal Rules of Civil Procedure to make proceedings as

15    speedy, just, and efficient as possible.

16               MR. FANTALIS:  Your Honor, I ask you look at

17    their actions.  Everything they've done in this case is

18    to avoid discovery.  Everything they've done on this

19    case is to avoid discovery.

20               THE COURT:  Well, and they're not asking

21    for -- I mean, the stay of discovery would apply only to

22    your claims, because I don't think you're asking -- did

23    you ask for a complete stay?

24               MR. KOTZKER:  I don't believe so.  Just on the

25    defendants claims, Your Honor.

```
 1              THE COURT:  Right.
 2              MR. FANTALIS:  They're claiming that
 3    everything has to do with the counterclaims when --
 4              THE COURT:  But you're claiming nothing -- I
 5    mean, you're claiming everything has to do with their --
 6              MR. FANTALIS:  I'm claiming it's both.
 7              THE COURT:  -- fundamental --
 8              MR. FANTALIS:  I mean, maybe there's a handful
 9    of questions in there that maybe they can make an
10    argument would only be having to do with the
11    counterclaims.  But their whole thing is, well -- I
12    mean, they've said this all along.  All this stuff is
13    going to be dismissed, so I don't need to answer that.
14    And, you know, I have a right -- they say, well, you
15    don't have a right to understand our financials.  Well,
16    I do.  Because if they're a bogus company, which they
17    are, that has something to do with it.  I don't have a
18    right to understand the attorneys setup.  Well, I do,
19    because 90 percent of the costs are going to the
20    attorneys.  This is an attorney-driven case not a
21    client-driven case.
22              THE COURT:  Well, you say they're a bogus
23    company.  What do you mean by that?
24              MR. FANTALIS:  The only reason the company
25    exists, Your Honor, is to sue people.  That's the only
```

1    thing they do.

2                 THE COURT:  But there's -- I see that all the

3    time.  You ever heard of patent trolling?  Sometimes --

4    lots of times rich people get together, they form a

5    company solely for the purpose of pursuing patent

6    infringement cases, no intention of ever using the

7    patents that they quote/unquote own.  They've purchased

8    a bunch of patents.  They go around looking for people

9    who are infringing on their patents, and then they sue

10   them.  They all put in a million dollars to the pot for

11   litigation costs and then they hope for, like, a 10,

12   $15 million return each.  There's nothing illegal about

13   that.

14               MR. FANTALIS:  Well, Your Honor, though, but

15   when the attorneys are getting most of the money I

16   believe there is something illegal about that.

17               THE COURT:  Well, an attorney can only get a

18   reasonable fee for their services.

19               MR. FANTALIS:  That's what it's supposed to

20   be, Your Honor.  We have actual -- someone on the radio

21   who was friends with the owner of the company said he

22   had a conversation with him and disclosed that the owner

23   of this company said that they only get 10 percent on

24   the dollar for things that are collected.  I believe

25   that that's not legal, Your Honor.

1          THE COURT:  Well, I mean, that's -- that's a
2    hypothetical.  Let's say that you collect $10,000 but a
3    reasonable attorneys fee based on the hours expended
4    would be $9,000.
5          MR. FANTALIS:  Well, that's part of what we
6    want to --
7          THE COURT:  There's nothing illegal --
8          MR. FANTALIS:  -- find out, Your Honor.
9          THE COURT:  -- about that.  It's stupid from
10   the company's perspective to pay an attorney nine to go
11   get one.  We can all agree on that.  But that's not --
12   that's a monumentally bad business plan, but it's not
13   illegal.  It's only illegal for an attorney, No. 1, to
14   be in business, for example, with their client.  You
15   can't be in business with your client.  You have to --
16          MR. FANTALIS:  They are, Your Honor.
17          THE COURT:  -- represent your client.
18          MR. FANTALIS:  The attorneys actually
19   approached the owners of Malibu Media, which didn't even
20   exist at the time they approached, and they created the
21   company just to do this.  The attorneys approached them
22   to create this company.  Attorneys basically would say
23   they'll handle the whole thing.
24          THE COURT:  Well, those are questions that --
25   that to some extent you can get into even without your

1    counterclaim.

2              MR. FANTALIS:  Thank you, Your Honor.

3              THE COURT:  Because if you contend -- I think

4    you're contention basically is there's not a real

5    plaintiff here.

6              MR. FANTALIS:  It's one of the many, Your

7    Honor.  But, again, that's one of the things that they

8    said only applied to the counterclaim.

9              THE COURT:  Well, I understand.  And they

10   might be right.  They might not be right.  Ultimately,

11   it's the judge in the case that gets to decide what has

12   to do with what, and so that's what we were going to do

13   today.

14             I guess, though, I would be inclined -- if in

15   fact I can get a decision out within a week or two of

16   the matter being briefed, motion to dismiss being

17   briefed, then there may be no delay -- unnecessary delay

18   in this case and we can continue on our schedule.  So,

19   we wouldn't be sitting around for a year waiting on a

20   decision from someone else.

21             MR. FANTALIS:  Your Honor, we'd be sitting

22   around for another couple of months waiting to do

23   discovery, which is the thing that's going to slow this

24   case down the most.

25             THE COURT:  Right.  But that's only because of

43

 1    your schedule.  You see, if you -- if we brief this on

 2    time you would be filing a response on November 26th or

 3    so.  A reply would be filed by December 10th, and we'd

 4    have a decision out, really, about 40 days from now.

 5            MR. FANTALIS:  Still delaying 40 days, Your

 6    Honor.

 7            THE COURT:  Delaying 40 days.  Right.  But, if

 8    you compare delay of 40 days versus what Mr. Kotzker

 9    says, producing tens of thousands of pages at a

10    potential cost -- and by the way, do you know have to

11    pay up to $0.25 a page for the discovery that

12    you receive?

13            MR. FANTALIS:  That's only if I lose, I

14    believe, Your Honor.

15            THE COURT:  No.  Well, in discovery that's not

16    generally followed, because in most cases the parties

17    are exchanging an equal amount of documents, therefore,

18    they don't charge each other.

19            MR. FANTALIS:  Uh-huh.

20            THE COURT:  But I believe the law -- the state

21    of the law is if you want 10,000 pages of documents --

22            MR. FANTALIS:  I'm fine with getting them --

23            THE COURT:  -- they could cost you --

24            MR. FANTALIS:  -- electronically, Your Honor.

25            THE COURT:  They could charge you right now

1    $0.25 a page.

2              MR. FANTALIS:  Your Honor, I'm fine with

3    getting those electronically.  Besides, there's only a

4    few questions in there where we're asking for background

5    information.

6              THE COURT:  Okay.

7              MR. FANTALIS:  Most of the questions are

8    simple questions they can answer.  They've avoided

9    answering the simple questions.  They've avoided -- they

10   claimed they didn't understand certain things which have

11   to do with the basis of the case.  They didn't

12   understand basic information about the case.  And then

13   on some of the ones they responded to they just outright

14   lied.  That's even a different topic.  And they're --

15   again, they're doing everything they -- if they wanted

16   to say, Your Honor, we're going to respond to all of

17   these except for these three that are going to take a

18   lot, a lot of work and we want to, you know, state that

19   we think these three things are related to things that

20   may go away if the -- if the dismissal goes away, you

21   know, if the dismissal is accepted, I don't think that's

22   unreasonable, Your Honor.  But, again, they avoided

23   answering any question that would show that they're full

24   of crap.

25             THE COURT:  Well, to be fair, some of the

1    delay in the case has been caused by you, right?  You've

2    amended a couple times.

3              MR. FANTALIS:  Uh-huh.

4              THE COURT:  And so both sides are contributing

5    to how old the case is, which is by our standards, by

6    the way, not that old.  Last year -- no.  So far this

7    year we've had I think 40 civil jury trials and the

8    average age of the case is 28 months.  That's average.

9    So, some are up to seven or eight.  One's eight years

10   old.  The youngest ones are probably 12 to 14 months.

11   But the average is 28 months.

12             MR. FANTALIS:  Uh-huh.

13             THE COURT:  Twenty-eight months in this case

14   would be the end of 2014.  I guarantee you we're having

15   a trial in 2013.  So, no matter what, we're going to get

16   this case tried at least a year earlier than average in

17   this district.  So, we're not talking about a case

18   that's languishing for years and years.  Agreed?

19             MR. FANTALIS:  Yes.

20             THE COURT:  Okay.  So, I guess my inclination

21   is that it's worth -- by your own admission you could

22   have filed a motion to dismiss and didn't.  He did.  And

23   he has a right to ask for a stay when he's moved to

24   dismiss, especially if that stay would dispose of all

25   your claims -- or the dismissal would dispose of all

1    your claims -- and you did move to dismiss all claims in

2    the counterclaim?

3              MR. KOTZKER:  Correct, Your Honor.

4              MR. FANTALIS:  But, Your Honor, it's not going

5    to change what he has to do discovery on.

6              THE COURT:  Well, and that's -- if that's true

7    then -- then a stay won't matter.  Correct?

8              MR. FANTALIS:  Well, I don't know.  I mean, I

9    thought the stay meant that they were going to do no

10   discovery.

11             THE COURT:  No.  Just no discovery on your

12   counterclaims.  But if the discovery you seek is broad

13   enough to encompass his affirmative claim, which he's

14   limited down to one now, direct infringement.

15             MR. KOTZKER:  Uh-huh.

16             THE COURT:  Then that discovery is

17   permissible.

18             MR. FANTALIS:  And I would state that most, if

19   not all, of what I've asked for still applies.

20             THE COURT:  All right.

21             MR. KOTZKER:  Your Honor, if I may, just --

22             THE COURT:  Go ahead.

23             MR. KOTZKER:  Just by way of example.  If we

24   limit this down to one count for direct infringement --

25   the elements of that are ownership of a valid copyright

1    registration and infringement of substantial parts

2    thereof, correct?  For --

3              THE COURT:  Well, that's the elements of the

4    claim.  But in every civil case, defendant has a right

5    to test whether this is the proper plaintiff to bring

6    such a case, and some other peripheral matters.

7              MR. KOTZKER:  Sure.

8              THE COURT:  Okay.

9              MR. KOTZKER:  The first -- the first objection

10   is to Interrogatory No. 8.  And just to show you the

11   breadth of what he is requesting, you know, describe and

12   identify any contractor agreements or knowledge thereof

13   by and between, and then it lists seven or eight or nine

14   different entities on a whole host of topics.  I simply

15   don't see how that's relevant to any sort of direct

16   copyright infringement.

17             THE COURT:  Well, we're going to have to get

18   into that, I guess.  All right.  So, I am going to grant

19   then the motion to stay, which is Docket 101.  The

20   request was only -- well, let's see.  Well, Mr. Kotzker,

21   you're asking for a stay of all discovery?

22             MR. KOTZKER:  Yes, I'm pulling it up now, Your

23   Honor.

24             THE COURT:  So you're saying you don't even --

25   you're electing not to engage in any discovery.

1          MR. KOTZKER:  If we could limit the claims

2     down and we could go through a substantive discussion

3     today on how, for example, the interrogatory that I just

4     read to the court pertains to a count for direct

5     infringement I would be -- you know, I would be happy to

6     proceed in discovery for those claims only.

7          THE COURT:  Well, but -- Mr. Fantalis, as busy

8     as you are, would a two-month stay on both sides hurt

9     you or would it help you?  Would it help you focus on

10    briefing the motion to dismiss?

11         MR. FANTALIS:  Your Honor, I don't want

12    anything to stop discovery.  The whole reason I'm doing

13    this case is to get the discovery available.  And I know

14    I'm not supposed to put it out there for the whole world

15    to see right away, but certainly at some point the whole

16    world can see the discovery according to the rules, as I

17    understand it.  And certainly, when people call me up,

18    as people have, and ask for my help because they're

19    being extorted out of money, I can give them information

20    related to the discovery.

21         THE COURT:  Right.  Well, you obviously can't

22    say orally on the phone what you can't produce

23    physically under a protective order.  So, if the --

24         MR. FANTALIS:  Of course.

25         THE COURT:  -- protective order says you

1    can't --

2              MR. FANTALIS:  I'm not talking about

3    confidential things, Your Honor.

4              THE COURT:  Okay.

5              MR. FANTALIS:  I'm talking about just basic

6    information.  You know, they objected to the fact that

7    an IP address is not a person, it's a device.

8    Meanwhile, in their original pleadings they stated that

9    -- pretty much the same thing.  Again, Your Honor,

10   they'll do anything to not have real information

11   available to people so they can protect themselves.

12   That's their whole goal.

13             THE COURT:  Okay.

14             MR. FANTALIS:  That's what they're trying to

15   do.  And I think the request for stay for everything is

16   stating more of the truth of what they're looking to do.

17   They're not looking to stay just a small part that may

18   not apply, they're looking to stay everything.  They're

19   looking to not reply to anything.  Why didn't they reply

20   to some of these things that would apply to only actual

21   damages or all the other damages that they were saying

22   at the time.  They didn't because they don't want to do

23   that.  And if the court continues to allow them to not

24   respond to reasonable discovery, you're just playing

25   into what they're doing.  They're continuing to abuse

1    the court in the -- you know, by pushing the court in

2    the directions.

3            Their original filings for the 30 Does are

4    garbage.  They're not true.  There are statements in

5    there that are simply false.  But, of course, the

6    court -- judges aren't technical.  They don't understand

7    that.  The filings for the three -- three people

8    mentioned in this case, again, untrue statements are

9    stated in there.  They can't let this come to an end.

10           THE COURT:  Right.  Well, but just as you made

11   allegations against Mr. Kotzker and the fact that -- the

12   allegation that attorneys went to the company to say we

13   can do this for you, et cetera, your motive in your case

14   cannot be that you're doing this on behalf of others not

15   in this lawsuit.  You understand that.  That's an

16   improper --

17           MR. FANTALIS:  I understand that.

18           THE COURT:  -- motive.

19           MR. FANTALIS:  I understand that I cannot use

20   that as a reason to ask for things that I couldn't ask

21   for otherwise.

22           THE COURT:  Right.  Yeah.

23           MR. FANTALIS:  I'm allowed to have my motives,

24   right, but I can't ask --

25           THE COURT:  Well --

1          MR. FANTALIS:  I can't ask for things.

2          THE COURT:  -- you're allowed to bring claims

3     that are only permitted by law.

4          MR. FANTALIS:  Right.  I can't do things that

5     aren't permitted.  I don't think anything I've asked for

6     is unreasonable.  There are a few things that would take

7     a lot of work, agreed.

8          Now, a reasonable party would have come to me

9     and said, Jeff, there's a lot here on these three

10    claims; that you're asking for a lot; can we keep it to

11    just these kinds of things.  That never happened.  Why?

12    Because they're not interested in giving me any

13    information.  The more information that gets out there

14    it only hurts them.  The truth points them out as not

15    only having no case, but they're actually creating

16    criminal actions.  So, they can't do that.  They can't

17    let the truth get out there.

18          THE COURT:  One other principle that I'm

19    obligated to uphold is proportionality.  In other words,

20    somebody can't bring a $1,000 claim and then engage --

21    force the other side to spend $100,000.  There's a

22    proportionality requirement in the federal rules.  What

23    is the value of your counterclaim?

24          MR. FANTALIS:  A million.

25          THE COURT:  Okay.

1           MR. FANTALIS:  Easily.

2           THE COURT:  Okay.  What part of your

3    counterclaim is worth millions?

4           MR. FANTALIS:  If you look at some of the

5    charges you can go down other cases and find, you know,

6    abuse of process and so forth where defendants have

7    gotten millions of dollars.

8           THE COURT:  In punitive damages, I assume?

9           MR. FANTALIS:  Yeah.

10          THE COURT:  Because you don't have millions in

11   actual damages.

12          MR. FANTALIS:  You could -- yeah.  I mean,

13   Your Honor, I will have a difficult time for the rest of

14   my life getting a job.  Period.  Because just about

15   every company will go on to Google and search your name

16   when they're considering you.  I'm about to hire

17   someone.  I did the same thing.

18          THE COURT:  Okay.

19          MR. FANTALIS:  Under my name, for the rest of

20   my life, on the first page is going to be pornography

21   and stole something.

22          THE COURT:  Well, who do you work for?

23          MR. FANTALIS:  I work for a -- you know, a

24   technology company.

25          THE COURT:  You do right now?

53

1          MR. FANTALIS:  Yes.

2          THE COURT:  Okay.  So, you're an employee.

3   And have you been an employee --

4          MR. FANTALIS:  Yeah.

5          THE COURT:  -- in the past.

6          MR. FANTALIS:  Yeah.

7          THE COURT:  All right.  Don't have your own

8   company?

9          MR. FANTALIS:  No, I do not.

10          THE COURT:  All right.  Okay.  Well, I'm going

11   to grant the stay, but only limited to your

12   counterclaims.  We're going to go through the discovery

13   requests and determine which ones have to go forward

14   based on the claim that's pending.  Okay.

15          I think it's best just to do that,

16   unfortunately, one by one.  And I'll just have to tell

17   you whether I agree or disagree that it's within the

18   scope of this case.  I don't have, I don't think, a copy

19   of the request.  Does anybody have a copy of the

20   request?  Do you?  One you can share with me?

21          MR. FANTALIS:  Which one are you looking for?

22   The motion for discovery?  Their response?

23          THE COURT:  No.  No.

24          MR. FANTALIS:  Or the compel?

25          THE COURT:  I'm looking for your request for

1    production, your request for admissions, and your

2    interrogatories.

3              MR. FANTALIS:  They're all attached to the

4    compel.  Do you have the compel, Your Honor?

5              THE COURT:  I do.  What -- what --

6              MR. FANTALIS:  I --

7              THE COURT:  -- exhibit are they?

8              MR. FANTALIS:  What exhibit are they in the

9    compel?  I didn't print it out because it was quite

10   long, Your Honor.

11             THE COURT:  Okay.

12             MR. FANTALIS:  It's the long one, or the long

13   three.  We did that purposely because there was so many

14   unanswered questions we thought it was just easier to

15   attach the whole thing.

16             THE COURT:  All right.

17             MR. FANTALIS:  I can -- we have copies of

18   those, Your Honor, but they're my only ones, so I might

19   need them also.

20             THE COURT:  I can pull it up here.  Well, your

21   docket -- your motion to compel is Docket No. 86.

22   Motion pursuant to Federal Rules of Civil Procedure

23   37(a) to compel plaintiff to produce answers to

24   discovery requests.  Is that what --

25             MR. FANTALIS:  Yep.

```
 1            THE COURT:  Is that what we're talking about?
 2   I actually don't see any -- my computer doesn't show a
 3   single attachment to that.
 4            MR. FANTALIS:  Was it maybe not put as an
 5   attachment and just included in --
 6            THE COURT:  Oh, maybe it's an individual
 7   document.  All right.  And I actually -- you do repeat
 8   -- you have plaintiff's response, but do you have your
 9   original discovery requests?  In other words, you
10   submitted a document to them requesting --
11            MR. FANTALIS:  I think their response had the
12   original --
13            THE COURT:  It does.  I --
14            MR. FANTALIS:  -- questions.
15            THE COURT:  I know.
16            MR. FANTALIS:  Do we have the original
17   discovery documents?
18            THE COURT:  Like, for example, I don't know
19   what you mean by prior lawsuit.  That's a definition
20   that you used in your original request, but I don't have
21   your definitions.  Do you know what I'm saying?
22            MR. FANTALIS:  Okay.
23            THE COURT:  I don't have the document you gave
24   them that defines the request being made.  So I need
25   that.
```

1           MR. FANTALIS:  Let's see if we have that, Your

2    Honor.  I don't think we have it printed out, Your

3    Honor.

4           THE COURT:  Well -- all right.

5           MR. FANTALIS:  I can bring it up on my screen.

6           THE COURT:  What is the prior lawsuit?

7           MR. FANTALIS:  I'd have to look at the

8    question.

9           MR. KOTZKER:  Your Honor, it was the suit

10   originally filed where Mr. Fantalis was joined with the

11   other Doe defendants in which his identifying

12   information was provided to us.

13          THE COURT:  Okay.  And then once you got that

14   identifying information you filed this lawsuit.

15          MR. KOTZKER:  Correct, Your Honor.

16          THE COURT:  All right.  Well, I'll try and go

17   off of your -- your responses, the plaintiff's

18   responses.  So, Mr. Fantalis, the ball's in your court.

19   I would like you to first give me the discovery request

20   and a brief justification for it under the cases, framed

21   by the plaintiff's single claim for direct infringement.

22   So start with request for production and tell me --

23          MR. FANTALIS:  Okay.

24          THE COURT:  -- what number.

25          MR. FANTALIS:  All documents -- oh, Item No.

1   1, Request for Production No. 1, Your Honor.

2          THE COURT:  Okay.  That's the first one at

3   issue is No. 1, huh.  All right.  I'm reading it.

4          MR. FANTALIS:  All documents (unintelligible)

5   and electronically stored information, including

6   e-mails, phone records, recordings, text messages,

7   correspondence and other communications between and

8   among you and any persons pertaining to sharing.

9          So, Your Honor, this goes to basically what

10   they're doing as a business, how they're going about

11   doing their business.  Is this even -- are they

12   basically a business of extortion whereby they would

13   have no claim as an example.  Those sorts of things.

14          THE COURT:  But this would be looking for any

15   piece of information that pertains to file sharing,

16   downloading technology.  So any -- anything they have

17   that relates to simply some technology that's out there.

18          MR. FANTALIS:  Well, Your Honor, again, we're

19   pretty confident, for example, that the information that

20   they're using to collect information is flawed.  And so

21   this would fall under that also, that they would have

22   knowledge of that if they discussed the fact that that

23   information is flawed and they knew that going into

24   this.

25          THE COURT:  Okay.  Explain what you mean by

1    it's "flawed."

2            MR. FANTALIS:  Your Honor, there was a case in

3    Germany by a company called Gartilay (phonetic), which

4    was the IPP equivalent in this case, where I believe the

5    German court decided that not only was the technology

6    flawed but the company knew it.  I believe the owner of

7    the company fled Germany, and is actually the same owner

8    of IPP is our assumption.  We're trying to find that out

9    but, again, they won't provide information.  And that

10   the -- the thing that they use to collect information is

11   flawed.  And I think that they know that, and I think

12   they don't care.  Because they don't want to try a case,

13   they just want to extort money from people.

14           THE COURT:  Is your defense in this case that

15   you did not download any of their files?

16           MR. FANTALIS:  Of course.

17           THE COURT:  Okay.  And so you're calling into

18   question the technology they're using that, supposedly,

19   originally identified you.

20           MR. FANTALIS:  Yes.  And also the fact that --

21   Your Honor, not just that, but that it does -- that, in

22   general, with the file sharing that you don't -- you

23   don't know who the person is.  The best that you can

24   potentially get is an IP address.  There's no way to

25   know the actual person.

1           THE COURT:  And I don't think they -- do you

2    disagree with that?

3           MR. KOTZKER:  I wouldn't -- no, I don't think

4    that that's necessarily a disagreement, no.  We

5    understand that an IP address relates to someone --

6    someone's internet connection.

7           THE COURT:  Okay.  Do you stipulate then that

8    an IP address does not itself identify a person?

9           MR. KOTZKER:  Yes, Your Honor.

10           MR. FANTALIS:  We asked that question and they

11    wouldn't answer it, Your Honor.  Somewhere in here we'll

12    get to that.

13           THE COURT:  Well, right now, why don't you

14    make a note of the stipulations we're receiving.

15           MR. FANTALIS:  Yeah.

16           THE COURT:  Okay.  And then --

17           MR. FANTALIS:  It just goes to their

18    unwillingness to answer anything in general until

19    they're put on the spot, Your Honor.

20           THE COURT:  Okay.  Well, we're putting people

21    on the spot, so --

22           MR. FANTALIS:  Thank you, Your Honor.  I

23    appreciate you doing so.

24           THE COURT:  All right.  So, if that's the

25    point of Request No. 1, the law encourages parties to

1    agree to certain facts to avoid the necessity of proving

2    those and the cost of proving those.  In fact, in the

3    scheduling order we have a section for stipulated facts.

4    The whole purpose is, if you can stipulate to something

5    you avoid the expense of discovery on that issue.  All

6    right.  So, have we just addressed No. 1?

7             MR. FANTALIS:  And that was one of the things

8    we were trying to get them to do in discovery, Your

9    Honor, but they would not.

10            THE COURT:  I understand.  Have we addressed

11   Request for Production No. 1, the need for it right now?

12            MR. FANTALIS:  No, not the whole need.  That

13   was just one item, Your Honor.  Again, when we go around

14   their way of collecting information it is flawed.  Even

15   -- as an example, Your Honor, in a case an IP address

16   came up and it was -- it turned out to be a printer.

17            THE COURT:  Okay.

18            MR. FANTALIS:  Now, in their response later on

19   they -- they stated that their technology has zero

20   defects; that it will never do anything --

21            THE COURT:  All right.

22            MR. FANTALIS:  -- wrong.

23            THE COURT:  I understand.  What I'm going to

24   order with -- do you want to say anything?  I'll make it

25   a ruling and then I'll allow you to comment on the

1    ruling and see if I'm going to change it.  But my ruling

2    would be for you to produce any documents that describe

3    flaws or deficiencies in the technology that the company

4    is using to identify IP addresses.  So if they actually

5    discuss shortcomings in that, as Mr. Fantalis has

6    described, then produce those.  Okay.  Let's go to

7    Request No. 2.

8              MR. FANTALIS:  Do you want me to read these

9    out loud or just read them --

10             THE COURT:  No, I'll read them.

11             MR. FANTALIS:  Okay.  Similar, Your Honor.

12             THE COURT:  Right.  But is it -- is it

13   disputed -- do you dispute how it is that they -- the

14   technology that they use to identify the IP address

15   here?

16             MR. FANTALIS:  One -- yes.  That's one of the

17   disputes.

18             THE COURT:  So you -- you don't agree with the

19   explanation of how they came across your IP address.

20             MR. FANTALIS:  In fact, Your Honor, the

21   judge -- the court in Germany decided that the way that

22   things like this were collected had flaws and it will

23   come up with IP addresses that don't exist or that

24   people didn't use, et cetera.

25             THE COURT:  Well, unlike the Supreme Court --

1            MR. KOTZKER:  Those are different parties and

2      different --

3            THE COURT:  -- I'm not inclined --

4            MR. KOTZKER:  -- software.

5            THE COURT:  -- to accept decisions from

6      overseas.  I want a -- I want a --

7            MR. FANTALIS:  No.  But my point is there's

8      precedent for the fact that it did -- you know, that

9      courts have found that to be the case, Your Honor.

10            THE COURT:  Okay.  But wait a second.  Did --

11      okay.  Well, anyway, the response to No. 2 says they've

12      already provided all documents.  So there was no

13      objection there.  No. 3, there was an objection.  All

14      documents, et cetera, that plaintiff used or may use to

15      support any claims or defenses in this case.  That --

16      you know, that's just overbroad.  An attorney can't

17      answer that.  That's asking for every piece of paper you

18      might use to support your claim, and that's incapable of

19      being answered.  So I'll sustain the objection on that

20      one.  No. 4.

21            MR. FANTALIS:  Your Honor.

22            THE COURT:  Yes.

23            MR. FANTALIS:  May I?

24            THE COURT:  Go ahead.

25            MR. FANTALIS:  This goes to the 30 original

63

1    people, and I would think substantive information about

2    what was discussed and decided in those, especially

3    considering we were held joint and severally liable is

4    pertinent because the damages, according to the law --

5    because, again they'd like to forget that they

6    originally filed it as joint and severally liable

7    they're trying to now say in some of their responses

8    that they're just suing me.  But the law states that

9    since they filed it that way they can't just change

10   their mind back and forth whenever they -- it suits

11   them.  These cases are combined according to law.

12           THE COURT:  Right.  But all I'm reading is

13   what you asked.  I mean, you're reinterpreting it now,

14   but what you asked for, specifically using, you know,

15   sentence construction is everything you're going to

16   use -- you have used, are using, or going to use to

17   support claims and defenses in this case.  That's what

18   it asks for.  So, it's just overbroad.  I mean, I

19   understand there might be some little subset of

20   information within that question that's -- that you can

21   ask for, but as written it's just way overbroad --

22           MR. FANTALIS:  Uh-huh.

23           THE COURT:  -- and vague.  So, again, I'm

24   going to sustain the objection.  I'm not saying there's

25   something you couldn't get, it's just that that question

1    doesn't get it.

2         No. 4, the plaintiff says it doesn't have any

3    information.  And historically when a party says we

4    don't deem it -- we don't have it, there's very little I

5    can do to say, yeah, you do.

6         MR. FANTALIS:  It would be kind of sad for

7    them to base a whole business model based on a

8    particular ability of technology to perform without

9    actually looking into it.  But in this case, Your Honor,

10   it would not surprise me that they didn't because

11   they --

12        THE COURT:  Well, if that's true --

13        MR. FANTALIS:  They didn't really care if the

14   information was right.

15        THE COURT:  If they didn't then that will be

16   fruitful impeachment that you can use at trial.

17        MR. FANTALIS:  Right.

18        MR. KOTZKER:  Your Honor, by way of example,

19   if a company was using, you know, Adobe, you know,

20   software and then was being sued, requests about how

21   that Adobe software worked would not be in that

22   company's possession, so --

23        MR. FANTALIS:  This is not a standard product,

24   Your Honor.  And it's been impeached in other courts.  I

25   know I wouldn't go into a business where I was using the

1   software without understanding if it were accurate.

2          THE COURT:  Well, if you have -- if you can

3   get information that leads a reasonable person to

4   believe the response is incorrect then there's something

5   I can do about that.

6          MR. FANTALIS:  No, I think their response in

7   that case may be correct.  It's unreasonable, but I

8   think it -- you know, now looking at it it may be

9   correct.

10          THE COURT:  Well, and that response may be

11   more helpful to you than any other response could

12   possibly be.

13          MR. FANTALIS:  Agreed, Your Honor.

14          THE COURT:  All right.  Request for Production

15   No. 5, all documents pertaining to the file -- the file

16   is the --

17          MR. FANTALIS:  The site rep.

18          THE COURT:  Pardon?

19          MR. FANTALIS:  The site rep.  What they do,

20   Your Honor, is they put together -- in this case --

21   actually, it's not clear because in one of their

22   findings they said 103 files and another one that says

23   107, and it can be dismissed on that alone.  But they

24   create a file and they stick it out there for people to

25   download to try to --

1           THE COURT:  This is a movie?

2           MR. FANTALIS:  No, this is 103 to 107 movies,

3    Your Honor.  They put them all together --

4           THE COURT:  Oh, okay.

5           MR. FANTALIS:  -- into one giant file.

6           THE COURT:  All right.

7           MR. FANTALIS:  It's called a honey pot in

8    their industry.  The idea is to try to get people to

9    download it.

10           THE COURT:  But is it ostensibly for sale?

11           MR. FANTALIS:  Not -- in that form, no.

12           THE COURT:  Where do they put it?

13           MR. FANTALIS:  They put it on a BitTorrent

14    site to try to get people to download it so they can sue

15    them.  That's their business model.

16           THE COURT:  What's -- is there -- is there a

17    file that contains numerous movies on it?

18           MR. KOTZKER:  For sale?

19           THE COURT:  Yes.

20           MR. KOTZKER:  Not that I'm aware of, Your

21    Honor.

22           THE COURT:  Okay.  You're going to have to

23    reeducate me.  Where --

24           MR. KOTZKER:  Most of these -- most of these

25    films are available for download on my client's website

1    or for sale through, you know, hard copies as far as I

2    understand.

3              MR. FANTALIS:  Not the same company.

4              THE COURT:  Well, what was swarmed?

5              MR. KOTZKER:  It was a large file, like a

6    compressed file, that contains, you know, a hundred and

7    something movies in it.

8              THE COURT:  Where did it exist?

9              MR. KOTZKER:  On one of these BitTorrent

10   sites.  And the theory that, you know, my client puts it

11   out there for other people to download so they can turn

12   around and sue for infringement is ludicrous by the way.

13             THE COURT:  So you deny that your company put

14   that file there?

15             MR. KOTZKER:  As far as I know, yes, Your

16   Honor.  And I can --

17             MR. FANTALIS:  Your Honor, the only way that

18   they can actually use their technology is to create a

19   file so that their technology can see the IP address.

20   It's actually how the technology works.  In other words,

21   there's no way for them to know, as far as I understand,

22   the IP address without basically -- it's like putting a

23   bug, Your Honor, on a person and sending them out there,

24   and, you know -- and seeing who might, you know,

25   approach them.

1            THE COURT:  Okay.  Well, I think Request for

2    Production -- Request for Production No. 5 is

3    appropriate if you have -- if you have information in

4    your -- the file is what was swarmed, is that what we're

5    talking about?

6            MR. FANTALIS:  It's 103 movies, or whatever it

7    is, Your Honor.

8            THE COURT:  And -- but it was located

9    somewhere on the web and it was swarmed allegedly.

10           MR. FANTALIS:  Allegedly.

11           THE COURT:  And you're saying they put it

12   there.

13           MR. FANTALIS:  Yes.

14           THE COURT:  So, you're saying you didn't.  So,

15   if you have documents pertaining to the file that's an

16   appropriate request.

17           MR. KOTZKER:  I mean, pertaining to the file

18   in what sense?  I mean, the business and production

19   documents behind those individual movies, or are we

20   talking about --

21           THE COURT:  No.  Pertaining to how the file

22   ended up where it was at the time it got swarmed.

23           MR. FANTALIS:  And does it -- for example,

24   Your Honor, as I understand it the file consists of lots

25   of movies.  I think all of them -- I'm not sure, I think

```
1    all of them are owned by the owner of Malibu Media in

2    various forms for various companies.  And so they kind

3    of put -- you know, we've got seven different companies

4    that we sue people from.  We'll put all their movies in

5    here into one file, we'll stick it out there, and then

6    anyone who downloads it -- you know, if we want to be

7    Malibu we'll sue them for these seven movies that are

8    ours.  If we want to be Patrick Collins, which is

9    another company owned by them that they sue people on,

10   we'll use these other eight movies.

11           THE COURT:  Well, have you given them a list

12   of movies and asked whether they own the rights to these

13   particular movies?

14           MR. FANTALIS:  Well, it's -- no, we haven't

15   gone through one by one, Your Honor.  But we know some

16   of them, just by looking at other cases, it seems to be

17   the same file and yet they're suing, you know, under a

18   different name.

19           THE COURT:  All right.

20           MR. KOTZKER:  Well, the suit is really

21   predicated on the 13 federally registered, you know,

22   films that were included in that --

23           THE COURT:  I understand.

24           MR. KOTZKER:  -- site with numerous others,

25   which were all owned by Malibu.
```

1          MR. FANTALIS:  Which -- which by the way, Your

2    Honor, was work-for-hire originally, created before

3    Malibu Media existed.  So now they're changing their

4    declarations because they realized it's not possible.

5    They're claiming it was a mistake, but obviously it

6    wasn't.

7          THE COURT:  Well, here's the point for me.

8    With regard to Request for Production No. 5 if they have

9    documents that address the creation of that file, which

10   you think they do, I'm ordering that to be produced.

11         Now, under your suspicion, if they have them

12   and don't then they're in violation of a federal order

13   which would lead to contempt.

14         MR. FANTALIS:  Uh-huh.

15         THE COURT:  So you have all that you can get.

16         MR. FANTALIS:  Yep.  I'm --

17         THE COURT:  All right.

18         MR. FANTALIS:  -- fine with that, Your Honor.

19         THE COURT:  Request for Production No. 6,

20   communications of any kind between you and anyone

21   concerning enforcement of plaintiff's copyrights against

22   internet infringement, including all e-mail

23   communications of all present and past board members,

24   and present and past employees.  And --

25         MR. FANTALIS:  This would go to internal

1    discussions basically, Your Honor, about scheming on how

2    to extort money out of people.

3           THE COURT:  Right.  So, if there are

4    communications that are not attorney-client privileged.

5           MR. FANTALIS:  I would actually state -- and I

6    know this is an uncomfortable statement, Your Honor --

7    but since this process is being driven by attorneys and

8    not by Malibu Media, I don't think those should be

9    excluded.

10          THE COURT:  Well, but the attorney-client

11   privilege is very sacrosanct in this country.

12          MR. FANTALIS:  I understand, Your Honor.  But,

13   you know, when you look at that I don't think what was

14   considered was that the attorney would actually be using

15   that in order to hide behind that veil.  That's what's

16   going on.  Mr. Lipscomb has stated publicly that this is

17   a campaign that he is running.

18          THE COURT:  Well, I don't have Mr. Lipscomb

19   here.  I have Mr. Kotzker.

20          MR. FANTALIS:  Right.  And I'm okay with

21   Mr. Kotzker's e-mails, maybe not -- you know, between

22   him and Malibu, but I think if Mr. Lipscomb was sending

23   e-mails to Malibu --

24          THE COURT:  Identify who Mr. Lipscomb is

25   again.

1      MR. FANTALIS:  Mr. Lipscomb is an attorney.  I

2   believe he technically works for Malibu Media along with

3   countless other pornography companies.  But he's the

4   mastermind behind this, Your Honor.  His company, slash,

5   law firm is the one who reaches out to -- you know, the

6   people like the owners of Malibu Media and states things

7   like, hey, I can make you a lot of money.  You know, all

8   you've got to do is create a fake company and we'll do

9   all the work with -- you know, we'll take all the money.

10   Then he goes and hires people like Mr. Kotzker in each

11   state, because he can't practice in every state, to --

12   to do the work.

13      THE COURT:  Well, have you subpoenaed him?

14      MR. FANTALIS:  Not yet.  We're trying to get

15   information, Your Honor.  We wanted to start with --

16      THE COURT:  Right.

17      MR. FANTALIS:  -- information before we

18   subpoena people.

19      THE COURT:  Well, if there are communications

20   that are not privileged regarding that issue, then I'm

21   ordering them to be produced.  Okay.

22      MR. FANTALIS:  Now, when we say not

23   privileged, who would be considered -- is Mr. Lipscomb

24   considered privileged because he's an attorney for them?

25      THE COURT:  If -- he's an attorney for -- you

1    think he's an attorney for Malibu Media?

2              MR. FANTALIS:  Oh, yeah.  In the bellwether

3    case, for example, Your Honor, Mr. Fiore, I think is the

4    way it's pronounced, is the equivalent is Mr. Kotzker in

5    Pennsylvania.  And what happened there -- I don't know

6    if you saw what happened, but they were ordered by the

7    court to do something.  They claimed they did it.  The

8    defense caught them not doing it.  They claimed they did

9    it again.  The judge said under perjury I want you to

10   state this.  And what came out was they didn't do it,

11   first of all.  Second of all, Mr. Lipscomb's firm had

12   filed some of the things with Mr. Fiore's name on it.

13             Because, again, these guys are just puppets

14   for this nationwide thing.  And so, Mr. Fiore wasn't

15   even aware I think of everything that was going on in

16   that case, what's going on there.  Because it's an

17   important case Mr. Lipscomb is stepping up now and

18   saying, you know, hey, we're the real force behind this,

19   so we don't want you little local attorney, you know, to

20   screw this up so we're going to step in.

21             And so they claim that they had a flood in

22   their offices, and that made them lie on record,

23   basically, Your Honor, that they -- you know, and that

24   Mr. Fiore -- some things were filed under his name that

25   Mr. Lipscomb's office had written.  Again, Your Honor,

1    this is not a single deep thing.  This isn't a

2    company --

3              THE COURT:  No, I understand.  Okay.  So just

4    to give you my impression of what's to happen here.

5    If -- Mr. Kotzker knows what an attorney-client

6    communication is, or a work product is.  But he also

7    knows that sometimes lawyers act as businesspeople.

8    When a lawyer is acting as a businessperson and talking

9    to others about business that's not privileged.

10             MR. FANTALIS:  That's all I'm asking for, Your

11   Honor.

12             THE COURT:  Okay.

13             MR. FANTALIS:  That's perfect.

14             THE COURT:  It's only when a lawyer is

15   intending to give legal advice that it's a privileged

16   communication, or when a lawyer is using his mental

17   processes to assist someone in prosecuting or defending

18   a lawsuit.  That's work product.  But if it's -- but a

19   lawyer as a businessperson is not protected by

20   attorney-client.

21             So, what Mr. Kotzker needs to do is produce

22   documents.  And to the extent there are responsive

23   documents that are privileged he will produce a

24   privilege log, which is -- what we all do in our

25   lawsuits is we identify the documents we're

1    withholding --

2              MR. FANTALIS:  Uh-huh.

3              THE COURT:  -- with sufficient information for

4    you to come back and potentially challenge those as to

5    whether they're privileged or not.  So it will say

6    October 6, 2012, memo between Kotzker and Lipscomb

7    concerning strategy, for example.  That's strategy in

8    this case, whatever.  And then if you think you have a

9    basis to challenge his designation of attorney-client

10   material then you can do that.

11             MR. FANTALIS:  Okay.

12             THE COURT:  It's pretty standard stuff.

13             MR. FANTALIS:  And, Your Honor, if they're

14   concerned about creating too much paper, I'd be happy to

15   take all this stuff electronically.

16             THE COURT:  Okay.  Well, we encourage

17   documents to be exchanged electronically anyway.

18   Mr. Kotzker, when was the first of these cases filed?

19             MR. KOTZKER:  By me, Your Honor?

20             THE COURT:  Well, in the country.

21             MR. KOTZKER:  That I don't know, Your Honor.

22             THE COURT:  By you.

23             MR. KOTZKER:  By me, I want to say maybe

24   August of last year.

25             THE COURT:  August of 2011.

```
 1              MR. KOTZKER:  Or June of last year, maybe.
 2              THE COURT:  Okay.  Then I'll limit the
 3    timeframe to '11 and '12.
 4              MR. FANTALIS:  Your Honor, could it also be
 5    communication -- initial communication between
 6    Mr. Lipscomb and the owners in terms of the business
 7    model itself, because that goes to what we talked about
 8    and that would have been before then.
 9              THE COURT:  Well, we're only on No. 6 right
10    now.  And now we move to No. 7, which is communications
11    between you and M. Keith Lipscomb.  And I think that's
12    what you're referring to, right?
13              MR. FANTALIS:  Yeah, you're right.  These two
14    overlap a little bit, Your Honor.
15              THE COURT:  All right.
16              MR. FANTALIS:  We were just trying to be
17    clear.
18              THE COURT:  And again, the same ruling --
19    well, now, I don't see how all communications between
20    Malibu Media and some attorney could possibly be
21    directed to relevant evidence here.  Because they could
22    be talking about anything.
23              MR. FANTALIS:  I'm perfectly fine for it to be
24    related --
25              THE COURT:  They could be talking about --
```

1          MR. FANTALIS:  -- to the business.

2          THE COURT:  The Steelers-Nick --

3          MR. FANTALIS:  Right.  Right.

4          THE COURT:  The Steelers-Giants game

5     yesterday.

6          MR. FANTALIS:  I'm not happy about that one,

7     by the way, Your Honor.  But, Your Honor, I'm perfectly

8     fine with keeping it to -- related to the business

9     model, this particular business itself, you know, Malibu

10    Media that are not attorney-client privilege.  Like you

11    said, Your Honor, I think you put it well.  Something

12    around the business -- when he's trying to be more of a

13    business manager than they're trying to -- than they're

14    providing legal advice.

15         THE COURT:  Okay.  What I'm going to do --

16         MR. KOTZKER:  But that would relate only to

17    the specific claim in this count, correct?

18         THE COURT:  Yeah.  What I'm going to do is

19    collapse 6 and 7.  Okay.

20         MR. FANTALIS:  And, Your Honor, I want to

21    address what Mr. Kotzker just said.  It's not related to

22    this specific case.  It's related to the business model

23    in general is what I'm asking for.  Not just related to

24    this specific case.

25         MR. KOTZKER:  Well, his defense for a claim

1    for direct infringement.

2              THE COURT:  Right.

3              MR. KOTZKER:  I mean, there's no relevancy for

4    what else is going on in business models elsewhere.

5              THE COURT:  Yeah.  If you could prove that

6    these guys were dirty, rotten scoundrels in every case

7    but this one that wouldn't be admissible because you're

8    the defendant here, and if you're -- if the case against

9    you is a valid one under existing law, then what they're

10   doing anywhere else in the world is not relevant.

11             MR. FANTALIS:  Right, Your Honor.  But

12   wouldn't -- if the business model is one that is

13   illegal, which I think this one is, wouldn't the fact

14   that they discussed that and purposely set the business

15   up to be that wouldn't be specific to this case, it's

16   specific to the business model.

17             THE COURT:  Well -- well, we're going to limit

18   -- try to limit the discovery to matters that concern

19   you.

20             MR. FANTALIS:  That does concern me, Your

21   Honor.

22             THE COURT:  Right.

23             MR. FANTALIS:  The business model that they've

24   used, if it's an illegal model, they're not -- again,

25   they're not going to talk about this case in terms of --

1          THE COURT:  But what do you mean illegal

2    model?  What law are you relying on when you might call

3    it an illegal model?

4          MR. FANTALIS:  I can't -- I can't spout it out

5    right now.  Maybe my paralegal can help me here.  But

6    from what I understand, if you set up a model where the

7    attorneys are getting most of the money, purposely, not

8    because it's just expensive, that that's illegal.

9          THE COURT:  So, if a lawyer went to them and

10   said, you know, I think we could bring a thousand cases

11   and we'd get 10,000 a case, which I think is 10 --

12         MR. FANTALIS:  A lot.  Ten million.

13         THE COURT:  Ten million.  Now, my fees are

14   going to be nine million of that, but you'll be left

15   with a million.

16         MR. FANTALIS:  Or even a percentage.  It may

17   not be fees, Your Honor.  One of the things we want to

18   find out is are these people involved getting paid a

19   percentage.  For example, is IPP getting a percentage.

20   If they're getting a percentage then -- then, you know,

21   their ability to state things clearly and truthfully

22   would certainly be at issue.  This goes to unclean

23   hands, Your Honor.

24         THE COURT:  Well, why don't you just take a

25   30(b)(6) deposition of Malibu Media and ask those

1     questions?

2              MR. FANTALIS:  We'll get there.

3              THE COURT:  Well, why?  Why wait?

4              MR. FANTALIS:  First of all it's expensive,

5     Your Honor.

6              THE COURT:  Well, a deposition will cost you

7     about a thousand bucks.

8              MR. FANTALIS:  I've heard closer two --

9              THE COURT:  A full day deposition.

10              MR. FANTALIS:  -- two was the statement.

11              THE COURT:  It might be.  I don't know.

12              MR. FANTALIS:  I do plan on asking for a bond,

13     Your Honor, to cover my costs when I do win.  It's been

14     asked in another case recently also.  People are going

15     to start asking for it.  The other concern is that

16     Malibu Media basically sues people, gets lots of money,

17     then the fire gets kind of hot around the country and

18     they just go out of business because they have no actual

19     -- from what we can tell, besides the ability to sue

20     people the company doesn't have, really, any other

21     actual weight to it.  And so we want to make sure that

22     at least our costs, once we start to incur significant

23     costs, will be covered by a bond.

24              THE COURT:  Yeah.  But you know that's quite

25     unusual.

1           MR. FANTALIS:  It's quite unusual for a

2    company to nationally go around and extort money out of

3    people.

4           THE COURT:  Well, I don't know about extort,

5    but it's not unusual for a company to sue a lot of

6    people.  I see it all the time.

7           MR. FANTALIS:  Right.  But this is more than

8    that, Your Honor.  This is driven by the attorneys, set

9    up specifically to do so, and no way of proving it.  And

10   they know there's no way of proving it.

11          THE COURT:  All right.  Are we on Request

12   No. 8?  Is that what we're talking about at the moment?

13          MR. FANTALIS:  I think so.

14          MR. KOTZKER:  We're still working on combining

15   6 and 7.

16          THE COURT:  Well, we did combine 6 and 7.

17          MR. FANTALIS:  Okay.

18          THE COURT:  And the answer for 7 is the same

19   as the answer for 6.

20          MR. KOTZKER:  I just wanted to be clear that

21   it relates solely to this suit against Mr. Fantalis.

22          THE COURT:  Yes.  Now 8 is what Mr. Fantalis

23   was just talking about, I think, and that is

24   communications between Malibu Media and anyone

25   concerning the method of bringing legal proceedings to

1    enforce plaintiff's copyrights against internet

2    infringement and -- you know, the ultimate problem,

3    Mr. Fantalis, is that they may not have documents.  If

4    they're as savvy and as clever as you say they are --

5              MR. FANTALIS:  I've seen e-mails, Your Honor.

6              THE COURT:  -- they would have put it in

7    writing.

8              MR. FANTALIS:  They -- I've seen e-mails from

9    companies like them where they e-mail attorneys,

10   basically saying here's the business model, do you want

11   to join, you know, because you're an IP attorney.

12             THE COURT:  Involving Malibu Media?  These

13   e-mails?

14             MR. FANTALIS:  I haven't seen the Malibu

15   Media -- I've seen ones from Lipscomb involving Malibu

16   Media.  I've seen ones, for example, where he threatened

17   an attorney for fighting back.

18             THE COURT:  What was the threat?

19             MR. FANTALIS:  Do you remember what it was?

20             MR. KOTZKER:  That he would actually bring

21   litigation.

22             MR. FANTALIS:  What?  Do you remember what it

23   was?  Oh, he was going to basically add additional

24   countersuits against the client, I think even including

25   criminal charges for, if I remember, child pornography

1    and so forth if they didn't drop their counterclaim.

2              THE COURT:  Well, as to No. 8 --

3              MR. KOTZKER:  Your Honor, are you -- I mean,

4    the term "legal proceedings," I mean, a legal proceeding

5    is brought by filing a complaint.

6              THE COURT:  Yeah.

7              MR. KOTZKER:  And that's really the only

8    method we've used.

9              THE COURT:  Well, I think it's overbroad and I

10   don't think it goes to -- I don't think it falls even

11   within a broad interpretation of the current claim.  So,

12   I'll sustain the objection on No. 8.

13             No. 9, all documents plaintiffs had -- made or

14   had before this case in order to determine whether

15   defendants' internet access could be -- internet account

16   could be accessed wirelessly at any time.  That's a fine

17   request.  I mean, is there any problem with that one?

18   No.  He didn't object to that one.

19             MR. KOTZKER:  No.  I think the next objection

20   is down for 17, Your Honor.

21             THE COURT:  Okay.  By the way, when you say

22   you will produce all documents in your possession,

23   custody or control are we putting a limit on that?  What

24   -- what would you anticipate as far as -- when you

25   responded in that manner I'd like you to go ahead and --

1        MR. FANTALIS:  Your Honor, I believe they were

2   actually already stated through the court that they were

3   going to supply them and didn't.  Again.

4        THE COURT:  When are you going to produce the

5   documents that you're agreeing to produce to the extent

6   you have any?

7        MR. KOTZKER:  As soon as we have clarity on

8   this motion to compel we will begin producing any

9   documents.

10        THE COURT:  All right.  I'd like production to

11   start by Friday, if possible, please, and be completed

12   within two weeks thereafter of the documents relating to

13   the current outstanding request that you're agreeing to

14   produce.  Obviously, for example, for No. 12, let's say,

15   when you say you'll agree to produce you need to either

16   produce documents for No. 12 by that time period or else

17   a statement that you have looked and there are no

18   documents.  But either way you need to inform

19   Mr. Fantalis what is your actual response to that one.

20   Okay?

21        MR. KOTZKER:  Yes, Your Honor.

22        THE COURT:  What's the next one that has an

23   objection?

24        MR. KOTZKER:  Seventeen, I believe, Your

25   Honor.

1        THE COURT:  Seventeen is all documents related

2    to contracts between plaintiff and a bunch of people.

3    So --

4        MR. KOTZKER:  It includes things such as

5    retainer agreements, just general BitTorrent protocol

6    services.  It's -- again, it's very broad.

7        THE COURT:  Right.  If you have contracts

8    with -- again, you have to tell me.  IPP, I understand

9    who that is.  So, if you have a contract with IPP

10   produce that.  What about -- I don't know who Tobias

11   Fieser is.

12       MR. KOTZKER:  He works for IPP Limited, Your

13   Honor.

14       THE COURT:  Okay.  Patrick Collins, Inc.?

15       MR. KOTZKER:  That's a separate entity, Your

16   Honor.

17       MR. FANTALIS:  I believe owned by the same

18   company, Your Honor, and also suing people in a similar

19   manner.

20       THE COURT:  Okay.  But -- I mean, you don't

21   have to produce your fee agreement, Mr. Kotzker.  What

22   about X-Art com?  Again, another company -- which of

23   these people are either employees -- employees or

24   affiliated with the plaintiff or were used by the

25   plaintiff as part of the process that led us here today?

1    Is it --

2              MR. KOTZKER:  IPP Limited, Tobias Fieser,

3    Brigham Field, and Colette.

4              THE COURT:  Okay.

5              MR. FANTALIS:  X-Art, I believe, according to

6    another filing, Your Honor, is owned by them and is a

7    sub company of Malibu Media.  We recently found that

8    out.

9              THE COURT:  Right.  But did they have anything

10   to do with this case?  That's the question.

11             MR. FANTALIS:  Yeah.  They actually put the

12   movies on their website there.  They're the actual real

13   company here, Your Honor.  They're the ones who really

14   produced the stuff and sell it on their website for, I

15   believe, a monthly fee.  They are, I believe, the only

16   one that's creating legitimate revenue for this company.

17   Malibu Media has corporate, if you want to call it

18   that -- they're, I believe, just collecting money, you

19   know, through the extortion, and then X-Art money I

20   assume rolls up to them in some form or fashion.

21             THE COURT:  Well, are you saying that you

22   disagree with Mr. Kotzker that his client owns the

23   rights of these films that he's alleging they own?

24             MR. FANTALIS:  It's kind of unclear, Your

25   Honor, because again they were work-for-hire originally.

1    I think -- don't call me on these dates, but use them as

2    generalities.  In 2010, I think they were work-for-hire

3    which would mean they had to be for a company.  Malibu

4    Media didn't exist at that time, so now the cases are

5    coming in and they realize that they can't be sloppy.

6    They went back and now they're saying, whoops, we didn't

7    mean work-for-hire.

8              THE COURT:  Well, as part of your

9    case-in-chief you have to put on proof that you own the

10   rights of these --

11             MR. KOTZKER:  Correct, Your Honor.

12             THE COURT:  -- films, and so you would have

13   designated that information in the Rule 26 disclosures.

14             MR. KOTZKER:  Right.  And we attached copies

15   of --

16             MR. FANTALIS:  We got copies of those, Your

17   Honor.

18             THE COURT:  All right.

19             MR. FANTALIS:  But there's some fuzziness, if

20   you will, because of that, Your Honor.  Of course, we're

21   also asserting that are these even -- you know,

22   potentially are they even allowed to sue because of

23   pornography and the obscenity, and that's one of the

24   things that we have in there in one of the -- in one of

25   the claims that, you know -- again, the Supreme Court

```
1    said if it's obscene it can't be copyrighted.  Obscene

2    is in the eye of the beholder.  What we're asking is the

3    beholder to be the state of Colorado.

4         THE COURT:  So, are you -- do you intend to

5    file a motion in limine finding that some or all of

6    these are obscene and, therefore, can't be copyrighted?

7         MR. FANTALIS:  It's already in there, Your

8    Honor, in the sense that we filed a -- what was it -- a

9    declaratory judgment of such.

10        THE COURT:  All right.  Okay.  Well, for right

11   now then I'll require production by plaintiff of any

12   agreements between plaintiff and IPP, Tobias Fieser,

13   Brigham Field, and Colette Leah.

14        MR. FANTALIS:  Not X-Art, Your Honor?

15        THE COURT:  Well, X-Art -- if all their

16   involvement is is they once owned the films --

17        MR. FANTALIS:  No, they're a sub company of

18   Malibu.

19        THE COURT:  Right.  But --

20        MR. FANTALIS:  And they put the films on their

21   website, these same films.

22        MR. KOTZKER:  Again, I --

23        THE COURT:  Well, but --

24        MR. KOTZKER:  -- don't see how that's relevant

25   to this -- this --
```

1           THE COURT:  Pardon.  Malibu Media can contract

2     with anyone to sell its copyrighted works.  They can --

3           MR. FANTALIS:  It's not contract, it's owned

4     by Malibu Media.  It's not contracting.

5           THE COURT:  Right.  But they can -- they can

6     sell their stuff through anybody they want to.  But

7     you're not claiming that the file -- as we call it, the

8     file was on X-Art's --

9           MR. FANTALIS:  No.  The file only exists for

10    purposes of extorting money, Your Honor.

11          THE COURT:  Right.  I don't see the connection

12    with X-Art enough for requiring production, at the

13    moment.

14          MR. FANTALIS:  Okay.

15          THE COURT:  What was the next request?

16          MR. KOTZKER:  The next objection I think was

17    18.

18          THE COURT:  Employer retainer agreements or

19    other contracts between IPP and plaintiff.  Well, I've

20    already -- I've already ordered contracts between the

21    two.

22          MR. FANTALIS:  Similar request, Your Honor.

23          THE COURT:  All right.  So that one's taken

24    care of.  Nineteen, is that the next one?

25          MR. KOTZKER:  Yes, Your Honor.

1          THE COURT:  Is the majority of the 64 going to

2     be at issue?

3          MR. KOTZKER:  Majority, I don't know.  Again,

4     we have 90 pages here, so --

5          THE COURT:  Are there some gaps we're going to

6     skip here pretty soon?

7          MR. FANTALIS:  Not a lot of them,

8     unfortunately, Your Honor.  Now, these are the -- these

9     are the ones where we're requesting more information,

10    Your Honor.  When we get to some of the other documents

11    it's more answers, that they just wouldn't answer.  So

12    these are the harder ones, if you will, Your Honor.

13         THE COURT:  All right.  All documents of phone

14    calls made by plaintiff in connection with -- records of

15    phone calls by --

16         MR. FANTALIS:  Your Honor, if I may?

17         THE COURT:  Go ahead, because I don't

18    understand that one.

19         MR. FANTALIS:  What -- what their business

20    model is is they -- believe it or not, Your Honor, they

21    actually have a call center where their only job is to

22    take -- like once they file against the 30 Does in this

23    case, they call those Does up and they basically imply,

24    you know, you're going to get sued, you're going to --

25    it's going to cost you a lot of money.  You know, if you

1    pay us some money we'll go away.  They don't say it

2    quite as bluntly.  They've gotten better at finding ways

3    of saying it so that it doesn't -- it can't be

4    explicitly seen as extortion, but that's what it is.

5    They're basically saying it's going to cost you lots and

6    lots and lots of money to, you know, try to protect

7    yourself, and so you're better off just --

8              THE COURT:  Okay.

9              MR. FANTALIS:  -- go ahead and getting an

10   attorney and giving us money.

11             THE COURT:  I understand.

12             MR. KOTZKER:  Advising someone that they're

13   going to be sued for infringement is perfectly legal

14   under the petition clause, you know.

15             THE COURT:  Well, but that question would go

16   squarely to your counterclaims and not to their claims.

17   So, it may be that you'll get it some day very soon it's

18   just not today because I'm staying that part of the

19   case.

20             MR. FANTALIS:  Okay.  I can see that, Your

21   Honor.

22             THE COURT:  And -- but I'm staying -- I'm

23   denying that without prejudice in the event that some or

24   all of your claim survive.

25             MR. FANTALIS:  Got it.

1        THE COURT:  Then you'll be under the onus to

2   come back and ask these or at least reopen that issue.

3   Okay?

4        MR. FANTALIS:  All right.

5        THE COURT:  So you understand what the words

6   "without prejudice" means?

7        MR. FANTALIS:  Yeah.  That makes sense, Your

8   Honor.

9        THE COURT:  All right.

10        MR. FANTALIS:  That's, like, an example I

11   think of one that's reasonable if you're going to stay

12   it that would make sense to stay.

13        THE COURT:  Okay.  Twenty.

14        MR. FANTALIS:  I think it would fall under the

15   same thing, Your Honor.

16        THE COURT:  Okay.  We'll reserve that one for

17   later then.  So, that objection is sustained just for

18   the moment.  Retainer agreements between Jason Kotzker

19   and -- you know what, I don't see -- that's -- that's

20   virtually never produced except when there's a

21   disagreement between the attorney and his own client.

22   So --

23        MR. FANTALIS:  Again, this goes towards

24   unclean hands, Your Honor.

25        THE COURT:  I understand.  What I'd like to

1    do -- what I'm going to ask, Mr. Kotzker, is that you

2    submit your agreement in-camera.  I just need to make

3    sure that nothing unethical is happening.  Okay?

4              MR. KOTZKER:  Yes, Your Honor.

5              THE COURT:  Because the allegation has been

6    raised.  We won't need to go any farther than that.

7    Okay?

8              MR. KOTZKER:  Yep.

9              THE COURT:  And I'm not going to ask for

10   Mr. Lipscomb's because Mr. Kotzker is the attorney here,

11   so No. 22 is denied.  There is no 23 listed in your

12   document, Mr. Fantalis.

13             MR. FANTALIS:  I don't know what happened.

14             THE COURT:  It goes from 22 to 24, I guess.  I

15   don't know if that's Mr. Kotzker's mistake or your

16   mistake.

17             MR. KOTZKER:  No.  I see.  I jump to 24 as

18   well.

19             THE COURT:  All right.

20             MR. FANTALIS:  We'll get back to you on that

21   one, Your Honor.

22             THE COURT:  All right.  So, 24 is retainers

23   between Kotzker and Mr. Lipscomb.  But, again, I'm

24   asking for the agreement between Mr. Kotzker and his

25   client, so I'll make sure that -- I'll be the gatekeeper

1    to make sure nothing untoward is going on.  Okay?

2           MR. FANTALIS:  Okay.  Your Honor, will you --

3    just from a process standpoint, do we hear back from you

4    you received it and it's fine, or how does that work?

5           THE COURT:  You know, we'll receive it and --

6    and if you hear nothing then everything is okay.  We'll

7    just return it to Mr. Kotzker.  If there's something I

8    think needs to be addressed then I'll have to set up a

9    hearing --

10          MR. FANTALIS:  Okay.

11          THE COURT:  -- or something.  Some process.

12   Twenty-five, produce and identify takedown notices to

13   any ISP for any and all works.

14          MR. KOTZKER:  Your Honor, that's not a

15   precondition for bringing a copyright infringement suit,

16   so --

17          THE COURT:  But that -- what that means is

18   that you think that some ISP -- that IPs within some ISP

19   are infringing and you ask the ISP -- I guess, is Qwest

20   an ISP?

21          MR. KOTZKER:  Yes.

22          MR. FANTALIS:  Yeah.

23          THE COURT:  You ask Qwest to -- you issue a

24   takedown notice to Qwest and what -- what would the

25   takedown notice say, Mr. Fantalis?

1              MR. FANTALIS:  Basically the idea is any

2     legitimate company, Your Honor, would start with the ISP

3     and say, you know, hey, these people are doing things.

4     You should -- you should deal with it.

5              THE COURT:  So, like, take -- take the IP

6     down?  I mean, disallow --

7              MR. FANTALIS:  They could.

8              THE COURT:  Right.  But wouldn't that risk --

9     that would be risking getting sued.

10             MR. FANTALIS:  What typically they would do,

11    Your Honor, I believe, is that they would call up their

12    client, in this case it would be me, and say, hey,

13    you're doing things illegal.  Stop it or we're going to

14    shut you down.  You know, there's also the ISP on the

15    BitTorrent side, Your Honor.  Did they go to the

16    BitTorrent and say, hey, you're doing all this stuff,

17    all these people are downloading things that they

18    shouldn't.  You should stop them from doing that.

19             THE COURT:  Are you capable of stipulating

20    that you have not issued takedown notices?

21             MR. KOTZKER:  Your Honor, in a -- in a

22    different case not involving Mr. Fantalis, like,

23    Mr. Arsenault here, we did discuss that.  And my client

24    does do -- issue takedown notices to these various

25    BitTorrent sites just to find that the movies are

1    available again within a day, a week.

2              THE COURT:  Okay.

3              MR. FANTALIS:  We would like to see them, Your

4    Honor, because my guess is they only occurred after they

5    started to get people fighting them, and they're doing

6    it just for show.

7              THE COURT:  Are takedown notices are there any

8    -- are they in any way confidential under -- because

9    they're issued to a third party, right?

10             MR. KOTZKER:  Correct.

11             THE COURT:  So --

12             MR. KOTZKER:  I mean, I don't see how that

13   relates to this specific claim, Your Honor.

14             MR. FANTALIS:  Credibility, Your Honor.

15             THE COURT:  Well, let me think about that for

16   a second.

17             MR. KOTZKER:  And my client has no obligation

18   to do that.  While -- I mean, they have done it and

19   sometimes in hundreds per day, you know, they've found

20   that to be an exercise in futility because it doesn't

21   stop the infringement.  And, you know, US Congress has

22   given my client the right to seek copyright infringement

23   remedies.

24             THE COURT:  Okay.  And I think that -- I think

25   this is another one, Mr. Fantalis, that would definitely

1    relate to your counterclaims, but as I see it would

2    probably not be admissible if the only claim going to

3    trial was one claim for direct infringement.

4              MR. FANTALIS:  Your Honor, so you don't see

5    that a company doesn't follow what is industry standard

6    practice, by the way, and that would show that they're

7    legitimately trying to stop the infringement?  So,

8    again, Your Honor, one of the things -- what I'm stating

9    is, they're not trying to -- not only are they not

10   trying to stop the infringement, they're actually

11   encouraging the infringement.

12             THE COURT:  Well, let's assume that you were

13   the only person in the world they've ever gone after.

14             MR. FANTALIS:  Uh-huh.

15             THE COURT:  Even though there's billions of

16   people out there.

17             MR. FANTALIS:  Right.

18             THE COURT:  That's not a defense.

19             MR. FANTALIS:  It shows unclean hands.  It

20   shows no interest in actually protecting -- a company --

21             THE COURT:  But then --

22             MR. FANTALIS:  -- that doesn't protect their IP

23   and has no interest in protecting their IP, I believe

24   according to law, can't then sue someone for infringing

25   on their IP.

1          THE COURT:  Well, unclean hands is an

2     equitable doctrine.  They're bringing a legal claim

3     under a federal statute.  They're not bringing an

4     equitable claim, they're bringing a legal claim.  If

5     they were bringing an equitable claim then the unclean

6     hands, which is an equitable doctrine, might come in but

7     I'm not sure that --

8          MR. FANTALIS:  Wouldn't it go to my defense,

9     Your Honor, that they are trying to say that you

10    infringed on something when -- as part of my defense, in

11    addition to not doing it and they can't prove it and all

12    -- I mean this is 7th and 8th down the line, Your Honor,

13    but it's still there that they've shown no interest in

14    protecting their IP.

15         THE COURT:  Well, if you can come back and

16    show me that selective prosecution is a defense to an

17    infringement act then that's relevant.  So, what --

18    you're in essence claiming that they're selectively

19    prosecuting.

20         MR. FANTALIS:  Not that they're selectively

21    prosecuting, Your Honor, that they're actually not

22    interested in protecting their IP, they're only

23    interested in suing people.

24         MR. KOTZKER:  The number of suits around the

25    country show that they're interested in protecting their

1    IP.

2              MR. FANTALIS:  No.  They're interested in

3    extorting money out of people.

4              THE COURT:  Well, they could show -- it could

5    show both, actually, at the same time.  But I still

6    don't see how it would be admissible or lead to the

7    discovery of admissible evidence with regard to their

8    claim against you.  So, this is another one I'm going to

9    have to reserve for later in the event that claims

10   survive.

11             Produce all cease and desist letters sent by

12   plaintiff to anyone.  That's the same nature.

13             MR. FANTALIS:  Yes, Your Honor.

14             THE COURT:  All documents demonstrating

15   plaintiff's alleged loss of income.  Well, that's

16   certainly --

17             MR. KOTZKER:  Since we're electing statutory

18   damages, loss of income wouldn't be relevant.

19             THE COURT:  You're waiving the actual damages.

20   That's right.  So, he's going to dismiss actual damages

21   by the end of this week.

22             MR. FANTALIS:  Right.

23             THE COURT:  And so he's not going to even

24   allege a loss of income.

25             MR. FANTALIS:  I thought there was something

1   still in there, Your Honor, about there still has to be

2   some proof of something.  But I can't pull it off the

3   top of my head, to be honest with you.

4          THE COURT:  Okay.  Well, you can always come

5   back and move to reconsider if -- if you come up with

6   something that I'm doing that you believe is clearly

7   erroneous.

8          MR. FANTALIS:  Okay.

9          THE COURT:  Okay.

10          MR. KOTZKER:  Your Honor, I think the only

11   proof element in there would be a proof of willfulness,

12   and that would raise the statutory maximum from 30,000

13   to 150,000 per work.

14          THE COURT:  Well, it still doesn't have

15   anything to do with your income.

16          MR. KOTZKER:  Correct.  Right.  I was just

17   clarifying Mr. Fantalis's remarks.

18          THE COURT:  Yeah.  What are we up to?

19          MR. FANTALIS:  Twenty-eight, I think.

20          THE COURT:  Twenty-eight.

21          MR. KOTZKER:  I think the next one we object

22   to is 31, Your Honor.

23          THE COURT:  Okay.  Let's reiterate that you're

24   going to begin production of documents by --

25          MR. KOTZKER:  By this Friday.  And it will be

1    done within two weeks of today.

2              THE COURT:  Right.  Well, and I'm going to --

3    two weeks -- this Friday is the 9th.  Two weeks takes

4    you to the 23rd, so it needs to be the 26th.  Actually,

5    the 27th, because there's two federal holidays

6    intervening.  Okay.  The federal government takes a lot

7    of time off.

8              All right.  Thirty-one, plaintiffs business

9    license or substantially similar document.

10             Well, aren't there -- I'm sorry, is it an LLC?

11             MR. KOTZKER:  Yes.

12             THE COURT:  So there would be articles of

13   incorporation.

14             MR. KOTZKER:  Well, not incorporation, but

15   certificate of organization perhaps.

16             THE COURT:  All right.  Can you produce that,

17   please, just to show that you're a lawful company.  I

18   think that's a fair request.

19             Thirty-one -- or 32.  C-level, meaning chief,

20   I assume.

21             MR. FANTALIS:  It's all the executives, Your

22   Honor.  I'm guessing there's only the two people, a

23   husband and wife.  But if there's anyone else involved

24   in the company we'd like to -- you know, if there's a

25   CFO is there a VP of this, a VP of that.

1          THE COURT:  How is that relevant to their

2    claim?

3          MR. FANTALIS:  The possibility of us talking

4    to them, of deposing them to -- you know, to understand

5    what their involvement is.

6          MR. KOTZKER:  I don't see how that relates to

7    a defense for direct infringement, Your Honor.

8          THE COURT:  Well, I think you could -- you can

9    ask for employees who have knowledge of the facts

10   underlying the claim.

11         MR. FANTALIS:  That's reasonable.

12         THE COURT:  But employees.

13         MR. FANTALIS:  Uh-huh.

14         THE COURT:  Not owners.

15         MR. FANTALIS:  Well, owners would be employees

16   too, right?

17         THE COURT:  Well, they might be, but they're

18   not necessarily.

19         MR. FANTALIS:  Okay.

20         THE COURT:  So just employees.  You are

21   entitled to that, but not to -- you know, for example,

22   you don't get to take the deposition of Bill Gates just

23   because Microsoft sues somebody.

24         MR. FANTALIS:  But if he has knowledge of

25   something then it would.

 1          THE COURT:  Well, if he has knowledge of it in

 2     the capacity of the owner maybe, but who has it -- it's

 3     the employees who have involvement that --

 4          MR. FANTALIS:  In this case, Your Honor, I

 5     think -- it wouldn't surprise me if the only, you know,

 6     people that are -- you know, the two owners might be the

 7     only people part of the company.

 8          THE COURT:  They might.

 9          MR. FANTALIS:  And so excluding them,

10     obviously, you know, if they were a VP or something like

11     -- we know the two owners, so I'm -- we know those two

12     names, but if there are others that have knowledge, I

13     think that would be fine.

14          THE COURT:  Well, does the company have

15     employees?  An employee at least?

16          MR. KOTZKER:  That, I'm not aware of.  I can

17     tell you that the only two people ever involved at

18     C-level position are the two co-owners that we discussed

19     before.

20          THE COURT:  Well, you already know then.

21          MR. FANTALIS:  We have those two names.  Yeah.

22          THE COURT:  Right.  Okay.  So you are

23     representing there are no others?

24          MR. KOTZKER:  Co-owners, no.

25          THE COURT:  Okay.

```
 1              MR. KOTZKER:  Or -- or anyone else that's ever

 2     held a C-level position.

 3              THE COURT:  Okay.  There you go.  That's the

 4     answer to that.

 5              MR. FANTALIS:  Okay.

 6              THE COURT:  Okay.  Thirty-three, all documents

 7     pertaining to all employees of plaintiff.  And so I'm

 8     going to collapse 33 into 32 and sustain the objection

 9     on that.

10              Thirty-four, all documents pertaining to

11     responsibilities and obligations of plaintiff's

12     president.  I don't find that relevant.

13              Thirty-five, documents pertaining to

14     responsibilities of president.  Again, not relevant.

15              Thirty-six, not relevant.  I mean, you know,

16     companies act through boards and boards have protections

17     for a reason.  It's the employees of a company that --

18     that do the bidding of the company.

19              MR. FANTALIS:  I would guess they don't have

20     board meetings since it's not a real company, Your

21     Honor.

22              THE COURT:  Probably not.

23              MR. FANTALIS:  But that's kind of what I was

24     looking for here, quite honestly, Your Honor, was for

25     them to say we don't have board meetings and being
```

1    honest about it.

2              THE COURT:  Right.  So --

3              MR. FANTALIS:  That's what a lot of these

4    questions were related to, Your Honor.  For them to come

5    back and say we don't have employees, there's just these

6    two owners.  We don't have any other C-levels, there's

7    just these two owners.  We don't have board meetings.

8    You know, basically confirming that this is not a real

9    company.

10             MR. KOTZKER:  I don't see how that goes to the

11   claim or defense for --

12             THE COURT:  I agree.

13             MR. KOTZKER:  -- infringement.

14             THE COURT:  I agree.  Thirty-seven is the same

15   response; 38, same; 39 -- okay.  Well, he answered that

16   question anyway.

17             Forty --

18             MR. FANTALIS:  Your Honor.

19             THE COURT:  Yeah, he said that the -- that the

20   owners previously were unincorporated partners and that

21   the partners were the current owners.  That's what

22   you're saying.

23             MR. KOTZKER:  Correct.

24             MR. FANTALIS:  But yet, Your Honor, I think

25   what would go to this, for example, is the fact that

1    predecessor in this case could refer to what is now

2    being changed which is the ownership of the file.  So,

3    in other words, the owners -- and forgive me, Your

4    Honor, I don't know how this is perfectly correct.  The

5    -- originally when this was filed it was work-for-hire

6    that was supposedly hired by Malibu, but the movies were

7    made before Malibu existed.  Now they're saying, oops,

8    we made a mistake.  Greg actually owns these and I guess

9    is giving them, or something, to Malibu or -- in some

10   way.  And so I think to understand that relationship in

11   a response would be beneficial.

12           THE COURT:  Well, the documents you produced

13   that established your ownership, the company's ownership

14   of the copyright --

15           MR. KOTZKER:  The registration.

16           THE COURT:  Right.  Does it show from whom

17   they received?

18           MR. KOTZKER:  No.  They were -- it just shows

19   the ownership.

20           THE COURT:  That they registered then?

21           MR. KOTZKER:  Correct.

22           THE COURT:  And had they been previously

23   registered?

24           MR. KOTZKER:  Not that I'm aware of, Your

25   Honor.

 1          MR. FANTALIS:  The registration is changing,

 2     Your Honor.  They're changing all the registrations from

 3     work-for-hire to whatever the other type is.  I don't

 4     remember what it is.

 5          THE COURT:  No.  But each of these movies has

 6     a title, doesn't it?

 7          MR. KOTZKER:  Correct.

 8          THE COURT:  Was that title previously

 9     registered?  That's the question I have.

10          MR. KOTZKER:  No.

11          THE COURT:  Do you doubt that?

12          MR. FANTALIS:  I don't believe the title was

13     registered differently, just how it was registered and

14     who owned that.

15          THE COURT:  Well, explain -- explain what

16     you're thinking to me.

17          MR. FANTALIS:  Okay, Your Honor.  And my

18     thinking is a little garbled here, I must admit --

19          THE COURT:  Okay.

20          MR. FANTALIS:  -- because I don't understand

21     the law behind some of this.  But originally the lawsuit

22     was filed and these things were work-for-hire for Malibu

23     Media.

24          THE COURT:  Work -- work-for-hire.

25          MR. FANTALIS:  Work-for-hire.  So, the way I

1    understand that is a company hires someone to create

2    these movies and the company owns it.

3                THE COURT:  Okay.  So a production company --

4    if you could call it that loosely.

5                MR. FANTALIS:  Whatever you'd like to call it,

6    Your Honor.

7                THE COURT:  -- makes a film.

8                MR. FANTALIS:  In this case the -- the

9    statement was, basically, Malibu Media paid for this

10   film to be made.  Okay?

11               THE COURT:  That's what you believe.

12               MR. FANTALIS:  No.  That's -- that's because

13   it was work-for-hire.  That's basically a fact for how

14   it would work.  Then they realized that Malibu Media was

15   created after the movie was created.  So how could --

16   because they didn't file them immediately, they filed

17   them later.

18               THE COURT:  Right.  So -- and I'm asking you

19   what you believe -- who made these movies and the --

20               MR. FANTALIS:  Brig -- Brig, the owner of this

21   company made these movies, filed it as work-for-hire --

22               THE COURT:  What's his name?

23               MR. FANTALIS:  Brig Field, Brigham Field.

24               MR. KOTZKER:  Brigham Field.

25               THE COURT:  Brigham Field.

1        MR. FANTALIS:  He made these movies.  He filed

2    it under work-for-hire because for whatever reason at

3    the time he felt that was most beneficial to him.  Okay?

4    He didn't even pay attention, of course, to the fact

5    that Malibu Media didn't exist because he doesn't care.

6    And then -- now, when this was brought up by, probably,

7    another attorney they went and said, whoops, we made a

8    mistake.  They weren't work-for-hire.  I think they

9    filed them as Brig owns them.  And then I don't know if

10   he sold them to Malibu or he's giving them the right

11   only to sue for infringement or -- you know, I'm not

12   sure what that is.

13       THE COURT:  So, you believe Brigham Field --

14   which sounds like a Mormon name to tell you the truth --

15   makes these movies.

16       MR. FANTALIS:  Yeah.

17       THE COURT:  And after he makes a movie he then

18   did what with it?

19       MR. FANTALIS:  Originally, they filed it as a

20   work-for-hire.  After they created -- I believe this is

21   the order.  Right.  They make the movie.  They don't

22   even file it right away because who cares.  It's a --

23   you know, they make a thousand of these things a week,

24   right.  Then they decide, hey, we're going to sue a lot

25   of people for stealing this, so we've got to file it.

1    So we file it as a work-for-hire for Malibu Media, this

2    company that we just made.  Some attorney somewhere

3    points out, hey, you made these movies before you were a

4    company.

5             THE COURT:  Okay.

6             MR. FANTALIS:  Oh, we made a mistake.  It

7    wasn't work-for-hire, it was -- I guess Brigham owns

8    them himself and he gives them the right or whatever --

9             THE COURT:  Assigned the right to them.

10            MR. FANTALIS:  I don't really --

11            THE COURT:  Okay.

12            MR. FANTALIS:  That's what -- we'd just like

13   to have that on record as to what happened there.

14            THE COURT:  And why does that matter?

15            MR. FANTALIS:  It goes to the -- you know,

16   whether this is a real company and whether they really

17   were setting out to do what I'm claiming they set out to

18   do, which is to extort money from people and not trying

19   to protect an intellectual property.

20            MR. KOTZKER:  Which was not a claim or a

21   defense, Your Honor.

22            THE COURT:  Well --

23            MR. FANTALIS:  It's a defense, Your Honor.

24            THE COURT:  How is it a defense?

25            MR. FANTALIS:  It's a defense that someone

1    isn't really in business to do this, they're in business

2    only to sue people.  That's what they're in business to

3    do.  They're not in business -- first of all, Malibu

4    Media does nothing but sue people.  That's their thing.

5    That's all they do.  We believe.  They won't answer

6    questions about it.  Can't say for sure, okay.  Second

7    of all, they don't have a goal of actually protecting

8    their IP.  In fact, they're putting it out there for

9    people to take down, that's the file.  And then they're

10   manipulating the court in every way they can.  It's

11   joint and several liability today.  Tomorrow when it

12   doesn't suit me it's not.  It's work-for-hire today.

13   Huh-oh, we made a mistake.  We're not allowed to do

14   that.  Now it's owned by Brig.

15             I also think there's a possibility they

16   changed that ownership so they can easily shut down

17   Malibu Media at any point.  It doesn't do anything but

18   sue people.  It wouldn't take anything for them to shut

19   it down and call it Malibu Media 2 and start -- Brigham

20   can then give those movies to those guys and go and do

21   it to someone else.

22             THE COURT:  I think all that is very

23   interesting with regard to your claims, which we may get

24   to in the next month or two.  Okay?  So, the objection

25   is sustained on 39.

```
 1              MR. FANTALIS:  But that falls under the --
 2    we'll likely come back at --
 3              THE COURT:  Without prejudice.  Without
 4    prejudice.  I can't say likely or not.
 5              MR. FANTALIS:  Right.
 6              THE COURT:  I can't prejudge the motion to
 7    dismiss.  All documents things or electronically stored
 8    information, dividends is 40, so that's not relevant.
 9    Insurance policies.  What in the world would that
10    matter?
11              MR. FANTALIS:  Their ability to pay damages.
12    I mean, for my expenses, their ability to pay --
13              THE COURT:  All right.  So that, again, would
14    go toward --
15              MR. FANTALIS:  No.  I believe, Your Honor, if
16    I have expenses, let's say I hired an attorney, for
17    example, which I may need to do, and I win the case they
18    have to pay for that, right?  Again, it goes to, one,
19    their ability to pay; and two, what real LLC that's out
20    there doesn't have insurance?  It goes to the viability
21    of this company.
22              THE COURT:  Okay.  And I don't find that as
23    relevant for the moment either, so the objection is
24    sustained on that one.
25              Federal and state tax returns.  See, their
```

1    financial state is only relevant -- I mean, what costs

2    do you have right now?

3            MR. FANTALIS:  There's not a huge cost but,

4    Your Honor, I'm considering hiring an attorney.  I'm

5    going to probably be deposing people.  I'm considering a

6    private investigator.  These are all going to add up to

7    huge amounts.  Keith Lipscomb, again the attorney for

8    them, has stated on the record that an average cost to

9    defend this is $600,000.

10           THE COURT:  Well, let me -- let me say this

11   and see if I can give you some assurance on your --

12   whatever cost you'll have in this case, and -- because I

13   don't think I'm going to allow any -- plaintiff's

14   financial information at the moment.  But if you win

15   this case and get a cost award, and they don't pay it

16   the gig is up.  Because they're required to pay it.  And

17   if they don't then that opens up all kinds of discovery

18   you can get into in their company and I will allow that.

19   You'll have almost carte blanche.

20           MR. FANTALIS:  But if I've spent half a

21   million dollars, Your Honor, and then they go out of

22   business --

23           THE COURT:  Well, you don't have an attorney.

24   You can't possibly spend a half a million dollars.

25           MR. FANTALIS:  If I hire an attorney.

1        THE COURT:  If you hired an attorney you

2    might.  Let's -- we'll cross that bridge when we get to

3    it, but at the moment I'm not worrying about them paying

4    because they're obligated to, and --

5        MR. FANTALIS:  That hasn't actually panned out

6    to everyone paying when they're obligated to, especially

7    companies that aren't real.

8        THE COURT:  Well, I know.  But do you know of

9    a single instance where they've failed to pay any court

10   ordered obligation?

11       MR. FANTALIS:  No, because -- well, they

12   failed to do a lot of court ordered obligations

13   (unintelligible).  But, no, they haven't taken anything

14   to court, Your Honor, because they avoid it.  They avoid

15   court.  Right?  They've filed thousands and thousands of

16   these things and --

17       THE COURT:  Well, yeah.  But the longer we sit

18   here the more that statement looks like it's not fact

19   based.  Do you understand?  I mean, you and I and

20   Mr. Kotzker have been in five or six hearings so far,

21   and yet here they are.  They're litigating.

22       MR. FANTALIS:  Well, they can't get out until

23   they get the charges against them -- I mean, their whole

24   goal, Your Honor -- clearly, they want to get the

25   charges dismissed.  Once they get it dismissed they're

1    going to run like hell.  Guarantee you.

2                THE COURT:  What does that mean, run?

3                MR. FANTALIS:  They're going to drop.  They're

4    going to drop out of this case.

5                THE COURT:  Once they get your claims --

6                MR. FANTALIS:  If they can get my claims

7    dismissed --

8                THE COURT:  Then you think they'll fold up and

9    go away.

10               MR. FANTALIS:  Yeah.  They can't win their

11   case, Your Honor.  Of course they will.

12               THE COURT:  Okay.

13               MR. FANTALIS:  If I said right now -- if I

14   walked across there and said right now I'll drop if you

15   drop, he'd hug me.

16               THE COURT:  All right.  Forty-two we'll

17   reserve for some later date if necessary.

18               Forty-three, you can have that.  Those are

19   public filings.  Forty-four, I'll sustain the objection

20   on that; 45, the same; 46, same.  Because they're all

21   considered the finances of the plaintiff.

22               MR. FANTALIS:  Yep.

23               THE COURT:  Forty-seven, the same; 48, the

24   same.  You know, a lot of these are appropriate for a

25   class action of some kind.

1          MR. FANTALIS:  Well, that's also starting to

2     happen too around this country, Your Honor.

3          THE COURT:  But not necessarily.  Is there a

4     class action filed?

5          MR. FANTALIS:  I believe I've -- yeah, I've

6     heard of one.

7          THE COURT:  Okay.

8          MR. FANTALIS:  You know, there may be more.

9     You know, and there's the bellwether case which may be

10    combined.  I assume you're familiar with that one.

11         THE COURT:  Is that an actual name of the case

12    or are you just terming it "a bellwether case"?

13         MR. KOTZKER:  That's what it's been termed by

14    the court.

15         MR. FANTALIS:  Yeah.

16         THE COURT:  Okay.

17         MR. FANTALIS:  Basically --

18         MR. KOTZKER:  It's just really an expedited --

19         MR. FANTALIS:  Yeah.

20         MR. KOTZKER:  -- let's move it to trial.

21         THE COURT:  By the court that's issuing it

22    they're calling it --

23         MR. FANTALIS:  Yeah.

24         MR. KOTZKER:  Yeah.

25         MR. FANTALIS:  The judge basically --

1        THE COURT:  I'm suspicious of any particular

2   judge who calls his own case a bellwether case.

3        MR. FANTALIS:  Well, let's say that he's

4   proactive, Your Honor.

5        THE COURT:  Sure.

6        MR. FANTALIS:  But clearly what he's seen is

7   some of the things that I'm saying.  He's tired of his

8   court being filled with these things.

9        THE COURT:  Sure.

10        MR. FANTALIS:  And the first thing that they

11   asked for Malibu to do, they avoided.  They can't have a

12   bellwether case go through.  They'll probably all end up

13   in jail.  They're going to do everything they can to

14   avoid that case.  I'll bet you dollars to donuts that

15   doesn't go to trial.  They're going to find some way to

16   get out of it.

17        THE COURT:  If you did dollars to burritos I

18   might take that bet.

19        MR. FANTALIS:  All right.  I'll do it however

20   you want it, Your Honor.

21        THE COURT:  I don't eat donuts.

22        MR. FANTALIS:  Whatever your favorite food is.

23        THE COURT:  Okay.  And 49 is the same

24   category.  As to each of the works, now we're

25   reaching --

```
 1              MR. FANTALIS:  They provided a bunch of it,

 2    Your Honor, but not J.  Is it J?

 3              THE COURT:  Pardon?  Oh, as to each work.

 4    I --

 5              MR. KOTZKER:  That would only be relevant if

 6    we were seeking actual damages, Your Honor.

 7              THE COURT:  Yeah, I -- I can't see A, B -- I

 8    mean, who cares if they found this stuff laying in the

 9    street and copyrighted it --

10              MR. FANTALIS:  What's that?

11              THE COURT:  -- as long as they own the

12    copyright.

13              MR. FANTALIS:  One of the things -- H.  Let me

14    just read through this.

15              THE COURT:  Well, he's already agreed to

16    produce F and G, H, federal recordkeeping relating to

17    the age and consent of the actors in the work.

18              MR. FANTALIS:  Yeah, so they're basically

19    saying trust us there, Your Honor.

20              THE COURT:  Well --

21              MR. KOTZKER:  What does that have to do

22    with --

23              THE COURT:  Well, is it a defense?  If they

24    prove this as obscenity, legally, do you agree that it

25    can be copyrighted?
```

1           MR. KOTZKER:  If it's obscene?

2           THE COURT:  If it's obscene.

3           MR. KOTZKER:  I think that's a decision that

4    Congress needs to make, not the court.

5           MR. FANTALIS:  Actually, the Supreme Court

6    already made the decision --

7           THE COURT:  Well --

8           MR. FANTALIS:  -- and already stated it.

9           THE COURT:  -- obscenity is illegal.  We can

10   agree on that, right?

11          MR. KOTZKER:  Sure.

12          THE COURT:  It just says if a judge has

13   determined that something is obscene that means it's

14   illegal.

15          MR. KOTZKER:  Okay.  I don't think you could

16   copyright something that's illegal.

17          THE COURT:  I don't think you can either,

18   although I'm not a copyright attorney.  So --

19          MR. KOTZKER:  But I don't know how what the

20   age of the actors or actresses has to do with the

21   copyright ability or the obscenity of it.

22          THE COURT:  Well, if the person is 14 then

23   it's child pornography.

24          MR. KOTZKER:  Well, I understand that.

25          THE COURT:  Then it's illegal and it can't be

1    copyrighted.  If you want to -- if you want to produce a

2    statement in response to H to the best of your --

3              MR. KOTZKER:  I did in the response.  I said,

4    Plaintiff avers that these records do exist and that all

5    the actors were over the age of majority --

6              THE COURT:  Okay.

7              MR. KOTZKER:  -- at the time the movies were

8    created.

9              THE COURT:  Then that's what I would have

10   required you to do anyway.  Okay.  I, you're agreeing to

11   anyway.  J --

12             MR. FANTALIS:  I think the rest are all --

13             THE COURT:  Okay.  I'll sustain either the

14   objection or the response to the rest of 50, 51.  As to

15   all funds received from settlements, again, that's going

16   to be your later case if you have one.

17             MR. FANTALIS:  Your Honor, I believe that even

18   with actual they can't double collect the statutory,

19   sorry.  And since I was in this with 30 other people and

20   they claimed joint several liability then, I don't think

21   they can claim not now.

22             THE COURT:  Well, they probably can't get more

23   than -- what's the limit?

24             MR. KOTZKER:  30,000, and then 150,000 for

25   willfulness.

1           THE COURT:  Okay.

2           MR. FANTALIS:  And so, Your Honor, if I may?

3           THE COURT:  Yes.

4           MR. FANTALIS:  They claim that this was one

5     giant swarm to begin with.

6           THE COURT:  Right.

7           MR. FANTALIS:  And we all conspired -- all 30

8     people conspired to steal that file, okay.  One file,

9     okay?  One hundred and seven movies, but one file.  So,

10    if their actual damages, let's just say, are $30,000 and

11    they collected $28,000 on those damages already, they

12    only got $2,000 left.

13          THE COURT:  Well, it's a relevant

14    consideration, I agree.  Are we down to only Dunn and

15    Mr. Fantalis --

16          MR. KOTZKER:  Correct.

17          THE COURT:  -- of the original lawsuit?  The

18    prior lawsuit?

19          MR. FANTALIS:  Well, that's out of the three,

20    Your Honor.  There were 30 when it was a Doe case,

21    right.  They claimed the thirty were joint and severally

22    liable, okay.

23          THE COURT:  I understand.

24          MR. FANTALIS:  Then they came back and said

25    these three are joint and severally liable.  But if we

1    go to the 30, originally they claim those 30 were joint

2    and severally liable.  I believe we have knowledge that

3    they settled on at least nine of those.

4              THE COURT:  I understand.

5              MR. FANTALIS:  And so I believe the total

6    collected would go into the potential.

7              THE COURT:  Well, do you have a concept --

8    well, what is your opinion on the law?  Are you entitled

9    to collect 30,000 from each person?

10             MR. KOTZKER:  Correct, Your Honor.  That's my

11   understanding.

12             THE COURT:  And why do you think that's not

13   true.

14             MR. FANTALIS:  From research that I can't

15   bring off the top of my head, Your Honor.

16             THE COURT:  Okay.

17             MR. FANTALIS:  I mean, if it's actual damages,

18   Your Honor.  Let's just be logical.  If it's actual

19   damages.

20             THE COURT:  Well, they're not going actual.

21   They're going statutory.

22             MR. FANTALIS:  Sorry, statutory.  But it's

23   still only -- they claimed originally that we all

24   conspired to download that file once.  Though, if that's

25   the case they can't go to everybody and say that, you

1    know, you owe me for statutory full amount, you owe me

2    for statutory, you owe me --

3              THE COURT:  Well, except that they -- I think

4    they're claiming that each of you got the movie, the

5    file.

6              MR. FANTALIS:  Not -- no, Your Honor.  The

7    idea in a swarm, and this is their thing here, is that

8    basically the data -- anyone who runs -- a BitTorrent is

9    legal.  Anyone can run a BitTorrent.  Okay.  With a

10   BitTorrent the idea -- and I only found this out, Your

11   Honor, by getting involved in this case -- but the idea

12   is when you're running a BitTorrent -- even if you're

13   not downloading, let's say you're running a BitTorrent

14   and you have a daughter in college and you're trying to

15   download a paper on something.  Data can go through your

16   BitTorrent for pornography, and they would claim that

17   you were part of the swarm.  Okay?

18             So, by putting us all together they were

19   claiming we were all part of a swarm when that file came

20   down.  Now, I don't believe that they claim that each of

21   the 30 people each downloaded that file, they say we

22   were part of one swarm, which would --

23             MR. KOTZKER:  Each of them was responsible for

24   direct infringement themselves and contributory

25   infringement with respect to the others.

```
 1              THE COURT:  Right.  But what do you allege

 2    each of them ended up with at the end of the day?

 3              MR. KOTZKER:  They each -- well, we're not

 4    alleging that they ended up with anything.  What we're

 5    alleging is that they committed direct copyright

 6    infringement and that they assisted others in committing

 7    copyright infringement as well.

 8              THE COURT:  What's the purpose of somebody

 9    having the software if they don't end up with a movie at

10    the end of the day?

11              MR. KOTZKER:  Well, I'm sure they did end up

12    with the software -- or the movie at the end of the day.

13              THE COURT:  That's what I mean.

14              MR. KOTZKER:  Correct.

15              THE COURT:  Do you believe -- is it your

16    allegation that each of the IP addresses did this for

17    the purposes of getting pornography?

18              MR. KOTZKER:  Correct.  Yes.

19              THE COURT:  And having it on their computer so

20    they could watch it.

21              MR. KOTZKER:  Yes.

22              THE COURT:  One movie or the whole file?

23              MR. KOTZKER:  The whole file.  The whole site

24    rep.

25              THE COURT:  All the movies?
```

1            MR. KOTZKER:  Yeah.

2            THE COURT:  Each person all the movies?

3            MR. KOTZKER:  Yeah.

4            THE COURT:  How many gigabytes was that?

5            MR. KOTZKER:  Like 42 gigabytes.

6            THE COURT:  Okay.

7            MR. FANTALIS:  All at once, Your Honor.  We

8    all conspired to all download the same file all at once.

9            MR. KOTZKER:  We're not saying it's a

10   conspiracy.  We're saying that --

11           THE COURT:  No.

12           MR. KOTZKER:  -- they assisted one another.

13           THE COURT:  I know what you're saying and

14   that's -- that's the whole rub about whether you can or

15   can't join all of these Does in one case, and that's

16   where things are in flux, especially in this district

17   with judges going different directions.  Daniel on one

18   side, I think, and -- Daniel and Martinez potentially on

19   one side and Arguello on the other.

20           MR. KOTZKER:  Right.

21           THE COURT:  Anybody else issue a decision as

22   far as you know?

23           MR. KOTZKER:  No, Your Honor.

24           THE COURT:  All right.  But I, think

25   Mr. Fantalis, they're claiming that at the end of the

1   day the people who participated in the swarm got a movie

2   at least, or a bunch of movies.  Isn't that -- isn't

3   that you're understanding of what they're alleging?

4            MR. FANTALIS:  No.  If you look at the idea of

5   a swarm, Your Honor, as far as I understand it from my

6   research, is when you participate in a swarm everyone is

7   not downloading the file, the file is just moving

8   through everyone.  In other words, there weren't 30

9   people that all tried to download the movie at the same

10  time.

11           THE COURT:  No.  No.  I know.  But the purpose

12  of the -- the 30 each ended up somewhere at the end of

13  the whole process with a movie.

14           MR. FANTALIS:  No.

15           THE COURT:  No?

16           MR. FANTALIS:  Okay.  Let's take us right

17  here, Your Honor.  Okay.  We're all running a

18  BitTorrent.  You go to download the file -- sorry to put

19  it on you, right.  We're running a BitTorrent, data goes

20  through him, through me, through her, to help get it to

21  you.

22           THE COURT:  Well, why are you helping me if

23  you don't get anything for it?

24           MR. FANTALIS:  I'm not.  I don't even know I'm

25  helping you.  That's the idea of a swarm.  It's just

1    going through these computers to help pull it down

2    faster and get it to you.

3              THE COURT:  Do the computers have to have some

4    kind of software to enable this?

5              MR. FANTALIS:  BitTorrent software.  That's

6    it.  But you can be using it -- I could be using it

7    perfectly legally.

8              THE COURT:  How does my computer know that

9    your computer has a BitTorrent?

10             MR. FANTALIS:  It's all handled by the

11   software.

12             THE COURT:  Whose software?

13             MR. FANTALIS:  The BitTorrent software handles

14   it.

15             THE COURT:  My software?

16             MR. FANTALIS:  The BitTorrent software that

17   we'd all have to be running.

18             THE COURT:  Off of a website?

19             MR. FANTALIS:  I think you download -- I don't

20   know if -- I have to think, just from my technology

21   experience, it's you probably download a BitTorrent, so

22   it's probably a local thing that you run on each of our

23   machines.  So we'd all be running this BitTorrent

24   software.

25             THE COURT:  And how does a firewall -- a

1    reasonable firewall let you get into my computer or get

2    into your computer?

3              MR. FANTALIS:  The computer -- I don't know

4    how that works, Your Honor.  It's part of the BitTorrent

5    technology.

6              MR. KOTZKER:  If you turned on the BitTorrent

7    software to -- whether you're using it -- and there are

8    many, good, valid, legal reasons to use BitTorrent.

9    It's extremely useful to transfer large pieces of data.

10   So if it's on I imagine that your firewall settings are

11   adjusted to prevent blocking BitTorrent communications.

12             THE COURT:  But, Mr. Fantalis is saying that

13   at the end of the day some people who participate in a

14   swarm don't end up with any files on their computer.

15             MR. FANTALIS:  Hence --

16             MR. KOTZKER:  That's not what we're

17   (unintelligible).

18             MR. FANTALIS:  -- the contributory, Your

19   Honor.

20             THE COURT:  Is that contrary to your

21   understanding of the way this works?

22             MR. KOTZKER:  Yes, Your Honor.

23             MR. FANTALIS:  Your Honor?

24             THE COURT:  Yes.

25             MR. FANTALIS:  Contributory.  The whole reason

1    they put contributory to begin with, which of course

2    they can't prove and all that, was that, okay, we all

3    participated in a swarm, right, and so because it went

4    to you they wanted to get me with contributory because

5    it went through me.  Not because I downloaded the file.

6    That's the whole idea of why they originally put

7    contributory.  Then they realized that contributory

8    basically states that they know that you're not

9    downloading it and that they can't prove it because

10   there's no willful act, and so they remove contributory.

11   That's one of the reasons they're removing it.

12           MR. KOTZKER:  That's -- that's not accurate,

13   Your Honor.  Your Honor, the contributory claim is

14   because -- and we've discussed this in another matter as

15   well, is once you start downloading the file, the

16   BitTorrent is set up so that if you automatically begin

17   to upload the pieces of the same file to others that are

18   requesting it.  It's not simply a pass-thru, a passive

19   thing that's happening.  It's a setting that you're

20   making.  You're downloading at a faster speed because

21   you're uploading to other users.

22           So you're collecting pieces of the movie which

23   is the direct infringement, and then you're uploading

24   those pieces of those movies to other people in the

25   swarm, which is the contributory infringement.

1          THE COURT:  But in order to upload are you

2    just copying the file, or sending the file completely

3    out of your computer?

4          MR. FANTALIS:  No.

5          MR. KOTZKER:  No.

6          MR. FANTALIS:  It's copying.

7          MR. KOTZKER:  It's copying a piece of it and

8    moving it on.

9          THE COURT:  Copying.  So the original -- not

10   the original, but whatever existed on your computer

11   stays there.

12         MR. KOTZKER:  Correct.

13         THE COURT:  And it sends out a copy.

14         MR. KOTZKER:  Right.  To facilitate others in

15   doing the same copying.

16         THE COURT:  Well, you guys are disagreeing on

17   this, clearly, so that's something that's maybe going to

18   need to be the subject of expert testimony.

19         MR. FANTALIS:  They don't have any experts,

20   Your Honor, because no expert would actually support

21   them that's reasonable.

22         THE COURT:  Well, we haven't reached a time

23   for designating experts here anyway.

24         MR. FANTALIS:  I think we have.

25         THE COURT:  Have we?

1          MR. FANTALIS:  Yeah.

2          THE COURT:  Oh, you didn't designate an

3   expert?

4          MR. KOTZKER:  No.

5          THE COURT:  Okay.

6          MR. KOTZKER:  You know, there has never been

7   an alternative theory of how BitTorrent works to my

8   understanding.  In fact, when Mr. Arsenault sat over in

9   the same table there he agreed with my exact

10  understanding with it and explained it to you probably

11  better than I did.

12         MR. FANTALIS:  It's not --

13         THE COURT:  So, are you hearing this for the

14  first time?

15         MR. KOTZKER:  Yes.

16         MR. FANTALIS:  Your Honor, it's not -- it's

17  not a question of how BitTorrent works it's a question

18  of what they're case was.  They, I believe, said to the

19  court that these 30 people were a swarm.  A swarm, as

20  far as I understand it, is one group of people

21  participating through each other to download a file.

22         THE COURT:  Well --

23         MR. KOTZKER:  Sharing the same file.

24         THE COURT:  Yes.  But, at the end of the day

25  that person ends up with a file.

1          MR. FANTALIS:  This is their thing?

2     (Unintelligible).

3          THE COURT:  Well, while they're doing that,

4     Mr. Kotzker, let me ask you, the original lawsuit

5     what's -- I don't know what term you use, first lawsuit

6     or --

7          MR. KOTZKER:  Prior lawsuit.

8          THE COURT:  Prior lawsuit.

9          MR. KOTZKER:  Correct.

10         THE COURT:  It named how many Does?

11         MR. KOTZKER:  Thirty is what Mr. Fantalis

12    says.  I don't know the number off the top of my head.

13         THE COURT:  Is that approximately correct?

14         MR. KOTZKER:  Presumably, yeah.

15         THE COURT:  Okay.  And do you know whether

16    settlements in that case would exceed $30,000 of all

17    those people?

18         MR. KOTZKER:  They would not, Your Honor.

19         THE COURT:  All right.

20         MR. FANTALIS:  Your Honor?

21         THE COURT:  Yes.

22         MR. FANTALIS:  This is in one of the things

23    that we sent in, actually I think we just sent it in

24    today on the surreply.

25         THE COURT:  Uh-huh.

1          MR. FANTALIS:  Copyright plaintiff alleges

2     that two or more defendants have joined in and

3     contributed in the same infringement, which is the

4     swarm.  The Copyright Act provides for joint and several

5     liability, and limits any recoverable or statutory

6     damages to a single award.  And then we have a case to

7     back that.  Infringements are the same work by two

8     divisions of a corporation and cannot give rise to

9     duplicative statutory damages claims in a distinct

10    action against each division.

11         THE COURT:  Right.  But Mr. Kotzker has just

12    put on the record that he hasn't achieved $30,000 here.

13         MR. FANTALIS:  But even if he hasn't, Your

14    Honor, let's say he's achieved 10, that's 10 less than

15    he can -- than he can get from me if he were to win.

16         THE COURT:  Well --

17         MR. FANTALIS:  If he were to win $30,000, then

18    it should be 30 minus 10.

19         THE COURT:  And if you were saying that you

20    need that information in order to analyze whether you

21    should settle, then I could find it relevant.  But if

22    you're saying that you need that information -- that's a

23    damages phase issue.

24         MR. FANTALIS:  Okay.

25         THE COURT:  And we could -- I don't have a

1    request pending, but we could bifurcate liability and

2    damages in this case.  Do you understand that?  So

3    that -- well, the -- you've asked for a jury trial.  The

4    jury would hear only evidence concerning whether

5    copyright infringement happened.  It would not receive

6    any evidence that -- what they're requesting from you.

7    Okay.  How much money they want or whatever.  If

8    after -- if at the trial on the merits a jury returns a

9    verdict for the plaintiff, then we would move to penalty

10   phase.  And I think probably the penalty is a judicial

11   determination anyway.

12            MR. KOTZKER:  Correct.

13            THE COURT:  And it's not for the jury since

14   you're not claiming damages.

15            MR. KOTZKER:  It's set out statutorily.

16            THE COURT:  So therefore, if at that -- if --

17   if you were liable, at that time I would receive

18   briefing on your exposure to penalty, and if I agreed

19   with you that the penalty had been exhausted then I

20   would not impose a penalty.

21            MR. FANTALIS:  Okay.

22            THE COURT:  So --

23            MR. FANTALIS:  Well, then would it be

24   reasonable to have it for potential settlement?  Not

25   that I'm planning to do so, but I might want it for

1    consideration.

2            THE COURT:  Your exposure is relevant for

3    settlement purposes.  You're entitled to know whether

4    you could be liable for 2 or 30 or $150,000.

5            MR. FANTALIS:  I believe it's 30 times

6    whatever number they claim they owned in this particular

7    case.

8            MR. KOTZKER:  Right.

9            MR. FANTALIS:  Right?  I don't remember.

10           THE COURT:  Are you claiming 30 per work?

11           MR. KOTZKER:  Correct.

12           THE COURT:  All right.

13           MR. KOTZKER:  Actually we're claiming 150 per

14   work.  We -- we are --

15           THE COURT:  Because of the willfulness.

16           MR. KOTZKER:  -- alleging willfulness.

17   Correct.

18           THE COURT:  Okay.  Well, then if -- what I'd

19   like you to do is -- yeah, this is within the realm

20   of -- but it -- I can only -- I'm only going to allow

21   relevant information.  So, you don't -- you don't need

22   to know names?

23           MR. FANTALIS:  No.

24           THE COURT:  Or breakdowns?

25           MR. FANTALIS:  No.

1           THE COURT:  All you need to know is totals.

2           MR. FANTALIS:  They can go by John Doe No. 1,

3    2, 3.

4           THE COURT:  No, not even that.  I mean just

5    total.  But it's -- I'm sure he'll designate it as

6    confidential because they're all confidential

7    settlements.

8           MR. KOTZKER:  Correct, Your Honor.

9           THE COURT:  So I'd like you to provide the

10   total received in settlements.

11          MR. FANTALIS:  Can it be also, Your Honor, the

12   number of settlements and the total?  Not the number

13   per, but we've settled with 10 people?

14          THE COURT:  No.  Just total.  Because it's the

15   dollar amount that reduces your liability, potentially,

16   under your theory.

17          MR. FANTALIS:  Right.  But that assumes that

18   they're being honest.

19          THE COURT:  I'm going to assume that.

20          MR. FANTALIS:  That's a big one, Your Honor.

21          THE COURT:  Mr. Kotzker -- I'm sure he cares

22   far more about his license and his ability to provide

23   for his family than he does about this particular

24   lawsuit or this client even.

25          MR. FANTALIS:  I would tend to disagree, Your

137

1    Honor.  I expect him to be in jail at the end of this,

2    but that's a whole different thing.

3           THE COURT:  Yeah, I -- you know, there's only

4    so much you can say, Mr. Fantalis, before you get into a

5    little bit of trouble.

6           MR. FANTALIS:  Uh-huh.

7           THE COURT:  You're using -- I note --

8           MR. KOTZKER:  I've put up the extortion --

9           THE COURT:  -- you've been patient beyond what

10   most people do, but you can't make scandalous

11   allegations like that against your opponent.  It's not

12   ethical even for a nonlawyer.  And so, I would like you

13   to stick to the issues in the case without

14   sensationalism.  Sensationalism doesn't buy you anything

15   in front of a judge.  It won't buy you anything in front

16   of a jury except prejudice against you.  I want to -- if

17   you want to win on the case, win on the merits.  But the

18   rhetoric game will only hurt you.

19          MR. FANTALIS:  Okay, Your Honor.

20          THE COURT:  Okay.  So, I'm going to admonish

21   you not to accuse Mr. Kotzker of criminal behavior

22   again.  If you think you have an allegation in that

23   regard, then you're free to go to a district attorney or

24   the United States Attorney's Office if it's a federal

25   crime.  Okay.

1    MR. KOTZKER:  If we could also limit the use

2    of extortion in here as well, that would be fantastic,

3    Your Honor.

4    THE COURT:  Well, here's the thing,

5    Mr. Kotzker, on that.  I do hear that all the time for

6    lots of different cases.  And I do settlement

7    conferences and every -- almost every single settlement

8    conference involves a defendant saying blackmail or

9    extortion.  I'm going to assume that Mr. Fantalis is

10   using that just as a means of expressing frustration

11   with being in the condition that he's in, having to

12   defend a lawsuit like I've probably heard

13   representatives of Qwest, the large -- Wells Fargo.  The

14   largest entities in the world use the same language,

15   although, admittedly, usually behind closed doors, not

16   in the presence of their opponent.  But if you wouldn't

17   mind limiting or removing that from the equation also,

18   and let's fight above the belt.

19   MR. FANTALIS:  Okay.

20   THE COURT:  Okay.  All right.  So,

21   Mr. Kotzker, all you need to provide is total received

22   to date in settlement of cases arising out of the prior

23   lawsuit.  And, Mr. Fantalis, I'll remind you again, this

24   information is not to be shared and I'd be very

25   disappointed, not to mention upset, and --

1          MR. FANTALIS:  There's no need to worry, Your

2     Honor.

3          THE COURT:  All right.  Good.  All right.  So

4     52, documents --

5          MR. KOTZKER:  The next objection was 54, Your

6     Honor.

7          THE COURT:  All right.  Fifty-four, documents

8     supporting plaintiff's contention that persons who used

9     BitTorrent software to download the works are jointly

10    and severally liable for copyright infringement.

11         MR. FANTALIS:  Your Honor, I'm sorry, where

12    are you?

13         THE COURT:  Fifty-four is the next objection.

14         MR. FANTALIS:  What happened -- oh, so the

15    next -- the plaintiff claimed --

16         THE COURT:  Yeah, on this one I think it asked

17    for legal analysis, and any interrogatory that calls for

18    legal analysis is -- is not permissible.  So I'll

19    sustain the objection on that.

20         The answer to that question will be decided on

21    people briefing it to me if necessary.  The jury won't

22    decide, for example, whether somebody is jointly and

23    severally liable it will be a legal decision by a court.

24    Fifty-five, documents -- I've already dealt with 55 --

25         MR. FANTALIS:  Uh-huh.

1           THE COURT:  -- so that objection is sustained.

2    Well, there's not an objection, actually.  Oh, yeah,

3    there is.  So, we've already dealt with that.

4    Fifty-six, documents relating to persons other than

5    defendant that plaintiff has alleged is liable for

6    copyright infringement -- of this swarm is what you're

7    talking about?

8           MR. FANTALIS:  Yeah.  The original 30.

9           THE COURT:  And why is the liability or

10   nonliability of any other defendant a concern for you?

11          MR. FANTALIS:  One second, Your Honor, if you

12   would.

13          THE COURT:  Okay.  Unless you wanted to

14   cross-claim, I guess.  Although, I don't know what the

15   foundation would be.

16          MR. FANTALIS:  I think this has to go to -- I

17   think this would go toward the dollars again, Your

18   Honor --

19          THE COURT:  Okay.

20          MR. FANTALIS:  -- that you've already stated.

21          THE COURT:  Yeah.  I agree.  Fifty-seven,

22   tracking (unintelligible) determination of the IP

23   address.  Okay.  Does this have to deal with IPP?  The

24   work IPP does?

25          MR. FANTALIS:  Yes.

1          MR. KOTZKER:  I don't know, Your Honor.  I

2    presume and --

3          THE COURT:  Well, did --

4          MR. KOTZKER:  -- and he's addressing it to any

5    purported infringer of the work whether or not they were

6    in the swarm or --

7          THE COURT:  Right.  Well --

8          MR. KOTZKER:  -- out of the swarm, or --

9          THE COURT:  -- we're limiting it to himself.

10          MR. KOTZKER:  My client is not, as far as I

11    know, in possession of the source code of software that

12    a third-party company uses to track infringement.

13          THE COURT:  Well, I think you need to respond

14    -- respond more clearly to this.  If you don't have

15    the -- if this is exclusively within IPP, which is not

16    owned by you, correct?

17          MR. KOTZKER:  Correct.

18          THE COURT:  Not owned by --

19          MR. KOTZKER:  Correct.

20          THE COURT:  It's a complete and separate third

21    nonparty contractor.

22          MR. KOTZKER:  Right.

23          THE COURT:  So if -- if -- please just

24    identify whether any information related to this request

25    would be in the possession, custody or control of IPP.

1          Fifty-eight.  Okay.  And again, I -- you're

2    talking about the actors in the actual movie -- movies?

3          MR. FANTALIS:  Yeah.

4          THE COURT:  Okay.  I'll sustain the objection

5    on that one.  Complete and accurate copy of each of the

6    works.  Why do you need that?  I guess you're going to

7    get it anyway.

8          MR. FANTALIS:  I was supposed to.

9          THE COURT:  I guess you need it -- you need it

10   for the obscenity argument I suppose.  All right.

11         MR. FANTALIS:  Well, they said they were going

12   to supply that, Your Honor --

13         THE COURT:  Yeah.  Yeah.

14         MR. FANTALIS:  -- and they never did.

15         THE COURT:  No.  No.  It's a moot point.

16   Sixty.  What's a section 2257 statement.

17         MR. KOTZKER:  That's our recordkeeping

18   statement for the age of the actors I believe, Your

19   Honor.

20         THE COURT:  Okay.  All right.  I'll sustain

21   the objection on that one.  They're going to produce in

22   response to 61, 62.  That -- that would go towards your

23   claims if and when we reach those.  Sixty-three.  So,

24   actually, we've had relatively few that relate only to

25   your case, right?

1        MR. FANTALIS:  I think the other documents

2    will be more so, Your Honor.

3        THE COURT:  Yeah.  Sixty-three, same thing;

4    64, I don't relevance to that.  All right.  Moving to

5    the interrogatories.  Is that just 8 through 10?

6    Hopefully, please.  Is this 8 through 10 or -- no, I

7    guess the request for admissions are next, right?  Do we

8    have issues, Mr. Fantalis, with regard to request for

9    admissions?

10        MR. FANTALIS:  Oh, yeah.

11        THE COURT:  All right.  Okay.

12        MR. KOTZKER:  Our first objection was with

13    Request 46, I think, so we can skip a little bit.

14        THE COURT:  All right.

15        MR. FANTALIS:  I think it was in here, I would

16    like to point out, Your Honor, that they denied an

17    e-mail that we were in possession of.  They denied it

18    existed.

19        THE COURT:  What number?

20        MR. FANTALIS:  Do you remember?

21        THE COURT:  Okay.  Well, if you see that let

22    me know and if you have the e-mail, I need to see it.

23        MR. FANTALIS:  Oh, I have the e-mail.

24        THE COURT:  With you today?

25        MR. FANTALIS:  Um, I'd have to get internet

1    access --

2              THE COURT:  See, and when you make --

3              MR. FANTALIS:  Do we have a printout?

4              THE COURT:  The thing is, I guess for future

5    reference, when you make an allegation like that you've

6    really got to prove it up right now.  You can't just --

7              MR. FANTALIS:  I think we have it, Your Honor.

8              THE COURT:  -- send those out into the ether

9    world, okay.

10             MR. FANTALIS:  Can you bring up the -- if you

11   want to wait a second, Your Honor, we can --

12             THE COURT:  Well, she can look for it while we

13   go forward.  Forty-six, out of the 30 John Does who are

14   defendants in the prior lawsuit, plaintiff has reached

15   settlements with eight of these Doe defendants.  Yeah, I

16   don't find that relevant.  You're going to get the

17   amount which is what you need.  Mr. Kotzker, can you

18   please keep directing me to --

19             MR. KOTZKER:  Yeah, we move on to 47.

20             THE COURT:  Forty-seven, same.

21             MR. KOTZKER:  Forty -- let's see, the next one

22   is --

23             THE COURT:  Forty-eight.

24             MR. KOTZKER:  Forty-eight.

25             THE COURT:  Yeah, that goes to Mr. Fantalis's

1    potential claim which is stayed.  Go ahead.

2              MR. KOTZKER:  Forty-nine.

3              THE COURT:  Same.

4              MR. KOTZKER:  Yeah.

5              MR. FANTALIS:  There's a bunch in a row --

6              MR. KOTZKER:  We're just going to keep

7    going --

8              MR. FANTALIS:  -- that are related to that.

9              MR. KOTZKER:  -- like this for --

10             THE COURT:  Fifty is the same; 51 is the same;

11   52 is the same; 53 is the same.

12             MR. FANTALIS:  You can go through 60, Your

13   Honor.

14             THE COURT:  Okay.  I assume you're pulling

15   those numbers out of somewhere.

16             MR. KOTZKER:  Thin air, Your Honor.

17             THE COURT:  Oh.

18             MR. FANTALIS:  Well, we're just trying to get

19   quick answers, Your Honor.

20             THE COURT:  Fifty-four.  Is it kind of like

21   Battleship.

22             MR. FANTALIS:  I guess you could call it

23   similar to that, Your Honor.

24             THE COURT:  To see --

25             MR. FANTALIS:  We're trying to get a feel.

1        THE COURT:  -- if you land one of those red

2   pegs in a ship.  Fifty-five, same; 56, 57.  By the way,

3   I only know that because I have 11 children and I've

4   played some Battleship in my life.

5        MR. FANTALIS:  Eleven children?

6        THE COURT:  Eleven children.

7        MR. FANTALIS:  Oh, my God.  I'm sorry.

8        THE COURT:  And no pornography by the way.

9        MR. FANTALIS:  What's that?

10       THE COURT:  No pornography.  I don't think

11   pornography has ever been within the four corners of my

12   house, but I'm not sure because I do have sons.  But I

13   don't think so.

14       MR. FANTALIS:  I can actually say the same,

15   Your Honor.

16       THE COURT:  2011 -- or 58 is the same; 59 is

17   the same; 60 --

18       MR. FANTALIS:  Sixty is the last one.

19       THE COURT:  All right.

20       MR. KOTZKER:  And then our next objection is

21   to 67, I believe, Your Honor.

22       THE COURT:  Okay.  I'm actually going to

23   allow -- I'm going to require an answer to this.  I

24   think it's a fair question to ask whether -- what you're

25   asking is whether any of the film -- any movie in that

1    file has ever been sold.  That's what your --

2              MR. FANTALIS:  By Malibu Media specifically.

3              THE COURT:  Well, that's not what you're

4    asking.  See, when it comes to request for admissions

5    the specific language is critical.

6              MR. FANTALIS:  Uh-huh.

7              THE COURT:  So if they can't answer it, admit

8    it precisely as you've written it.  The way you've

9    written it is the work or any individual work has not

10   generated any revenues that were not related to

11   litigation since its creation.  You don't -- you don't

12   tie that to them.  So, if they don't have any, but they

13   don't know about anybody else, the answer to that would

14   be -- however it's worded -- can neither admit nor deny.

15   But you know the wording I'm thinking of.  I can't

16   remember what all words --

17             MR. FANTALIS:  Well, since that time, Your

18   Honor, that we wrote this question we found out that the

19   works, we believe, are on X-Art.  And so I think we know

20   the answer.  Now, I don't think they're specifically

21   purchased.  I think it is a monthly subscription from

22   what I understand, so I don't know how they'll answer

23   that because --

24             THE COURT:  But, by the way -- well, if they

25   have the same knowledge as you do that some work has

1    actually been sold the answer to No. 67 is denied.  But

2    I'm going to require a answer to 67.  What's the next

3    one?

4              MR. KOTZKER:  With respect to just Malibu

5    Media or in its --

6              THE COURT:  No.

7              MR. KOTZKER:  As written.

8              THE COURT:  As written.

9              MR. KOTZKER:  Okay.

10             MR. FANTALIS:  We have to write a new one if

11   we want it with respect to Malibu Media.

12             THE COURT:  Right.  What's the next one?

13             MR. FANTALIS:  I think the next one is --

14             MR. KOTZKER:  Sixty-eight.

15             THE COURT:  Sixty-eight.

16             MR. FANTALIS:  I think we're into a set of

17   objections here.

18             THE COURT:  Okay.  The works have generated

19   non-litigation revenues since creation of

20   (unintelligible).  I think the revenue question is fine.

21   The amount is not.  So I'll sustain the objection as to

22   that one.  Seventy, 71, 72, 73.  Okay.  Seventy-four,

23   75, 76, 77, 78, I'll sustain.  Seventy-nine, because of

24   the -- well, this -- Mr. Kotzker, doesn't 79 go to the

25   essence of your client?  He's saying there's no possible

1    way for any of the defendants to have worked together in

2    a BitTorrent forum and you say there is.

3              MR. KOTZKER:  Uh-huh.

4              THE COURT:  So don't you deny that?  I'm going

5    to require an answer to 79.  Eighty --

6              MR. KOTZKER:  We're also confused about

7    exactly what identical means, whether it involves the

8    same works, whether it involves --

9              THE COURT:  That's true.  I'm going to sustain

10   the objection here.  But there probably is some

11   information, Mr. Fantalis, you could obtain if you

12   worded it correctly.

13             MR. FANTALIS:  Got you.

14             THE COURT:  You have to be a little more

15   general.

16             MR. FANTALIS:  Yeah.

17             THE COURT:  I don't want to describe that

18   because I don't want to do your work for you.

19             MR. FANTALIS:  No, I understand, Your Honor.

20   And I -- you're correct.

21             THE COURT:  All right.

22             MR. FANTALIS:  The wording isn't great.

23             THE COURT:  Eighty-one.  At the moment I'm not

24   going to require an answer to that, but that's without

25   prejudice.  Same with 82, 83, 84, 85, 6, 7, 8, 9, 90, 1,

1    2, 3, 4, 5, 6, 7 -- no, not -- yeah, so go to 98.

2              MR. KOTZKER:  It goes more to his

3    counterclaims than any sort of --

4              THE COURT:  Yeah, it's a good question.  It

5    does go to your counterclaims, and you'll get the answer

6    to that if those stay.  So I'll sustain the objection

7    for the moment.  Ninety-nine is relevant, so I'll

8    require an answer to that.  One hundred, I'll require an

9    answer to that one too; 101, please answer that; 102,

10   no.  Sustain the objection on 102; 103, sustain the

11   objection; 104 -- how many do we have here by the way?

12             MR. FANTALIS:  215 or something.

13             THE COURT:  How many?

14             MR. FANTALIS:  215.

15             THE COURT:  All right.

16             MR. FANTALIS:  Sorry, Your Honor.

17             THE COURT:  No, that's okay.  It's my job.

18   I'm sorry to keep you guys here so late.  Same, 105.

19   Same, sustain the objection; 106 --

20             MR. FANTALIS:  Your Honor, can I just --

21             THE COURT:  What?

22             MR. FANTALIS:  -- ask a question on that --

23             THE COURT:  Go ahead.

24             MR. FANTALIS:  -- or these in general?

25   Doesn't it go to their willingness to actually see if

1   someone has infringed to their willingness to prosecute

2   a case and if they really are trying to prosecute a

3   case.

4           THE COURT:  Well, with some of the questions

5   where you ask whether this discovery -- whether

6   discovery has taken place or whether there's depositions

7   been taken, I think it's fair for you to monitor cases

8   and how they progress, and whether there's been an

9   exchange of discovery and, you know, and talk to people

10  in that case and share nonconfidential information.

11  That's okay.  But as to -- for example, whether they've

12  inspected a computer or not, that goes to your

13  allegation that -- what their motive is.

14          MR. FANTALIS:  Uh-huh.

15          THE COURT:  So, that's how I see it.

16          MR. FANTALIS:  Okay.  No, I can see that.

17          THE COURT:  Where are we at?

18          MR. FANTALIS:  106.

19          THE COURT:  106, same; 107 -- by the way, have

20  you offered your computer in this case?

21          MR. FANTALIS:  There they are, Your Honor.  He

22  can have them right now.

23          THE COURT:  They're the only two computers you

24  have?

25          MR. FANTALIS:  No, I've got two more.  One's

1    dead I haven't thrown away purposely because I didn't

2    want to throw away what could be potentially evidence.

3            THE COURT:  Sure.  That would be called

4    spoliation in other words, yeah.

5            MR. FANTALIS:  Yeah.  And one is my daughter's

6    computer that she received like a week before,

7    supposedly, the infringement occurred.  But it's

8    available to them if they'd like it.

9            THE COURT:  Okay.  107 -- did I do 106?

10           MR. KOTZKER:  Yes, Your Honor.

11           THE COURT:  All right.  107, sustain the

12   objection.  108, you can answer that one.  You mean --

13   you mean anything -- any action of the 30 Does in this

14   case?

15           MR. FANTALIS:  Right.

16           THE COURT:  Yeah.  I'll require an answer to

17   108.  109, what are the three alleged incidents of

18   infringement?

19           MR. FANTALIS:  Is that the contributory?  Oh,

20   the three people.  So, it's the three infringements by

21   the three people in this case.

22           THE COURT:  Right.  But then doesn't 108 --

23   107 already include -- or 108 already include the three

24   people in this case?

25           MR. FANTALIS:  It should.

1           THE COURT:  Okay.

2           MR. FANTALIS:  It should, but we wouldn't be

3    able to assign to the names versus -- in the 30 it will

4    be Does, in the three it would be names.

5           THE COURT:  All right.

6           MR. KOTZKER:  Why -- why would the --

7           THE COURT:  Go ahead, Mr. Kotzker.

8           MR. KOTZKER:  Why would to whom DMC notices

9    were issued necessarily be relevant?

10          THE COURT:  Go ahead.

11          MR. FANTALIS:  Why did they join --

12          MR. KOTZKER:  I'm going to answer 108 and say,

13   yes, they were issued to --

14          THE COURT:  Right.

15          MR. KOTZKER:  -- people in this 30.  Why does

16   it matter who those specific --

17          MR. FANTALIS:  (Unintelligible) join three.

18   I'm still -- I don't even know why they joined these

19   three people together.

20          THE COURT:  Well, that's a different question.

21          MR. FANTALIS:  Well, but the point is they go

22   and they say these people are joined together, and then

23   they say the information specific to these three people

24   is not relevant.  How could they make that claim?  How

25   could they --

```
 1              THE COURT:  No, I think -- actually, you can
 2    certainly ask if you have not, and I suspect you
 3    haven't, why did you join these three people.  Because
 4    that could go to an issue of misjoinder which is a
 5    legally relevant issue in this case.
 6              MR. FANTALIS:  Uh-huh.
 7              THE COURT:  Have you asked that question?
 8              MR. FANTALIS:  I don't think so.  We asked a
 9    lot of questions but I don't remember that one, Your
10    Honor.
11              THE COURT:  That one you could ask if you
12    haven't exceeded your limit, which I suspect you have
13    reached your limit.
14              MR. FANTALIS:  No, I haven't.
15              THE COURT:  Oh, interrogatories you haven't?
16    How many did I allow?
17              MR. FANTALIS:  Interrogatories, do you
18    remember how many?  Were they unlimited or --
19              THE COURT:  I would be shocked.  Well, anyway,
20    if you got an extra one you can.  So, 109 I'll sustain
21    the objection.  110 -- didn't we already deal with
22    takedown notices in a previous question?  But, anyway,
23    110 I'll sustain the objection.  111, I'll require a
24    response to that because it does deal with people -- so,
25    Mr. Kotzker, the questions I'm allowing deal with your
```

1    theory that the original 30 were properly joined in one

2    lawsuit.

3              MR. KOTZKER:  Correct.

4              THE COURT:  So, I think that that's a fair

5    area of inquiry, and so 111 I'll require an answer; 112,

6    no, I'll sustain the objection; 113, sustain the

7    objection; 114, sustain.  I'm just going to use

8    sustained or overruled.

9              MR. FANTALIS:  Your Honor, when you say

10   sustained but not you're not saying specifically without

11   prejudice does that mean the objection is forever or

12   it's still open for interpretation?

13             THE COURT:  I think I'll say -- I'm not sure

14   any have been forever so far.

15             MR. FANTALIS:  Okay.

16             THE COURT:  They all might be within the realm

17   of potential if you get farther in your case.

18             MR. FANTALIS:  And, Your Honor, going to 114

19   then.

20             THE COURT:  Yeah.

21             MR. FANTALIS:  I think that kind of maps to

22   the other two you accepted.

23             MR. KOTZKER:  Those other two, you accepted

24   that with the specific members of the suit.

25             THE COURT:  Right.

1            MR. FANTALIS:  This is dealing with, though,

2     the -- I believe that these are the BitTorrent sites and

3     the -- kind of question here is if people are illegally

4     downloading things from a BitTorrent site why haven't

5     you, you know, told the BitTorrent site to make that

6     stop.  I think that's a reasonable statement about if

7     you're not trying to protect your intellectual property

8     then you don't have the right to sue over it, I believe,

9     according to the law.  And so what we're trying to say

10    there is tell us that you've tried to protect it.

11            THE COURT:  So, if my car gets chopped -- you

12    know what that means -- I have to -- and I find out you

13    have my stuff and I can trace it with a serial number,

14    I'm supposed to have gone to the chop shop first and

15    said you shouldn't allow people to come in and put junk

16    -- take my stuff from me, put it -- bring it to you and

17    have it sold back out to --

18            MR. FANTALIS:  Your Honor, let's use your

19    example.

20            THE COURT:  Okay.

21            MR. FANTALIS:  Okay.  If you claim that

22    thousands of people are chopping your cars, okay, and

23    there's three chop shops in town, wouldn't you go to the

24    police and say, Your Honor -- you know --

25            THE COURT:  Yeah.

1          MR. FANTALIS:  -- Mr. Officer, shouldn't you

2    stop those people from chopping things.  These guys know

3    who are offering up their file -- which by the way they

4    put there -- shouldn't they go to them and say, hey,

5    stop that.  That's illegal.  I could sue you.

6          MR. KOTZKER:  And, again, Your Honor, we've

7    gone through that in another case and we have issued

8    those DMC takedown notices and found them to be futile.

9    That, and given the fact that those issues --

10          THE COURT:  Okay.

11          MR. KOTZKER:  -- the specific sites that he

12   mentions are out of the country it's -- there's not much

13   legally that we can do about it.

14          THE COURT:  What I'd like you to do is -- have

15   I -- have I ordered production of any information

16   regarding your efforts, at least on a couple of

17   occasions, to do this?

18          MR. KOTZKER:  I don't recall.  I'd have to go

19   back and look in the case that we with Mr. Arsenault on

20   whether that --

21          THE COURT:  No, I mean today have I done that?

22          MR. KOTZKER:  No.

23          THE COURT:  All right.  So what I'd like you

24   to do is in a written response identify at least -- if

25   you have three -- three times you've done that, and

1    include with it the statement that the recipient did not

2    comply.

3            MR. KOTZKER:  Well, I wouldn't say that they

4    didn't necessarily complied.  In my experience when

5    we've issued those DMC takedown notices they have

6    complied, taken the file down, only to find it --

7    another file or the same file, sometimes posted by

8    somebody else within hours or days.  So --

9            THE COURT:  Okay.  So, it's futile.

10           MR. KOTZKER:  Correct.  So, they have --

11           THE COURT:  All right.

12           MR. KOTZKER:  Technically, they may have

13   complied, but it's, again, not --

14           THE COURT:  Well, in response to this I would

15   like you to just say, well -- well, without

16   identifying -- well --

17           MR. KOTZKER:  I could aver right now that we

18   have issued them -- we have issued DMC takedown notices

19   to BitTorrent.

20           THE COURT:  Do you have a ballpark number?

21           MR. KOTZKER:  I don't know.  There's been

22   times that it's been hundreds per day.

23           THE COURT:  Takedown notices?

24           MR. KOTZKER:  Correct.

25           THE COURT:  Okay.

1          MR. FANTALIS:  And are these to BitTorrent

2     sites?

3          MR. KOTZKER:  I don't know if they have been

4     to specifically Torrentzap BTC, et cetera, but --

5          MR. FANTALIS:  No.  No.  I don't care the

6     names.

7          MR. KOTZKER:  But, yes, to those sites.

8          MR. FANTALIS:  To BitTorrent sites you've sent

9     them.  And you've done that before you brought the case

10    against me?

11         MR. KOTZKER:  That I don't know.

12         MR. FANTALIS:  That would be relevant, Your

13    Honor.

14         THE COURT:  Just identify whether you did, any

15    of those -- what did you call them DMC --

16         MR. KOTZKER:  DMC, Digital Millennium

17    Copyright Act.  It --

18         THE COURT:  Whether you did a DMC --

19         MR. KOTZKER:  It basically provides a safe

20    haven for websites if they receive a -- like a UTube or

21    something.

22         THE COURT:  All right.

23         MR. KOTZKER:  As soon as they remove it

24    they're not held liable.

25         THE COURT:  Just identify whether you did it

1    at least once before you sued them.  Okay.  This --

2    yeah, this lawsuit.  So that takes care of 116 as well;

3    117 as well.  Well, it doesn't take care of 117 because

4    you may have done it afterwards.  So, go ahead and

5    provide an answer to 117.

6              MR. KOTZKER:  And then by contacted, what does

7    that mean?

8              THE COURT:  Well, I think --

9              MR. KOTZKER:  By --

10             THE COURT:  -- any contact.  A DMCA notice is

11   a contact.

12             MR. KOTZKER:  Okay.  Well, yeah, he

13   specifically said DMCA in previous questions.  He didn't

14   say it here.

15             THE COURT:  No, I would call that as a

16   contact.

17             MR. FANTALIS:  Yeah.  I'm thinking any kind of

18   attempt is reasonable, Your Honor.

19             THE COURT:  Right.  118.

20             MR. KOTZKER:  Again, those sites are hosted

21   out of the country, so I don't know how much --

22             MR. FANTALIS:  Congress would have the

23   ability, Your Honor --

24             THE COURT:  Well, I know, but a person --

25             MR. FANTALIS:  -- to practically

1    (unintelligible).

2          THE COURT:  -- is free to lobby Congress, but

3    they are constitutionally free not to lobby Congress.

4          MR. FANTALIS:  That's right.  I'm not saying

5    that they were.  And I just think it's information that

6    I should have the right to have.

7          THE COURT:  No.  I disagree.  So, 118 I'll

8    sustain; 119, document attached -- well --

9          MR. FANTALIS:  What we're asking for, Your

10   Honor, is that they agree that it's a real document.

11         THE COURT:  Yeah, it's a fair -- use of

12   request for admissions to authenticate documents is a

13   fair and inexpensive way to do that.  This has nothing

14   to do with its admissibility.  The question is -- do you

15   know who Jason Koebler is?

16         MR. KOTZKER:  I have not idea, Your Honor.

17         MR. FANTALIS:  Well, they can click on the

18   link, Your Honor, and just see that it is real and

19   exists.

20         THE COURT:  I know, but that's not -- the word

21   "authentic" is a term of art in the law.  It means that

22   they know that that article was written by that person.

23   That's what authentic means.  And if they can't know

24   that -- so answer 119.  If you don't -- if you guys

25   don't know that the answer is denied.  It doesn't mean

```
 1    that there's not an article sitting on the web

 2    purportedly by that guy.

 3            MR. FANTALIS:  I understand what you're

 4    saying.

 5            THE COURT:  But they can't authenticate it.

 6            MR. FANTALIS:  Right.  I understand, Your

 7    Honor.  We go through a series of these, Your Honor.

 8            THE COURT:  All right.  120, that's --

 9            MR. FANTALIS:  The 120 is talking about

10    relevance versus authentic.

11            THE COURT:  Right.  And that calls for a legal

12    conclusion.

13            MR. KOTZKER:  I think our next objection is

14    down at 142.

15            THE COURT:  All right.

16            MR. FANTALIS:  Your Honor, one -- if we can

17    take just one second.

18            THE COURT:  Yeah.  Oh, that 15 seconds so far,

19    Mr. Fantalis.

20            MR. FANTALIS:  I'm sorry, Your Honor.  As we

21    pointed out there's a lot of questions.  The good news

22    is we're going through a lot of them.

23            THE COURT:  We're going through all of them as

24    far as I'm concerned.  Sorry to keep you both here.  You

25    can leave if you need to.  All right.  You can't.  You
```

1    volunteered, you're stuck.

2              MR. KOTZKER:  All of the objections --

3              THE COURT:  I'll give you comp time, though.

4              UNKNOWN SPEAKER:  I appreciate that.

5              MR. KOTZKER:  Your Honor, all of the

6    objection -- are all the -- whether you sustain or

7    overrule these are going to be noted in the order,

8    correct or not?

9              UNKNOWN SPEAKER:  I was planning on it, Your

10   Honor.

11             MR. KOTZKER:  Okay.

12             THE COURT:  If you --

13             MR. KOTZKER:  Very good.  Thank you.

14             THE COURTROOM DEPUTY:  I was planning on --

15             MR. KOTZKER:  Please don't go anywhere.

16             THE COURT:  It's amazing --

17             UNKNOWN SPEAKER:  (Unintelligible).

18             THE COURT:  Okay.  Well, you not only get comp

19   time, you get a bonus.

20             UNKNOWN SPEAKER:  I apologize.

21   (Unintelligible).

22             THE COURT:  Over at DOJ we had on-the-spot

23   awards.  Where I could walk off the -- I mean, I could

24   -- the court doesn't have them, but I could walk into

25   somebody's office and say I'd like this person to have

1    $150 for what they did today.

2              MR. FANTALIS:  I'm ready.

3              THE COURT:  Courts don't have that.  I would

4    do it for you, though.  Go ahead.

5              MR. FANTALIS:  134, Your Honor.  You asked

6    about the e-mail.

7              THE COURT:  Yeah.

8              MR. FANTALIS:  And by your definition of

9    authentic, if he's an attorney here they should be able

10   to clearly state whether it's authentic or not.

11             THE COURT:  The document attached to

12   defendants blah, blah, blah from Lipscomb to Brad

13   Patrick is relevant to this case.  That's what 134 is.

14             MR. FANTALIS:  No, 134 is authentic; 135 is

15   relevance.

16             THE COURT:  I'm sorry.  Document attached,

17   e-mail dated that date from Lipscomb to Brad Patrick is

18   authentic.  Well, they denied it.  Show me the e-mail.

19   You can approach.

20             MR. FANTALIS:  Sorry.

21             THE COURT:  That's all right.  It's a

22   formality that's always observed, although I'm not sure

23   why.  I'll let you take a look at it before I do.

24             MR. FANTALIS:  I think it was attached to

25   something we already sent, right?  It was attached to

1    the counterclaim, so they've already seen it.

2         THE COURT:  All right.  Well, to have denied

3    it they've already seen it too, because you can't really

4    deny something you haven't seen.  Okay.  So just as a

5    general matter unless Mr. Kotzker could say that every

6    jot and tittle of this document matches what M. Keith

7    Lipscomb actually sent -- did on Friday, July 1st, if he

8    can't say that, he has to say denied.

9         MR. FANTALIS:  Mr. Lipscomb is an attorney for

10   Malibu Media.  You -- again, I believe in discovery the

11   idea is that -- that the -- whoever is being discovered,

12   you know -- in their case, you know, that it's their

13   responsibility to do reasonable checking --

14        THE COURT:  Oh, yeah.

15        MR. FANTALIS:  -- as to whether something is

16   real or not.  Certainly checking with an attorney of

17   Malibu Media who's actually claiming that, you know, I'm

18   an attorney, you can't ask questions about this related

19   to this client they could have checked whether this is

20   real or not.

21        THE COURT:  And if Lipscomb is an agent of the

22   plaintiff they are required to check.  I agree.

23        MR. FANTALIS:  Okay.  That is an electronic

24   version, Your Honor.  It doesn't -- they don't get --

25   you know, words don't get messed up.  Something

1    wasn't -- that wasn't typed --

2              THE COURT:  Right.

3              MR. FANTALIS:  -- by me or anything.  That's a

4    forwarded version of the actual exact e-mail.

5              THE COURT:  But in the event that you

6    establish that, according to the rules you get the cost

7    of establishing that because they denied the request.

8    So, that's all I can do.  If you prove it, then you can

9    come back to me and get costs.  Isn't that your

10   understanding of the rule, Mr. Kotzker?

11             MR. KOTZKER:  Yes.

12             THE COURT:  You can understand -- you can come

13   back to me and get the cost of having produced it.  So,

14   if a lawyer spends $10,000 taking a deposition and

15   proving that that is an authentic copy, you get the

16   10,000 bucks because they should have admitted it in the

17   first place.

18             MR. FANTALIS:  There's nothing -- they can

19   basically deny something any time they want and there's

20   no ramifications for lying?

21             THE COURT:  Oh, yeah.  These answers -- if I

22   went to the -- scroll to the end I assume they're signed

23   by somebody with authority.  If they're not they need to

24   be, as you know, Mr. Kotzker.  Yeah.  So -- yeah,

25   somebody named Colleen Pelissier.

1              MR. FANTALIS:  The other owner.

2              THE COURT:  Colette Pelissier signed these.

3     So she would be guilty of -- potentially guilty of

4     perjury.

5              MR. FANTALIS:  Okay.

6              THE COURT:  Because she signed them under

7     oath.

8              MR. FANTALIS:  We have another one, Your

9     Honor, that's the same thing.

10             THE COURT:  Okay.

11             MR. FANTALIS:  No. 137, but --

12             THE COURT:  Right.  So denying it means that

13    you're now under the onus to prove it up.

14             MR. FANTALIS:  Okay.

15             THE COURT:  All right.  Mr. Kotzker, you said

16    we skip down to what?

17             MR. KOTZKER:  142 I believe, unless

18    Mr. Fantalis said anything else between them.

19             MR. FANTALIS:  Just the other one that is

20    similar.  But, again, I guess it doesn't apply to this

21    discussion, Your Honor.  It sounds like our burden to

22    prove it.

23             THE COURT:  Okay.  Who is Tobias Fieser?

24             MR. KOTZKER:  He works for IPP Limited.

25             MR. FANTALIS:  And is their, I think, only

1      witness.

2                  THE COURT:  Whose only witness?

3                  MR. FANTALIS:  Plaintiffs.

4                  MR. KOTZKER:  Ours, Your Honor.

5                  THE COURT:  Have you designated him as a

6      witness?

7                  MR. KOTZKER:  Yes.

8                  THE COURT:  Okay.

9                  MR. FANTALIS:  A rebuttal witness, Your Honor.

10                 THE COURT:  Okay.  Well, his financial

11     interest and a stake in this case is relevant because

12     that's a witness's bias, interest, prejudice or

13     corruption.  So, my law school training teaches me that

14     those are always relevant.  So if he has a financial

15     interest that has to be answered.

16                 MR. FANTALIS:  Thank you.

17                 THE COURT:  Same as 43.  So answer 43.  I'm

18     not going to require an answer to -- to questions about

19     a third party.  You can ask the third party those kinds

20     of questions because if they're a United States entity

21     they're subject to a subpoena.  Because you know federal

22     court's -- do you know the process of subpoenaing in

23     federal courts?  I mean, you can take -- you can go to

24     -- if they're in California you can go to a court in

25     California.  They hand out subpoenas like candy.  Pick

1    up a copy, slap it on somebody, expect a motion to quash

2    of some kind, but that's --

3                MR. FANTALIS:  Your Honor --

4                THE COURT:  -- what happens.

5                MR. FANTALIS:  -- related to that, we were

6    provided IPP as, you know, another party.  I think -- I

7    don't think we've actually ever received any contact

8    information.

9                THE COURT:  What do you mean another party?

10               MR. FANTALIS:  A witness.  You know, they're

11   included in the R-26(a) if I recall.

12               THE COURT:  Well, all right.  If there's a

13   human being that Mr. Kotzker knows is associated with

14   IPP Limited then I'll require that as a supplemental

15   Rule 26 disclosure.

16               MR. FANTALIS:  Thank you.

17               THE COURT:  All right.  So, anyway, 144 --

18               MR. KOTZKER:  I don't think we had another

19   objection until 177, unless --

20               THE COURT:  All right.

21               MR. FANTALIS:  Well, there's -- well, we're on

22   144.

23               THE COURT:  Right.  But they didn't object.

24   We're only going over objections.

25               MR. FANTALIS:  Oh, okay.  Because they're just

1    saying they don't have any information.

2              THE COURT:  Right.

3              MR. FANTALIS:  Got you.

4              THE COURT:  Which if you find that to be false

5    then there are remedies.

6              MR. FANTALIS:  Right.  That will be a tough

7    one to prove, but, yes.  What number are we on?

8              THE COURT:  171.

9              MR. KOTZKER:  177.

10             THE COURT:  Oh, sorry.  Okay.  177.  Plaintiff

11   has been threatened with blah, blah, blah.  No, I don't

12   find that relevant because there are often situations in

13   a lawsuit where we sanction somebody.  For example, if I

14   sanction Mr. Kotzker or his client for being late in

15   filing something and I fine them $100, which I'm allowed

16   to do, that wouldn't be admissible in evidence that I

17   had to sanction them for discovery abuses.  That -- that

18   would unduly prejudice a jury.  It's irrelevant, and so

19   I find 177 to be a -- I'll sustain the objection to

20   that.

21             MR. FANTALIS:  You probably won't like 178

22   either.

23             THE COURT:  Well, not that I don't like it or

24   dislike it, it's just I'm trying to apply the law the

25   best I can.  So, 178 the same; 179, even if plaintiff

1    obtained identifying information for every IP address --

2    I'll sustain the objection to that.  I guess that's the

3    you-bit-off-more-than-you-can-chew position.

4           MR. FANTALIS:  Right.  Yeah, I mean, that kind

5    of shows that they never planned to litigate.

6           THE COURT:  Well, what I'm envisioning is this

7    case actually being in front of a jury.

8           MR. FANTALIS:  Uh-huh.

9           THE COURT:  That's what the whole process

10   we're doing is is getting documents, evidence that would

11   be in front of a jury.  If we are in front of a jury

12   that's a prima facie case that they litigate, right?

13          MR. FANTALIS:  Uh-huh.

14          THE COURT:  So, we won't need it by that time.

15          MR. FANTALIS:  Well, but that's one out of

16   thousands.

17          THE COURT:  Right.

18          MR. FANTALIS:  I think this may apply to the

19   counterclaims, it may not apply to the claim.

20          THE COURT:  Okay.

21          MR. FANTALIS:  But it certainly applies to the

22   counterclaim.

23          THE COURT:  Well, you can hold that one in

24   reserve.  180, the same; 181, the same; 182, same; 3, 4,

25   -- 185 I'll sustain because it's just an improper

1    question saying what's possible.  I mean, that's just --

2    it's not the way we write questions.  It's hypothetical.

3    186.

4              MR. FANTALIS:  I think it's a proper question

5    that they probably can't answer.

6              THE COURT:  I will -- so, there's only three

7    answers here really.  One is admitted, one's denied, and

8    one is --

9              MR. KOTZKER:  (Unintelligible) information.

10             THE COURT:  Current information to admit or

11   deny.

12             MR. FANTALIS:  Right.  I think it's the third

13   answer there.

14             THE COURT:  So I'm going to require an answer

15   to that one.  187, going back to the old sustained, 188,

16   189, 190, 91, 92, 94, 95, but I will be looking at the

17   agreement.

18             MR. FANTALIS:  Right.  That would be covered

19   by you looking at the agreement --

20             THE COURT:  Yes.

21             MR. FANTALIS:  -- elsewhere.

22             THE COURT:  And -- now, remember that

23   contention fees are legal.

24             MR. FANTALIS:  Right, to a percentage of --

25             THE COURT:  To a percentage.

1          MR. FANTALIS:  Right.

2          THE COURT:  I've seen as high as 43 percent.

3          MR. FANTALIS:  I think the state -- some of

4     the states maximize what the maximum amount is if I

5     recall.

6          THE COURT:  Right.  They might.  But -- so

7     that would actually be receiving a portion of a

8     settlement or a judgment --

9          MR. FANTALIS:  Right.

10         THE COURT:  -- technically.

11         MR. FANTALIS:  Right.  But, again, I think

12    that there's a limit to what is acceptable, and it's my

13    understanding if --

14         THE COURT:  No doubt.

15         MR. FANTALIS:  -- it's 90 percent that that's

16    not.

17         THE COURT:  90 percent would be unethical.  So

18    we'll take a look at that one, okay.

19         MR. FANTALIS:  Okay.

20         MR. KOTZKER:  I wish it was 90 percent, Your

21    Honor.

22         MR. FANTALIS:  Well, I'm not saying --

23         THE COURT:  No you don't because then you'd be

24    in trouble.

25         MR. KOTZKER:  Well, yes.  But --

1          MR. FANTALIS:  I'm not saying individually,

2     Your Honor.

3          MR. KOTZKER:  I would have driven here in a

4     Ferrari.

5          THE COURT:  195.  So, 195 I'll take a look at.

6     I'll sustain the objection, but I'll be looking at that

7     question in another context.  96 is the same, sustained;

8     97, that is relevant because a -- IPP Limited is a

9     witness here and their financial interest in a lawsuit

10    is relevant.  So answer that one.  98, that's not

11    improper no matter what your claims are.  And those are

12    the kind of things where records speak for themselves.

13    Have you heard of that objection, the record speaks for

14    itself?

15         MR. FANTALIS:  Uh-huh.

16         THE COURT:  But, frankly -- I mean, if Judge

17    Martinez called it criminal that still wouldn't be

18    admissible in my case because it's not binding here.  If

19    the Tenth Circuit did, that's a different matter.

20         MR. FANTALIS:  Uh-huh.

21         THE COURT:  But you understand that one judge

22    at the same level -- and for purposes of this case,

23    Judge Martinez is the same level -- what they say about

24    their cases is not binding on me.

25         MR. FANTALIS:  It's not binding, but isn't it

1    relevant to a jury to have a judge's opinion about --

2              THE COURT:  Absolutely not.  It is -- it is so

3    not relevant that if I admit it and you won, I'd be

4    reversed and we'd be back here trying the case.  And you

5    don't want that.

6              MR. FANTALIS:  No.

7              THE COURT:  You want a good solid legal

8    decision, right.  So I would get reversed in a --

9              MR. FANTALIS:  I was unaware.

10             THE COURT:  -- flat second --

11             MR. FANTALIS:  Sorry, Your Honor.

12             THE COURT:  -- if I allowed some judge's

13   opinion.  Okay?

14             MR. FANTALIS:  Okay.

15             THE COURT:  199, I think it might be relevant

16   to -- wordedly [sic] different -- worded differently.

17   Worded differently it might be relevant if your claim

18   survives, but otherwise I'll sustain the objection for

19   the moment.

20             MR. FANTALIS:  Your Honor, just for

21   understanding.  So, you're saying it doesn't apply to my

22   defense either if worded differently?

23             THE COURT:  And your defense is what?  Which

24   defense?

25             MR. FANTALIS:  That they're not looking to

```
 1    actually protect their copyright, they're just looking
 2    to sue people and get money out of them.
 3            THE COURT:  Well, is a -- is a person who was
 4    -- is an employee who was called the N word and fired
 5    from his job because we don't like your kind of people
 6    here, would you put on a requirement that he go to the
 7    company before he sues them and say, just generally,
 8    please, you know, give me my job back, or you shouldn't
 9    have called me that, or --
10            MR. FANTALIS:  No, but this is --
11            THE COURT:  -- do you want to settle with me
12    first?
13            MR. FANTALIS:  This is proof of innocence.  In
14    other words, Your Honor, they weren't -- they don't care
15    if I'm innocent.  Normally, in a case like this, as I
16    understand it, somebody would call you and say, hey, we
17    think you did this, you know, and they'd give you an
18    opportunity to discuss it before they file a case
19    against you.
20            THE COURT:  Well, there is -- if they have a
21    legal claim there is nothing improper with asserting
22    that claim without first giving you an opportunity to
23    explain.  If you prove that they pulled the trigger in a
24    situation they never should have, and it's bad faith;
25    that they just got the wrong guy and they were grossly
```

1    negligent in naming you and they've caused you damage,

2    that's a different matter.

3            MR. FANTALIS:  And that's the counterclaim.

4            THE COURT:  That's the counterclaim.

5            MR. FANTALIS:  I could see that.

6            THE COURT:  In fact, you know, there are rules

7    against filing frivolous claims, and that would be,

8    essentially, filing a frivolous claim if you had no

9    factual foundation for doing it.  There's all kinds of

10   bad, bad things that the courts do in situations like

11   that under Rule 11 to the Federal Rules of Civil

12   Procedure.

13           MR. FANTALIS:  Filing frivolous claims?

14           THE COURT:  Yeah.

15           MR. FANTALIS:  (Unintelligible) reasonable

16   counterclaim (unintelligible).

17           THE COURT:  Well, filing a frivolous claim or

18   a frivolous counterclaim is against -- well, Rule 11

19   applies only to -- let me read Rule 11.  Are you

20   familiar with Rule 11?

21           MR. KOTZKER:  Uh-huh.

22           MR. FANTALIS:  Not very much.

23           THE COURT:  All right.  I don't know how long

24   it is, but -- every pleading, written motion and other

25   paper -- and a complaint is a pleading -- must be signed

1    by at least one attorney of record in the attorney's

2    name or by a party personally, if that party is

3    unrepresented -- that would be you.  The paper must

4    state the signer's address, e-mail address and telephone

5    number unless a rule or statute specifically states

6    otherwise.  A pleading need not be verified da, da, da.

7    By presenting to the court a pleading, written motion,

8    or other paper whether by signing, filing, submitting or

9    later advocating it, an attorney or an unrepresented

10   party certifies that to the best of the person's

11   knowledge, information and belief, formed after an

12   inquiry reasonable under the circumstances it is not

13   presented for an improper purpose, it's warranted by

14   existing law, it's -- it has factual foundation.  Okay?

15   So, there's a whole bunch of things that they're

16   asserting --

17             MR. FANTALIS:  Right.

18             THE COURT:  -- in signing anything.

19             MR. FANTALIS:  Right.

20             THE COURT:  And if somebody signs something,

21   whether you or Mr. Kotzker, that doesn't have a

22   foundation in law and fact and you're signing it just

23   for the purpose of, say, harassment or some other

24   improper reason, that's a violation of Rule 11.  And

25   sanctions would be including money and --

1      MR. FANTALIS:  But it's not a counterclaim,

2   correct, Your Honor?  It's just sanctionable?

3      THE COURT:  That's sanctionable conduct.

4   Right.  No.  No.  Sanctionable conduct can also be --

5   have as a foundation something for a counterclaim.  They

6   can be both at the same time.  Okay?  Like abuse of

7   process can -- you can have a claim for abuse of process

8   and at the same time have a motion under Rule 11 that

9   somebody violated.  Okay?

10      MR. FANTALIS:  Okay.

11      THE COURT:  200.  That's relevant.  So, if

12   Mr. Kotzker knows -- can find out whether that statement

13   was made then answer that, please.  201, not going to

14   require an answer to that.  203, that goes to financial,

15   which I've already said I'll sustain the objection for

16   the time being.  Same with 204 and 205.

17      MR. KOTZKER:  I don't think we object to

18   anything until 212 again, Your Honor.

19      THE COURT:  Oh, I'm sorry.  205 actually is

20   a -- I understand.  Okay.  Until what, Mr. Kotzker?

21      MR. KOTZKER:  212.

22      THE COURT:  And how far do we go here?  Are we

23   almost done?

24      MR. FANTALIS:  Almost done.  This one.

25      THE COURT:  All right.  The works depict

1    sexual activity.  I think the nature of the work has to

2    be relevant.

3           MR. KOTZKER:  Whether he infringed the

4    copyright in it?

5           MR. FANTALIS:  Whether it is copyrightable.

6           THE COURT:  Well --

7           MR. KOTZKER:  Or do we (unintelligible)

8    counterclaims that it's not copyrightable?

9           THE COURT:  No.  I mean, it's just --

10          MR. KOTZKER:  If we were doing a case about a

11   picture on the wall, I mean would you see a -- a

12   statement that said it contains a tree?

13          THE COURT:  But Mr. Kotzker, the name of the

14   works is admissible.

15          MR. KOTZKER:  Sure.

16          THE COURT:  Is there a single name of a single

17   work that doesn't have a sexual connotation?

18          MR. KOTZKER:  I don't know about that.

19          THE COURT:  Don't you think they all have a

20   sexual connotation?

21          MR. KOTZKER:  Probably.  Probably.

22          THE COURT:  So I think I'll require an answer

23   to 12.  That cat's out of the bag.  But that's as far as

24   I'll go on that one.  So, 213 I'll sustain; 214,

25   sustained.  215, that's a legal question that I won't

```
 1    require, but it may be the subject of a judicial
 2    decision.  Do you know whether that has been briefed in
 3    any court?
 4              MR. FANTALIS:  In any court?
 5              THE COURT:  Yes, whether any of these works
 6    are obscene.  Is that currently --
 7              MR. FANTALIS:  These particular works?
 8              THE COURT:  Yes.
 9              MR. FANTALIS:  I don't believe so.
10              THE COURT:  Okay.  These -- do you know if
11    people are gearing up for that anywhere or thinking
12    about it, you know, besides you?  Present company
13    excluded.
14              MR. FANTALIS:  You know, Your Honor,
15    unfortunately, I seem to be a little bit on the
16    forefront here.  I know that a lot of people have
17    contacted me who are also being -- I'll watch my
18    words -- in a similar situation, and many of them have
19    thought about filing in a similar way that I am.
20              THE COURT:  Okay.
21              MR. FANTALIS:  And so I don't know if they're
22    going to take all -- I know in some cases some people
23    have said they are going to file a lot of what I have
24    and more.  In some cases, you know, they haven't said
25    more.  I assume they'll always go through and say, you
```

1    know, I like this, I don't like that kind of thing.  But

2    I don't think anyone has specifically done that, Your

3    Honor.

4            THE COURT:  Okay.  By the way, you just made a

5    lot of sense and stated a very reasonable statement

6    without --

7            MR. FANTALIS:  I was careful.

8            THE COURT:  -- pejorative words.

9            MR. FANTALIS:  I understand, Your Honor.

10           THE COURT:  So, you -- okay.

11           MR. FANTALIS:  I apologize for before.

12           THE COURT:  No.  That's fine.  I understand

13   your emotions and, you know --

14           MR. FANTALIS:  I take it very personally, Your

15   Honor.  Not just for myself.

16           THE COURT:  Sure.

17           MR. FANTALIS:  You know, because it's bad

18   enough for myself, but then I put lots of other people

19   in the same position, knowing that I didn't do this, and

20   knowing that that doesn't seem to matter, you know, on

21   top of it.  And then seeing that what kind of hell I've

22   lived through for the last six months and lack of sleep

23   and all kinds of other stuff.  It's -- it's extremely

24   personal and I know you're used to dealing with attorney

25   on attorney who are very professional and have a layer

1    between them --

2              THE COURT:  No, actually they --

3              MR. FANTALIS:  -- and all that.

4              THE COURT:  I have far too many attorneys take

5    it far too personally and they get so wrapped around the

6    axle that they can't see the forest for the trees, and

7    they get way too in tight with the their client.

8              MR. FANTALIS:  Uh-huh.

9              THE COURT:  So, it's not that unusual.  That's

10   why I'm not that upset because I hear this stuff all the

11   time.  But I think it's fair to establish ground rules

12   that are -- that are --

13             MR. FANTALIS:  That's perfectly fine.

14             THE COURT:  Okay.  Eight, 9 and 10 I think are

15   what we're left with, right?  On the interrogatories?

16             MR. FANTALIS:  Yes.

17             THE COURT:  Describe and identify any -- you

18   mean, contracts probably, or agreements?

19             MR. FANTALIS:  I would think so, yes.

20             THE COURT:  Okay -- or your knowledge thereof

21   by and between the following persons.  So, I already

22   required production of certain contracts and I'll

23   require an answer to eight as to those contracts for

24   which I required production.  Okay, Mr. Kotzker?

25             MR. KOTZKER:  Yes, Your Honor.

 1            THE COURT:  Otherwise sustained.  No. 9, all

 2     information regarding any knowledge of relationship

 3     between German law firm Baumgarten Brandt, and Gartilay

 4     (phonetic).

 5            MR. FANTALIS:  Gartilay is a company, Your

 6     Honor, in Germany that the court has said that their

 7     technology was flawed.  And it's the one that we believe

 8     that IPP has direct ties to.

 9            THE COURT:  Okay.

10            MR. FANTALIS:  This goes to is their

11     collecting information, is it flawed.

12            THE COURT:  But I've already required them to

13     produce any documents that are in their possession,

14     custody, or control which discussed whether the

15     technology is flawed.

16            MR. FANTALIS:  Right.  I think based on the

17     discussions today it sounds like I've got to go to IPP

18     for similar questions --

19            THE COURT:  Yes.

20            MR. FANTALIS:  -- as opposed to these guys.

21            THE COURT:  Right.  So, I'm going to sustain

22     the objection on 9 and 10.  Describe your settlement

23     process for the moment, and IP provides you with the

24     person -- and that is quintessentially attorney-client

25     material.  Why somebody -- why you do one and not the

```
 1   other is work product.  It's quintessential work product

 2   and attorney-client.  So I'll sustain the objection on

 3   that.

 4           So, we've decided three motions today, I

 5   believe.  The motion to compel, motion for extension of

 6   time, motion to stay, right?  And we can't go have a

 7   beer together because I've got to remain neutral, but I

 8   appreciate your time and, you know, sincerity, both of

 9   you in resolving it in this manner.  Mr. Fantalis,

10   you've got Exhibit H up here.  Don't forget that.

11           MR. FANTALIS:  Okay.  Your Honor, I've got --

12           THE COURT:  Okay.

13           MR. FANTALIS:  -- I think one more thing.

14           THE COURT:  Okay.

15           MR. FANTALIS:  I promise it won't be long.

16           THE COURT:  Very good.

17           MR. FANTALIS:  This goes back to what we

18   discussed.  The extension of time for all the --

19           THE COURT:  Oh, yeah.  Yeah.

20           MR. FANTALIS:  -- the open items.

21           THE COURT:  Did you file a motion yet in that

22   regard?  Oh, no.

23           MR. FANTALIS:  No, I thought -- I didn't know

24   if I had to.  I thought --

25           THE COURT:  No, you don't.
```

1          MR. FANTALIS:  -- we can just discuss it

2     today.

3          THE COURT:  Let's do.  You mean responding to

4     the motion to dismiss?

5          MR. FANTALIS:  It's the motion to dismiss and

6     wasn't there one other -- I think there's one or two

7     others.

8          THE COURT:  And you probably don't have a real

9     position on that since discovery is stayed on his

10    claims --

11         MR. FANTALIS:  Right.

12         THE COURT:  -- pending resolution, so it's in

13    his best interest to get it out as soon as possible.

14    Propose a date, Mr. Fantalis.

15         MR. FANTALIS:  When I -- when I say days are

16    we talking business days or calendar days just so I

17    know?

18         THE COURT:  You just propose a date, period,

19    when you want to file a response.

20         MR. FANTALIS:  Okay.  There's multiple things

21    here, Your Honor.  We can put all the --

22         THE COURT:  Oh.

23         MR. FANTALIS:  -- dates the same time.

24    There's a motion to dismiss.  There's a motion to strike

25    affirmative defenses that was filed sometime today.  I

 1    don't know if you've seen that.

 2              THE COURT:  And motion to modify schedule.

 3              MR. FANTALIS:  And motion to modify schedule.

 4              THE COURT:  Okay.

 5              MR. FANTALIS:  Which I just don't -- I don't

 6    have an objection to the -- in fact, I was the one who

 7    brought the idea up.  It's just I don't know how real it

 8    is that we can make those dates --

 9              THE COURT:  Okay.

10              MR. FANTALIS:  -- based on what we've seen.

11              THE COURT:  Let me put up motion to modify

12    schedule.  What is that docket number?

13              UNKNOWN SPEAKER:  Ninety-four.

14              THE COURT:  Ninety-four.  Thank you.

15              MR. KOTZKER:  And much of that might now be

16    modified again since you're staying --

17              THE COURT:  Right.

18              MR. KOTZKER:  -- some discovery.

19              THE COURT:  I'm going to deny 94 without

20    prejudice.  I think we're premature in dealing with

21    ultimate schedules.

22              MR. KOTZKER:  Okay.

23              THE COURT:  I think we need to get through

24    currently what we're doing in the motion to dismiss and

25    then at the end of that process I'll set a status

1    conference and revisit all the schedules.

2           MR. FANTALIS:  Some of the things, though,

3    have passed during the conversation.  Can we agree that

4    the things that have passed during this conversation --

5           THE COURT:  Absolutely.

6           MR. FANTALIS:  -- will not pass without that

7    discussion, if you will.

8           THE COURT:  What do you mean?

9           MR. FANTALIS:  The -- there was -- no, it was

10    -- it was depositions.  Depositions passed like a week

11    and a half ago, the date for depositions.

12           THE COURT:  Right.  No.  No.

13           MR. FANTALIS:  So, we discussed it and we said

14    we would wait.

15           THE COURT:  You will be permitted to take

16    depositions.  Don't worry about that.

17           MR. FANTALIS:  Those are the kind of things

18    I'm talking about.

19           THE COURT:  Yeah.

20           MR. FANTALIS:  In the meantime, if those

21    things pass can we agree that they will not tech -- you

22    know, that --

23           THE COURT:  Yes.  Stipulate to that.  Yes.

24    We're agreeing on that.

25           MR. FANTALIS:  And then I think we can all

1   step back and look at what dates are reasonable.  I

2   think we probably all would agree that the dates in the

3   scheduling order right now probably won't be met.

4            THE COURT:  Right.

5            MR. FANTALIS:  But it's just a matter -- I

6   don't want to change it five times if we can take --

7            THE COURT:  Me too.

8            MR. FANTALIS:  -- a better guess.

9            THE COURT:  Exactly.  So my -- my procedure

10  would be let's get through the unknowns, have a

11  conference, and I always -- I try to do this, and

12  99 percent successful, is get a date that's good for

13  both of you because we usually can arrive at a date

14  where you guys choose and you get to direct your own

15  course.  Okay?  So that's what we'll do here.

16           MR. FANTALIS:  Yeah, we're just looking for

17  dates not to fly by.  That's all, Your Honor.

18           THE COURT:  Right.

19           MR. FANTALIS:  That we would like to do

20  something on.

21           THE COURT:  No.  You will not be prejudiced by

22  this process.

23           MR. FANTALIS:  Thank you.

24           THE COURT:  So, 94 is denied without

25  prejudice.  And then --

1              MR. FANTALIS:  So, it's motion to strike

2    affirmative defenses and motion to dismiss are the two

3    that we're talking about.  I would -- I would like --

4    again, Your Honor, the goal would actually be to get

5    them in as soon as possible, clearly, and I think I've

6    shown that all along.  But considering the vacation, the

7    responding to these and then holidays coming up, if we

8    can say December 31st, and I will give you my word that

9    -- our hope is to -- like, with the motion to dismiss,

10   I'm hoping 10 days from now if we can possibly get it

11   done --

12             THE COURT:  Okay.

13             MR. FANTALIS:  -- we'll respond.

14             THE COURT:  All right.

15             MR. FANTALIS:  But just to kind of put a date

16   on there that we feel comfortable hitting.

17             THE COURT:  Okay.  No later than

18   December 31st.  Your reply will be governed by the

19   rules.  Right?

20             MR. FANTALIS:  I don't understand.

21             THE COURT:  Well, the reply is 15 days, I

22   think.  Fourteen or fifteen?  Fourteen.

23             MR. FANTALIS:  Ten -- fourteen.

24             THE COURT:  Fourteen days.

25             MR. FANTALIS:  Okay.

1           THE COURT:  So --

2           MR. FANTALIS:  Right.

3           THE COURT:  I don't want to give him --

4           MR. FANTALIS:  Yeah, if he wants an

5      extension --

6           THE COURT:  -- a date --

7           MR. FANTALIS:  -- he can ask for it --

8           THE COURT:  -- certain.

9           MR. FANTALIS:  -- at that time, right?

10          THE COURT:  Yeah.  I don't want to give him a

11     date certain because you can file anywhere between today

12     and December 31st.

13          MR. FANTALIS:  Right.

14          THE COURT:  His is 14 days later.

15          MR. FANTALIS:  Right.

16          THE COURT:  Okay.

17          MR. FANTALIS:  I thank you for that, Your

18     Honor.

19          THE COURT:  Okay.

20          MR. FANTALIS:  Again, I'm hoping to do it

21     sooner.

22          THE COURT:  Good.  That's fine.

23          MR. FANTALIS:  You know, we filed a lot of the

24     information in the response to the motion to compel, so

25     we'll be pulling a lot of it out of there.  Not compel,

1    sorry, the sanctions.

2              THE COURT:  Okay.  Anything further,

3    Mr. Fantalis?

4              MR. FANTALIS:  What was that?  Is there going

5    to be an order coming out of today specific to

6    everything that --

7              THE COURT:  A minute order.

8              MR. FANTALIS:  There will be a minute order?

9              THE COURT:  Yeah.  It's going to be a big dog

10   minute order.

11             MR. FANTALIS:  Going to be a big, big

12   document.  I'll probably not pull it down and spend the

13   money.  I'll wait for the big thick document to come in

14   the mail.

15             THE COURT:  You should.  Yes.  You can get a

16   transcript of today, by the way, but that's expensive.

17             MR. FANTALIS:  I know.

18             THE COURT:  They really charge you through the

19   nose on --

20             MR. FANTALIS:  I know.  I heard.

21             THE COURT:  -- transcripts.

22             MR. FANTALIS:  I'll also let the court know

23   that I have signed up for the class to file things

24   electronically --

25             THE COURT:  Wonderful.

```
 1              MR. FANTALIS:  -- in December.  I can't

 2    guarantee I'll be able to make it based on work

 3    schedule.  I tried to sign up for it in November.  It

 4    was full, so I signed for it in December.  So, I know it

 5    causes some issues with getting information out quickly

 6    that I'm not on there, so I want to do my best to

 7    eliminate that.  So I just wanted you to know.

 8              THE COURT:  Thank you.

 9              MR. FANTALIS:  And also, I'm assuming the

10    clerk, to know because it's come up like with this

11    today.

12              THE COURT:  Law clerk, by the way, which

13    means --

14              MR. FANTALIS:  Right.

15              THE COURT:  -- lawyer.

16              MR. FANTALIS:  Oh, I know.

17              THE COURT:  Yeah.

18              MR. FANTALIS:  Former law clerk, mother was a

19    law clerk for 30 years --

20              THE COURT:  Really?

21              MR. FANTALIS:  -- for a judge.

22              THE COURT:  Where?

23              MR. FANTALIS:  In New York.

24              THE COURT:  What kind of judge?

25              MR. FANTALIS:  Appellate --
```

1           UNKNOWN SPEAKER:  Supreme --no.

2           MR. FANTALIS:  Was it supreme court?  I think

3    she did appellate for a while and then --

4           THE COURT:  Because, you know, supreme court

5    in New York is at the trial level.

6           MR. FANTALIS:  Yeah.  Yeah.  Yeah, she's

7    actually -- she retired and then she goes back in to

8    still help.

9           THE COURT:  That's your mom.  Okay.  That's

10   interesting.  All right.  Anything else?  Okay.  From

11   you?

12          MR. KOTZKER:  No, Your Honor.

13          THE COURT:  Okay.  So -- okay.  We just got to

14   address, Mr. Fantalis -- you're a very sincere person,

15   but we need to discuss openly among us all the concept

16   of *ex parte* communications, because you called to our

17   chambers which is -- any time one side to a lawsuit

18   calls into our chambers it's very problematic.  There

19   was one instance years ago with Judge Miller, I think.

20   And I don't know who was on the bad end -- were you on

21   the bad end of that?  And Christina -- in my chambers we

22   really do try to be as nice as possible.

23          MR. FANTALIS:  She's been exceedingly nice.

24          THE COURT:  As accommodating as possible.

25          MR. FANTALIS:  She doesn't answer a lot, but

1    she's been exceedingly nice.

2              THE COURT:  And so we like to do things

3    informally if the rules permit.

4              MR. FANTALIS:  Uh-huh.

5              THE COURT:  And so one time years ago

6    Christina did that in a way that we view as proper, but

7    a way that a district judge viewed as improper *ex parte*

8    communication.  So, no one side is entitled to access to

9    the judge.  Whenever there's a communication with the

10   judge -- and my law clerks are an extension of me --

11   both sides have to be present on that conversation.

12   Because you wouldn't want me and Mr. Kotzker to be

13   talking and him to be saying, you know, I'd really --

14   you know, I really got the goods on this guy; I'll tell

15   you, we're going to get him at trial.

16             MR. FANTALIS:  It's never been anything like

17   that.  And I'm certainly not looking --

18             THE COURT:  No.  No.  It hasn't.

19             MR. FANTALIS:  -- for any edge whatsoever.

20   It's really more a process, Your Honor.  Like, he filed

21   to not have this meeting today.

22             THE COURT:  Right.

23             MR. FANTALIS:  And it went in at like

24   5 o'clock and I didn't know what to do because --

25             THE COURT:  Right.

1           MR. FANTALIS:  -- for me to file it wouldn't

2      even get in here.  I did find out that I could file via

3      fax and stuff like that, but it's been, like, what do I

4      do here, you know, that kind of thing.  What -- how does

5      the court want to view this; how is the court going to

6      handle this, as opposed to give me information that I

7      shouldn't have.

8           THE COURT:  But we get nervous as all can

9      be --

10          MR. FANTALIS:  I know.

11          THE COURT:  -- because it at least creates the

12     potential for us to engage in *ex parte* communications

13     which is unethical for me.

14          MR. FANTALIS:  Of course.

15          THE COURT:  Or for her.  So, what I'd like to

16     do is -- what phone number does he have for you?

17          MR. KOTZKER:  My office.

18          THE COURT:  Your office.  And you're generally

19     there during business hours.

20          MR. KOTZKER:  Correct.

21          THE COURT:  All right.

22          MR. KOTZKER:  And it's forwarded to my

23     personal phone, so --

24          THE COURT:  All right.  So, voicemail would be

25     -- would appear as an e-mail on your phone and you could

1    access your voicemail.

2              MR. KOTZKER:  Correct.

3              THE COURT:  All right.  So I'd like you to,

4    from now on, if you have any call that needs to be made

5    get Mr. Kotzker on the line.  Okay?  And we can either

6    call you both -- because we can call you and you and

7    conference you in, or you can call in together --

8              MR. FANTALIS:  I can conference.

9              THE COURT:  -- somehow.

10             MR. FANTALIS:  That's not an issue.

11             THE COURT:  Okay.  But let's make all contacts

12   with chambers from now on with both attorneys -- both

13   parties on the line.

14             MR. FANTALIS:  What if I can't reach him and

15   it's something that has to be resolved?

16             THE COURT:  If you can't reach him, and you've

17   tried and you've left him a voicemail -- so I want you

18   to give him a cushion of 10 minutes, 15 minutes.  How

19   long does it take for you to reach your voicemail?

20             MR. KOTZKER:  That -- yeah, usually.

21             THE COURT:  I want you to give him a cushion

22   of -- in an emergency.

23             MR. FANTALIS:  Right.

24             THE COURT:  You plan ahead enough that you can

25   leave 15 minutes cushion.

 1            MR. FANTALIS:  All right.  Well, in this case,

 2    as an example, it was his emergency that he was trying

 3    to -- and there was no time.

 4            THE COURT:  Right.

 5            MR. FANTALIS:  But there are other cases, I

 6    have called, quite frankly, when I could have but I just

 7    -- I didn't think -- I wasn't asking anything that --

 8    you know, but I understand the concern.

 9            THE COURT:  Okay.

10            MR. FANTALIS:  So I've got no issue trying to

11    pull him in, you know, and --

12            THE COURT:  Try to pull him in and give him

13    15 minutes lead time.  If he doesn't respond to you in

14    15 minutes, and it's a true emergency and it's only

15    procedural we'll at least field the call.  We may not

16    give you any information because we may view it

17    differently than you do, but only in that circumstance

18    should you be calling in by yourself.  Okay?

19            MR. FANTALIS:  Okay.

20            THE COURT:  But even then we'll make -- we

21    have to make the ultimate determination about whether

22    the communication is proper or improper.

23            MR. FANTALIS:  Of course.

24            THE COURT:  Do you understand?

25            MR. FANTALIS:  And I don't believe I've ever

1    given you a problem when you --

2            THE COURT:  Do you have a problem with that

3    process?

4            MR. FANTALIS:  -- said you can't --

5            MR. KOTZKER:  Not at all.

6            MR. FANTALIS:  -- answer that, so --

7            THE COURT:  Right.

8            MR. FANTALIS:  I'm not looking to, you know,

9    manipulate anything, I'm just trying to make sure that,

10   in some cases, I understand what the hell is going on.

11   You know.

12           THE COURT:  I understand.  I wish I knew that

13   all the time myself.

14           MR. FANTALIS:  If you could make a phone call

15   to find that out, you probably would.

16           THE COURT:  It's called Google.  I can usually

17   find out 99 percent of what I need to know.  Okay.

18   We'll be in recess.  Thank you guys.

19           MR. KOTZKER:  Thank you.

20           MR. FANTALIS:  Thank you.

21           UNKNOWN SPEAKER:  Thank you.

22           THE COURTROOM DEPUTY:  All rise.

23           (Whereupon, the within hearing was then in

24   conclusion at 5:38 p.m. on this date.)

25

200

1           I certify that the foregoing is a correct

2    transcript, to the best of my knowledge and belief

3    (pursuant to the quality of the recording) from the

4    record of proceedings in the above-entitled matter.

5

6

7

8    /s/ Kelly Mair                December 7, 2012

9    Signature of Transcriber         Date

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25